**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| In re:  **EARLE D. MUNNS** | ) | Case No.:  **11-10912-RGM** |
| | ) | |
| **Debtor.** | ) | **Chapter 7** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **BANK OF AMERICA, N.A.** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Adversary No. 11-01255** |
| | ) | |
| **EARLE D. MUNNS** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**BANK OF AMERICA'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Bank of America, N.A. (the "Bank"), by its undersigned attorneys and pursuant to

Federal Rule of Bankruptcy Procedure 7056 and Local Bankruptcy Rules 7056-1 and 9013-1,

respectfully submits this Memorandum of Points and Authorities in Opposition to Defendant's

Motion for Summary Judgment.  As set forth below, the Motion for Summary Judgment (Doc.

No. 7) filed by Earle D. Munns ("Munns") should be denied in its entirety because there are

genuine issues as to material facts and Munns is not entitled to judgment as a matter of law in

this adversary proceeding.

## I.      INTRODUCTION

Munns and his business partner, Michael Byrd ("Byrd"), made false representations to

the Bank in connection with the origination of a loan used by Munns and Byrd to finance their

2391879

acquisition of AC Technology, Inc. ("AC Tech"), a Virginia closely-held corporation engaged in the business of reselling Sun Microsystems computer hardware and software to the Federal Government and other organizations.  After AC Tech defaulted on the Bank's loan within a matter of months and ceased operations, the Bank obtained judgments against Munns and Byrd on their guaranties of the loan.  Byrd's debt to the Bank for his guarantee of the AC Tech loan has already been determined to be non-dischargeable by the United States Bankruptcy Court for the District of Maryland.

In his summary judgment motion, Munns seeks to evade the operation of 11 U.S.C. § 523 by invoking the doctrine of collateral estoppel on the basis of an arbitrator's finding against the Bank on misrepresentation and conversion counts in a prior arbitration between the parties.  It is well-settled, however, that collateral estoppel does not preclude subsequent litigation where, as was the case here, the party against whom the doctrine is invoked had a heavier burden of proof in the first action than applies in the subsequent action.  Moreover, the Bank has raised numerous factual and legal issues in this adversary proceeding that were not actually litigated in the arbitration.  Finally, Munns failure to comply with his discovery obligations should be reason alone to deny Munns' summary judgment motion and draw an adverse inference from Munns' unjustified withholding of probative evidence.

## II.    STATEMENT OF FACTS

### A.    *The AC Tech Revolving Line of Credit Facility*

The Bank made a $10 million revolving line of credit facility (the "Line of Credit") available to AC Tech and MB Security Corporation ("MBSC" and collectively with AC Tech, the "Borrowers") to enable Munns and Byrd to acquire a controlling interest in AC Tech from Christopher Sands and Arthur J. Sands, Jr. (collectively, the "Sellers") and to provide working

capital for AC Tech.   (Complaint to Determine Dischargeability of Debt (Doc. No. 1) ("Complaint") at ¶¶ 5-7; Munns' Answer (Doc. No. 6) at ¶ 1).

Certain terms and conditions of the Line of Credit, representations and warranties of the Borrowers, and affirmative and negative covenants of the Borrowers, among other things, were set forth in a Credit and Security Agreement dated as of June 30, 2008 (the "Credit Agreement") by and among the Borrowers and the Bank.   A copy of the Credit Agreement is attached as Exhibit A to the Affidavit of Robert S. Cashion in Support of Opposition to Defendant's Motion for Summary Judgment (the "Cashion Affidavit") submitted herewith.

The Borrowers' obligation to repay advances under the Line of Credit was evidenced by a Revolving Loan Note dated June 30, 2008 (the "Note") in the original principal amount of $25 million payable by the Borrowers to the order of the Bank.   (Complaint at ¶ 10; Munns' Answer at ¶ 1).   Munns unconditionally guaranteed full payment of all amounts owed by the Borrowers to the Bank pursuant to a Continuing and Unconditional Guaranty dated June 30, 2008.   A copy of Munns' Continuing and Unconditional Guaranty dated June 30, 2008 is attached as Exhibit B to the Cashion Affidavit.

Payment of the Note was secured by the personal property collateral, including all of AC Tech's accounts receivable and inventory and all proceeds and products thereof, described in the Credit Agreement.   (*See* Cashion Aff., Ex. A, Credit Agreement at § 1.4(e)).   The Bank perfected the security interests granted to it under the Credit Agreement by filing a UCC-1 Financing Statement with the Virginia State Corporation Commission.   (Complaint at ¶ 10; Munns' Answer at ¶ 1).

The Bank made its first and only advance on the Line of Credit (the "Initial Advance") on June 30, 2008 in the amount of $5.5 million.   (Affidavit of Michael A. Hass in Support of

Opposition to Defendant's Motion for Summary Judgment (the "Hass Affidavit") submitted herewith, Ex. A, Plaintiff's 26(a)(2) Expert Report of Todd A. Feuerman, CPA, MBA (the "Feuerman Report") at 3).  Munns and Byrd used the Initial Advance to finance their acquisition of a majority of the outstanding capital stock of AC Tech.  (Complaint at ¶¶ 5-7; Munn' Answer at ¶ 1).  As of June 30, 2008, Munns and Byrd had no other commitments for financing their acquisition of AC Tech.  (Hass Aff., Ex. B, Munns Depo. at 81:10-82:14).

> ### B.   *The Acquisition of AC Tech by Munns and Byrd*

The Sellers, on behalf of AC Tech and as shareholders, acknowledged and agreed to a letter of intent dated June 14, 2008 (the "Letter of Intent"), signed by Munns, outlining certain proposed terms of the acquisition of 80% of AC Tech's outstanding capital stock by MBSC, a Delaware corporation formed by Munns for the purpose of purchasing AC Tech.  A copy of the electronic mail message submitting the Letter of Intent to the Bank is attached as Exhibit C to the Cashion Affidavit.

Munns and Byrd sought to finance their acquisition of AC Tech with funding to be provided by the Bank under the Line of Credit.  (*See* Complaint at ¶ 7; Munns' Answer at ¶ 1).  Pursuant to the Letter of Intent, the proposed purchase price for 80% of AC Tech's capital stock was $5 million payable at closing in immediately available funds as follows:

> (a)   $2 million to the Sellers; and

> (b)   approximately $3 million to Textron Financial Corporation ("Textron") to satisfy certain then-existing secured financing obligations of AC Tech.

(Cashion Aff., Ex. C, Letter of Intent at § 2).[1]

---

[1]   The Letter of Intent also provided that the Sellers would receive the "accounts payable portions" of accounts receivable attributed to the Textron financing satisfied at closing and AC Tech would retain the profits on such receivables.  (*Id*.).

In connection with its analysis of Munns' and Byrd's loan request, the Bank sent the following inquiry on June 16, 2008 to Byrd, with a copy to Munns, regarding the terms of the AC Tech acquisition:

> Is there any longer term earn out or other purchase structure?  We need to complete our analysis of the transaction based upon your negotiations.  Please provide this detail asap….

Munns responded to the Bank's inquiry on June 16, 2008 as follows:

> On the executed LOI, this is a cash deal and there are no other terms of significance such as earn-out notes or any other purchase structure of the deal.

A copy of the electronic mail chain containing the Bank's June 16, 2008 inquiry and Munns' response thereto is attached as Exhibit D to the Cashion Affidavit.  A copy of the Letter of Intent was submitted to the Bank on June 17, 2008.  (*Id.*, Ex. C)

As the closing date of the AC Tech acquisition approached, however, the Sellers raised the purchase price and insisted that certain additional proceeds of AC Tech's accounts receivable be paid to the Sellers after closing.  (Hass Aff., Ex. C, August 8, 2008 E-Mail from J. Stephen Britt).  Before closing, the Sellers' counsel circulated a draft Stock Purchase Agreement setting forth terms of the transaction that differed significantly from the terms set forth in the Letter of Intent provided to the Bank, including:

(i.)     purchase price of $6,386,701.00 for 98% of AC Tech's outstanding stock;

(ii.)    payment after closing to the Sellers of all proceeds (including AC Tech's net profit) from accounts receivable attributable to the Textron financing satisfied with sale proceeds at closing; and

(iii.)   payment after closing to the Sellers of 50% of all collections on accounts receivable existing as of the closing date but not attributable to the Textron

financing satisfied with sale proceeds at closing (the "Non-Textron Payable Reimbursement").

(Hass Aff., Ex. D, Draft Stock Purchase Agreement at §§ 2.2 and 2.5). The Non-Textron Payable Reimbursement was subsequently quantified as $618,252.87 payable within 6 months of closing. (Hass Aff., Ex. E, Exhibit D to Stock Purchase Agreement).

The last-minute changes in the terms of the AC Tech acquisition, which were not disclosed to the Bank, significantly increased the post-closing payment obligations of AC Tech in comparison to the obligations set forth in the Letter of Intent submitted to the Bank. AC Tech became obligated to pay the Sellers a total of more than $5.8 million, which obligation was in addition to the $2.2 million paid to Textron at closing. (Hass Aff., Ex. F, June 29, 2008 E-Mail from Christopher Sands).

Despite being duly served with requests for production of documents in this adversary proceeding (and in the prior arbitration between the parties) to which the Stock Purchase Agreement is clearly responsive, Munns has never produced an executed copy of the final version of the Stock Purchase Agreement. (*See* Cashion Aff. at ¶ 10). The Bank did not learn of the terms set forth in the draft Stock Purchase Agreement circulated by the Sellers' counsel (Hass Aff., Ex. D and E) until discovery in subsequent litigation with Christopher Sands and J. Stephen Britt, AC Tech's counsel. If Munns had disclosed the actual terms of the AC Tech acquisition to the Bank prior to closing on the Line of Credit, the Bank would not have funded the Initial Advance on June 30, 2008. (*See* Cashion Aff., Ex. A, Credit Agreement at §§ 1.2, 3.6 and 3.17).

C.    *The False Receivables Information Submitted by Munns to the Bank to Obtain the Initial Advance.*

The primary collateral securing repayment of the Line of Credit was AC Tech's accounts receivable.  (Hass Aff. Ex. H, Arbitration Hearing Tr. at 32:6-7).  Thus, the availability of advances under the Line of Credit was governed by a "Borrowing Base," which was a calculation set forth in the Credit Agreement based on the amounts of certain categories of AC Tech's accounts receivable.  (Cashion Aff. Ex. A, Credit Agreement at § 1.2).  Specifically, the Borrowing Base limited the total amount the Bank would loan the Borrowers under the Line of Credit to:

> an amount equal to the sum of (a) ninety percent (90%) of Eligible Government Accounts, plus (b) eighty percent (80%) of Eligible Commercial Accounts, plus (c) fifty percent (50%) of Eligible Unbilled Accounts, minus (d) such reserves as Lender may from time to time establish in good faith on the basis of its Field Exams and otherwise.

(*Id*. at § 1).  As a condition precedent to funding the Initial Advance, the Borrowers were required to submit a "Borrowing Base Certificate" to the Bank certifying, among other things, the amounts of AC Tech's total accounts receivable and eligible accounts receivable.  (*Id.* at § 2.1).  Munns understood that the Borrowing Base Certificate was to serve as the foundation for the amount of the loan to be received from the Bank.  (Hass Aff., Ex. M, Interim Award of Arbitrator (the "Arbitrator's Interim Award") at 5).[2]

Munns and Byrd were not given direct access to AC Tech's QuickBooks accounting software before closing and therefore relied upon the Sellers to provide pre-closing financial information.  (*Id.* at 4).  On Friday, June 27, 2008 at 7:43 p.m., one business day before closing

---

[2]    Munns is a non-practicing lawyer who holds an L.L.M. with a thesis in federal government contracting and has more than 24 years of "executive experience" with government contracting businesses.  (Cashion Affidavit, Ex. E, Executive Bios)

on the AC Tech acquisition, Christopher Sands sent Munns and Byrd an electronic mail message with an A/R Aging Summary as an attachment indicating that the total amount of AC Tech's accounts receivable, as of 6:00 p.m. on June 27, 2008, was $4,896,514.65.   A copy of Christopher Sands' June 27, 2008 electronic mail message (with attachment) is Exhibit G to the Hass Affidavit.

Later on June 27, 2008, Byrd sent to the Bank, but then electronically recalled, a Borrowing Base Certificate dated June 27, 2008 (the "Initial June Borrowing Base Certificate") with a supporting A/R Aging Summary listing AC Tech purported accounts receivable as of June 27, 2008.  A copy of Byrd's June 27, 2008 electronic mail message (with attachments) is Exhibit F to the Cashion Affidavit.  According to the Initial June Borrowing Base Certificate, AC Tech's total "trade accounts receivable," as of June 27, 2008, were $9,879,989.40.  (Cashion Aff., Ex. F).  According to the A/R Aging Summary that accompanied the Initial June Borrowing Base Certificate, AC Tech's total accounts receivable, as June 27, 2008, were $9,649,523.00.  (*Id.*) The accounts receivables totals in the Initial June Borrowing Base Certificate and A/R Aging Summary submitted and then recalled by Byrd exceeded the accounts receivable total in the A/R Aging Summary provided to Munns and Byrd less than 2 hours earlier by Christopher Sands by more than $4.7 million.  (*Id.*; Hass Aff., Ex. G).

On June 29, 2008, after the Bank advised AC Tech's counsel that Byrd had electronically recalled his message transmitting the Initial Borrowing Base Certificate, Munns sent the following message to the Bank:

> Diane, Jessica, and Yanlin,
>
> We sent our revised and carefully reviewed BBC on Friday evening as per the email trail below (see attachments).  This was later than we planned, but another $2.1 mm was booked Friday and we almost have another $646,700 which we expect tomorrow.

> I am resending the email and attachments now after I was apprised today you may not have received the email and attachments Friday. Our apologies for any confusion.
>
> Our transaction with AC Technology is fully agreed and we are ready to proceed.

A copy of Munns' June 29, 2008 electronic mail message to the Bank (with attachments) is Exhibit G to the Cashion Affidavit.

Munns attached a Borrowing Base Certificate dated June 27, 2008 (the "Munns-Submitted June Borrowing Base Certificate") and A/R Aging Summary as of June 27, 2008 (the "Munns-Converted A/R Report") to his June 29, 2008 electronic mail message to the Bank. (Cashion Aff., Ex. E). Munns participated in the careful review of the Munns-Submitted June Borrowing Base Certificate. (Hass Aff., Ex H, Arbitration Hearing Tr. at 196:17-18). The Munns-Converted A/R Report was created in Microsoft Word[3] and converted by Munns to an Adobe PDF document. (Datz Report at 1).

According to the Munns-Submitted June Borrowing Base Certificate, AC Tech's total "trade accounts receivable," as of June 27, 2008, were $9,788,299.19. (Cashion Aff., Ex. G). According to the Munns-Converted A/R Report, AC Tech's total accounts receivable, as of June 27, 2008, were $9,649,523.00. (*Id*.). The Bank reasonably relied on information in the Munns-Submitted June Borrowing Base Certificate when it loaned AC Tech $5.5 million. (Arbitrator's Interim Award at 5).

On Monday, June 30, 2008 at 3:02 a.m., Byrd submitted a Borrowing Base Certificate dated June 27, 2008 (the "Final June Borrowing Base Certificate") to the Bank by electronic

---

[3]     AC Tech's official accounting records were maintained in Intuit QuickBooks. (Hass Aff. Ex. I, Plaintiff's Rule 26(a)(2) Expert Report of Garrett M. Datz, MCSE, CCNA (the "Datz Report") at 2).

mail.  A copy of Byrd's June 30, 2008 electronic mail message (with attachment) is Exhibit H to

the Cashion Affidavit.  The Final June Borrowing Base Certificate was updated by Byrd so that

the total amount of trade accounts receivable listed on the Final June Borrowing Base Certificate

was consistent with the total accounts receivable listed on the Munns Converted A/R Report

submitted to the Bank by Munns the day before.  (Cashion Aff., Ex. H).

At 11:02 a.m. on June 30, 2008, the Bank sent an electronic mail message to Munns and

others inquiring in pertinent part:

> All –
>
> I wanted to let you know that I have reviewed and accepted the
> borrowing base certificate that Michael submitted this morning.  I
> am assuming that the agings that came with Earle and Steve's
> submissions over the weekend are the correct aging to be using,
> but I would like confirmation of this.

A copy of the June 30, 2008 electronic mail chain including the Bank's inquiry is Exhibit I to the

Cashion Affidavit.

At 11:42 a.m. on June 30, 2008, Christopher Sands sent Munns and Byrd an electronic

mail message with an A/R Aging Summary as an attachment indicating that the total amount of

AC Tech's accounts receivable, as of June 30, 2008, was $6,335,373.82.  A copy of Christopher

Sands' June 30, 2008 electronic mail message (with attachment) is Exhibit J to the Hass

Affidavit.

At 12:20 p.m. on June 30, 2008, 38 minutes after Christopher Sands provided Munns and

Byrd a more current A/R Aging Summary listing total accounts receivable of $3.3 million less

than the total accounts receivable listed on the Munns-Converted A/R Report, Munns responded

to the Bank's 11:02 a.m. inquiry and represented that the Munns-Converted A/R Report was the

"correct" accounts receivable aging for the Bank to rely upon in funding the Initial Advance.

(Cashion Aff., Ex. I).  Munns specifically stated:

> 1.      Yes, the AR Aging submitted by me and Steve over the weekend is the correct aging to be used.  In the future, our new financial team will fully anticipate and meet the Bank's needs on the submission of all Loan documentation.

(*Id.*).

Both the Sands A/R Aging Summary and the Munns-Converted A/R Report significantly overstated the amount of AC Tech's accounts receivable as of the date of closing on the Line of Credit.  (Feuerman Report at 4).   The Munns-Converted A/R Report contained a fictitious receivable for General Dynamics in the amount of $4.4 million.  (Arbitrator's Interim Award at 5).  According to AC Tech's official books and records reviewed by a forensic accountant after AC Tech defaulted on the Line of Credit, the actual total amount of AC Tech's accounts receivable, as of June 27, 2008, was $2,828,866.00, or over $6.8 million less than the total accounts receivable listed on the Munns-Converted A/R Report.  (Feuerman Report at 4).  If Munns had disclosed the actual amount of AC Tech's accounts receivable to the Bank, the Bank would not have funded a $5.5 million advance on the Line of Credit on June 30, 2008.  (Cashion Aff. at ¶ 17, Ex. A, Credit Agreement at § 1.2(a))  An advance on the Line of Credit of less than $5.5 million would not have been sufficient to enable Munns and Byrd to buy AC Tech from the Sellers.  (Hass Aff., Ex. B, Munns Depo. at 106:17-22; Ex. H. Arbitration Hearing Tr. at 200:14).

### D.      *The Undisclosed Arrow Electronics Financing*

Despite prohibitions in the Credit Agreement against encumbering AC Tech's assets, Munns, through MBSC, entered into a credit facility with Arrow Electronics, Inc. (the "Distributor") prior to the closing on the Line of Credit.  (*See* Hass Aff. Ex. K, Conditional Personal Guaranty dated June 27, 2008).  To induce the Distributor to extend credit to AC Tech

on a $1,998,025.60 purchase order, Munns gave a Conditional Personal Guaranty dated as of June 27, 2008 in favor of the Distributor.  (*Id.*).  To induce the Distributor to extend credit to AC Tech on a $511,363.20 purchaser order, Munns gave a Supplemental Conditional Personal Guaranty dated as of June 30, 2008 in favor or the Distributor.  (*Id.*, Ex. L, Supplemental Personal Guaranty).  Munns failed to disclose his obligations under the Distributor guaranties to the Bank.  (*Id.* Ex. B, Munns Depo. at 77:5-10; 166:19-21; Ex. H. Arbitration Hearing Tr. at 203:20).

Less than two months after the Initial Advance, the Distributor delivered a certified letter to the Bank notifying the Bank that the Distributor intended to take a purchase money security interest in certain AC Tech inventory.  In response to an inquiry from the Bank's counsel concerning the Distributor's notice, counsel for AC Tech stated:

> As we discussed, the recent MOCA letter was the result of a mistaken execution of a document by AC Technology.  We expect to have the underlying purchase order paid off in the next couple of weeks and have taken steps to ensure it doesn't happen again.  It resulted from an over-zealous effort to capture some new A/R.

(Cashion Aff., Ex. J, September 12, 2008 E-Mail from J. Stephen Britt).

Contrary to the written representations of AC Tech's attorney and in direct contravention of certain covenants in the Credit Agreement, AC Tech had incurred significant secured indebtedness to the Distributor.  The Distributor filed a UCC-1 Financing Statement with the Virginia State Corporation Commission on August 5, 2008 covering certain products sold to AC Tech by the Distributor and the accounts receivable and other rights to payment derived from AC Tech's sale of those products.  (Complaint at ¶ 42, Munns' Answer at ¶ 1).  AC Tech granted to the Distributor a Limited Power of Attorney authorizing the Distributor to endorse checks payable to AC Tech and to deposit those checks in the Distributor's bank account.  (*Id.*).  Certain

accounts receivable of AC Tech were secretly required to be remitted to a post-office box in New

Jersey. (*See* Hass Aff., Ex. B, Munns Depo. at 158:3 - 161:20).  The Distributor's secured

financing constituted a clear Event of Default under the Credit Agreement that was undisclosed

to the Bank. (*See* Cashion Aff., Ex. A, Credit Agreement at § 6.4).

> **E.      The Borrowers' Default on the Line of Credit and the Bank's Exercise of its Rights and Remedies.**

Less than 6 months after the Initial Advance, the Borrowers' defaulted on the Line of

Credit.  By letter dated December 17, 2008 (the "Default Letter"), the Bank gave notice that AC

Tech was in default under the applicable loan documents for, among other reasons, (i) suffering a

financial covenant default and (ii) providing the Bank incorrect and materially misleading

information with respect to AC Tech's financial condition as of the June 30, 2008 closing on the

Line of Credit.  A copy of the Default Letter is Exhibit J to the Cashion Affidavit.

The Bank initially agreed to forbear from exercising its remedies under the loan

documents pursuant to the terms of a Loan Modification Agreement dated as of February 19,

2009.   Following AC Tech's failure to honor its obligations under the Loan Modification

Agreement, however, the Bank's counsel delivered a Notice of Enforcement of Rights and

Remedies dated March 30, 2009 to AC Tech, Munns, Byrd and others.  (Complaint at ¶ 57;

Munns' Answer at ¶ 1).

On April 9, 2009, the Bank filed its Verified Complaint for Breach of Contract, Fraud

and Conversion against AC Tech, Munns and Byrd in the United States District Court for the

Eastern District of Virginia (the "District Court") commencing Case No. 1:09-cv-00391-GBL-

TCB.   (Munns' Motion for Summary Judgment, Ex. 1).   Shortly thereafter, in direct

contravention of certain covenants in the Credit Agreement, Munns secretly established

operating, expense and escrow accounts in the name of AC Tech at Cardinal Bank (the "Cardinal

Bank Accounts"). Munns diverted AC Tech's accounts receivable collections to the Cardinal Bank Accounts and then withdrew funds from the accounts for his personal use. (Hass Aff., Ex. K, Statements for Cardinal Bank Accounts).[4] Munns concealed the existence of the Cardinal Bank Accounts, even during testimony under oath. (*Id.*, Ex. B, Munns Depo. at 194:14-15). As a result, the Bank did not learn of Munns' diversion of its collateral proceeds until the eve of the arbitration hearing described below. (*Id.*, Ex. H, Arbitration Hearing Tr. at 13:7-11; 211:12-18).

### F.    *The Prior Arbitration*

Pursuant to an Order entered by the District Court on October 9, 2009 granting a motion by AC Tech, Munns and Byrd to compel arbitration, Case No. 1:09-cv-00391-GBL-TCB was dismissed and the matter was referred to the American Arbitration Association (AAA Case No. 16 148 Y 00590 09) for a determination of the Bank's claims against AC Tech, Munns and Byrd (the "Arbitration"). (*See* Munns' Motion for Summary Judgment, Ex. 2).

The Bank duly served requests for production of documents on Munns in the Arbitration. Despite entry of an order by the arbitrator granting a motion filed by the Bank to compel production of documents, Munns failed to comply with that order. (Arbitrator's Interim Award at 2).

On February 25, 2010, prior to the conclusion of the Arbitration, Byrd filed a voluntary Chapter 7 bankruptcy petition commencing Case No. 10-13755-TJC in the United States Bankruptcy Court for the District of Maryland (the "Maryland Bankruptcy Court"). The Bank commenced an adversary proceeding in the Maryland Bankruptcy Court seeking (i) judgment on Byrd's guarantee of AC Tech's debt to the Bank and (ii) a determination that Byrd's obligation

---

[4]    Although his testimony on the subject has varied, Munns has stated that he took between $250,000 and $300,000 out of AC Tech during the approximately 9-month period the company operated under his control. (*See* Hass Aff., Ex. B, Munns Depo. at 193:14:15; Ex. H., Arbitration Hearing Tr. at 206:19-21).

to the Bank was not dischargeable.   Pursuant to a consent order entered by the Maryland

Bankruptcy Court on April 26, 2010, Byrd's debt to the Bank was determined to be non-

dischargeable pursuant to 11 U.S.C. 523(a)(2).   A copy of the consent order entered by the

Maryland Bankruptcy Court is Exhibit O to the Hass Affidavit.

At the conclusion of the Arbitration, the AAA entered a Final Award of Arbitrator dated

October 4, 2010 in favor of the Bank and against Munns and AC Tech, jointly and severally, in

the amount of $5,207,124.39, plus interest (the "Award").   (Munns' Motion for Summary

Judgment, Ex. 4).   The Circuit Court of Fairfax County confirmed the Award and entered

judgment in favor of the Bank against Munns and AC Tech, jointly and severally, in the amount

of $5,207,124.39, plus interest, on November 30, 2010.  (*Id.*, Ex. 5).

The arbitrator's findings with respect to the Bank's claims against Munns and AC Tech

are set forth in an Interim Award of Arbitrator dated August 12, 2010.   (Hass Aff. Ex. M,

Arbitrator's Interim Award).    The arbitrator granted the Bank's breach of contract and

constructive fraud claims but denied the Bank's fraudulent misrepresentation and conversion

claims.   (*Id.* at 3-6).   As to the Bank's misrepresentation count, the arbitrator considered two

specific claims:

> In particular, the Bank claims that Mr. Munns committed
> actual fraud because the Borrowing Base Certificate dated June 27,
> 2008 (the "BBC") submitted to the Bank included materially false
> information which caused the Bank to loan an amount significantly
> higher than the Bank would have loaned if the BBC had not
> included the false information.
>
> . . . .
>
> The Bank claims that Mr. Munns, in contravention of
> provisions in the Credit Agreement, committed actual fraud by
> allowing accounts used as collateral for the Bank's loan to be
> encumbered and that this included certain actions involving Arrow
> Electronics both prior to approval of the line and funding (allowing

a credit facility and personally guaranteeing those receivables) and
also after funding (allowing a subsequent security arrangement and
for funds to be deposited in a "secret" lock box).

(*Id.* at 4-5).

In both instances, the arbitrator concluded that the Bank failed to meet its burden of proving

actual fraud by "clear and convincing evidence."  (*Id.* at 4).

Munns' Motion for Summary Judgment asserts that he is entitled to judgment as a matter

of law in this Adversary Proceeding because collateral estoppel precludes the Bank from re-

litigating the arbitrator's previous ruling on the Bank's misrepresentation and conversion counts

in the Arbitration.  For the reasons set forth below, however, Munns' misplaced reliance on

collateral estoppel does not affect the application of 11 U.S.C. § 523 to his debt to the Bank.

### III.    APPLICABLE LEGAL STANDARD

A motion for summary judgment must be denied unless the moving party demonstrates

that no genuine issue as to any material fact exists and that he is entitled to judgment as a matter

of law.  FED R. BANKR. P. 7056; *Hagan v. McNallen (In re McNallen)*, 62 F.3d 619, 623 (4th Cir.

2006).  A court reviewing a motion for summary judgment construes all facts and reasonable

inferences to be drawn from those facts in favor of the non-moving party.  *Id.*  To avoid

summary judgment, the non-moving party may not rest on its pleadings, but instead "must show

that specific, material facts exist that give rise to a genuine triable issue."  *Id.* at 623-24.  In an

adversary proceeding to determine the dischargeability of a debt, summary judgment based on

collateral estoppel may only be granted if an issue determined by prior adjudication is *identical*

to the ultimate issue in the adversary proceeding.  *Duncan v. Duncan (In re Duncan)*, 448 F.3d

725, 728 (4th Cir. 2006).

Applying the foregoing standard, it is clear that Munns is not entitled to judgment as a matter of law on the Bank's claims in this adversary proceeding because his motion for summary judgment fails to prove all of the requisite elements of collateral estoppel.

## IV.   ARGUMENT

Congress intended for bankruptcy courts to resolve dischargeability issues. *Brown v. Felson*, 442 U.S. 127, 138 (1979). A Virginia state court judgment is only given preclusive effect in a subsequent adversary proceeding to determine the dischargeability of a debt to the extent that: (i) the parties in the two proceedings are the same or in privity, (ii) the initial action resulted in a "valid and final judgment against the party against whom preclusion is sought" or its privy, (iii) the factual issues sought to be precluded were "actually litigated" in the earlier proceeding; (iv) the factual issues sought to be precluded were essential to the prior determination and (v) the party invoking preclusion would have been bound if the prior litigation of the issue had reached the opposite result (mutuality). *See Duncan*, 448 F.3d at 728 (applying Virginia law).

Munns' reliance, in his summary judgment motion, on collateral estoppel is unavailing because the significant difference between the Bank's heightened "clear and convincing evidence" burden of persuasion in the Arbitration and its "preponderance of the evidence" burden in this adversary proceeding prevents application of the doctrine against the Bank. Even if collateral estoppel could properly be applied against the Bank, Munns fails to show the existence an identity of issues in the two proceedings sufficient to preclude the Bank's claims. Munns' willful refusal to comply with his discovery obligations, both in this adversary proceeding and in the prior Arbitration, is sufficient independent reason to deny the relief Munns seeks.

### A.     The Heavier Burden of Persuasion in the Prior Arbitration Renders Collateral Estoppel Inapplicable in this Proceeding.

Collateral estoppel does not apply "where the party against whom the doctrine is invoked had a heavier burden of persuasion on that issue in the first action than he does in the second, or where his adversary has a heavier burden in the second action than he did in the first." *Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 217-18 (4th Cir. 2006) (quoting *Newport News Shipbldg. & Dry Dock Co. v. Dir., Office of Workers' Comp. Programs*, 583 F.2d 1273, 1279 (4th Cir. 1978)); *In re Lee*, No. 09-16342-RGM, 2010 WL 396177 at *1 (Bankr. E.D. Va. Jan. 27, 2010); *Stone v. Becker* (*In re Becker*), 100 B.R. 811, 813 n.2 (Bankr. E.D. Va. 1988); RESTATEMENT (SECOND) OF JUDGMENTS § 28(4) (1982).[5]   Because the process of adjudication of an issue cannot be reconstructed in the subsequent action based on a new and different burden of persuasion, preclusive effect is properly denied where there are differing burdens. *Id.* at § 28, cmt. f.  "Clear and convincing evidence" and "preponderance of the evidence" are sufficiently different burdens to trigger the exception to collateral estoppel set forth in Section 28(4) of RESTATEMENT (SECOND) OF JUDGMENTS. *Id.* at § 28, cmt. f, illustration 11.

The Bank's burden in the parties' prior Arbitration was undeniably heavier than its burden in this adversary proceeding.  In the Arbitration, the "clear and convincing evidence" burden of proof was critical to the arbitrator's determination of the Bank's misrepresentation

---

[5]     Although federal and state courts, including the Fourth Circuit and certain states within the Fourth Circuit, have generally accepted the position set forth in RESTATEMENT (SECOND) OF JUDGMENTS § 28(4), the Bank found no reported cases applying the exception under Virginia law.  *See Collins*, 468 F.3d at 217-18 (federal law); *Attorney Grievance Comm'n of Md. v. Bear*, 763 A.2d 175, 181 (Md. 2000) (Maryland law); *Pye v. Aycock*, 480 S.E.2d 455, 460 (S.C. 1997) (South Carolina law); *Conley v. Spillers*, 301 S.E.2d 216, 225 n.14 (W. Va. 1983) (West Virginia law). Virginia has, however, adopted another one of the exceptions to collateral estoppel described in Section 28 of the Restatement. *See AKAK, Corp. v. Commonwealth of Va.*, 567 S.E.2d 589, 591 (Va. Ct. App. 2002) (collateral estoppel is inapplicable where "[t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action.") (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 28(1)).

count.  (*See* Arbitrator's Interim Award at 4 ("The Bank, however, did not meet its burden of proof")).  Indeed, there are four separate references to the Bank's burden of proof in the page and a half of the Arbitrator's Interim Award devoted to the Bank's misrepresentation count.  (*Id.*).

Unlike the Arbitration, in which the Bank was required to prove the elements of its actual fraud claim by "clear and convincing evidence," the Bank must only prove its 11 U.S.C. § 523(a) claims in this adversary proceeding by a preponderance of the evidence.  (*Id.* at 4-5); *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 220 (4th Cir. 2007).  Given that a significantly heavier burden of proof was integral to the arbitrator's prior determination, the exception to collateral estoppel for differing burdens of proof, which has been generally accepted by state and federal courts, should apply in this adversary proceeding.

**B.      The Bank Has Raised Numerous Factual and Legal Issues Not Actually Litigated in the Arbitration.**

Even if this Court were to decline to follow the Fourth Circuit and other courts applying Section 28(4) of RESTATEMENT (SECOND) OF JUDGMENTS, the Bank's claims against Munns would only be precluded by collateral estoppel if, as to each claim, the ultimate issue was found to be *identical* to an issue actually litigated in the prior Arbitration and necessary to the arbitrator's decision.  *Duncan v. Duncan*, 448 F.3d 725, 728 (4th Cir. 2006).  The Court must make a "careful and considered determination" that an issue was actually litigated and was necessary to the arbitrator's ruling.  *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir. 1988).

The arbitrator expressly limited his decision on the Bank's misrepresentation count[6] to two very specific claims:

---

[6]      Munns' reliance on the preclusive effect of the arbitrator's denial of the Bank's conversion count is inapposite.  (*See* Munns' Memorandum of Points and Authorities at 4).  The arbitrator found that Munns' post-default diversion of AC Tech's accounts receivable collections to secret bank accounts did not rise to the level of conversion under applicable law because the

(i.)     Munns' delivery of the false Munns-Submitted June Borrowing Base Certificate to the Bank on June 29, 2008; and

(ii.)     Munns' concealment of the Distributor credit facility and of the Distributor's security interest in certain accounts receivable of AC Tech.

(Arbitrator's Interim Award at 4-5).

In no small part due to Munns' refusal to honor his discovery obligations in the Arbitration, the following issues were not raised or actually litigated in that proceeding:

(i)     Munns' false representation to the Bank on June 16, 2008 that the acquisition of AC Tech was "a cash deal" with "no other terms of significance such as earn out notes or any other purchase structure of the deal"  (Cashion Aff., Ex. D);

(ii)     Munns' concealment of the actual terms of the acquisition of AC Tech, including the post-closing obligations of AC Tech to the Sellers (*See* Cashion Aff. at ¶ 10);

(iii)     Munns' concealment of AC Tech accounts receivable information received from Christopher Sands on the morning of June 30, 2008 that conflicted with accounts receivable information submitted to the Bank the previous day by Munns (Hass Aff., Ex. J); and

(iv)     Munns' false representation to the Bank on June 30, 2008 that the Munns-Converted A/R Report was the "correct" accounts receivable report for the Bank to rely upon in funding the Initial Advance (Cashion Aff., Ex. I).

---

Bank did not own the funds.  (Arbitrator's Interim Award at 5).  The arbitrator's ruling in this regard has little, if any, bearing on whether Munns' debt to the Bank is a debt for money obtained by false pretenses, a false representation or actual fraud or by a false written statement respecting Munns' or an insider's financial condition.  *See* 11 U.S.C. § 523(a)(2) (setting forth exception to discharge applicable in this proceeding).  Munns' commandeering of collateral proceeds is nonetheless highly probative of his systematic and willful derogation of the Bank's contractual rights, even if it did not rise to the level of an intentional tort.

There is plainly no identity between the foregoing issues and the two specific issues determined by the arbitrator in connection with the Bank's misrepresentation count in the Arbitration.  Indeed, none of the foregoing issues were actually litigated in the Arbitration, nor are they essential to the arbitrator's prior determination.  *See Duncan*, 488 F.3d at 728 (setting forth Virginia prerequisites for collateral estoppel).  Any of these previously unlitigated issues could form the basis for a determination that Munns' debt to the Bank for his guarantee of the AC Tech loan is not dischargeable under 11 U.S.C. § 523(a)(2).  As a result, Collateral estoppel does not bar the Bank's claims in this adversary proceeding.

### C.   *Munns Default on His Discovery Obligations is Grounds for Denial of Summary Judgment.*

Munns' persistent refusal to comply with his discovery obligations is additional grounds for denial of his summary judgment motion.  Rule 56 of the Federal Rules of Civil Procedure provides in pertinent part as follows:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1)   defer considering the motion or deny it;

FED R. CIV. P. 56(d) (applicable to this adversary proceeding pursuant to Fed. R. Bankr. P. 7056).

Munns failed to timely respond to the Bank's duly served requests for production of documents in the Arbitration.  Even in the face of an order by the arbitrator granting a motion to compel, Munns failed to fully comply with that order.  (Arbitrator's Interim Award at 2).  Instead, prior to the Arbitration Hearing, Munns produced a damaged hard drive from an AC Tech computer and certain CDs containing copies of AC Tech electronic mail folders.  (Hass Aff. at ¶ 20).

Munns produced no copies of electronic mail messages from his personal MSN electronic mail account (which appeared to be his primarily mode of communication during the relevant period); no copies of agreements, financial statements or due diligence materials from his files relating to the AC Tech acquisition; no copies of bank statements for the various bank accounts he opened in AC Tech's name and no copies of other documents from his files relating to AC Tech or its acquisition.

Despite testifying under oath that the hard drive on his personal computer "broke" six months before the Arbitration hearing rendering its contents inaccessible, Munns was able to produce copies of certain electronic mail messages in support of his defenses at the hearing. (*See* Hass Aff., Ex. B, Munns Depo. at 13:10-14). On the eve of the Arbitration hearing, Byrd turned over certain AC Tech bank account statements to the Bank's counsel that had previously been withheld by Munns. (*Id.*, Ex. H, Arbitration Hearing Tr. at 13:7-11; 211:12-18). In short, Munns' default on his discovery obligations clearly hindered the full and fair litigation of the Bank's claims in the Arbitration.

Munns' pattern of withholding responsive documents and other information has continued in discovery in this adversary proceeding. Munns has yet to serve initial disclosures as required by Federal Rule of Civil Procedure 26(a). Moreover, on July 29, 2011, the Bank duly served interrogatories and requests for production of documents on Munns. Munns' answers to the Bank's interrogatories were incomplete, internally inconsistent and in many cases non-responsive. Other than the 12 exhibits attached to his interrogatory answers, Munns has produced no documents in this adversary proceeding. (Hass Aff. at ¶ 21).

Munns has implausibly asserted throughout the parties' litigation that he was an unwitting pawn in Byrd's fraud on the Bank. Thus, the discovery sought by the Bank,

specifically Munns' personal e-mails, correspondence, financial records, written agreements and other records relating to the Line of Credit  and the AC Tech acquisition, is imperative to show Munns' knowledge and intent.  (*Id.* at ¶ 22).  If Munns persists in his refusal to honor his discovery obligations, the Court should draw an adverse inference from the unavailability of the requested documents.

Munns, having availed himself of the protections of the Bankruptcy Code, must also satisfy the Code's requirements.  Until he fully complies with his discovery obligations, the Bank cannot determine if there are additional grounds for excepting Munns' debt to the Bank from discharge and whether such additional grounds are identical to issues actually litigated in the Arbitration.  Munns' request for summary judgment should therefore be denied, as provided in Rule 56(d).

## V.    CONCLUSION

For the foregoing reasons, the Bank respectfully requests that this Court deny Munns' Motion for Summary Judgment and grant the Bank such other and further relief as the Court deems just and proper.

Bank of America, N.A., a national banking association,


By:  /s/ Michael A. Hass
               Counsel

Michael A. Hass (VSB No. 74974)
mahass@ober.com
E. John Steren (*admitted pro hac vice*)
ejsteren@ober.com
Walter R. Kirkman (*admitted pro hac vice*)
wrkirkman@ober.com
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W., 5th Floor
Washington, D.C.  20005
(202) 408-8400
(202) 326-5270 facsimile


## CERTIFICATE OF SERVICE

I certify that on the 17th day of October, 2011, a copy of the foregoing Bank of America's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment along with supporting affidavits and proposed form of order was served by first-class mail, postage prepaid on:

Richard G. Hall, Esquire
7369 McWhorter Place, Suite 412
Annandale, Virginia 22003

*Counsel for the Defendant*


/s/ Walter R. Kirkman
Walter R. Kirkman

2391879                                                24