

|                    |                                                  |
|--------------------|--------------------------------------------------|
| **BORROWERS:**     | MB SECURITY CORPORATION                          |
|                    | AC TECHNOLOGY, INC.                              |
| **GUARANTOR:**     | EARLE D. MUNNS, JR.                              |

## CONTINUING AND UNCONDITIONAL GUARANTY

To:    Bank of America, N.A.

   1.   _The Guaranty._   For valuable consideration, the undersigned ("Guarantor") hereby unconditionally guarantees and promises to pay promptly to Bank of America, N.A., its subsidiaries and affiliates (collectively, "_Bank_"), or order, in lawful money of the United States, any and all Indebtedness of MB SECURITY CORPORATION, a Delaware corporation and AC TECHNOLOGY, INC., a Virginia corporation (collectively, the "_Borrowers_") to Bank when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter.   The liability of Guarantor under this Guaranty is not limited as to the principal amount of the Indebtedness guaranteed and includes, without limitation, liability for all interest, fees, indemnities, and other costs and expenses relating to or arising out of the Indebtedness and for all swap, option, or forward obligations relating to or arising out of the Indebtedness now or hereafter owing from Borrowers to Bank.   The liability of Guarantor is continuing and relates to any Indebtedness, including that arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied.   This Guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor.   If Guarantor is a subsidiary or affiliate of Borrowers, Guarantor's liability hereunder shall not exceed at any one time the largest amount during the period commencing with Guarantor's execution of this Guaranty and thereafter that would not render Guarantor's obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code (Title 11, United States Code) or any comparable provisions of any applicable state law.

   2.   _Definitions._

   (a)   "Borrowers" shall mean the entities named in Paragraph 1 of this Guaranty.

   (b)   "Guarantor" shall mean the individual signing this Guaranty.

   (c)   "Indebtedness" shall mean any and all debts, liabilities, and obligations of Borrowers to Bank including, without limitation, those arising pursuant to the Loan Documents, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Bank by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Bank for its own account or as agent for another or others, whether Borrowers may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all obligations of Borrowers to Bank for reasonable attorneys' fees and all other costs and expenses incurred by Bank in the collection or enforcement of the Loan Documents.   Indebtedness also includes, without limitation, all obligations of Borrowers arising under any interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, securities puts, calls, collars, options or forwards or any combination of, or option with respect to the Loan Documents whether now or hereafter entered into between Borrowers and Bank.



EXHIBIT
B

(d) "Loan Documents" shall mean shall mean the Credit and Security Agreement between Borrowers and Lender, the Revolving Loan Note from Borrowers in favor of Lender, and all other written agreements, documents, and instruments evidencing any of the Indebtedness, and deeds of trust, mortgages, security agreements, and other written agreements, documents, and instruments executed by Borrowers in connection with such loan agreements, promissory notes, and other agreements, documents, and instruments evidencing any of the Indebtedness, all as now in effect and as hereafter amended, restated, renewed, or superseded.

3.  **Obligations Independent**.  The obligations hereunder are independent of the obligations of Borrowers or any other guarantor, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrowers or any other guarantor or whether Borrowers or any other guarantor be joined in any such action or actions.  Anyone executing this Guaranty shall be bound by its terms without regard to execution by anyone else.

4.  **Rights of Bank**.  Guarantor authorizes Bank, without notice or demand and without affecting its liability hereunder, from time to time to:

(a)  renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon, or otherwise change the terms of any Loan Documents;

(b)  receive and hold security for the payment of this Guaranty or any Indebtedness and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security;

(c)  apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine;

(d)  release or substitute any Guarantor or any one or more of any endorsers or other guarantors of any of the Indebtedness; and

(e)  permit the Indebtedness to exceed Guarantor's liability under this Guaranty, and Guarantor agrees that any amounts received by Bank from any source other than Guarantor shall be deemed to be applied first to any portion of the Indebtedness not guaranteed by Guarantor.

5.  **Guaranty to be Absolute**.  Guarantor agrees that until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner or to any extent vary the risks of Guarantor under this Guaranty or that, but for this paragraph, might discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty.  Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Bank described in the immediately preceding paragraph of this Guaranty.  It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional.

6.  **Guarantor's Waivers of Certain Rights and Certain Defenses**.  Guarantor waives:

(a)  any right to require Bank to proceed against Borrowers, proceed against or exhaust any security for the Indebtedness, or pursue any other remedy in Bank's power whatsoever.

(b)  any defense arising by reason of any disability or other defense of Borrowers, or the cessation from any cause whatsoever of the liability of Borrowers; and

(c)  any defense based on any claim that Guarantor's obligations exceed or are more burdensome than those of Borrowers.

No provision or waiver in this Guaranty shall be construed as limiting the generality of any other waiver contained in this Guaranty.



Continuing and Unconditional Guaranty
Page: of

7. <u>Waiver of Subrogation</u>. Until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, even though the Indebtedness may be in excess of Guarantor's liability hereunder, Guarantor waives to the extent permitted by applicable law any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise) including, without limitation, any claim or right of subrogation under the Bankruptcy Code (Title 11, United States Code) or any successor statute, arising from the existence or performance of this Guaranty, and Guarantor waives to the extent permitted by applicable law any right to enforce any remedy that Bank now has or may hereafter have against Borrowers, and waives any benefit of, and any right to participate in, any security now or hereafter held by Bank.

8. <u>Waiver of Notices</u>. Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of intent to accelerate, notices of acceleration, notices of any suit or any other action against Borrowers or any other person, any other notices to any party liable on any Loan Document (including Guarantor), notices of acceptance of this Guaranty, notices of the existence, creation, or incurring of new or additional Indebtedness to which this Guaranty applies or any other Indebtedness of Borrowers to Bank, and notices of any fact that might increase Guarantor's risk.

9. <u>Security</u>. To secure all of Guarantor's obligations hereunder, Guarantor assigns and grants to Bank a security interest in all moneys, securities, and other property of Guarantor now or hereafter in the possession of Bank, all deposit accounts of Guarantor maintained with Bank, and all proceeds thereof. Upon default or breach of any of Guarantor's obligations to Bank, Bank may apply any deposit account to reduce the Indebtedness, and may foreclose any collateral as provided in the Uniform Commercial Code and in any security agreements between Bank and Guarantor.

10. <u>Subordination</u>. Any obligations of Borrowers to Guarantor, now or hereafter existing, including but not limited to any obligations to Guarantor as subrogee of Bank or resulting from Guarantor's performance under this Guaranty, are hereby subordinated to the Indebtedness. In addition to Guarantor's waiver of any right of subrogation as set forth in this Guaranty with respect to any obligations of Borrowers to Guarantor as subrogee of Bank, Guarantor agrees that, if Bank so requests, Guarantor shall not demand, take, or receive from Borrowers, by setoff or in any other manner, payment of any other obligations of Borrowers to Guarantor until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated. If any payments are received by Guarantor in violation of such waiver or agreement, such payments shall be received by Guarantor as trustee for Bank and shall be paid over to Bank on account of the Indebtedness, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Any security interest, lien, or other encumbrance that Guarantor may now or hereafter have on any property of Borrowers is hereby subordinated to any security interest, lien, or other encumbrance that Bank may have on any such property.

11. <u>Revocation of Guaranty</u>.

(a) This Guaranty may be revoked at any time by Guarantor in respect to future transactions, unless there is a continuing consideration as to such transactions that Guarantor does not renounce. Such revocation shall be effective upon actual receipt by Bank, at the address shown below or at such other address as may have been provided to Guarantor by Bank, of written notice of revocation. Revocation shall not affect any of Guarantor's obligations or Bank's rights with respect to transactions committed or entered into prior to Bank's receipt of such notice, regardless of whether or not the Indebtedness related to such transactions, before or after revocation, has been incurred, renewed, compromised, extended, accelerated, or otherwise changed as to any of its terms, including time for payment or increase or decrease of the rate of interest thereon, and regardless of any other act or omission of Bank authorized hereunder. Revocation by Guarantor shall not affect any obligations of any other guarantor.

(b) In the event of the death of a Guarantor, the liability of the estate of the deceased Guarantor shall continue in full force and effect as to (i) the Indebtedness existing at the date of death, and any renewals or extensions thereof, and (ii) loans or advances made to or for the account of Borrowers after

the date of the death of the deceased Guarantor pursuant to a commitment made by Bank to Borrowers prior to the date of such death. As to all surviving Guarantors, this Guaranty shall continue in full force and effect after the death of a Guarantor, not only as to the Indebtedness existing at that time, but also as to the Indebtedness thereafter incurred by Borrowers to Bank.

(c) Guarantor acknowledges and agrees that this Guaranty may be revoked only in accordance with the foregoing provisions of this paragraph and shall not be revoked simply as a result of any change in name, location, or composition or structure of Borrowers, the dissolution of Borrowers, or the termination, increase, decrease, or other change of any personnel or owners of Borrowers.

12. **Reinstatement of Guaranty.**  If this Guaranty is revoked, returned, or canceled, and subsequently any payment or transfer of any interest in property by Borrowers to Bank is rescinded or must be returned by Bank to Borrowers, this Guaranty shall be reinstated with respect to any such payment or transfer, regardless of any such prior revocation, return, or cancellation.

13. **Stay of Acceleration.**  In the event that acceleration of the time for payment of any of the Indebtedness is stayed upon the insolvency, bankruptcy, or reorganization of Borrowers or otherwise, all such Indebtedness guaranteed by Guarantor shall nonetheless be payable by Guarantor immediately if requested by Bank.

14. **Information Relating to Borrowers.**  Guarantor acknowledges and agrees that it has made such independent examination, review, and investigation of the Loan Documents as Guarantor deems necessary and appropriate, including, without limitation, any covenants pertaining to Guarantor contained therein; and shall have sole responsibility to obtain from Borrowers any information required by Guarantor about any modifications thereto. Guarantor further acknowledges and agrees that it shall have the sole responsibility for, and has adequate means of, obtaining from Borrowers such information concerning Borrowers' financial condition or business operations as Guarantor may require, and that Bank has no duty, and Guarantor is not relying on Bank, at any time to disclose to Guarantor any information relating to the business operations or financial condition of Borrowers.

15. **Borrowers' Authorization.**  It is not necessary for Bank to inquire into the powers of Borrowers or of the officers, directors, partners, members, managers, or agents acting or purporting to act on their behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder, subject to any limitations on Guarantor's liability set forth herein.

16. **Information Relating to Guarantor.**  Guarantor authorizes Bank to verify or check any information given by Guarantor to Bank, check Guarantor's credit references, verify employment, and obtain credit reports. Guarantor acknowledges and agrees that the authorizations provided in this paragraph apply to any individual general partner of Guarantor and to Guarantor's spouse and any such general partner's spouse if Guarantor or such general partner is married and lives in a community property state.

17. **Change of Status.**  Any Guarantor that is a business entity shall not enter into any consolidation, merger, or other combination unless Guarantor is the surviving business entity. Further, Guarantor shall not change its legal structure unless (a) Guarantor obtains the prior written consent of Bank and (b) all Guarantor's obligations under this Guaranty are assumed by the new business entity.

18. **Remedies.**  If Guarantor fails to fulfill its duty to pay all Indebtedness guaranteed hereunder, Bank shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law. Without limiting the foregoing, Bank may, at its option and without notice or demand:

(a) declare any Indebtedness due and payable at once;

(b) take possession of any collateral pledged by Borrowers or Guarantor, wherever located, and sell, resell, assign, transfer, and deliver all or any part of the collateral at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Bank may impose reasonable conditions upon any such sale. Further, Bank, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of the collateral to be sold, free from and discharged of all trusts, claims, rights of redemption and

equities of Borrowers or Guarantor whatsoever. Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker, or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided herein; and

(c) set off against any or all liabilities of Guarantor all money owed by Bank or any of its agents or affiliates in any capacity to Guarantor, whether or not due, and also set off against all other liabilities of Guarantor to Bank all money owed by Bank in any capacity to Guarantor. If exercised by Bank, Bank shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books subsequent thereto.

19. Notices. All notices required under this Guaranty shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Guaranty, or sent by facsimile to the fax numbers listed on the signature page (with a copy by one of the other methods of notice), or to such other addresses as Bank and Guarantor may specify from time to time in writing. Notices sent by (a) first class mail shall be deemed delivered on the earlier of actual receipt or on the fourth business day after deposit in the U.S. mail, postage prepaid, (b) overnight courier shall be deemed delivered on the next business day, and (c) telecopy shall be deemed delivered when transmitted.

20. Successors and Assigns. This Guaranty (a) binds Guarantor and Guarantor's executors, administrators, successors, and assigns, provided that Guarantor may not assign its rights or obligations under this Guaranty without the prior written consent of Bank, and (b) inures to the benefit of Bank and Bank's indorsees, successors, and assigns. Bank may, without notice to Guarantor and without affecting Guarantor's obligations hereunder, sell, assign, grant participations in, or otherwise transfer to any other person, firm, or corporation the Indebtedness and this Guaranty, in whole or in part. Guarantor agrees that Bank may disclose to any assignee or purchaser, or any prospective assignee or purchaser, of all or part of the Indebtedness any and all information in Bank's possession concerning Guarantor, this Guaranty, and any security for this Guaranty.

21. Amendments, Waivers, and Severability. No provision of this Guaranty may be amended or waived except in writing. No failure by Bank to exercise, and no delay in exercising, any of its rights, remedies, or powers shall operate as a waiver thereof, and no single or partial exercise of any such right, remedy, or power shall preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision of this Guaranty.

22. Costs and Expenses. Guarantor agrees to pay all reasonable attorneys' fees, and all other costs and expenses that may be incurred by Bank (a) in the enforcement of this Guaranty or (b) in the preservation, protection, or enforcement of any rights of Bank in any case commenced by or against Guarantor or Borrowers under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute.

23. Annual Personal Financial Information. Guarantor hereby covenants and agrees, within one hundred twenty (120) days of each calendar year end during which this Guaranty is in effect, to prepare, sign and deliver to the Bank a personal financial statement in form and substance satisfactory to the Bank.

24. Governing Law and Jurisdiction. This Guaranty shall be governed by and construed and enforced in accordance with federal law and the law of the Commonwealth of Virginia. Jurisdiction and venue for any action or proceeding to enforce this Guaranty shall be the forum appropriate for such action or proceeding against Borrowers, to which jurisdiction Guarantor irrevocably submits and to which venue Guarantor waives to the fullest extent permitted by law any defense asserting an inconvenient forum in connection therewith. It is provided, however, that if Guarantor owns property in another state, notwithstanding that the forum for enforcement action is elsewhere, Bank may commence a collection proceeding in any state in which Guarantor owns property for the purpose of enforcing provisional remedies against such property. Service of process by Bank in connection with such action or proceeding shall be binding on Guarantor if sent to Guarantor by registered or certified mail at its address specified below.

25. <u>Dispute Resolution Provision</u>. This paragraph, including the subparagraphs below, is referred to as the "Dispute Resolution Provision." This Dispute Resolution Provision is a material inducement for the parties entering into this agreement.

(a)  This Dispute Resolution Provision concerns the resolution of any controversies or claims between the parties, whether arising in contract, tort or by statute, including but not limited to controversies or claims that arise out of or relate to: (i) this agreement (including any renewals, extensions or modifications); or (ii) any document related to this agreement (collectively a "Claim"). For the purposes of this Dispute Resolution Provision only, the term "parties" shall include any parent corporation, subsidiary or affiliate of the Bank involved in the servicing, management or administration of any obligation described or evidenced by this agreement.

(b)  At the request of any party to this agreement, any Claim shall be resolved by binding arbitration in accordance with the Federal Arbitration Act (Title 9, U.S. Code) (the "Act"). The Act will apply even though this agreement provides that it is governed by the law of a specified state.

(c)  Arbitration proceedings will be determined in accordance with the Act, the then-current rules and procedures for the arbitration of financial services disputes of the American Arbitration Association or any successor thereof ("AAA"), and the terms of this Dispute Resolution Provision. In the event of any inconsistency, the terms of this Dispute Resolution Provision shall control. If AAA is unwilling or unable to (i) serve as the provider of arbitration or (ii) enforce any provision of this arbitration clause, the Bank may designate another arbitration organization with similar procedures to serve as the provider of arbitration.

(d)  The arbitration shall be administered by AAA and conducted, unless otherwise required by law, in any U.S. state where real or tangible personal property collateral for this credit is located or if there is no such collateral, in the state specified in the governing law section of this agreement. All Claims shall be determined by one arbitrator; however, if Claims exceed Five Million Dollars ($5,000,000), upon the request of any party, the Claims shall be decided by three arbitrators. All arbitration hearings shall commence within ninety (90) days of the demand for arbitration and close within ninety (90) days of commencement and the award of the arbitrator(s) shall be issued within thirty (30) days of the close of the hearing. However, the arbitrator(s), upon a showing of good cause, may extend the commencement of the hearing for up to an additional sixty (60) days. The arbitrator(s) shall provide a concise written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed and have judgment entered and enforced.

(e)  The arbitrator(s) will give effect to statutes of limitation in determining any Claim and may dismiss the arbitration on the basis that the Claim is barred. For purposes of the application of any statutes of limitation, the service on AAA under applicable AAA rules of a notice of Claim is the equivalent of the filing of a lawsuit. Any dispute concerning this arbitration provision or whether a Claim is arbitrable shall be determined by the arbitrator(s), except as set forth at subparagraph (h) of this Dispute Resolution Provision. The arbitrator(s) shall have the power to award legal fees pursuant to the terms of this agreement.

(f)  This paragraph does not limit the right of any party to: (i) exercise self-help remedies, such as but not limited to, setoff; (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial or power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies.

(g)  The filing of a court action is not intended to constitute a waiver of the right of any party, including the suing party, thereafter to require submittal of the Claim to arbitration.

(h)  Any arbitration or trial by a judge of any Claim will take place on an individual basis without resort to any form of class or representative action (the "Class Action Waiver"). Regardless of

anything else in this Dispute Resolution Provision, the validity and effect of the Class Action Waiver may be determined only by a court and not by an arbitrator. The parties to this Agreement acknowledge that the Class Action Waiver is material and essential to the arbitration of any disputes between the parties and is non-severable from the agreement to arbitrate Claims. If the Class Action Waiver is limited, voided or found unenforceable, then the parties' agreement to arbitrate shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver. The Parties acknowledge and agree that under no circumstances will a class action be arbitrated.

(i) By agreeing to binding arbitration, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any Claim. Furthermore, without intending in any way to limit this agreement to arbitrate, to the extent any Claim is not arbitrated, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of such Claim. This waiver of jury trial shall remain in effect even if the Class Action Waiver is limited, voided or found unenforceable. WHETHER THE CLAIM IS DECIDED BY ARBITRATION OR BY TRIAL BY A JUDGE, THE PARTIES AGREE AND UNDERSTAND THAT THE EFFECT OF THIS AGREEMENT IS THAT THEY ARE GIVING UP THE RIGHT TO TRIAL BY JURY TO THE EXTENT PERMITTED BY LAW.

26. **FINAL AGREEMENT.** BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

Executed June 30, 2008.

Witness:

EARLE D. MUNNS, JR.                                    (Seal)

Address for notices to Bank:

Jessica L. Tencza
Senior Vice President
Bank of America, N.A.
8300 Greensboro Drive, Mezzanine Level
McLean, Virginia 22102

Address for notices to Guarantor:

EARLE D. MUNNS, JR.
11660 Great Falls Way
Great Falls, VA
22066

*Affiliate Sharing Notice.  Notice to Guarantor (hereinafter, "Obligor"):  From time to time Bank of America, N.A. (the "Bank") may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates").  The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.  If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates.  The Obligor can make this election by (1) calling the Bank at 1.888.341.5000, (2) visiting the Bank online at www.bankofamerica.com, selecting "Privacy & Security," and then selecting "Set Your Privacy Preferences," or (3) contacting the Obligor's client manager or local banking center.  To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.  If the Obligor makes this election, certain products or services may not be made available to the Obligor.  This request will apply to information from applications, consumer reports and other outside sources only, and may take six to eight weeks to be fully effective.  Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.  The Bank may change this policy from time to time.  Visit our website, www.bankofamerica.com, for the latest policy.*

Continuing and Unconditional Guaranty
Page  of

**From:**       Tencza, Jessica [jessica.tencza@baml.com]
**Sent:**       Tuesday, June 17, 2008 3:37 PM
**To:**         Yin, Yanlin
**Subject:**    FW: Fully Executed LOI
**Attachments:** ACT_LOI_Executed.zip

fyi...

*Jessica Tencza*
*Bank of America*
*Government Contracting & Technology Banking*
*703.761.8558*
*jessica.tencza@bankofamerica.com*

---

**From:** Michael Byrd [mailto:mabyrd@sydiansys.com]
**Sent:** Tuesday, June 17, 2008 3:20 PM
**To:** Tencza, Jessica; Zanetti, Diane B
**Cc:** 'E M'; sbritt@ltblaw.com
**Subject:** Fully Executed LOI

Ladies,

For your review and records.  Thank you for your cooperation and participation in this transaction!

All the best,

Mike and Earle


<<...>>



EXHIBIT

*C*

BAE 002118



*MB Security Corp*



June 14, 2008

Mr. Chris Sands
Founder and Chief Executive Officer
AC Technology, Inc.
22695 Commerce Center Court
Dulles, VA 20166

Dear Chris,

This letter of intent ("Letter of Intent" or "LOI") outlines certain non-binding understandings and certain binding agreements between MB Security Corporation, a to-be-formed Delaware corporation or its designee (collectively, "MBSC"), on the one hand, and AC Technology, Inc., a Virginia corporation ("ACT"), and the shareholders and owners of ACT and the primary owners of Advanced Biometric Controls LLC ("ABC") (collectively, the "Shareholders" and together with ACT, the "Sellers"), on the other hand, regarding the proposed acquisition of eighty percent (80%) of the outstanding capital stock of ACT and execution of other agreements as described herein (the "Transaction").

<u>Non-Binding Provisions</u>

The following numbered paragraphs of this Letter of Intent (collectively the "Non-Binding Provisions") reflect the mutual understandings of MBSC, ACT and the Shareholders (individually, a "Party" and collectively, the "Parties"). They are not intended to create or constitute any legally binding obligations between the Parties, and the Parties shall have no liability to each other with respect to the Non-Binding Provisions until a fully integrated, definitive agreement (the "Definitive Agreement") is entered into by and among the Parties.

1.  <u>Basic Transaction</u>.  MBSC will acquire eighty percent (80%) of the outstanding capital stock of ACT. The Parties contemplate that the Shareholders shall own the remaining twenty percent (20%) of the capital stock of ACT at closing, which is intended to occur on or about June 30, 2008 if this LOI and the Definitive Agreement are promptly executed (the "Closing"). Other elements of the Transaction are as follows:

a.  At Closing, the Parties will execute a mutually acceptable reseller agreement granting to ACT an irrevocable (subject to termination solely for material uncured breach by ACT), non-exclusive, perpetual right to (i) resell BiObex,™ a biometric software solution, on terms representing "most-favored nation pricing" (*i.e.*, the lowest and most favorable pricing offered by ABC to any customer); (ii) receive from ABC, on reasonable terms, such product development and maintenance support as may be needed by ACT for its customers; and (iii) provide for the escrow of BiObex™ with a commercial escrow company to protect ACT's rights under the reseller agreement should ABC cease business in the normal course, suspend its support of BiObex™ or be sold (in any form of transaction) to a third party, as agreed in the Definitive Agreement.

*MBSC – CONFIDENTIAL*

06/14/08 09:19P P.002

b.  ACT will retain all right, title and interest in and to all ACT contracts, bids, proposals, teaming agreements and engagements, including all GWAC and GSA contracts, schedules, prime contracts and subcontracts in place as of the effective date of this LOI or executed by ACT at any time prior to Closing.

c.  At Closing, by wire transfer by or on behalf of MBSC, all liens, lines of credit and equipment leases (including but not limited to Textron Financial Corporation) shall be paid in full so that none of the assets of ACT shall be subject to liens or encumbrances other than such liens as are related to MBSC's financing of the Transaction.

d.  Cash in the amount of $250,000.00 shall remain in ACT at Closing and will be used to fund an Indemnity escrow in favor of MBSC as described in Section 2 hereof. The Shareholders shall be permitted to sweep and withdraw all other net cash from ACT after payment of current Textron payables (and no other payables) as further agreed in the Definitive Agreement.

e.  ACT shall have an option to purchase ABC on mutually acceptable terms.

f.  The principal owners of MBSC may structure the Transaction so that ACT will be eligible for SBA 8(a) and SDVOB status after closing.

2.  **Purchase Price.** Based on the information known to MBSC as of the date hereof, the purchase price of the Transaction shall be Five Million and 00/100 dollars ($5,000,000.00), payable to or on behalf of the Shareholders as follows:

a.  Two Million and 00/100 dollars ($2,000,000.00), payable by bank check or wire transfer of funds to the Shareholders at Closing.

b.  Approximately Three Million and 00/100 dollars ($3,000,000.00), payable by bank check or wire transfer to Textron Financial Corporation, resulting in the release of all liens, UCCs and payment lock-box mechanisms related to ACT (to the extent the Textron payment increases, the Shareholder payments in subsection a shall decrease). ACT will pay the Shareholders the accounts payable portions of the Textron accounts receivable as and when received on such terms and on such payment schedule as set forth in the Definitive Agreement.

c.  Two Hundred Fifty Thousand and 00/100 dollars ($250,000.00) of the cash remaining in the Company at Closing will be deposited for one year in an interest-bearing escrow account with an escrow agent acceptable to MBSC, for the benefit of MBSC, to secure Sellers' indemnification obligations under the Definitive Agreement ("Indemnity Escrow"). At the end of the one-year period, the balance of the Indemnity Escrow, net of claims, losses and reserves, will be distributed to the Shareholders with applicable simple interest of 5%.

3.  **Due Diligence.** MBSC will conduct due diligence of the prospects, business, assets, contracts, rights, liabilities, and obligations of ACT, including, without limitation, financial, marketing, employment, legal, regulatory, and environmental matters.

*MBSC – CONFIDENTIAL*

2

BAE 002120

4.    Form of Agreement. Upon execution of this Letter of Intent by all of the Parties, MBSC's counsel will commence preparing the Definitive Agreement (and such other necessary and appropriate documents) for review and negotiation by the Parties.   The Definitive Agreement shall be subject to the approval of MBSC's lenders and investors, the Parties' respective Boards of Directors and, to the extent required by law, the Parties' respective shareholders.  The Agreement shall contain the normal and usual warranties and representations as are customary in transactions of the type contemplated herein, including, without limitation, representations and warranties as to the state of ACT's corporate affairs, the accuracy of ACT's financial statements, and the absence of undisclosed liabilities such as contractual disputes, taxes, claims, promissory notes, warranty agreements, unfunded employee benefit plans, litigation and/or threatened litigation, etc.

5.    Employment Agreements. MBSC will enter into two-year employment and non-compete agreements with all Key Personnel designated by MBSC during due diligence. The execution of employment agreements by all Key Personnel and continuance of employment by at least 95% of ACT's current employees will be a condition of Closing.

Binding Provisions

Upon execution of this Letter of Intent, the following numbered provisions shall constitute the legally binding and enforceable agreement of the Parties as described herein.

1.    Non-Binding Provisions Not Enforceable. The Non-Binding Provisions do not create or constitute any legally binding obligations between MBSC, ACT or the Shareholders, and neither MBSC, ACT nor the Shareholders shall have any liability to the other Party with respect to the Non-Binding Provisions until the Definitive Agreement, if one is successfully negotiated, is executed by all Parties. If the Definitive Agreement is not executed and delivered for any reason, no Party to this Letter of Intent shall have any liability to any other Party hereto based upon, arising from, or relating to the Non-Binding Provisions.

2.    Definitive Agreement. MBSC and its counsel shall be responsible for preparing the initial draft of the Definitive Agreement. Promptly following the execution of this Letter of Intent and subject to the final sentence of paragraph 3 below, the Parties shall negotiate in good faith to arrive at a mutually acceptable Definitive Agreement for approval, execution, and delivery on the earliest reasonably practicable date. Both Parties shall cooperate fully with the schedules and due diligence requirements of banks, investors and other lenders in order to close at the earliest practicable date.

3.    Access. From and after the execution of this Letter of Intent, ACT shall provide to MBSC and its directors, employees, accountants, bankers, lawyers and other agents and representatives (collectively, the "Representatives") with all due diligence materials relating to ACT's business, including, without limitation, all corporate, business, financial, tax, and other records and information relating thereto, and shall otherwise afford MBSC and its Representatives full and complete access to all assets, personnel, properties, contracts, books, records, documents, and any and all other relevant materials and information relating to ACT's business. The preceding sentence notwithstanding, the Parties are sensitive to confidentiality issues concerning ACT's employees and will cooperate by limiting MBSC's access to ACT's premises and employees during the early stages of MBSC's due diligence to the extent necessary. However, access to ACT's key managers and key administrative staff will be

BAE 002121

06/14/08 09:19P  P.004

necessary to complete the due diligence process. In addition, access to ACT's key clients will be necessary to complete the due diligence process. MBSC understands the sensitivity of this contact and will coordinate all such access with ACT. MBSC shall not be under any obligation to continue with its due diligence or negotiations regarding the Definitive Agreement if, at any time, the results of its due diligence are not satisfactory to MBSC for any reason in its sole discretion. If at any time during its due diligence MBSC concludes that the results of its due diligence are not satisfactory, it shall so notify ACT in writing immediately, which notice shall serve to terminate the obligations of the Parties under this Letter of Intent except for Paragraphs 4 and 6 hereof, and shall automatically release ACT from the Exclusive Dealing provisions contained herein. Each of the Parties shall use their good faith and reasonable best efforts to promptly complete this due diligence review and, in connection therewith, MBSC hereby agrees to minimize any interference with the business of ACT, or the operations thereof, in conducting such due diligence.  This due diligence investigation shall continue until expiration of the Exclusivity Period or extensions thereto (as defined in Paragraph 4 below) and execution of the Definitive Agreement and Closing. If the Parties do not enter into the Definitive Agreement, no further obligations will exist under this Paragraph 3.

   4.    Exclusive Dealing.  ACT and the Shareholders shall not, directly or indirectly, through any representative or otherwise, solicit or entertain offers from, negotiate with or in any manner encourage, discuss, accept, or consider any proposal of any other person relating to the acquisition of the stock or assets of ACT, in whole or in part, whether through direct purchase, merger, consolidation, or other business combination for the period following execution of this Letter of Intent until July 15, 2008 (the "Exclusivity Period"); *provided, however, that* the Parties may agree to extensions of the Exclusivity Period based on the requirements of due diligence and other scheduling considerations (including by lenders and investors). During the Exclusivity Period and following execution of the Definitive Agreement through Closing, ACT shall continue to provide its most current interim financial statements as they become available to MBSC.

   5.    Conduct of Business.  Following execution and delivery of this Letter of Intent and until the Definitive Agreement has been duly executed and delivered by all of the Parties or the Binding Provisions have been terminated, in accordance with the terms hereof, ACT shall conduct their respective business only in the ordinary course and assure that (a) neither has nor will, within the ninety (90) day period preceding the execution of this Letter of Intent, pay any bonuses or extraordinary compensation to any Shareholder, employee, or consultant or increase any employee's or consultant's compensation other than as the result of regularly scheduled bonuses or raises in the ordinary course of business; (b) shall use their best efforts to preserve intact their respective business organizations and the good will of their employees, customers, suppliers, and others having business with them; and (c) operate in the ordinary course of business and not enter into any extraordinary transactions or commitments without the prior written consent of MBSC. It is expressly understood that cash in ACT in the amount of at least $500,000.00 shall not be swept or distributed and shall be maintained through Closing.

   6.    Non-Disclosure.  Each of the Parties shall (and in each case shall cause their respective Representatives to) keep confidential, shall not (and in each case shall cause their respective Representatives not to) disclose to any person, and shall not make any use, other than for the purpose of consummating the Transaction, of: (a) the fact that discussions or negotiations are taking place between the Parties regarding the Transaction; (b) any Confidential Information (as defined below) of any Party which may be provided or disclosed to the other Party or its Representatives in connection with such Party's due diligence examination or otherwise; and (c) any terms, conditions or other facts with respect to the

BAE 002122

Transaction, as may be evidenced in the Definitive Agreement or otherwise. For purposes of this Letter of Intent, "Confidential Information" of any Party expressly includes, but is not limited to, any and all non-public information, whether written or oral, including, without limitation, sales and marketing information, customer lists, projections, reports, plans, proposals, balance sheets, income statements, financial statements, contracts, documents, intellectual property, trade secrets, know how and all other materials which are not publicly available. Except as and to the extent required by law or as otherwise permitted hereby, the Parties shall not (and in each case shall cause their respective Representatives not to), directly or indirectly, make any public comment, statement, or communication with respect to, or otherwise disclose or permit the disclosure of the existence of discussions regarding a possible transaction between the Parties or any of the terms, conditions or other aspects of the Transaction or any other transactions contemplated by this Letter of Intent, without the prior written consent of the other Party. Any Party's statements or communications will require the approval of the other Party, such approval not to be unreasonably withheld. If a Party is required by law to make any such disclosure, such Party shall provide the other Party prior written notice of the content of the proposed disclosure, the reasons that such disclosure is required by law and the time and place that the disclosure will be made. Upon request of the other Party, each Party hereto and its Representatives, will return to the other Party all Confidential Information, including all copies thereof, and will deliver such Confidential Information and confirm in writing that all such Confidential Information has been returned in accordance with this provision. Notwithstanding the foregoing, the Parties shall be permitted to disclose such matters and information to those of their Representatives with a need to know such information for purposes of the proposed Transaction; *provided, however, that* such disclosing Party shall remain liable for the breach by any of its Representatives of such Party's non-disclosure obligations. This Paragraph 6 supersedes any prior confidentiality agreement between the parties hereto and the terms of this Paragraph 6 shall also apply to all Confidential Information provided by either of the Parties hereto prior to the date of this Letter of Intent.

7.    Costs. Each Party shall be responsible for and bear all of their own costs and expenses (including any broker's or finder's fees) incurred in connection with the Transaction, including expenses of their respective Representatives, incurred at any time in connection with pursuing or consummating the Transaction.

8.    Consents. The Parties shall cooperate with each other and proceed, as promptly as is reasonably practicable, to seek to obtain all necessary consents and approvals from lenders, landlords, counter-parties to contracts and agreements and any and all other third parties, and to endeavor to comply with all other legal or contractual requirements for or preconditions to the execution and consummation of the Transaction.

9.    Governing Law. This Letter of Intent shall be governed by and construed in accordance with the laws of the State of Virginia. The Parties consent to the jurisdiction and venue of the federal and state courts of the State of Virginia, which shall have exclusive jurisdiction over any dispute with respect to or arising out of this Letter of Intent.

10.    Termination. The Binding Provisions may be terminated: (a) by mutual written consent of the Parties or (b) upon written notice by either Party to the other Party for material breach of any of the Binding Provisions which are not cured within 5 days of such notice, or (c) upon written notice by either Party to the other Party if the Definitive Agreement has not been executed by August 1, 2008; *provided, however, that* the termination of the Binding Provisions shall not affect the liability of a Party for breach of Paragraphs 4 and 6, which shall survive any such termination.

BAE 002123

06/14/08 09:19P P.006

11.   <u>Additional Items To Be Negotiated</u>.  The Parties agree that some business matters remain to be negotiated, including without limitation, the following:

    a.    Employment Agreements with all Key Personnel.
    b.    Reseller software license for BiObex.™
    c.    Option to Purchase ABC.

If the foregoing meets with your approval, please sign and return this letter by 5:00 on Sunday, June 15, 2008, whereupon this letter shall constitute a Letter of Intent between the Parties in accordance with the terms and provisions set forth above when executed by all the Parties hereto.  Facsimile or scanned executed versions of this LOI shall be fully enforceable.

Sincerely yours,
**MB Security Corporation**

Earle D. Munns, Jr.
CEO & President-designate

**Acknowledged and agreed**

On behalf of **AC TECHNOLOGY, INC.** and as Shareholders

Mr. Chris Sands
Chief Executive Officer and Shareholder
Date:  June *14*, 2008

Mr. Art Sands
Executive Vice President and Shareholder
Date:  June *14*, 2008

*MBSC – CONFIDENTIAL*         6

BAE 002124

Case 11-01255-KHK   Doc 16-3   Filed 10/17/11   Entered 10/17/11 15:07:48   Desc
Exhibit(s) Exhibits to Cashion Affidavit (Part 2 of 2)   Page 16 of 40

Page 1 of 2

| From: | E M [emunns2325@msn.com] |
|---|---|
| Sent: | Monday, June 16, 2008 6:28 PM |
| To: | Tencza, Jessica; Zanetti, Diane B |
| Cc: | Yin, Yanlin |
| Subject: | My PFS |
| Attachments: | PFS-BofA.xls |

Dear Ladies,

My Personal Financial Statement is attached per your request. I am sure I have made mistakes. For personal privacy reasons I am not copying Mike or Steve on this note.

Sorry for missing you today Diane and will catch up tomorrow. Call in the am ok? Very hectic Tuesday!

Thanks for the note Jessica and we truly appreciate your words of encouragement. I know the Bank Team will get us there! Related, Steve was called today by your lawyer and that went very well - they know each other and Steve's partner also. That lawyer discussion was that loan documents should be done by the end of this week. Wow! On the executed LOI, this is a cash deal and there are no other terms of significance such as earn-out notes or any other purchase structure of the deal. Please let me know if you have any questions.

Warmest Regards,

Earle

Earle Munns
(703)731-0452

Date: Mon, 16 Jun 2008 13:35:30 -0400
From: jessica.tencza@bankofamerica.com
Subject: RE: Update
To: mabyrd@sydiansys.com; Diane.B.Zanetti@bankofamerica.com
CC: EMUNNS2325@MSN.COM; Yanlin.Yin@bankofamerica.com

Michael,
That is fantastic news!! Congrats! Just want to give you a head's up, we will work as fast as we can, but we were pushing to get to month end for closing. I think we are still awaiting your personal financial statements. We need those asap. Is there any longer term earn out or other purchase structure? We need to complete our analysis of the transaction based upon your negotiations. Please provide this detail asap....
Yanlin - is there anything else we are missing at this point?
Jessica
*Jessica Tencza*
*Bank of America*
*Government Contracting & Technology Banking*
*703.761.8558*



EXHIBIT
D

Case 11-01255-KHK   Doc 16-3   Filed 10/17/11   Entered 10/17/11 15:07:48   Desc
Exhibit(s) Exhibits to Cashion Affidavit (Part 2 of 2)   Page 17 of 40

Page 2 of 2

*jessica.tencza@bankofamerica.com*
<<Tencza, Jessica (jessica.tencza@bankofamerica.com)
(jessica.tencza@bankofamerica.com).vcf>>

**From:** Michael Byrd [mailto:mabyrd@sydiansys.com]
**Sent:** Monday, June 16, 2008 1:23 PM
**To:** Tencza, Jessica; Zanetti, Diane B
**Cc:** EMUNNS2325@MSN.COM
**Subject:** Update

Ladies,
Good afternoon.  We are in possession of a fully executed LOI and began negotiations of a
Definitive Agreement this morning.  We anticipate finalizing negotiations by Thursday of this week.
We will require $5.25M at closing.  Desire to close on June 26th with contingency date of June 27th.
Steve Britt is fully engaged with Def Agreement activities and is at the ready to work with your
counsel, as necessary.

Thank you for your cooperation in ensuring a smooth transaction.  Have a great afternoon/evening!
MAB

**Michael Byrd** | Managing Principal | **Sydian Systems** | Ph: 301.523.4556  Fax: 301.218.1889
2201 Darnell Court | Bowie, MD 20721 | www.sydiansys.com

Now you can invite friends from Facebook and other groups to join you on Windows Live™ Messenger. Add them now!

**Bank of America**

Confidential Personal Financial Statement/Certification as of _____    15-Jun-08

The assets, liabilities, income and expenses described on this (or the attached) financial statement are (check the appropriate box):

☑ **Individual**  If this is an individual financial statement, list all your income, expenses and assets including your partial
ownership interest in and income from any partially owned assets and list all of your direct and contingent liabilities.

☐ **Joint**  If this is a joint financial statement, list all of both of your income, expenses and assets including your partial ownership in and income from any partially
owned assets and list all of both of your direct and contingent liabilities. A separate Personal Financial Statement may be provided for each individual if you prefer.

| Name | | Date of Birth | Employer | | | Years |
|---|---|---|---|---|---|---|
| Earle D. Munns | | | MB Security Corporation | | | 1 |
| Home Address | Phone | SSN | Occupation | Years | Position | Years |
| | | | Business Executive | 15 | CEO | 2 |
| City/State/Zip | No. Dependents | Drivers License # & State | Business Address | | Phone | |
| | | | 11660 Great Falls Way, GF, VA | | 703/731-0452 | |
| Joint/Spouse Name (Only if 2nd box above is checked) | | Date of Birth | Employer | | | Years |
| Home Address | Phone | SSN | Occupation | Years | Position | Years |
| City/State/Zip | Rel'ship to above | Drivers License # & State | Business Address | | Phone | |

I (we) understand that the following questions are addressed to me (us) and I (we) have answered them as appropriate.

☑ Yes   ☐ No    1. Are you named as beneficiary of a trust, will or estate?

☐ Yes   ☑ No    2. Are any of the assets listed herein held under a trust agreement of any type, held in an estate, or in any other
name or capacity?  Please detail in "Additional Remarks" below.

☐ Yes   ☑ No    3. Are any of the assets listed herein on deposit, located, or otherwise held outside the United States of America?

☐ Yes   ☑ No    4. Do any of your assets secure any debts which have not been reported in the following schedules?

☐ Yes   ☑ No    5. Are any of the assets listed herein located in the community property states of Arizona, California, Idaho, Louisiana,
Nevada, New Mexico, Texas, or Washington?

☑ Yes   ☐ No    6. Are any of your real estate properties used by you in your business?

☐ Yes   ☑ No    7. Have you ever filed for personal bankruptcy, had property you owned foreclosed, or made a settlement or an
assignment for the benefit of creditors?

☐ Yes   ☑ No    8. Has any corporation or partnership in which you are (were) a major owner or a general partner ever filed for
bankruptcy, had property it owned foreclosed, or made a settlement or assignment for the benefit of creditors?

☐ Yes   ☑ No    9. Are you, or any corporation or partnerships in which you are a major owner or a general partner, a party to any suit or
legal action, or are there any unsatisfied judgments against you?

☑ Yes   ☐ No   10. Personal income tax returns have been filed through (year _____    2007
Wanda Palt
audited or contested No

☐ Yes   ☑ No   11. Are you an officer, director, or principal shareholder of a financial institution?

Provide full explanation of all "Yes" answers to the foregoing questions under "Additional Remarks" on this page (or on an attachment)

☐ Yes   ☑ No   12. Do you have any Contingent Liabilities?  Contingent Liabilities are defined on page 2 in the Contingent Liabilities
section.  If you answered Yes, you must complete the Contingent Liabilities section on page 2.

☑ Yes   ☐ No   13. I (we) have made a will; date of will or last revision _____    1989

Additional Remarks:

The undersigned (I/we) herewith submit to Bank of America (you) this (or the attached) financial and supporting schedules which constitute my (our) personal financial statement.
This statement is submitted to you for the purpose of inducing you to extend or maintain credit to me (us) whether as direct obligor(s) or indirectly as guarantor(s) or other
indirect obligor(s) of credit extended to others. I (we) hereby certify that this statement presents a true, complete, and correct statement of my (our) financial condition as of the
date shown & does not omit any pertinent information. I(we) understand that misrepresenting information on this (or the attached) statement is a criminal offense under federal law.

I (we) will notify you promptly in writing of any material unfavorable change in my (our) financial condition.  In the absence of such notice, you may consider this a continuing
statement and substantially correct.  If I (we) apply for further credit, this statement shall have the same force and effect as if delivered as an original statement of my (our)
financial condition at the time I (we) request such further credit.  You are hereby authorized to contact credit reporting agencies and other sources for the purpose of verifying
any information stated herein or at any time are authorized to answer any questions about your credit experience with me (us), and furnish to Bank of America or any of
its subsidiaries information which I (we) have provided to you and information regarding any of my (our) accounts.

Signature _____    Date _____

Signature _____    Date _____

95-05-0162NSBE  07-2003

BAE 001823

**Balance Sheet**

Page 2

| Assets (omit cents) | | | | Liabilities (omit cents) | | |
|---|---|---|---|---|---|---|
| Cash | In this Bank | | $25,000 | Mortgages | Primary Residence | $300,000 |
| (Schedule 1) | In Other Institutions | | | Payable | Oth Wholly-Owned RE | |
| Securities | Marketable | | | (Schedule 7) | Partially Owned RE | |
| (Schedule 2) | Not Publicly Traded | | | Notes | To this Bank | |
| Accounts Receivable/Notes Receivable (Sch. 3) | | | $40,000 | Payable | Other Notes Payable | |
| Net Cash Value Ins. & Annuities (Schedule 4) | | | $175,000 | (Sched 6 & 8) | Margin Account | |
| Real | Primary Residence | | $800,000 | Taxes | Income Taxes | $3,000 |
| Estate | Other Wholly-Owned RE | | | Owing | Other Taxes | |
| (Schedule 7) | Partially Owned RE | | $125,000 | | Unrealized Asset Apprec. | |
| Other Partnership Interest | | | | Estimated Credit Card Balance | | |
| Equipment & Other Business Assets (Sch. 8) | | | | Accounts Payable | | |
| Deferred Comp & Retirement Plans (Sch. 5) | | | $73,000 | Other Liabilities (Itemize on page 1 or attachment) | | |
| Other Assets (Itemize on pg 1 or attach) | Fine Art/Jewelry | | $750,000 | | | |
| Offshore Assets (Itemize on pg 1 or attach) | | | | | | |
| | | | | Total Liabilities | | $393,000 |
| Total Assets | | | $1,985,000 | Net Worth (Assets Less Liabilities) | | $1,682,000 |

**Contingent Liabilities**

**Instructions:** State Total Amount by Type of Liability and Provide Appropriate Detail in The Space Below.

Contingent liabilities are financial obligations of other individuals, partnerships, or companies which you have endorsed, guaranteed or otherwise agreed to or have a statutory obligation to honor in the event of certain contingencies and any direct obligations that are not reflected in the balance sheet above but you will be required to honor in the event of certain contingencies. These include obligations to Bank of America as well as to other banks or creditors of any kind. You must disclose all such guarantees, endorsements, etc. in this schedule.

| 1. As Guarantor or Endorser | | 3. Legal Claims or Judgments | | 5. Standby Letter of Credit | |
|---|---|---|---|---|---|
| 2. On Leases or Contracts | | 4. Income Tax Claim or Dispute Amount | | 6. Other | |
| Type # | Name of Primary Obligor | Due To | Max. Legal Obligation Amount | Maturity | Explanation: Include whether you anticipate having to honor this liability. |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Annual Income/Expense Information**

Alimony, Child support or Separate Maintenance income need not be revealed unless you wish to have them considered as a basis for repaying the requested credit.

| Sources of Cash | Last Year 20_07_ | Projected This Year 20_08_ | Use of Cash | Last Year 20__07 | Projected this Year 20__08 |
|---|---|---|---|---|---|
| Recurring | | | Expenses | | |
| Salary & Wages | $170,000 | $175,000 | Income Taxes & FICA | | |
| Commissions, Bonus | | | Other Payroll Deduction | $120,000 | $140,000 |
| Interest & Dividends | | | Living Expense, Misc. | | |
| Real Estate Income | | | Real Estate Expense | $45,000 | $65,000 |
| Trust Income | | | Planned Investments | $65,000 | $65,000 |
| Other Business Income | $35,000 | $60,000 | Alimony, Child Suppt, Sep Maint | | |
| Other: | | | Other: | | |
| Sub Total | | | Sub Total | | |
| Non-Recurring | | | Debt Service | | |
| Commissions, Bonus | $25,000 | $35,000 | Primary Residence Pmt. | $65,000 | $65,000 |
| Sale of Assets | | | Scheduled Principal & Int. | | |
| Tax Refund | | | Other Interest Pmts. | | |
| Other | | | Other Principal Pmts. | | |
| | | | Contingent Liability Pmts. | | |
| | | | Total Cash Uses | | |
| Total Cash Sources | $230,000 | $270,000 | Total Cash Flow | | |

BAE 001824

**Schedule 1 - Cash; Deposit Accounts**                                                                 Page 3

| Name on Account | Deposit Institution & Location | Balance | Type of Account | Account Number | Pledged? Yes/No |
|---|---|---|---|---|---|
| Earle Munns and/or Beverly Munns | Bank of America Great Falls Va or Rockville MD | ~$25,000.00 | Checking | | |
| | | | | | |
| | | | | | |
| | | | | | |

Total This Bank to Page 2  $0          Total Other Institutions to Page 2

**Schedule 2 - Securities; Stocks and Bonds**    ***"Restricted" means trading of the Security is subject to limitations due to letter, legend or control.***

| Name of Issuer | Where Traded | No. of Shares | Mkt. Price per Share | Market Value | Cost per Share | Pledged? Yes/No | *Restricted Yes/No | Registered in the Name of |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Total Marketable to Page 2  $0          Total Not Publicly Traded to  Page 2

**Schedule 3 - Accounts Receivable; Notes Receivable**

| Due From | Original Amount | Present Balance | Rate | Maturity | Payment Terms | Collectable? Yes/No | Collateral |
|---|---|---|---|---|---|---|---|
| John Burkman Burkma an &Assoc | $60,000 | $40,000 | | | Immediate | yes | |
| | | | | | | | |
| | | | | | | | |

Total  to Page 2  $40,000

**Schedule 4 - Life Insurance and Annuities (Including Employer Provided)**

| Company | Face Amount | Beneficiary | Cash Value | Policy Loan | Net Cash Value | Insured | Pledged? Yes/No |
|---|---|---|---|---|---|---|---|
| The Equitable | 200,000 | spouse | | | | spouse | |
| NW Mutual | 200000 | spouse | 75000 | | | spouse | |
| IMC | 175000 | spouse | 100000 | | | spouse | |
| AFBRA | 250000 | spouse | 0 | | | spouse | |

Total  to Page 2  $175,000

**Schedule 5 - Deferred Compensation & Retirement Plans (Includes I.R.A. Accounts, KEOGH, 401(K) Fully Vested Benefit Plans, etc.)**

| Trustee or Plan Administrator | Type of Account | Beneficiary | Balance/ Value | Plan Loan | Net Plan Value | In Name of |
|---|---|---|---|---|---|---|
| IMC | 401k | spouse | 73000 | | | earle Munns |
| | | | | | | |
| | | | | | | |

Total to Page 2  $73,000

**Schedule 6 - Notes Payable (Exclude Mortgages Listed in Schedules 7 & 8)**

| Due To | Original Amount | Present Balance | Rate | Maturity | Payment Terms | Current? Yes/No | Collateral |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Total to Page 2  $0   **If you are a Co-Maker, list the loan in this Schedule and state the Borrower's Name in the Collateral Column.

Page 4

For Schedules 7 and 8, if the amount of Debt which can be legally enforced against you exceeds your % of ownership, please detail in contingent liability section on Page 2.

## Schedule 7 Real Estate Owned (Including Partnership Interests)

| # | Ownership, Description / Location, Site, Improvements | Year Acquired | Cost & Investments | Market Value | Related Debt (Mark *** by amount if not personally liable) | | | | Annual Payments | **Net Operating Revenue | Taxes Current Yes or No |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Present Balance | Lienholder | Maturity | Interest Rate | | | |

**Primary Residence**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1) | | 1999 | $790,000 | $2,200,000 | $600,000 | yes | 30 years | 6.5 | 65,000 | | yes |

Totals to Page 2    $2,200,000    $600,000

**Other Wholly Owned Real Estate**

Totals to Page 2    $0    $0

**Partial Ownership in Real Estate (include %)**

| 25% | | 2004 | 0 | $125,000 | $0 | no | n/a | n/a | | | yes |

Totals to Page 2    $125,000    $0

**Your Portion of Market Value and Debt**    $125,000    $0

## Schedule 8 - Other Business Assets (including Whole & Partial Ownership in Equipment, O & G, Mineral Interest, etc.)

| | Location, Description, Type of Interest & Source of Valuation | % | Year Acquired | Date of Valuation | Present Valuation | Related Debt (Mark *** by amount if not personally liable) | | | | Annual Payments | **Net Operating Revenue | Taxes Current Yes or No |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Present Balance | Lien-holder | Maturity | Interest Rate | | | |
| 1 | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | |

Totals to Page 2    $0    $0    $0    $0

**Net Operating Revenue after Operating Expense

BAE 001826

Executive Bios.doc

Case 11-01255-KHK   Doc 16-3   Filed 10/17/11   Entered 10/17/11 15:07:48   Page 1 of 1
Exhibit(s) Exhibits to Cashion Affidavit (Part 2 of 2)   Page 22 of 40

| | |
|---|---|
| **From:** | Yin, Yanlin [yanlin.yin@baml.com] |
| **Sent:** | Wednesday, June 25, 2008 5:48 PM |
| **To:** | Tencza, Jessica |
| **Subject:** | FW: Executive Bios.doc |
| **Attachments:** | Executive Bios.doc |

Jessica,

There are some changes in the management team compared to the business plan dated in March 2008. Please review the CAM and let me know if there are any changes. Deal ID:84435. Thanks.

**Yanlin Yin**
Assistant Vice President
Bank of America Commercial Banking
1101 Wotton Parkway, 4th floor
Rockville, MD 20852
Ph: 301-517-3143
Email: yanlin.yin@bankofamerica.com

**From:** Michael Byrd [mailto:mabyrd@sydiansys.com]
**Sent:** Wednesday, June 25, 2008 4:58 PM
**To:** Yin, Yanlin
**Subject:** Executive Bios.doc


Yanlin,
For your review.  Thanks!!
MAB

<<...>>



BAE 002332

### *Earle Munns – President, CEO and Chairman*

A champion of corporate leadership, Earle brings to AC Technology a highly successful twenty-four years of executive experience with Fortune 500 high-technology "Prime Contractor" companies and two small government contractor businesses combined with thirty years of service in the United States Army, primarily in the Texas National Guard and the US Army Reserve. Prior to assuming his duties and responsibilities as President and CEO of MBSC, Earle most recently was President of a small Government Contracting business which sold for $17 Million, and before that was the Executive Director of a Government Contracting professional services and solutions consulting firm specializing in IT services, project management, and contracting and regulatory compliance. His depth of background in executive leadership and extensive professional relationships with key executives in all Intel and DOD agencies increased contract values with Government agencies in excess of $6 million in the first nine months for this firm.

Earle was Corporate Vice President for BAE Systems North America, the London based subsidiary of BAE Systems, a company with $28 Billion in 2004 annual revenues. Earlier, he was a Corporate Vice President for high technology leader E-Systems, Inc. and a Vice President for its buyer Raytheon. His impressive corporate experience focuses on corporate strategic development, business development, federal acquisition, mergers and acquisitions, and corporate partnerships and alliances. Of special note is Earle's experience teaching government contract law at the University of Virginia Law School, where he taught many of the current general counsels and senior acquisition executives of the government agencies who are now his customers. Mr. Munns is a retired Army Colonel and a service disabled veteran with more than 30 years of Army experience  He has continuously held Top Secret and Special Compartmentalized Security Clearances with the Federal Government throughout his long career.

Earle holds a B.S. in Business from the University of Wisconsin, a J.D. from the University of Nebraska and an L.L.M. with a thesis on federal government contracting from the University of Virginia. In addition, he is a graduate of the Army Command and General Staff College. During his early corporate training he completed studies for an Executive M.B.A. at Duke University, and is a certified graduate of the Program Management course offered by Raytheon.

### *Michael (Mike) Byrd – Executive Vice President, Corporate Strategy and Business Development*

Mike has more than 16 years of leadership experience and a comprehensive background in business development and corporate strategy, general management, operations and marketing. A former Marine Corps officer and attack helicopter pilot, Mike has provided business technology solutions to federal, public and private sector clients for a number of years. During his career in the Armed Services, Mike provided Mike's consulting expertise began with providing systems engineering, systems integration, and project management support to the Department of Defense; primarily NAVAIR, HQMC and NAVSEA. His role then expanded to identifying, engaging and capturing federal business targets of opportunity. Mike's business development, contractual and contract management experience has been proven with both large and small systems integrators, such as Titan Corporation (now L-3) and Axiom Corporation. He has supported various governmental agencies including Headquarters Marine Corps (HQMC), Naval Air Systems Command (NAVSEA), Naval Seas Systems Command, Missile Defense Agency (MDA) and NASA. By leveraging his understanding of the federal market place and his established senior executive level relationships, Mr. Byrd is able to effectively provide advice and assistance in presenting ACT's value proposition to current and potential clients.

BAE 002333

Mr. Byrd is a graduate of the USMC Command, Control, Communications, Computer and Intelligence (C4I) Course, Operational Executive Course and holds a B.S. in Mechanical Engineering from the U. S. Naval Academy and an MBA from the Darden School of Business at the University of Virginia.

### Christopher (Chris) Sands – Senior Vice President, Security Services

Chris was the President and Chief Executive Officer of AC Technology (ACT) since its inception in 1991. Upon the sale of ACT, Chris was requested and retained by MBSC to oversee and execute upon initiatives directed towards expanding ACT's presence within the federal market space. Over its 17 year business history, Chris was pivotal in growing ACT from a $50K to a $40+M firm. His proven business acumen and saviness is beyond reproach. MBSC desires to leverage Chris' expertise as it executes its strategic vision. Chris will play a vital role in success and mission accomplishment.

From 1975 to 1985, Chris was a manager of responsibility for the Finance and Accounting Division of Inco, Inc., an IT research and development firm focused in the Department of Defense (DOD) and Intelligence Agencies. Inco was acquired by McDonnell Douglas Aerospace Corporation in 1985. During his non-compete agreement (1986-1990), Mr. Sands was CEO of Sancor Financial Services and First Financial Funding; founding and managing the two financial services companies. Upon a successful tenor at Sancor, Chris founded AC Technology; developing core capabilities in the security of information and identity management.

In 1970 and 1971, Chris served in the U.S. Navy and was a candidate for the U.S. Naval Academy (until receiving a medical discharge in 1971). Mr. Sands holds a B.S. degree in Accounting & Marketing from Seton Hall University.

### Steve Britt – Interim Corporate Counsel; Member, MSBC Board of Directors

Steve is a corporate, software licensing and business transactional attorney and a partner at the law firm of Leach Travell Britt pc in McLean, Virginia. Steve's practice focuses on software and technology companies. He serves as outside general counsel to various companies, including government contractors in the intelligence space. He regularly prepares organizational documents, stock option agreements, buy-sell, employment, distribution, investment, merger and technology licensing agreements (commercial and governmental).

Steve serves as Chair of Northern Virginia Technology Council's (NVTC's) Cool Technology Committee and for 2008-09 is President-elect of George Mason University's Business Alliance.

Steve obtained his B.S., Business and Economics, Cum Laude, and his J.D. from West Virginia University, Order of the Coif. After 6 years of commercial litigation practice in Los Angeles and Pittsburgh, Steve was appointed to a series of senior Federal appointments. He served as General Counsel, Deputy General Counsel and Executive Director of 4 different Cabinet and independent regulatory agencies (1983-1992). After Federal service, Steve served as an associate at the Washington, D.C. law firm of Krooth & Altman and joined LTB as a partner in April 2006. Steve is admitted to practice law in both D.C. and Virginia.

Revised AC Tech BB Template-June

Page 1 of 1

---

| | |
|---|---|
| **From:** | Michael Byrd [mabyrd@sydiansys.com] |
| **Sent:** | Friday, June 27, 2008 9:21 PM |
| **To:** | Tencza, Jessica; Yin, Yanlin; Zanetti, Diane B |
| **Cc:** | E M |
| **Subject:** | Revised AC Tech BB Template-June |
| **Attachments:** | Borrowing Base Template.Jun08.xls; AR_Aging_Jun08.pdf |

Dear Ladies,

We are pleased to provide a revised BBC for AC Tech.

Thanks for your patience and for the explanation about "unbilled accounts" under the Credit Agreement.  We deleted the DHS line item for $7.7mm as not meeting this "Unbilled" standard.

On the Borrowing Base spreadsheet, we are glad you were aware of the formula error.

Beyond that...the news is all good, as the A/R figures are very strong and growing daily.  I've attached the latest A/R Aging for your review.

Please let us know as soon as practicable if you need any further information. You can contact me directly at 301-523-4556.

We greatly value your support and assistance these past few weeks and look forward to a great relationship ahead.

Have a good evening,
MAB



**EXHIBIT**

F

BAE 002428

# Bank of America

**Bank of America Asset Based Lending Services** - Monthly Borrowing Base Certificate

**BORROWER:    MB Security Corporation**

Certificate #:

Month Ending:    6/30/2008

ACCOUNTS RECEIVABLE

| Line | Roll Forward Information | Government | Commercial | Combined |
|---|---|---|---|---|
| 1 | Trade Accounts Receivable-Last Month End | 5,625,758.61 | 1,929,623.58 | 7,555,382.19 |
| 2 | Plus: Credit Sales | 2,324,607.21 | - | 2,324,607.21 |
| 3 | Plus: Debit Memos and Misc. Debit Adj. | - | - | - |
| 4 | Less: Collections | (2,460,798.38) | (67,739.80) | - |
| 5 | Less: Credit Memos for the Month | - | - | - |
| 6 | Other Debit or (Credit) Adj. (Attach Explanation) | - | - | - |
| 7 | Trade Accounts Receivable-This Month End | 5,489,567.44 | 1,861,883.78 | 9,879,989.40 |
| 8 | Less: Ineligible Receivables per attached (Schedule A) | 2,324,607.21 | - | 12,204,596.61 |
| 9 | Eligible Receivables (Line 7 minus line 8) | 3,164,960.23 | 1,861,883.78 | (2,324,607.21) |
| 10 | Advance Rate | 90% | 80% | |
| 11 | GROSS ACCOUNTS RECEIVABLE AVAILABILITY | 2,848,464.21 | 1,489,507.02 | 4,337,971.23 |

UNBILLED ACCOUNTS RECEIVABLE

| | | | | |
|---|---|---|---|---|
| 12 | Unbilled A/R from prior Month's BBC dated | 31-May-08 | | |
| | Plus: Estimated Unbilled A/R for the month (please exclude Billings in Excess of Costs) | | | |
| | Less: Billings Created for the Period | | | |
| 13 | Unbilled A/R this Month-End | | | $7,700,000.00 |
| 14 | Advance Rate | | | 50% |
| 15 | Unbilled A/R Availability/Unbilled Cap | | | 3,850,000.00 |
| | | | | |
| 16 | APPROVED OVERADVANCE ($0) | | | |
| 17 | GROSS COMBINED AVAILABILITY | | | 8,187,971.23 |
| 18 | Less: Outstanding Letter of Credit | | | |
| 19 | NET AVAILABILITY | | | 8,187,971.23 |
| 20 | APPROVED LINE OF CREDIT | $  10,000,000 | | |
| 21 | The Lesser of Net Availability or Credit Line | | | 8,187,971.23 |

LOANS OUTSTANDING

| | | | |
|---|---|---|---|
| 21 | Loan Balance - Since last Certificate | 5,500,000 | |
| 22 | Advances Since last Certificate | | |
| 23 | Less: Collections Applied To Loan | - | |
| 24 | Total Loan Balance this Certificate | 5,500,000 | 5,500,000.00 |
| 25 | Less: Collateral Reserves | | |
| 26 | REMAINING LOAN AVAILABILITY/(OVERADVANCE) (Line 19 minus lines 25 & 26) | | 2,687,971 |

I certify the above to be true and correct to the best of my knowledge and belief. We understand that you are relying upon
this Report and supporting documents in granting credit to us and we warrant that no Event of Default exists or is
imminent under any agreements between us. The undersigned further certifies that all inventory is owned by us free and
clear of any liens or encumbrances other than to Bank of America, that the same is under the control and in the possession of
the undersigned and otherwise complies with all provisions of agreements between us:

Borrower:

By:    **MB Security Corporation**
       Michael Byrd, EVP

Date:    6/27/2008

Borrowing Base Template Jun08.xls Revised 8-22-02

BAE 002429

| OBLIGOR | MB Security Corporation |
|---|---|
| | SCHEDULE A - SCHEDULE OF INELIGIBLES |

**INELIGIBLE ACCOUNTS RECEIVABLE**

| | | |
|---|---|---:|
| Past due: Over __90__ Days from Invoice Date | | 309,161.61 |
| Datings/Futures | | |
| Credit Balances in Past Dues | | |
| __50__ % Cross Aging | | |
| Intercompany/Affiliate | | 5,445.60 |
| Contra Elimination | | |
| Unapplied Cash | | |
| Cash/COD's | | |
| Credit Hold | | |
| Finance/Service Charges | | |
| Bankrupt Accounts | | |
| Pre-Billings/Bill and Hold | | 2,010,000.00 |
| Retentions | | |
| Bankrupt Accounts | | |
| Consignments | | |
| Debit Memos/Chargebacks | | |
| Other as banks deems ineligible | | |
| Variance Between Aging & G/L (if G/L is lower) | | |
| Excess __50__ % Concentration [x] Net [ ] Gross | | |
| Commerical A/R only | | |
| Excess Concentration limit (name specific) | | |
| TOTAL INELIGIBLES | | 2,324,607.21 |

BAE 002430

7:39 PM
06/27/08

## AC TECHNOLOGY INC.
## A/R Aging Summary
### As of June 27, 2008

| | Current | 1 - 30 | 31 -60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Advanced Biometric Controls, LLC | 1,445.60 | 0.00 | 0.00 | 0.00 | 0.00 | 1,445.60 |
| AFRL | 98,293.75 | 0.00 | 0.00 | 0.00 | 0.00 | 98,293.75 |
| Air Force | 15,672.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,672.00 |
| ArgonST | 31,650.00 | 0.00 | 0.00 | 0.00 | 0.00 | 31,650.00 |
| AVR Enterprises Inc. | 10,699.69 | 0.00 | 0.00 | 0.00 | 0.00 | 10,699.69 |
| Bureau of Labor Statistics | 0.00 | 7,427.78 | 0.00 | 0.00 | 0.00 | 7,427.78 |
| Bureau of the Census | 278,668.11 | 0.00 | 0.00 | 0.00 | 0.00 | 278,668.11 |
| CACI | 88,604.51 | 0.00 | 0.00 | 0.00 | 0.00 | 88,604.51 |
| Chenega Federal Systems LLC | 0.00 | 500.00 | 0.00 | 0.00 | 0.00 | 500.00 |
| CherryRoad GT Inc. | 343,506.21 | 226,847.33 | 0.00 | 0.00 | 0.00 | 570,353.54 |
| CSIC | 15,490.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,490.00 |
| DC Water & Sewer Authority | 246,100.17 | 0.00 | 0.00 | 0.00 | 0.00 | 246,100.17 |
| Defense Finance & Accounting Service | 1,215.57 | 0.00 | 893.79 | 0.00 | 0.00 | 2,109.36 |
| Defense Logistics Agency | 74,754.40 | 0.00 | 0.00 | 0.00 | 0.00 | 74,754.40 |
| Department of Homeland Security | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Enterprise Network MGMT OFC | 0.00 | 14,543.61 | 0.00 | 0.00 | 0.00 | 14,543.61 |
| FAA | 0.00 | 13,842.44 | 0.00 | 0.00 | 0.00 | 13,842.44 |
| General Dynamics | 4,475,000.00 | 0.00 | 0.00 | 0.00 | -5,490.87 | 4,469,509.13 |
| IRIDES, LLC | 0.00 | 0.00 | 0.00 | 0.00 | 2,723.48 | 2,723.48 |
| Lawrence Berkeley National Laboratory | 0.00 | 107,233.56 | 0.00 | 0.00 | 0.00 | 107,233.56 |
| Maryland Procurement Office | 0.00 | 25,980.00 | 0.00 | 0.00 | 0.00 | 25,980.00 |
| Michael Baker Corp | 0.00 | 9,790.28 | 0.00 | 0.00 | 0.00 | 9,790.28 |
| MOCA/Arrow, Inc. | 42,740.89 | 0.00 | 0.00 | 0.00 | 0.00 | 42,740.89 |
| Naval Air Warfare Center | 0.00 | 5,658.43 | 0.00 | 0.00 | 0.00 | 5,658.43 |
| Naval Satellite Operations Center | 51,786.11 | 0.00 | 0.00 | 0.00 | 0.00 | 51,786.11 |
| NCI Information Systems | 0.00 | 6,079.77 | 0.00 | 0.00 | 0.00 | 6,079.77 |
| NEWTEC | 0.00 | 2,400.30 | 0.00 | 0.00 | 0.00 | 2,400.30 |
| NOAA | 0.00 | 14,885.06 | 0.00 | 0.00 | 0.00 | 14,885.06 |
| Northrop Grumman Corporation | 0.00 | 2,030.11 | 0.00 | 0.00 | 0.00 | 2,030.11 |
| Maryland Procurement Office | 2,010,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,010,000.00 |
| NSWC | 344,631.96 | 0.00 | 0.00 | 0.00 | 0.00 | 344,631.96 |
| ORC, Inc. | 17,033.56 | 0.00 | 0.00 | 0.00 | 0.00 | 17,033.56 |
| SensorCom Inc. | 255.20 | 0.00 | 0.00 | 0.00 | 0.00 | 255.20 |
| Sun Microsystems, Inc | 0.00 | 0.00 | 0.00 | 0.00 | 311,929.00 | 311,929.00 |
| TKC Technology Solution, Inc | 0.00 | 1,581.95 | 0.00 | 0.00 | 0.00 | 1,581.95 |
| TKC Technology Solution, LLC | 99,140.52 | 26,093.68 | 0.00 | 0.00 | 0.00 | 125,234.20 |
| UC Lawrence Berkley Lab | 458,461.18 | 14,125.19 | 0.00 | 0.00 | 0.00 | 472,586.37 |
| Unisys | 8,196.13 | 0.00 | 0.00 | 0.00 | 0.00 | 8,196.13 |
| US House of Representatives | 0.00 | 485.56 | 0.00 | 0.00 | 0.00 | 485.56 |
| US Naval Academy | 18,481.32 | 0.00 | 0.00 | 0.00 | 0.00 | 18,481.32 |
| Wildflower International, LTD. | 0.00 | 126,591.12 | 0.00 | 0.00 | 0.00 | 126,591.12 |
| TOTAL | 8,731,826.88 | 607,640.72 | 893.79 | 0.00 | 309,161.61 | 9,649,523.00 |

Page 1

BAE 002431

| **From:** | E M [emunns2325@msn.com] |
|---|---|
| **Sent:** | Sunday, June 29, 2008 11:19 AM |
| **To:** | Diane B Zanetti; jessica.tencza@bankofamerica.com; Yanlin Yin |
| **Cc:** | mabyrd@sydiansys.com; Steve Britt |
| **Subject:** | Revised AC Tech BB Certificate-June (RESEND) |
| **Importance:** | High |
| **Attachments:** | BBTemp_270608.xls; AR_Aging_Jun08.pdf |

Diane, Jessica, and Yanlin,

We sent our revised and carefully reviewed BBC on Friday evening as per the email trail below ( see attachments). This was later than we planned, but another $2.1 mm was booked Friday and we almost have another $646,700 which we expect tomorrow.

I am resending the email and attachments now after I was apprised today you may not have received the email and attachments Friday. Our apologies for any confusion.

Our transaction with AC Technology is fully agreed and we are ready to proceed.

Thanks for all your assistance.

Please feel free to call me with any questions at (703)731-0452 or Mike at (301)523-4556.


>
> -----Original Message-----
> From: Michael Byrd [mailto:mabyrd@sydiansys.com]
> Sent: Friday, June 27, 2008 10:34 PM
> To: 'Tencza, Jessica'; 'Zanetti, Diane B'
> Cc: 'Yin, Yanlin'; 'sbritt@ltblaw.com'; 'E M'
> Subject: Revised AC Tech BB Certificate-June (RESEND)
>
>
>
> Jessica, Diane and Yanlin,
>
> We are pleased to provide a revised BBC for AC Tech. (My prior email had the
> incorrect attachment.)
>
> Thanks for your patience and for the explanation about "unbilled accounts"
> under the Credit Agreement. As you will see, we chose to delete the DHS
> "Unbilled" line item for $7.7mm. We expect this to be an eligible AR for
> the month of July.
>
> On the Borrowing Base spreadsheet, we are glad you were aware of the formula
> error.
>
> Beyond that...the news is all good, as the A/R figures are very strong and
> growing daily. I've attached the latest A/R Aging for your review.
>
> Please let us know if you need any further information. You can contact me



EXHIBIT

G

> directly at 301-523-4556.
>
> We greatly value your support and assistance these past few weeks and look
> forward to a great relationship ahead.
>
> Have a good evening,
> MAB
>
>
>
>

---

The i'm Talkathon starts 6/24/08.  For now, give amongst yourselves. <u>Learn More</u>


**Bank of America**

---

## Bank of America Asset Based Lending Services  - Monthly Borrowing Base Certificate

**BORROWER:    MB Security Corporation**

Certificate #: _____

Month Ending: ___6/30/2008___

**ACCOUNTS RECEIVABLE**

| Line | Roll Forward Information | | Government | Commercial | | | Combined |
|---|---|---|---|---|---|---|---|
| 1 | Trade Accounts Receivable-Last Month End | 31-May-08 | 5,625,758.61 | 1,929,623.58 | | - | 7,555,382.19 |
| 2 | Plus: Credit Sales | | 5,073,539.22 | 1,117,370.45 | | - | 6,190,909.67 |
| 3 | Plus: Debit Memos and Misc. Debit Adj. | | - | - | | - | - |
| 4 | Less: Collections | | (2,460,798.38) | (1,497,194.29) | | | (3,957,992.67) |
| 5 | Less: Credit Memos for the Month | | | | | | |
| 6 | Other Debit or (Credit) Adj. (Attach Explanation) | | | | | | |
| 7 | Trade Accounts Receivable-This Month End | 30-Jun-08 | 8,238,499.45 | 1,549,799.74 | | | 9,788,299.19 |
| 8 | Less: Ineligible Receivables per attached (Schedule A) | | 310,607.21 | | | | 310,607.21 |
| 9 | Eligible Receivables (Line 7 minus line 8) | | 7,927,892.24 | 1,549,799.74 | | | 9,477,691.98 |
| 10 | Advance Rate | | 90% | 80% | | | |
| 11 | GROSS ACCOUNTS RECEIVABLE AVAILABILITY | | 7,135,103.02 | 1,239,839.79 | | | 8,374,942.81 |

UNBILLED ACCOUNTS RECEIVABLE

| 12 | Unbilled A/R from prior Month's BBC dated | | |
|---|---|---|---|
| | Plus: Estimated Unbilled A/R for the month (please exclude Billings in Excess of Costs) | | |
| | Less: Billings Created for the Period | | |
| 13 | Unbilled A/R this Month-End | | |
| 14 | Advance Rate | | 50% |
| 15 | Unbilled A/R Availability/Unbilled Cap | | |

| 16 | APPROVED OVERADVANCE ($0) | | |
|---|---|---|---|
| 17 | GROSS COMBINED AVAILABILITY | | 8,374,942.81 |
| 18 | Less: Outstanding Letter of Credit | | |
| 19 | NET AVAILABILITY | | 8,374,942.81 |
| 20 | APPROVED LINE OF CREDIT | $   10,000,000 | |
| 21 | The Lesser of Net Availability or Credit Line | | 8,374,942.81 |

### LOANS OUTSTANDING

| 21 | Loan Balance - Since last Certificate | 5,500,000 | |
|---|---|---|---|
| 22 | Advances Since last Certificate | | |
| 23 | Less: Collections Applied To Loan | | |
| 24 | Total Loan Balance this Certificate | 5,500,000 | 5,500,000.00 |
| 25 | Less: Collateral Reserves | | |
| 26 | **REMAINING LOAN AVAILABILITY/(OVERADVANCE)** | | **2,874,943** |
| | (Line 19 minus lines 25 & 26) | | |

I certify the above to be true and correct to the best of my knowledge and belief. We understand that you are relying upon
this Report and supporting documents in granting credit to us and we warrant that no Event of Default exists or is
imminent under any agreements between us. The undersigned further certifies that all inventory is owned by us free and
clear of any liens or encumbrances other than to Bank of America, that the same is under the control and in the possession of
the undersigned and otherwise complies with all provisions of agreements between us:

| Borrower: | **MB Security Corporation** |
|---|---|
| By: | Michael Byrd, EVP |
| Date: | 6/27/2008 |

| OBLIGOR | MB Security Corporation |
|---------|-------------------------|
| | **SCHEDULE A - SCHEDULE OF INELIGIBLES** |

**INELIGIBLE ACCOUNTS RECEIVABLE**

| | |
|---|---:|
| Past due:       Over _____ 90 Days from **Invoice** Date | 309,161.61 |
| Datings/Futures | |
| Credit Balances in Past Dues | |
| _____ 50 % Cross Aging | |
| Intercompany/Affiliate | 1,445.60 |
| Contra Elimination | |
| Unapplied Cash | |
| Cash/COD's | |
| Credit Hold | |
| Finance/Service Charges | |
| Bankrupt Accounts | |
| Pre-Billings/Bill and Hold | |
| Retentions | |
| Bankrupt Accounts | |
| Consignments | |
| Debit Memos/Chargebacks | |
| Other as banks deems ineligible _____ | |
| Variance Between Aging & G/L (if G/L is lower) | |
| Excess _____ 50 % Concentration [x] Net [ ] Gross | |
|        Commerical A/R only | |
| Excess Concentration limit (name specific) | |
| TOTAL INELIGIBLES | 310,607.21 |

7:39 PM
06/27/08

# AC TECHNOLOGY INC.
## A/R Aging Summary
### As of June 27, 2008

| | Current | 1 - 30 | 31 -60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Advanced Biometric Controls, LLC | 1,445.60 | 0.00 | 0.00 | 0.00 | 0.00 | 1,445.60 |
| AFRL | 98,293.75 | 0.00 | 0.00 | 0.00 | 0.00 | 98,293.75 |
| Air Force | 15,672.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,672.00 |
| ArgonST | 31,650.00 | 0.00 | 0.00 | 0.00 | 0.00 | 31,650.00 |
| AVR Enterprises Inc. | 10,699.69 | 0.00 | 0.00 | 0.00 | 0.00 | 10,699.69 |
| Bureau of Labor Statistics | 0.00 | 7,427.78 | 0.00 | 0.00 | 0.00 | 7,427.78 |
| Bureau of the Census | 278,668.11 | 0.00 | 0.00 | 0.00 | 0.00 | 278,668.11 |
| CACI | 88,604.51 | 0.00 | 0.00 | 0.00 | 0.00 | 88,604.51 |
| Chenega Federal Systems LLC | 0.00 | 500.00 | 0.00 | 0.00 | 0.00 | 500.00 |
| CherryRoad GT Inc. | 343,506.21 | 226,847.33 | 0.00 | 0.00 | 0.00 | 570,353.54 |
| CSIC | 15,490.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,490.00 |
| DC Water & Sewer Authority | 246,100.17 | 0.00 | 0.00 | 0.00 | 0.00 | 246,100.17 |
| Defense Finance & Accounting Service | 1,215.57 | 0.00 | 893.79 | 0.00 | 0.00 | 2,109.36 |
| Defense Logistics Agency | 74,754.40 | 0.00 | 0.00 | 0.00 | 0.00 | 74,754.40 |
| Department of Homeland Security | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Enterprise Network MGMT OFC | 0.00 | 14,543.61 | 0.00 | 0.00 | 0.00 | 14,543.61 |
| FAA | 0.00 | 13,842.44 | 0.00 | 0.00 | 0.00 | 13,842.44 |
| General Dynamics | 4,475,000.00 | 0.00 | 0.00 | 0.00 | -5,490.87 | 4,469,509.13 |
| IRIDES, LLC | 0.00 | 0.00 | 0.00 | 0.00 | 2,723.48 | 2,723.48 |
| Lawrence Berkeley National Laboratory | 0.00 | 107,233.56 | 0.00 | 0.00 | 0.00 | 107,233.56 |
| Maryland Procurement Office | 0.00 | 25,980.00 | 0.00 | 0.00 | 0.00 | 25,980.00 |
| Michael Baker Corp | 0.00 | 9,790.28 | 0.00 | 0.00 | 0.00 | 9,790.28 |
| MOCA/Arrow, Inc. | 42,740.89 | 0.00 | 0.00 | 0.00 | 0.00 | 42,740.89 |
| Naval Air Warfare Center | 0.00 | 5,658.43 | 0.00 | 0.00 | 0.00 | 5,658.43 |
| Naval Satellite Operations Center | 51,786.11 | 0.00 | 0.00 | 0.00 | 0.00 | 51,786.11 |
| NCI Information Systems | 0.00 | 6,079.77 | 0.00 | 0.00 | 0.00 | 6,079.77 |
| NEWTEC | 0.00 | 2,400.30 | 0.00 | 0.00 | 0.00 | 2,400.30 |
| NOAA | 0.00 | 14,885.06 | 0.00 | 0.00 | 0.00 | 14,885.06 |
| Northrop Grumman Corporation | 0.00 | 2,030.11 | 0.00 | 0.00 | 0.00 | 2,030.11 |
| Maryland Procurement Office | 2,010,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,010,000.00 |
| NSWC | 344,631.96 | 0.00 | 0.00 | 0.00 | 0.00 | 344,631.96 |
| ORC, Inc. | 17,033.56 | 0.00 | 0.00 | 0.00 | 0.00 | 17,033.56 |
| SensorCom Inc. | 255.20 | 0.00 | 0.00 | 0.00 | 0.00 | 255.20 |
| Sun Microsystems, Inc | 0.00 | 0.00 | 0.00 | 0.00 | 311,929.00 | 311,929.00 |
| TKC Technology Solution, Inc | 0.00 | 1,581.95 | 0.00 | 0.00 | 0.00 | 1,581.95 |
| TKC Technology Solution, LLC | 99,140.52 | 26,093.68 | 0.00 | 0.00 | 0.00 | 125,234.20 |
| UC Lawrence Berkley Lab | 458,461.18 | 14,125.19 | 0.00 | 0.00 | 0.00 | 472,586.37 |
| Unisys | 8,196.13 | 0.00 | 0.00 | 0.00 | 0.00 | 8,196.13 |
| US House of Representatives | 0.00 | 485.56 | 0.00 | 0.00 | 0.00 | 485.56 |
| US Naval Academy | 18,481.32 | 0.00 | 0.00 | 0.00 | 0.00 | 18,481.32 |
| Wildflower International, LTD. | 0.00 | 126,591.12 | 0.00 | 0.00 | 0.00 | 126,591.12 |
| **TOTAL** | **8,731,826.88** | **607,640.72** | **893.79** | **0.00** | **309,161.61** | **9,649,523.00** |

Case 11-01255-KHK   Doc 16-3   Filed 10/17/11   Entered 10/17/11 15:07:48   Desc
Exhibit(s) Exhibits to Cashion Affidavit (Part 2 of 2)   Page 34 of 40
BBTemp_270608.xls

Page 1 of 1

| | |
|---|---|
| **From:** | Michael Byrd [mabyrd@sydiansys.com] |
| **Sent:** | Monday, June 30, 2008 3:02 AM |
| **To:** | Tencza, Jessica; Yin, Yanlin |
| **Subject:** | BBTemp_270608.xls |
| **Attachments:** | BBTemp_270608.xls |

Jessica and Yanlin,

I was preparing last minute notes for tomorrow and reviewing all pertinent financial information...when I discovered that the updated BBC spreadsheet sent to you has a slight data error.

I'm not sure how it happened and I have spent the last 4 hours trying to recreate the mix up to no avail.  I chalk it up to "gremlins".

I noticed that the Combined A/R ($9,788,299.19) in cell K15 is incorrect. The correct value should be $9,649,523.03...which is consistent with the A/R aging report.

I can only deduce that this error occurred during the population of the first trial BBC in which there was a logic error in cell K16.  Somehow, the incorrect data was migrated to the current correct logic spreadsheet.

I have attached the correct BBC spreadsheet for your review.  Please forgive any confusion.  Feel free to contact me at any time with questions. 301-523-4556

MAB

<<...>>



**EXHIBIT**

H

# Bank of America

**Bank of America Asset Based Lending Services** - Monthly Borrowing Base Certificate

**BORROWER:    MB Security Corporation**

Certificate #: _____

Month Ending: 6/30/2008

### ACCOUNTS RECEIVABLE

| Line | Roll Forward Information | | Government | Commercial | | Combined |
|------|---------|---|-----------|-----------|---|----------|
| 1 | Trade Accounts Receivable-Last Month End | 31-May-08 | 5,625,758.61 | 1,929,623.58 | | 7,555,382.19 |
| 2 | Plus: Credit Sales | | 5,073,539.22 | 1,117,370.45 | | 6,190,909.67 |
| 3 | Plus: Debit Memos and Misc. Debit Adj. | | | | | |
| 4 | Less: Collections | | (2,460,798.38) | (1,635,970.48) | | (4,096,768.86) |
| 5 | Less: Credit Memos for the Month | | | | | |
| 6 | Other Debit or (Credit) Adj. (Attach Explanation) | | | | | |
| 7 | Trade Accounts Receivable-This Month End | 30-Jun-08 | 8,238,499.45 | 1,411,023.55 | | 9,649,523.00 |
| 8 | Less: Ineligible Receivables per attached (Schedule A) | | 310,607.21 | | | 310,607.21 |
| 9 | Eligible Receivables (Line 7 minus line 8) | | 7,927,892.24 | 1,411,023.55 | | 9,338,915.79 |
| 10 | Advance Rate | | | | | |
| 11 | GROSS ACCOUNTS RECEIVABLE AVAILABILITY | | 90% | 80% | | |
| | | | 7,135,103.02 | 1,128,818.84 | | 8,263,921.86 |

### UNBILLED ACCOUNTS RECEIVABLE

| Line | | | | |
|------|---|---|---|---|
| 12 | Unbilled A/R from prior Month's BBC dated | | | |
| | Plus: Estimated Unbilled A/R for the month (please exclude Billings in Excess of Costs) | | | |
| | Less:  Billings Created for the Period | | | |
| 13 | Unbilled A/R this Month-End | | | |
| 14 | Advance Rate | | | |
| 15 | Unbilled A/R Availability/Unbilled Cap | | | 50% |
| 16 | APPROVED OVERADVANCE ($0) | | | |
| 17 | GROSS COMBINED AVAILABILITY | | | |
| 18 | Less: Outstanding Letter of Credit | | | 8,263,921.86 |
| 19 | NET AVAILABILITY | | | |
| 20 | APPROVED LINE OF CREDIT | $   10,000,000 | | 8,263,921.86 |
| 21 | The Lesser of Net Availability or Credit Line | | | 8,263,921.86 |

### LOANS OUTSTANDING

| Line | | | |
|------|---|---|---|
| 21 | Loan Balance - Since last Certificate | 5,500,000 | |
| 22 | Advances Since last Certificate | | |
| 23 | Less: Collections Applied To Loan | | |
| 24 | Total Loan Balance this Certificate | 5,500,000 | |
| 25 | Less: Collateral Reserves | | 5,500,000.00 |
| 26 | REMAINING LOAN AVAILABILITY/(OVERADVANCE) (Line 19 minus lines 25 & 26) | | 2,763,922 |

I certify the above to be true and correct to the best of my knowledge and belief. We understand that you are relying upon this Report and supporting documents in granting credit to us and we warrant that no Event of Default exists or is imminent under any agreements between us. The undersigned further certifies that all inventory is owned by us free and clear of any liens or encumbrances other than to Bank of America, that the same is under the control and in the possession of the undersigned and otherwise complies with all provisions of agreements between us:

Borrower:

By:    **MB Security Corporation**

Michael Byrd, EVP

Date:    6/27/2008

| OBLIGOR | MB Security Corporation |
|---------|-------------------------|

## SCHEDULE A - SCHEDULE OF INELIGIBLES

### INELIGIBLE ACCOUNTS RECEIVABLE

| | |
|---|---:|
| Past due:   Over _____ 90 Days from **Invoice** Date | |
| Datings/Futures | 309,161.61 |
| Credit Balances in Past Dues | |
| _____ 50 % Cross Aging | |
| Intercompany/Affiliate | |
| Contra Elimination | 1,445.60 |
| Unapplied Cash | |
| Cash/COD's | |
| Credit Hold | |
| Finance/Service Charges | |
| Bankrupt Accounts | |
| Pre-Billings/Bill and Hold | |
| Retentions | |
| Bankrupt Accounts | |
| Consignments | |
| Debit Memos/Chargebacks | |
| Other as banks deems ineligible | |
| Variance Between Aging & G/L (if G/L is lower) | |
| Excess _____ 50 % Concentration    [x] Net  [ ] Gross | |
| Commerical A/R only | |
| Excess Concentration limit (name specific) | |
| TOTAL INELIGIBLES | |
| | 310,607.21 |

| | |
|---|---|
| **From:** | E M [emunns2325@msn.com] |
| **Sent:** | Monday, June 30, 2008 12:20 PM |
| **To:** | Tencza, Jessica; Zanetti, Diane B |
| **Cc:** | Yin, Yanlin; Foust, Kathy; Schandlbauer, Nikolaus; Steve Britt; mabyrd@sydiansys.com |
| **Subject:** | MB Security Corporation |
| **Importance:** | High |

Dear Jessica,

First, on behalf of the MB Security Corporation team, many thanks to you and the Bank of America team. We look forward to a great relationship ahead!  Thanks so much for your support!

1.   Yes, the AR Aging submitted by me and Steve over the weekend is the correct aging to be used.  In the future, our new financial team will fully anticipate and meet the Bank's needs on the submission of all Loan documentation.

2.   The AP Aging submitted over the weekend did include a $2 MM plus MOCA/Arrow AP.  MOCA/Arrow is a 16-year relationship with AC Technology and provides a ready access to unsecured funding as needs arise.  The only reason this line is this large is that AC Technology ceased using the Textron Financial Corp financing last month in anticipation of the sale of the Company.  Of course, all of the MOCA/Arrow financing has been used to create Accounts Receivable in favor of the Bank (i.e., unsecured).  Our intention is to pay this account as and when the associated A/R is received by the Company.

3.   AC Technology is a Veteran owned business and there is no graduation date under current government rules for a Veteran owned business.   It is not  currently an 8a business.   We are currently undecided about whether to apply for 8a status with AC Technology or MB Security Corporation and will keep you apprised as those decisions are made.   MB Security is already Veteran-owned as you know.

Let me know if you need anything further.  We are coming over to the Bank now to open our accounts.

I sent the Sources and Uses document previously. I will send to Kathy Foust now.

Kind Regards,

Earle

Date: Mon, 30 Jun 2008 11:01:54 -0400
From: jessica.tencza@bankofamerica.com
Subject: FW: BBTemp_270608.xls
To: mabyrd@sydiansys.com; emunns2325@msn.com; sbritt@ltblaw.com
CC: nfschandlbauer@ober.com; Diane.B.Zanetti@bankofamerica.com;
Yanlin.Yin@bankofamerica.com; kathy.foust@bankofamerica.com



**EXHIBIT**

I

BAE 001732

All -

I wanted to let you know that I have reviewed and accepted the borrowing base certificate that Michael submitted this morning. I am assuming that the agings that came with Earle and Steve's submissions over the weekend are the correct aging to be using, but I would like confirmation of this. In the future, please make sure to submit the borrowing base and supporting documents in a single submission so that there is no confusion as to what matches with what.

A schedule of AP was submitted over the weekend, this included an AP of over $2 million to MOCA / Arrow. Please send me a written explanation of this AP and your intent with it. The concern is, of course, that this AP alone eats up almost the entire borrowing base availability.

On a bright note, we have received formal approval of the transaction. We do have one last question regarding your 8a status. When did the company enter the program, and what is the anticipated graduation date? Also, please confirm the veteran 8a status for us.

Finally, in order to fund today we will need a sources and uses with wiring instructions. Please make sure to send this as soon as you can as it is not only the last day of the month, but also the quarter, and our wire room tends to be very busy on days like to day. My associate Kathy Foust will be processing the loan and working on the funding once we receive instructions.

Thanks and I think we may have made it!!

Congrats to all!

Jessica

*Jessica Tencza*
*Bank of America*
*Government Contracting & Technology Banking*
*703.761.8558*
*jessica.tencza@bankofamerica.com*

---

Earn cashback on your purchases with Live Search - the search that pays you back! Learn More

---

Introducing Live Search cashback . It's search that pays you back! Try it Now

BAE 001733

# OBER | KALER
A Professional Corporation

Ober, Kaler, Grimes & Shriver
Attorneys at Law

1401 H. Street, NW, Suite 500
Washington, DC 20005-3324
202-408-8400  Fax 202-408-0640
www.ober.com

Nikolaus F. Schandlbauer
nfschandlbauer@ober.com
202-326-5016

Offices in
Maryland
Washington, D.C.
Virginia

December 17, 2008

## *Notice of Default and Reservation of Rights*

<u>**VIA ELECTRONIC MAIL**</u>

J. Stephen Britt, Esquire
Leach Travell Britt plc
8270 Greensboro Drive
Suite 1050
McLean, Virginia 22102

*Re:   Credit Facilities from Bank of America, N.A. (the "<u>Bank</u>") to
MB Security Corporation and AC Technology, Inc. (the "<u>Borrowers</u>")*

Dear Steve:

As you know, I represent the Bank in connection with the referenced commercial credit facilities as well as the various documents, instruments and written agreements executed by Borrowers and others in connection therewith (collectively, the "<u>Loan Documents</u>").  The credit facilities include a $10,000,000 revolving line of credit (the "<u>Revolver</u>") as well as an uncommitted $15,000,000 "guidance line" facility (the "<u>Guidance Line Facility</u>").

On December 4, 2008, the Bank received and has reviewed the Borrowers' compliance certificate in respect to the calendar quarter ended September 30, 2008 (the "<u>Compliance Certificate</u>").  The Compliance Certificate reports that the Borrowers' Funded Debt to EBITDA ratio was, as of the end of such quarter, 20.42:1, which greatly exceeds the covenant requirement of 2.75:1 established by the Loan Documents (the "<u>Covenant Default</u>").

The purpose of this letter is to notify you that the Borrowers have defaulted under the Loan Documents by, among other things, (i) suffering the Covenant Default <u>and</u> (ii) providing incorrect and materially misleading information to the Bank in regard to the Borrowers' financial condition as of the June 30, 2008 closing date (collectively with the Covenant Default, the "<u>Existing Defaults</u>").

As a result of the Covenant Default, the Bank has the immediate right to terminate any obligation or commitment of the Bank to make Advances or issue Letters of Credit for the account of Borrowers.  The Bank *specifically reserves all of its rights and remedies* in regard to the Existing Defaults.



EXHIBIT

J

OBER | KALER
A Professional Corporation

J. Stephen Britt, Esquire
December 18, 2008
Page 2

As an immediate consequence thereof, however, please allow this letter to confirm (i) that the Lender will not make any Advances under the Revolver except as approved by the Lender in its discretion upon the specific written request of the Borrowers; (ii) that that the Lender will not henceforth make any Guidance Line Advances under the Guidance Line Facility, and (iii) that the Guidance Line Facility feature of the Loan Documents is hereby terminated. In addition, because an Event of Default under the Loan Documents has occurred, the Borrowers are no longer permitted to pay regularly scheduled interest payments (or any payments, for that matter) in connection with the Subordinated Debt to Arthur Sands and Christopher Sands.

As a further result of the foregoing, the Bank has transferred day-to-day responsibility for the credit relationship from Mark Zirkle to Joseph R. Linus at the Bank's Special Assets Group in Charlotte, North Carolina. All day-to-day business communications between Borrowers and the Bank should go through Mr. Linus, who may be reached at (980) 386-3800. I will continue to serve as the Bank's legal counsel in this matter.

The Bank is greatly concerned that Borrowers has found itself in these circumstances so soon after the conclusion of the recent closing. For this reason, the Bank believes that the Borrowers should seek immediately to refinance their obligations under the Loan Documents with another institution.

The Bank wishes to keep lines of communication open between it and Borrowers' principals, and I expect the high quality of our prior communications to continue. In the meantime, please call me with any questions or comments.

Sincerely,

Nikolaus F. Schandlbauer

ccs (via electronic mail):
  Joseph R. Linus, Senior Vice President
  Diane B. Zanetti, Senior Vice President
  Mark A. Zirkle, Vice President
  Gordon Hunter, Chief Executive Officer
  Richard Burtner, Chief Financial Officer
  Earle D. Munns
  Michael A. Byrd