**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| In re:  EARLE D. MUNNS ) | Case No.:  11-10912-RGM |
| ) | |
| Debtor. ) | Chapter 7 |
| ) | |
| ) | |
| BANK OF AMERICA, N.A. ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Adversary No. 11-01255-RGM |
| ) | |
| EARLE D. MUNNS ) | |
| a/k/a EARLE D. MUNNS, JR. ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S RULE 26(a)(2) EXPERT REPORT**
**OF TODD A. FEUERMAN, CPA, MBA**



EXHIBIT

A

## I.   QUALIFICATIONS

I am a Director in the Audit, Accounting, and Consulting Department of Ellin & Tucker, Chartered.   My major responsibilities include providing audit, accounting, consulting and tax services to manufacturers, distributors, wholesalers, contractors, technology providers in the public and private sectors, military support providers and travel wholesalers.   I provide clients with traditional financial reporting and tax services as well as non-traditional services, including financial modeling and forecasting, merger and acquisition transaction consulting, cash flow forecasting and equity and debt structuring.   In addition, I have developed an expertise in providing consulting services to companies experiencing significant financial crisis, as well as providing credit support and evaluation services to regional and national banking institutions in the Mid-Atlantic region.

I graduated from the Merrick School of Business at the University of Baltimore earning a Master of Business Administration (MBA) degree.   I graduated from Towson University earning a Bachelor of Science degree in accounting and became a Certified Public Accountant immediately thereafter.

I was retained by Bank of America, N.A. (the "Bank") to review the books and records of AC Technology and to provide my opinions regarding the accuracy of certain statements made by AC Technology (also referred to as "AC Tech" and the "Company"), Earle Munns ("Munns") and Michael Byrd ("Byrd"), as detailed further below.   I have testified in the following matters:

1

- Bank of America, N.A. v. AC Technology, Inc., Earle D. Munns and Michael Andrew Byrd
  American Arbitration Association, Washington, D.C.
  Case Number 16 148 Y 00590 09
  April 2010 (Arbitration)

- Bank of America, N.A. v. Christopher Andrews and James Stephen Britt
  United States District Court for the Eastern District of Virginia, Alexandria Division
  Civil Action Number 1:10-CV-00731-CMH-JFA
  February 2011 (Deposition)

I have not provided other testimony as an expert either at trial or deposition in the last four (4) years. My hourly rate for this engagement is $360.

## II.    SUMMARY OF OPINIONS

As described in further detail below, it appears Munns and Byrd fabricated and submitted misleading information to the Bank from the start of the Company's relationship with the Bank, implemented very poor internal controls over financial reporting and disbursement of cash, allowed working capital to leave the Company for unverified purposes, and have been operating the Company with no working capital.

Based on my review, the Company was improperly reporting on its Borrowing Base Certificates ("BBC"s) submitted to the Bank and received funds it was not entitled to under its line of credit agreement. From the start of the Company's banking relationship, information was prepared outside of the Company's QuickBooks accounting system and manipulated in Microsoft Word and Excel. Munns and Byrd were able to recreate reports in Microsoft Word and Excel and submit these reports to the Bank for funding purposes under the line of credit

agreement. Munns' and Byrd's modifications to Bank-submitted reports appeared to be planned, calculated and deliberate without regard to compliance with AC Tech's obligation to comply with the provisions of its agreement with the Bank. It is my understanding that the Bank provided funding based on this information. The Company also pledged collateral to Arrow Electronics, Inc., severely impacting the Bank's potential ability to collect outstanding accounts receivable as of March 20, 2009.

**A.   Borrowing Base Certificates**

**1.   Inaccurate Bank Borrowing Certificate – June 30, 2008**

The initial funding of AC Tech occurred on June 30, 2008 and was based upon Munns and Byrd providing an initial BBC to the Bank to support an advance of $5,500,000, which included $5,000,000 for the Sands Brothers stock purchase and $500,000 for working capital. Munns provided an electronic version of the initial June 30, 2008 BBC and June 27, 2008 accounts receivable detail to the Bank via email on June 29, 2008 at 11:19 a.m. On June 30, 2008 at 3:02 a.m., Byrd provided the final electronic version of the Company's June 30, 2008 BBC. Both the Munns and Byrd emails state the BBC was as of June 30, 2008; however, the final accompanying accounts receivable detail totaling $9,649,523 was represented to be as of June 27, 2008. The following are significant observations that I made in reviewing the Company's June 30, 2008 BBC:

- Prior to June 30, 2008, Christopher Sands and Catherine Gaddis (Gaddis) maintained all of the Company's QuickBooks records. Munns and Byrd were not allowed access to the QuickBooks system until July 1, 2008.

- The Munns-prepared accounts receivable PDF report appeared to be generated from QuickBooks. However, I determined the PDF file was a Microsoft Word file converted to a PDF file on June 27, 2008.
- The Byrd-prepared accounts receivable PDF report appeared to be generated from QuickBooks. However, I determined as with the Munns' report, the PDF file was a Microsoft Word file converted to a PDF file on June 27, 2008.
- It appears Munns and Byrd obtained the accounts receivable detail as of June 27, 2008 from the Company prior to closing. They recreated the report in Microsoft Word and apparently manipulated the information to create the June 27, 2008 accounts receivable detail that supported the Company's initial draw request of $5,500,000.
- The Munns/Byrd BBC-submitted accounts receivable detail totaling $9,649,923, as of June 27, 2008, included amounts categorized as follows:
  o Accounts receivable per QuickBooks, assumed to be generated from items shipped, prior to June 27, 2008, and billed to customers - $2,828,866.
  o Sales orders, anticipated future sales or other unsubstantiated sales recorded, as of June 27, 2008, assumed for a sale not completed as of June 27, 2008 - $6,821,057.
- The correct June 27, 2008 accounts receivable detail that should have been submitted to the bank totaled $2,828,866. After subtracting out ineligible accounts receivable and applying the applicable borrowing rate, the final eligible accounts receivable and initial bank advance should have been $2,257,850.

In summary, Munns and Byrd were able to borrow $5,500,000 from the Bank by recording certain amounts as accounts receivable as of June 27, 2008 that were not the result of a sales transaction and not deemed appropriate collateral for borrowing purposes. As a result, AC Tech was advanced $3,242,150 in excess of the amount allowable under the Bank's credit and security agreement.

From the start, the amounts recorded on the June 30, 2008 BBC were inaccurate, including the roll-forward accounts receivable line items from May 31, 2008 to June 30, 2008. The following are examples of the roll-forward inaccuracies:

- Line 1 – "Trade Accounts Receivable – Last Month End, May 31, 2008" disclosed $7,555,382 versus the actual May 31, 2008 QuickBooks accounts receivable balance of $2,965,357.
- Line 2 – "Plus: Credit Sales" for the period June 1, 2008 – June 27, 2008 disclosed $6,190,910 versus the actual QuickBooks records for this timeframe of $1,274,189.
- Line 4 – "Less: Collections" for the period June 1, 2008 – June 27, 2008 disclosed $4,096,769 versus the actual QuickBooks records for this timeframe of $1,410,681.

By changing the accounts receivable detail in Microsoft Word, it appears Munns and Byrd were able to essentially maintain two sets of accounting records; QuickBooks, which has been deemed to be the correct accounting records, and Microsoft Word, used to manually create accounting entries independent of the Company's accounting system.

### 2.    Inaccurate Bank Borrowing Certificate – July, 31, 2008

The Company submitted its second BBC to the Bank on September 9, 2008 via email. As with the initial June 30, 2008 BBC, Byrd prepared the BBC and attached a PDF version of the Company's July 31, 2008 accounts receivable detail. According to the BBC, the Company continued to be in compliance with the Bank's borrowing formula.

We were informed by Gaddis that, in July 2008, Byrd had requested Gaddis to record a fictitious sale so Byrd could see "what things would be like with an additional sale". She refused to record the sale and informed Byrd that she would resign and notify whomever appropriate if he ever asked to do this again.

As with the June 30, 2008 BBC, Byrd provided an electronic version, prepared in Microsoft Excel of the Company's July 31, 2008 BBC and a PDF file of the Company's accounts receivable detail as of July 31, 2008.  It appears that Byrd used similar methodology with that used for the June 27, 2008 accounts receivable detail.

It appears Byrd imported the Company's QuickBooks accounts receivable detail into Microsoft Excel and manipulated the data to support the Company's $5,500,000 borrowing position.  I was able to determine that the PDF file sent to the Bank as an attachment to the July 31, 2008 BBC was a PDF file created from a Microsoft Excel file.  The following are significant observations related to the July 31, 2008 BBC:

- The BBC-submitted accounts receivable detail totaling $6,654,015 as of July 31, 2008 included amounts categorized as follows:
  - Accounts receivable per Quickbooks, assumed generated from items shipped prior to July 31, 2008 and billed to customers - $4,780,857.
  - Sales orders, anticipated future sales and other unsubstantiated amounts as of July 31, 2008 for sales that had not occurred as of July 31, 2008 - $1,873,948.
- The correct July 31, 2008 accounts receivable detail that should have been submitted to the Bank totaled $4,780,857.  After subtracting out ineligible accounts receivables and applying the applicable borrowing rate, the final eligible accounts receivable should have been $4,294,668.

Munns and Byrd were able to continue to show the Company in compliance with its borrowing formula by representing to the Bank accounts receivable as of July 31, 2008 that were not valid accounts receivable for borrowing purposes.  As a result of this, the Company, as of July 31, 2008, was advanced $1,205,332 in excess of the amount allowable under the Bank's credit and security agreement.

As noted with the June 30, 2008 BBC, the amounts recorded on the July 31, 2008 BBC were inaccurate, including the roll-forward accounts receivable line items from June 30, 2008 to July 31, 2008.  The following are examples of the roll-forward inaccuracies:

- Line 1 – "Trade Accounts Receivable – Last Month End, June 30, 2008" disclosed $9,649,923 which has been previously documented as inaccurate.
- Line 2 – "Plus:  Credit Sales" for the period July 1, 2008 – July 31, 2008 disclosed $1,341,412 versus the actual QuickBooks records for this timeframe of $3,247,668.
- Line 4 – "Less:  Collections" for the period July 1, 2008 – July 31, 2008 disclosed $4,336,920 versus the actual QuickBooks records for this timeframe of $1,993,251.

Munns and Byrd continued the inaccurate reporting to the Bank on the July 31, 2008 BBC and related accounts receivable detail.  The reason for the differences in the amounts reported in the roll-forward section of the July 31, 2008 BBC is most likely attributable to Byrd's attempt to continue to "make the numbers work" and was forced to adjust numbers independent of the Company's accounting system.

Munns and Byrd essentially maintained two sets of accounting books; QuickBooks, which has been deemed to be the correct set of records and Microsoft Excel, which was used to manually create entries independent of the Company's accounting system.

### 3.   Inaccurate Borrowing Base Certificate – March 20, 2009

AC Tech provided us with all monthly borrowing base certificates they submitted to the Bank from June 30, 2008 through February 28, 2009.  In addition, we were provided with the Company-prepared bank borrowing base certificate dated

March 20, 2009.  The certificate identified approximately $3,500,000 of borrowings in excess of calculated collateral.

Upon further review and inspection, I noted the borrowings in excess of collateral were likely significantly greater than this amount due to additional accounts receivable that should have been identified as potentially ineligible.  This is because certain accounts receivable were also pledged as collateral under vendor security agreements.

I noted the Company had executed vendor security agreements, with UCC filings, for many of the significant invoice amounts included in the March 20, 2009 accounts receivable aging report.  According to Gaddis, in September 2008, she advised Munns and Byrd that it was not legal to enter into these agreements without the Bank's approval.  In each case, I noted a security agreement was entered into for items purchased from Arrow Electronics, Inc.

The security agreements made specific reference to the actual sales invoice and purchase invoice and was approved by either Byrd or Hunter.  The security agreements stated that customer payment should be made directly to "AC Technology, Inc., P.O. Box 18803, Newark, NJ  07191-8803".  According to Gaddis, MOCA/Arrow Industries, Inc. is the owner of P.O. Box 18803.

As of March 20, 2009, the Company's accounts receivable detail was approximately $2,200,000.  In order to ascertain the validity of the recorded accounts receivable, I agreed all balances over $40,000 to supporting detail provided by Gaddis.  In all cases, the Company was able to provide proper documentation to support the sale and accounts receivable outstanding as of March 20, 2009;

8

however, a majority of the accounts receivable were subject to executed vendor security agreements.

**B.    Cash Disbursements Review**

I reviewed certain cash disbursements made to Munns, Byrd, Sands Brothers and the Company's "lobbyist" J.W. Burkman ("Burkman") during the period of June 1, 2008 through February 28, 2009.  These disbursements were made from all of the bank accounts listed below, including the lockbox, escrow and credit card accounts.  The following summarizes the results of this review:  Byrd received $142,000, Munns/Burkman received $550,000 and Sands Brothers received $2,795,000 (exclusive of $2,760,000 paid to purchase the Company).

Based on the information that I reviewed, I noted the Sands Brothers received payments of $5,555,000 during the period from June 1, 2008 through February 28, 2009.  The composition of this amount includes the following:  $2,760,000 – paid at closing; $1,398,000 – paid as of June 30, 2008; $1,397,000 – other payments, including $40,000 – paid to Advance Biometrics Controls LLC, a related entity of Sands Brothers.

It should be noted that most of Munns' payments were checks payable to cash, manually written checks with no check sequence, as were a significant portion of the payments made to Burkman.  According to Munns, it was not uncommon for the Company to write a check to cash and for Munns to go to the bank and convert it to a certified bank check which would then be remitted to Burkman.  I was not able to determine the purpose of the $550,000 paid to Munns and Burkman.

It appears payments were made to Burkman in three ways, a bank certified check, a check payable to J.W. Burkman or a check payable to J.W. Burkman & Associates. According to Munns, Burkman was a lobbyist who was assisting the Company in its marketing efforts to various governmental buyers of Sun Microsystems products. The Company did not provide any documentation, including any legal agreements related to the nature of the Burkman payments or the services to be provided.

According to Gaddis, she had, on numerous occasions, requested a federal identification number directly from Burkman and Munns but was never provided information to complete a Form 1099 for 2008. Accordingly, no Form 1099 was issued to Burkman for 2008.

## III.  DOCUMENTS REVIEWED

- 2007 financial statements, audited by Ritter & Company of Fairfax, Virginia
- Internal company QuickBooks records (electronic download) from October 2006 through March 20, 2009
- Company-prepared financial statements for December 31, 2008 and February 28, 2009
- Bank of America line of credit  and security agreement
- Bank of America borrowing base certificates and supporting detail prepared by Earle Munns (Munns) and Michael Byrd (Byrd) as of June 30, 2008
- Bank of America borrowing base certificate and supporting detail prepared by Byrd as of July 31, 2008
- Bank of America borrowing base certificate and supporting detail prepared by Richard Burtner as of March 20, 2009
- Invoice copies and Arrow Industries, Inc. security agreements for certain outstanding accounts receivable invoices as of March 20, 2009
- MOCA/Arrow Industries, Inc. and Subsidiaries standard security agreement forms used by AC Tech for products purchased and financed from Arrow Industries, Inc.

- June 30, 2008 stock purchase agreement between Christopher and Arthur Sands (Sands Brothers) and MB Security Corporation
- Bank of America and SunTrust Bank account statements for the period of June 1, 2008 through February 28, 2009
- Paychex payroll records for 2008 and 2009
- AC Tech corporate insurance policies in effect as of March 20, 2009

Bank statements and related enclosures of the following accounts for the period of June 1, 2008 through February 28, 2009:

- SunTrust Bank: 10000070894828 (AC Technology, Inc. – Money Market)
- SunTrust Bank: 10000024688110 (AC Technology, Inc. – Payroll)
- SunTrust Bank: 10000076430239 (AC Technology, Inc. – Credit Card)
- SunTrust Bank: 10000024688250 (AC Technology, Inc. – Lockbox)
- SunTrust Bank: 10000024688318 (AC Technology, Inc. – Operating)
- Bank of America: 4350-1204-5136 (MB Security Corporation – Escrow)
- Bank of America: 4350-1204-5149 (MB Security Corporation – Payroll)
- Bank of America: 4350-1204-5123 (MB Security Corporation – Operating)

ELLIN & TUCKER, CHARTERED
Certified Public Accountants

Todd A. Feuerman, CPA, MBA
Report Preparer

Baltimore, Maryland
July 6, 2011

Page 1

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

```
------------------------------X
BANK OF AMERICA, N.A.,          :
                                :
        Counterclaimant         :   16 148 Y 00590 09
                                :
        -vs-                     :
                                :
Ac technology, INC., EARLE      :
D. MUNNS and MICHAEL ANDREW     :
BYRD,                           :
                                :
        Counter-Respondents     :
------------------------------X
```

Deposition of Earle D. Munns

Washington, D.C.

Wednesday, February 24, 2010

Job 1662

Reported by:  Kathleen M. Vaglica, RMR



EXHIBIT

B

Page 13

1    or I stop into a friend's house.

2        Q.   Have you at any point in time had any

3    personal computers?

4        A.   Yes.

5        Q.   When did you last have a personal

6    computer?

7        A.   About four months ago.

8        Q.   And what happened to your personal

9    computer in the last four months?

10       A.   It broke.  The hard drive went.  No longer

11   useful.

12       Q.   Did you search that personal computer for

13   any responsive documents to this case?

14       A.   I could not.  I mean, it was --

15       Q.   How about before the hard drive went out?

16   Did you search it for any responsive documents?

17       A.   No, I would not have done that.  I'm

18   sorry.

19       Q.   Did you make any efforts to preserve any

20   responsive documents or documents that might have

21   been potentially responsive to this case?

22       A.   Yes.  The company did everything possible,

Page 77

1      A.   No, not to my knowledge.  I don't remember

2   doing that.

3      Q.   You don't recall providing Arrow with any

4   type of guaranties, personal guaranties?

5      A.   I just don't remember that, no.  If I did,

6   I mean, it's possible, but I just don't remember

7   that.  They were certainly a customer.  They were a

8   company that worked with AC Technology prior to

9   closing.  They were not a major customer, though.

10  The major customers were the ones I told you.

11     Q.   And how do you define a major customer?

12     A.   Customers that provide a substantial

13  portion of the revenues of the company.

14     Q.   And how do you define substantial?

15     A.   With this particular company, 15 percent

16  or more.

17     Q.   And Arrow, did Arrow at any point in time

18  qualify under your definition of substantial

19  customer?

20     A.   Arrow was not giving the company business.

21  They were helping the company in their reselling

22  business.  To my knowledge, they were not providing

Page 81

1    lined up for the purchase of AC Tech if you were

2    unable to secure the loan from Bank of America?

3         A.   At the time that I got the bank's approval

4    and a term sheet from the bank, I was working with

5    other financing sources.  None of them had given us

6    better terms, so --

7         Q.   Did you have -- I'm sorry.  Go ahead.

8         A.   I'm sorry.  None of them had given us

9    better terms.

10        Q.   Did you have commitments from anybody else

11   to actually loan the money?

12        A.   I think we had a bank that was going to do

13   it assuming we got either a million of equity or a

14   million of mezzanine financing, and I forget which

15   bank that was.  One of the other banks.

16        Q.   Did you have a written commitment letter

17   from that bank?

18        A.   No.  We had a meeting, and they said they

19   would do that, and we said we had some work to do,

20   and we were out doing that work.

21        Q.   Had you lined up any other equity

22   investors?

Page 82

1      A.   I had spoken to two different venture

2   capital firms and some of their people.  Mike and I

3   had done that, and we had spoken to an equity person

4   that Mike had introduced, too.  The conversations

5   were ongoing.

6      Q.   And have you had any commitments from any

7   equity investors?

8      A.   We had discussions of what they needed to

9   do certain amount, to provide equity.  Yes, we had

10  discussions.

11     Q.   So am I correct, though, that you did not

12  have any commitments to actually put in equity into

13  the purchase?

14     A.   No, no.  We were not at that point.

15     Q.   So these were still in discussion phases?

16     A.   They were in discussion phases.  All

17  discussions were ended when we agreed to go with the

18  Bank of America.

19     Q.   Are there any entities that actually

20  turned down your request to provide funding for the

21  purchase of AC Tech?

22     A.   Goodness.  I don't think we had any flat

Page 106

1   under the Credit and Security Agreement?

2       A.   Could you explain what you mean by

3   ceiling?

4       Q.   Yeah.   What was the maximum amount that NB

5   Security could have gotten and AC Tech could have

6   gotten if it qualified under the credit agreement?

7   How much money could it have borrowed from Bank of

8   America?

9       A.   I believe that's $25 million.

10      Q.   Ultimately it borrowed approximately

11  $5.5 million?

12      A.   That's correct.

13      Q.   How was it determined how much credit AC

14  Tech could take from Bank of America under the

15  Credit and Security Agreement?   What was your

16  understanding as to how that was computed?

17      A.   I'm not sure how it was computed, but I'll

18  tell you that my understanding is the bank knew that

19  we needed the 5.5 to buy AC Technology, and they

20  told us that we had sufficient assets to cover it,

21  so they would authorize that as the first draw to

22  purchase the company.

Page 158

1    A.   They would generally be that, hardware and

2  software.

3    Q.   Did there come a point in time that there

4  was a lockbox established for the benefit of Arrow?

5    A.   There was a time.

6    Q.   What is your recollection as to, first of

7  all, when that was established?

8    A.   I think that would have been in the late

9  August, first part of September time frame.

10   Q.   And what was the purpose of establishing

11  that lockbox?

12   A.   I don't have any real knowledge except

13  that I know the lockbox was established to make sure

14  that funds coming into, coming to the company are

15  earmarked for a particular client or a customer.

16   Q.   Did you have any involvement in

17  establishing the lockbox for Arrow?

18   A.   No, I did not.

19   Q.   Did you have any knowledge that it was

20  being established before it was established?

21   A.   No, I found out about it afterwards.   I

22  gave you an answer in the interrogatories about

Page 159

1   that.  I learned about some of these, but it was in

2   the late, I don't know what time it was, August time

3   frame.  And it was in a meeting that Mike and Gordon

4   and I had over at Steve Britt's offices.  And we

5   knew there were certain number of those that we

6   couldn't pay off right away because we had, we

7   needed to give the government time to process those

8   ends, so that's when I became aware of this

9   situation and, you know, the full scope of it, I

10  should say.  Prior to that time, I knew we had done

11  one small one, so that's what I knew about it.

12       Q.   Did you have an understanding as to

13  whether or not the credit arrangement with Arrow

14  would violate the covenants in the credit agreement

15  with Bank of America?

16       A.   We knew in the August time frame that it

17  did violate, and we were definitely trying to cure

18  that and make sure that we didn't do it again.

19       Q.   And how were you going about curing it?

20       A.   Well, we had a certain level that was

21  ongoing that we had to complete, in other words, get

22  paid off, and so Mike and Gordon and I talked, and

Page 160

1   Mike was taking the action to get them cleared up

2   and to do that as quickly as possible, and we said

3   within, I think we said within 60 days get it done.

4       Q.   And was that done?

5       A.   It turns out, no, it didn't get done.  It

6   turns out there was some other issues.

7       Q.   What other issues?

8       A.   All I know is that issues arose that we

9   didn't get them all paid off, and I think it had to

10  do with continuing course of business that we had,

11  business coming in that we needed to finance, so

12  that was the whole thing.

13      Q.   And how did the fact that you had business

14  coming in that you needed to finance affect your or

15  the company's ability to correct the problem with

16  the lockbox?

17      A.   Again, I don't know the scope of this.  I

18  did not know the scope of this.  What I found out

19  was that we had a certain level of business that we

20  needed to get financed by Arrow that was otherwise

21  not financeable.  We couldn't do the business

22  otherwise, so that was why we had done that.

Page 161

1      Q.    Do you know approximately when the bank

2  found out about the lockbox?

3      A.    I think somewhat in the same time frame,

4  September, something about then.  The answer is, the

5  answer is I don't remember.

6      Q.    Same time frame as when?

7      A.    That we were just talking about.  Sometime

8  in the September time frame.  I just don't remember.

9      Q.    That was the time frame that you found out

10  about it?

11      A.    About this, yeah, late August, early

12  September is when I found out about the scope, that

13  it was a lot more than just one or two.

14      Q.    Were there efforts made to inform the bank

15  about the lockbox?

16      A.    The answer is I don't know.  The answer is

17  I don't know.

18      Q.    Were there efforts made to conceal the

19  fact of the lockbox from the bank?

20      A.    I don't think so.

21      Q.    Do you recall providing any personal

22  guaranties to Arrow?

Page 166

1   order that they wanted to do a one time transaction

2   with us on.

3       Q.   Was money from the loan from Bank of

4   America used to satisfy these two purchase orders?

5       A.   To the best of my knowledge, the monies

6   that came in from the government on these two

7   transactions paid for and satisfied these purchase

8   orders.  That would be our practice, and I just

9   don't have any personal knowledge of that.

10      Q.   Well, let me ask you again.  Why is it

11  you're providing personal guaranties to Arrow?

12      A.   If memory serves, that was what they

13  wanted.  That's the only thing they would take in

14  the initial, and I, frankly, had forgotten about

15  this second one.  And it was their request.

16      Q.   Did you inform anybody at the bank that

17  you had personally guaranteed purchase invoices for

18  approximately $2.5 million?

19      A.   To my knowledge, no, I did not personally

20  inform them.  Steve Britt may have informed them.

21  Mike may have informed them.  I don't know.

22      Q.   The letter from Steve Britt on Exhibit

Page 193

1      A.    I don't recall exactly.

2      Q.    If I throw out about a half million

3  dollars, does that sound about right?

4      A.    No, I think it's less than that.

5      Q.    Did you keep track of how much money you

6  took out?

7      A.    There was an accounting of it, and I sat

8  down with Rick Burtner and Gordon and went over it

9  in some detail with them.

10      Q.    Do you have any estimation of how much

11  money you took out of the company?

12      A.    For myself?

13      Q.    Yes.

14      A.    I believe that the estimate was somewhere

15  around 300,000.

16      Q.    And how about for Mr. Burkman?

17      A.    It was in his, there's a number in his

18  agreement, and that was the number.  I don't

19  remember the number right now.

20      Q.    Do you have any ballpark for me?

21      A.    What's that?

22      Q.    Do you have any ballpark for me?

Page 194

1      A.   I just don't remember it, to tell you the

2   truth.

3      Q.   Were you also paying yourself a salary out

4   of the company?

5      A.   Um, I didn't take a salary until -- well,

6   I did not take a salary until very late, and then I

7   didn't take it at all for a while.

8      Q.   When did you start taking a salary?

9      A.   I do not remember doing that except that

10  it had to do -- well, the answer is I don't

11  remember.  I really don't remember.

12     Q.   Did AC Tech have bank accounts with any

13  banks other than Bank of America and Sun Trust?

14     A.   Those are the only banks that they had

15  accounts with.

16     Q.   At the time you were operating AC

17  Technology, did you have personal bank accounts at

18  other banks besides Bank of America and Sun Trust?

19     A.   I might have, yes.

20     Q.   Which ones?

21     A.   I don't remember.  I'm trying to think if

22  I did back then.  The answer is I don't know.

**From:** Steve Britt [sbritt@ltblaw.com]
**Sent:** Friday, August 08, 2008 9:54 AM
**To:** Gordon Hunter; Earle Munns
**Subject:** RE: Meeting follow up -- Plus Bo Kimbrough and financial analysis

Sure.

But on the financial front, MAB clearly doesn't have the financial acumen to internalize financial strategy. He has had access and I have pushed for analysis, etc. and nothing is there.   Even last night's conversation doesn't stimulate any kind of analysis.

As we were headed toward closing and Chris was raising the price, insisting that all these payables be paid in full to him (vs. the then-pending structure that we would pay him the Textron payable portion and keep the profit), I kept asking what other A/R we had coming in and whether we could operate if he took this A/R.  In addition, what would this do to B of A borrowing base analysis.   And on and on.

Bottom line, his access to financials has meant nothing to date and I (personally) have no confidence he understands what I am saying in this area.

Here is Chuck's web site for review.   There are probably other possible options but we could buy some time hourly ($295.00) and I bet 10-15 hours would do it.   http://www.caliberconsult.com

Steve



**J. Stephen Britt**
sbritt@ltblaw.com

**Leach Travell Britt pc**
8270 Greensboro Drive
Suite 1050
McLean, Virginia 22102
Tel 703.584.8904
Fax 703.584.8901
www.ltblaw.com

This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.

**From:** Gordon Hunter [mailto:ghunter@actechnology.com]
**Sent:** Friday, August 08, 2008 9:47 AM
**To:** sbritt@ltblaw.com; Earle Munns
**Subject:** RE: Meeting follow up -- Plus Bo Kimbrough and financial analysis

Steve,
Thanks for the kind words.

And thanks for Bo's resume will try to get to it over the weekend.

Disconnect is right.  I understand his frustrations – IMHO, some of them are self-inflicted but I'll spa



**EXHIBIT**

C

*LTB DRAFT 6/27/08*

## STOCK PURCHASE AGREEMENT

### BY AND BETWEEN

### MB SECURITY CORPORATION

*as Buyer*

### AND

### CHRISTOPHER A. SANDS AND ARTHUR J. SANDS

*as Sellers*

**June 30, 2008**



## TABLE OF CONTENTS

Article I  Definitions ..................................................................................................................1

Article II  Sale and Transfer of Shares; Closing ........................................................................10

    2.1    Shares ............................................................................................10
    2.2    Purchase Price ...............................................................................10
    2.3    Closing ..........................................................................................11
    2.4    Closing Obligations ......................................................................11
    2.5    Post-Closing Obligations ..............................................................11

Article III  Representations and Warranties of Seller ..................................................................13

    3.1    Organization and Good Standing. ..................................................13
    3.2    Authority; No Conflict. ..................................................................13
    3.3    Capitalization ................................................................................14
    3.4    Financial Statements .....................................................................15
    3.5    Books and Records .......................................................................16
    3.6    Title to Properties; Encumbrances ................................................16
    3.7    Condition and Sufficiency of Assets .............................................16
    3.8    Accounts Receivable .....................................................................16
    3.9    Inventory ......................................................................................17
    3.10   No Undisclosed Liabilities ............................................................17
    3.11   Taxes. ...........................................................................................17
    3.12   No Material Adverse Change. ........................................................18
    3.13   Employee Benefits. .......................................................................18
    3.14   Compliance with Legal Requirements; Governmental Authorizations. .................22
    3.15   Legal Proceedings; Orders. ...........................................................23
    3.16   Absence of Certain Changes and Events .......................................25
    3.17   Contracts; No Defaults. .................................................................25
    3.18   Insurance. .....................................................................................28
    3.19   Environmental Matters. .................................................................30
    3.20   Employees. ...................................................................................31
    3.21   Labor Relations; Compliance. ......................................................32
    3.22   Intellectual Property. .....................................................................32
    3.23   Certain Payments ..........................................................................35
    3.24   Disclosure. ....................................................................................35
    3.25   Relationships with Related Persons ..............................................35
    3.26   Brokers or Finders ........................................................................36

Article IV  Representations and Warranties of Buyer .................................................................36

    4.1    Authority; No Conflict. ..................................................................36
    4.2    Certain Proceedings ......................................................................37
    4.3    Brokers or Finders ........................................................................37

Deleted: 24

Deleted: 29

Deleted: 31

Deleted: 36

Article V  Covenants of Seller Prior to Closing Date ................................................37
    5.1    Access and Investigations ................................................37
    5.2    Operation of the Businesses of the Company and ABC ................37
    5.3    Negative Covenant ................................................38
    5.4    Required Approvals ................................................38
    5.5    Notification ................................................38
    5.6    Payment of Indebtedness by Related Persons ................................38
    5.7    No Negotiation ................................................38

Article VI  Covenants of Buyer Prior to Closing Date ................................................39
    6.1    Approvals of Governmental Bodies ................................................39

Article VII  Non-Competition and Non-Solicitation by Sellers
    7.1    Non-Competition; Non-Solicitation ................................................39

Article VIII  Conditions Precedent to Buyer's Obligation to Close ................................41
    8.1    Accuracy of Representations ................................................41
    8.2    Seller's Performance ................................................41
    8.3    Consents ................................................41
    8.4    No Proceedings ................................................41
    8.5    No Claim Regarding Stock Ownership or Sale Proceeds ................41
    8.6    No Prohibition ................................................42

Article IX  Conditions Precedent to Seller's Obligation to Close ................................42
    9.1    Accuracy of Representations ................................................42
    9.2    Buyer's Performance ................................................42
    9.3    Consents ................................................42
    9.4    No Injunction ................................................42

Article X  Termination ................................................42
    10.1    Termination Events ................................................42
    10.2    Effect of Termination ................................................43

Article XI  Indemnification; Remedies ................................................43
    11.1    Survival; Right to Indemnification Not Affected by Knowledge ................43
    11.2    Indemnification and Payment of Damages by Seller ................................44
    11.3    Indemnification and Payment of Damages by Buyer ................................44
    11.4    Time Limitations ................................................45
    11.5    Escrow; Right of Set-Off ................................................45
    11.6    Procedures for Indemnification -- Third Party Claims ................................45
    11.7    Procedure for Indemnification -- Other Claims ................................46

Article XII  Miscellaneous ................................................47
    12.1    Expenses ................................................47

Deleted: 37

Deleted: 38

Deleted: 38

Deleted: 38

Deleted: 40

Deleted: 40

Deleted: 40

Deleted: 40

Deleted: 41

Deleted: 41

Deleted: 41

Deleted: 41

Deleted: 43

Deleted: 44

Deleted: 44

Deleted: 46

Deleted: 46

| 12.2 | Public Announcements | 47 |
|------|---------------------|-----|
| 12.3 | Confidentiality | 47 |
| 12.4 | Notices | 47 |
| 12.5 | Further Assurances | 48 |
| 12.6 | Waiver | 48 |
| 12.7 | Disclosure Schedules. | 49 |
| 12.8 | Assignments, Successors, and No Third-Party Rights | 49 |
| 12.9 | Severability | 49 |
| 12.10 | Article and Section Headings, Construction | 49 |
| 12.11 | Time of Essence | 50 |
| 12.12 | Governing Law | 50 |
| 12.13 | Counterparts | 50 |

**Deleted:** 48

**Deleted:** 49

**Deleted:** 49

**List of Exhibits**

| EXHIBIT A: | ABC Option Agreement |
|-----------|---------------------|
| EXHIBIT B: | ABC Reseller Agreement |
| EXHIBIT C: | Seller Disclosure Schedule |
| EXHIBIT D: | Textron Payable Schedule |

– iii –

## STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** (this "*Agreement*") entered into as of June 30, 2008 ("*Effective Date*"), by and between MB SECURITY CORPORATION, a Delaware corporation (the "*Buyer*"), and CHRISTOPHER A. SANDS and ARTHUR J. SANDS, jointly and severally (each a "*Seller*" and collectively, the "*Sellers*"), being holders of all of the capital stock of AC TECHNOLOGY INC., a Virginia corporation (the "*Company*") and the owners of AC Technology Enterprises, LLC ("*ACTE*"), the primary owner and manager of ADVANCED BIOMETRIC CONTROLS LLC, a Virginia limited liability company ("*ABC*") (ACTE and ABC also collectively, ABC).  Buyer and the Sellers, individually, may be referred to herein as a "*party*" or, collectively, as the "*parties*."

### RECITALS

**WHEREAS,** the Sellers desire to sell, and the Buyer desires to purchase, ninety-eight percent (98%) of the issued and outstanding shares of capital stock of the Company (the "*Shares*"), for the consideration and on the terms set forth in this Agreement; and

**WHEREAS,** the Sellers and the Buyer desire that the Company and ABC enter into the Option Agreement and Reseller Agreement, as set forth herein, in further consideration of the purchase of Sellers' stock.

**NOW, THEREFORE,** in consideration of the foregoing recitals and the representations, warranties, agreements and covenants herein contained, and for good and other valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

### ARTICLE I
### DEFINITIONS

The following terms undefined in the text of this Agreement shall have the following meanings:

"*ABC*"--as defined in the first paragraph of this Agreement.

"*ABC Loan Receivable*"—the loan from the Company to ABC in the principal amount, as of the Closing Date, of $1,386,701.

"*Accounts Receivable*"--as defined in Section 3.8.

"*Applicable Contract*"--any Contract existing as of the Effective Date (a) under which the Company has or may acquire any rights, (b) under which the Company has or may become subject to any obligation or liability, or (c) by which the Company or any of the assets owned or used by it is or may become bound, including but not limited to, any and all ACT contracts, ABC subcontracts, bids, proposals, teaming agreements, GWAC and GSA schedules, license agreements, NDAs, etc..

-- 1 --

*"**Balance Sheet**"*--as defined in Section 3.4.

*"**BiObex™**"*--as defined in the Reseller Agreement.

*"**Breach**"*--a "Breach" of a representation, warranty, covenant, obligation, or other provision of this Agreement or any instrument delivered pursuant to this Agreement will be deemed to have occurred if there is or has been (a) any inaccuracy in or breach of, or any failure to perform or comply with, such representation, warranty, covenant, obligation, or other provision, or (b) any claim (by any Person) or other occurrence or circumstance that is or was inconsistent with such representation, warranty, covenant, obligation, or other provision, and the term "Breach" means any such inaccuracy, breach, failure, claim, occurrence, or circumstance.

*"**Business Day**"*--any day other than a Saturday, Sunday, public holiday under the laws of the Commonwealth of Virginia.

*"**Business of the Company**"*— provides infrastructure support products, services and solutions with a focus on information technology security, including but not limited to, products and services of ABC,

*"**Business of ABC**"*— selling and licensing of biometric software, hardware, associated peripherals, development services, support and maintenance services and other related services.

*"**Buyer**"*--as defined in the first paragraph of this Agreement.

*"**Buyer's Advisors**"*--as defined in Section 5.1.

*"**Buyer's Closing Documents**"*--as defined in Section 4.3(a).

*"**Closing**"*--as defined in Section 2.3.

*"**Closing Date**"*--the date and time as of which the Closing actually takes place.

*"**Company**"*--as defined in the first paragraph of this Agreement.

*"**Company Other Benefit Obligation**"*--an Other Benefit Obligation owed, adopted, or followed by the Company.

*"**Company Plan**"*--all Plans of which the Company is or was a Plan Sponsor, or to which the Company otherwise contributes or has contributed, or in which the Company otherwise participates or has participated. All references to Plans are to Company Plans unless the context requires otherwise.

*"**Competing Business**"*--as defined in Section 3.25.

*"**Consent**"*--any approval, consent, ratification, waiver, or other authorization (including any Governmental Authorization).

"*Contemplated Transactions*"--all of the transactions contemplated by this Agreement, including:

(a)    the sale of the Shares by Sellers to Buyer;

(b)    the execution, delivery, and performance of the Employment Agreements, Option Agreement and Reseller Agreement;

(c)    the execution, delivery and performance of a waiver and release by all officers and directors of the Company;

(d)    the performance by Buyer and Sellers of their respective covenants and obligations under this Agreement; and

(e)    Buyer's acquisition of the Shares.

"*Contract*"--any agreement, contract, obligation, promise, or undertaking (whether written or oral and whether express or implied) that is legally binding.

"*Copyrights*"--as defined in Section 3.22(a).

"*Damages*"--as defined in Section 11.2.

"*Disclosure Schedule*"--the Sellers' Disclosure Schedule attached to this Agreement as Exhibit C, describing any exceptions to any representations and warranties hereunder.

"*Employment Agreements*"—employment, non-competition and inventions assignment agreements.

"*Encumbrance*"--any mortgage, easement, right of way, charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction or adverse claim of any kind, including any restriction on use, voting, transfer, receipt of income or accounts receivable or exercise of any other attribute of ownership, or any other encumbrance or exception to title of any kind.

"*Environment*"--soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins, and wetlands), ground waters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"*Environmental, Health, and Safety Liabilities*"--any cost, damages, expense, liability, obligation, or other responsibility arising from or under Environmental Law or Occupational Safety and Health Law and consisting of or relating to:

(a)    any environmental, health, or safety matters or conditions (including on-site or off-site contamination, occupational safety and health, and regulation of chemical substances or products);

– 3 –

(b)      fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and response, investigative, remedial, or inspection costs and expenses arising under Environmental Law or Occupational Safety and Health Law;

(c)      financial responsibility under Environmental Law or Occupational Safety and Health Law for cleanup costs or corrective action, including any investigation, cleanup, removal, containment, or other remediation or response actions (*"Cleanup"*) required by applicable Environmental Law or Occupational Safety and Health Law (whether or not such Cleanup has been required or requested by any Governmental Body or any other Person) and for any natural resource damages; or

(d)      any other compliance, corrective, investigative, or remedial measures required under Environmental Law or Occupational Safety and Health Law.

The terms "removal," "remedial," and "response action," include the types of activities covered by the United States Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., as amended (*"CERCLA"*).

*"Environmental Law"*--any Legal Requirement, whether now existing or subsequently enacted or amended, relating to (a) pollution or protection of the Environment, including natural resources, (b) exposure of Persons, including but not limited to employees, to Hazardous Materials, (c) protection of the public health or welfare from the effects of products, by-products, wastes, emissions, discharges, migration, or releases of Hazardous Materials, or (d) regulation of the manufacture, use or introduction into commerce of Hazardous Materials including their manufacture, formulation, packaging, labeling, distribution, generation, transportation, handling, treatment, storage or disposal.  Without limitation, "Environmental Law" shall also include (a) any Government Authorization issued pursuant to any Environmental Law and the terms and conditions thereof and (b) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. 9601 et seq., Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Solid and Hazardous Waste Amendments of 1984, 42 U.S.C. 6901 et seq., Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 U.S.C. 1251 et seq., Clean Air Act of 1966, as amended, 42 U.S.C. 7401 et seq., Toxic Substances Control Act of 1976, 15 U.S.C. 2601 et seq., Hazardous Materials Transportation Act, 49 U.S.C. § 5101, et seq., Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. 651 et seq., Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. 11001 et seq., Safe Drinking Water Act of 1974, as amended, 42 U.S.C. 300(f) et seq., and any similar or implementing state law, and all amendments, rules, regulations and guidance documents promulgated thereunder.

*"ERISA"*--the Employee Retirement Income Security Act of 1974 or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

*"ERISA Affiliate"*--with respect to the Company, any other person that, together with the Company, would be treated as a single employer under IRC § 414.

– 4 –

*"ERISA Affiliate Plan"*--all Plans of which an ERISA Affiliate is or was a Plan Sponsor, or in which an ERISA Affiliate otherwise participates or has participated (other than a Company Plan).

*"Facilities"*--any real property, leaseholds or other interests currently or formerly owned or operated by the Company and any buildings, plants, structures, or equipment (including motor vehicles) currently or formerly owned or operated by the Company.

*"GAAP"*--generally accepted United States accounting principles, applied on a basis consistent with the basis on which the Balance Sheet and the other financial statements referred to in Section 3.4(b) were prepared.

*"Governmental Authorization"*--any approval, consent, license, permit, certification, registration, waiver or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

*"Governmental Body"*--any:

    (a)    nation, state, county, city, town, village, district, or other jurisdiction of any nature;

    (b)    federal, state, local, municipal, foreign, or other government;

    (c)    governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal);

    (d)    body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

*"Hazardous Activity"*--the distribution, generation, handling, importing, management, manufacturing, processing, production, refinement, Release, storage, transfer, transportation, treatment, or use (including any withdrawal or other use of groundwater) of Hazardous Materials in, on, under, about, or from the Facilities or any part thereof into the Environment, and any other act, business, operation, or thing that increases the danger, or risk of danger, or poses an unreasonable risk of harm to persons or property on or off the Facilities, or that may affect the value of the Facilities or the Company.

*"Hazardous Materials"*--any waste or other substance that is listed, defined, designated, or classified as, or otherwise determined to be, hazardous, radioactive, or toxic or a pollutant or a contaminant under or pursuant to any Environmental Law, including any admixture or solution thereof, and specifically including petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos or asbestos-containing materials, radon and urea-formaldehyde.

*"Indemnified Persons"*--as defined in Section 11.2.

*"Intellectual Property Assets"*--as defined in Section 3.22.

– 5 –

"*Interim Balance Sheet*"--as defined in Section 3.4.

"*IRC*"--the Internal Revenue Code of 1986 or any successor law, and regulations issued by the IRS pursuant to the Internal Revenue Code or any successor law.

"*IRS*"--the United States Internal Revenue Service or any successor agency, and, to the extent relevant, the United States Department of the Treasury.

"*Knowledge*"--an individual will be deemed to have "Knowledge" of a particular fact or other matter only if such individual is actually aware of such fact or other matter, or is aware of objective facts or events (*e.g.,* observance, receipt or discovery of writings, oral conversations or actions) that indicate that the subject matter of a statement involving Knowledge will or is reasonably likely to exist or occur; or

A Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter if any individual who is serving, as of the Effective Date, as a director, officer, partner, executor, or trustee of such Person (or in any similar capacity) has Knowledge of such fact or other matter.

"*Legal Requirement*"--any federal, state, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, court order, consent, decree, regulation, license, permit, statute, or treaty.

"*Marks*"--as defined in Section 3.22(a).

"*Multi-Employer Plan*"--has the meaning given in ERISA § 3(37)(A).

"*Occupational Safety and Health Law*"--any Legal Requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, and any program, whether governmental or private (including those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

"*Option Agreement*"--attached as <u>Exhibit A</u> hereto.

"*Order*"--any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body or by any arbitrator.

"*Ordinary Course of Business*"--an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if:

(a)    such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person;

(b)      such action is not required to be authorized by the board of directors of such Person (or by any Person or group of Persons exercising similar authority) and is not required to be specifically authorized by the parent company (if any) of such Person; and

(c)      such action is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors (or by any Person or group of Persons exercising similar authority), in the ordinary course of the normal day-to-day operations of other Persons that are in the same line of business and of the same financial size as such Person.

*"**Organizational Documents**"*--(a) the articles of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) the certificate of organization and operating agreement of a limited liability company; (e) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (f) any amendment to any of the foregoing.

*"**Other Benefit Obligations**"*--all obligations, arrangements, or customary practices, whether or not legally enforceable, to provide benefits, other than salary, as compensation for services rendered, to present or former directors, employees, or agents, other than obligations, arrangements, and practices that are Plans.  Other Benefit Obligations include consulting agreements under which the compensation paid does not depend upon the amount of service rendered, sabbatical policies, severance payment policies and fringe benefits within the meaning of IRC § 132.

*"**Patents**"*--as defined in Section 3.22(a).

*"**Pension Plan**"*--has the meaning given in ERISA § 3(2)(A).

*"**Person**"*--any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

*"**Plan**"*--has the meaning given in ERISA § 3(3).

*"**Plan Sponsor**"*--has the meaning given in ERISA § 3(16)(B).

*"**Proceeding**"*--any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

*"**Proprietary Rights Agreement**"*--as defined in Section 3.20(b).

*"**Purchase Price**"*--as defined in Section 2.2.

*"**Qualified Plan**"*--any Plan that meets or purports to meet the requirements of IRC § 401(a).

"***Related Person***"--with respect to a particular individual:

(a)      each other member of such individual's Family;

(b)      any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family;

(c)      any Person in which such individual or members of such individual's Family hold (individually or in the aggregate) a Material Interest; and

(d)      any Person with respect to which such individual or one or more members of such individual's Family serves as a director, officer, partner, executor, or trustee (or in a similar capacity).

With respect to a specified Person other than an individual:

(a)      any Person that directly or indirectly controls, is directly or indirectly controlled by, or is directly or indirectly under common control with such specified Person;

(b)      any Person that holds a Material Interest in such specified Person;

(c)      each Person that serves as a director, officer, manager, member, partner, executor or trustee of such specified Person (or in a similar capacity);

(d)      any Person in which such specified Person holds a Material Interest;

(e)      any Person with respect to which such specified Person serves as a general partner, manager, managing member or a trustee (or in a similar capacity); and

(f)      any Related Person of any individual described in clause (b) or (c).

For purposes of this definition, (a) the "***Family***" of an individual includes (i) the individual, (ii) the individual's spouse and former spouses, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree, and (iv) any other natural person who resides with such individual, and (b) "***Material Interest***" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of voting securities or other voting interests representing at least 20% of the outstanding voting power of a Person or equity securities or other equity interests representing at least 30% of the outstanding equity securities or equity interests in a Person.

"***Release***"--any spilling, leaking, emitting, discharging, depositing, escaping, leaching, dumping, or other releasing into the Environment, whether intentional or unintentional.

"***Representative***"--with respect to a particular Person, any director, officer, employee, manager, member, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"***Reseller Agreement***"—attached as <u>Exhibit B</u> hereto.

– 8 –

"***Securities Act***"--the Securities Act of 1933 or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

"***Sellers***"--as defined in the first paragraph of this Agreement.

"***Sellers's Closing Documents***"--as defined in Section 3.2(a).

"***Shares***"--as defined in the Recitals of this Agreement.

"***Subsidiary***"--with respect to any Person (the "***Owner***"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred) are held by the Owner or one or more of its Subsidiaries; when used without reference to a particular Person, "Subsidiary" means a Subsidiary of the Company.

"***Tax***"--any tax (including, without limitation, any income tax, capital gains tax, value-added tax, sales tax, property tax, gift tax, estate tax), levy, assessment, tariff, duty (including any customs duty), deficiency, or other fee, and any related charge or amount (including any fine, penalty, interest, or addition to tax), imposed, assessed, or collected by or under the authority of any Governmental Body or payable pursuant to any tax-sharing agreement or any other Contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, deficiency, or fee.

"***Tax Return***"--any return (including any information return), report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Legal Requirement relating to any Tax.

"***Textron***"--means Textron Financial Corporation.

"***Threat of Release***"--a substantial likelihood of a Release that may require action in order to prevent or mitigate damage to the Environment that may result from such Release.

"***Threatened***"--a claim, Proceeding, dispute, action, or other matter will be deemed to have been "Threatened" if any demand or statement has been made (orally or in writing) or any notice has been given (orally or in writing), or if any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such a claim, Proceeding, dispute, action, or other matter is likely to be asserted, commenced, taken, or otherwise pursued in the future.

"***Trade Secrets***"--as defined in Section 3.22(a).

"***Welfare Plan***"--has the meaning given in ERISA § 3(1).

– 9 –

## ARTICLE II
## SALE AND TRANSFER OF SHARES; CLOSING

**2.1    Shares.** Subject to the terms and conditions of this Agreement, at the Closing, the Sellers will sell, assign, transfer and deliver the Shares to the Buyer, and the Buyer will purchase and pay for the Shares from the Sellers. The certificates representing the Shares shall be duly endorsed in blank, and accompanied or represented by stock powers duly executed in blank, by the Seller transferring the same, and each Seller agrees to cure any deficiencies with respect to the endorsement of the certificates representing the Shares owned by such Seller or with respect to the stock power provided therewith or in lieu thereof. The two percent (2%) of the capital stock of the Company not constituting the Shares shall be held equally by each Seller in the amount of one percent (1%) each.

**2.2    Purchase Price.** The purchase price (the *"Purchase Price"*) for the Shares will be Six Million Three Hundred Eighty-Six Thousand, Seven Hundred One and 00/100 Dollars ($6,386,701.00) and performance of certain other obligations, as set forth below:

(a)    at the Closing, wire transfer in the amount of Five Million and 00/100 Dollars ($5,000,000.00) (the *"Cash Consideration"*), in immediately available funds, allocated between Textron's and Sellers' respective bank accounts in accordance with written instructions provided by Sellers at least three (3) days prior to the Closing, as follows:

(i)    to Textron, such amount as shall equal the outstanding balance of the Company's account with Textron so as to terminate and release all Textron Encumbrances and restrictions on Company assets (the *"Textron Payment"*); and

(ii)    to the Sellers, the Cash Consideration less the Textron Payment, with each Seller receiving his proportionate share of such payment based on the ownership of the Shares purchased by Buyer.

(b)    at the Closing, the Sellers shall deposit with Bank of America, N.A. (the *"Escrow Agent"*), the amount of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) (the *"Indemnity Escrow"*), to be held in an interest bearing account by the Escrow Agent for a period of one year after Closing, pursuant to the terms of an escrow agreement acceptable to the parties (the *"Escrow Agreement"*), as security for the performance by Sellers of the indemnity obligations of this Agreement.

(i)    The Indemnity Escrow shall be released by Escrow Agent to Buyer upon the written request of Buyer if, whenever and to the extent that Buyer is entitled to indemnity under this Agreement.

(ii)    Twelve (12) months following the Closing Date (the *"Indemnity Escrow Termination Date"*) the Buyer will cause the Escrow Agent to deliver to the Sellers the balance of the Indemnity Escrow, less the amount of any paid or pending claims for indemnification against Sellers hereunder. If on the Indemnity Escrow Termination Date there are any pending or reasonably expected claims

– 10 –

with respect to the Indemnity Escrow, the Buyer will cause the Escrow Agent to deliver to the Sellers the portion of the then-remaining Indemnity Escrow Funds, if any, that exceed the amount necessary to provide for payment in full of any pending or expected claims for indemnification.  The balance of the Indemnity Escrow will be delivered to the Sellers by the Escrow Agent within five (5) business days after resolution or release of any such pending or expected claims. In each case, the Escrow Agent will deliver to each of the Sellers such Seller's proportionate share of the Indemnity Escrow being released based on the amount of Shares sold by each Seller hereunder.  Any interest or earnings upon the Indemnity Escrow, after payment of the fees and costs of the Escrow Agent from the Indemnity Escrow, shall be added to and become a part of the Indemnity Escrow and disbursed in accordance with the provisions hereof.

(c)      at the Closing, the Company shall forgive and cancel the ABC Loan Receivable.

(d)      at the Closing, execution and delivery by Sellers (and any other owners) on behalf of ABC, of the Option Agreement and Reseller Agreement in a form acceptable to parties.

(e)      immediately prior to Closing, the Sellers may sweep and withdraw up to $_____.00 in remaining cash from the Company, and the Sellers shall be the sole and exclusive owners of such cash.

**2.3      Closing.**  The purchase and sale (the "*Closing*") provided for in this Agreement will take place at the offices of Buyer's counsel at Leach Travell Britt pc, 8270 Greensboro Drive, Suite 1050, McLean, Virginia  22102 at 10:00 a.m. (local time) on the later of (i) June 30, 2008 or (ii) at such other time and place as the parties may agree.

**2.4      Closing Obligations.**  At the Closing:      .

(a)      Sellers will deliver to Buyer:

(i)      certificates representing the Shares, representing not less than 98% of all of the capital stock of the Company, duly endorsed (or accompanied by duly executed stock powers), for transfer to Buyer;

(ii)      a certificate executed by Sellers representing and warranting to Buyer that each of Sellers's representations and warranties in this Agreement is accurate in all respects as of the Closing Date as if made on the Closing Date and identifying any Breaches of (or exceptions to) such representations and warranties as of such date;

(iii)      the resignations of all directors and officers, each of whom hereby irrevocably and unconditionally waives and releases, in favor of the Company and the Buyer, any and all claims, debts, liabilities, damages and obligations of any kind or nature, known or unknown, including attorneys' fees, arising or accruing with regard to the Company or such person's prior employment or work therewith prior to the Closing Date;

– 11 –

(iv)     an opinion of counsel to Sellers in form and substance reasonably satisfactory to Buyer customary for similar transactions as described herein (the "**Sellers' Counsel Opinion Letter**"); and

(v)     all other documents, certificates, instruments or writings required to be delivered by Sellers prior to or at the Closing pursuant to this Agreement or otherwise required in connection herewith.

(b)     Buyer will deliver to Sellers:

(i)     the amount, by wire transfer of immediately available funds to Textron's and to Sellers' approved bank accounts as described herein, of $5,000,000.00;

(ii)     a certificate executed by Buyer to the effect that, except as otherwise stated in such certificate, each of Buyer's representations and warranties in this Agreement was accurate in all respects as of the date of this Agreement and is accurate in all respects as of the Closing Date as if made on the Closing Date;

(iii)     the Employment Agreements executed by Buyer on behalf of the Company; and

(iv)     all other documents, certificates, instruments or writings required to be delivered by Buyer prior to or at the Closing pursuant to this Agreement or otherwise required in connection herewith.

(c)     <u>Board of Directors and Officers</u>.  As of the Closing, Earle D. Munns, Jr. shall be a director of the Company and shall serve as President & CEO thereof, and Michael A. Byrd shall be a director of the Company and shall serve as Executive Vice President thereof, each to hold office until his respective successors are duly appointed and qualified.  Other officers and directors may be named prior to Closing.

(d)     <u>Intra-Company Debt</u>.  All indebtedness, including loans, advances and expenses, by, among or between the Sellers and the Company and by or between any directors, officers and employees and the Company shall have been repaid by the Company or waived and released by the lender or recipient in full.

**2.5     Post-Closing Obligations.**  Following the Closing, the Company will:

(a)     pay to the Sellers the full amount, including the earning or net profits, collected by the Company after Closing that are directly related to and attributable to a Textron account payable paid by Seller at Closing (the "**Textron Payable Reimbursement**").  A list of the Textron accounts payable paid by Seller is set forth in Exhibit D hereto.  The Textron Payable Reimbursements shall be paid, in each case, within (10) days of the Company's receipt of the Account Receivable attributable thereto.

**Formatted:** Indent: First line:  0.5"

**Deleted:** their respective proportionate share of the Accounts Receivable

**Deleted:** and, in each case, only such portion of the Account Receivable as equals the related payable (*i.e.*, the earnings or net profits on such Accounts Receivable and any portion thereof attributable to any other vendor shall remain with the Company)

– 12 –

(b)    In addition to, and without limiting, 2.5(a), the Company will pay to Sellers fifty percent (50%) of all Accounts Receivable (excluding Accounts Receivable which are payable under 2.5(a)) (the "Non-Textron Payable Reimbursement") within ten (10) days of the Company's receipt of such Account Receivable.

**Deleted:** .

(c)    The Company shall continue to make the Textron Payable Reimbursement and Non-Textron Payable Reimbursement payments until the Company has paid Sellers $_____ under this Section 2.5.

(d)    The Company shall pay to the Sellers the sales tax refund from the Commonwealth of Virginia in the amount of $5,654.59 (or such other amount(s) as may be received) within ten (10) days of receipt.

**Formatted:** Heading 3

**Deleted:** _____

**2.6    Tax Election.**    The parties agree to make such elections and filings with the IRS relating to the tax consequences of the Contemplated Transactions as Sellers may reasonably request, consistent with applicable law and regulation as each party deems appropriate.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Sellers' Disclosure Schedule attached to this Agreement (the "*Sellers' Disclosure Schedule*"), the Sellers do each hereby represent and warrant to Buyer as follows:

**3.1    Organization and Good Standing.**

(a)    Except as set forth in Section 3.1 of the Sellers' Disclosure Schedule, the Company is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under Applicable Contracts.  The Company is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

**Deleted:** T

(b)    Sellers have delivered to Buyer copies of the Organizational Documents of the Company, as currently in effect.

**3.2    Authority; No Conflict.**

(a)    This Agreement constitutes the legal, valid, and binding obligation of the Sellers, enforceable against the Sellers in accordance with its terms.  Each Seller has the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and to perform his obligations under this Agreement.

(b)    Except as set forth in Section 3.2 of the Sellers' Disclosure Schedule, to Sellers' Knowledge, neither the execution and delivery of this Agreement nor the consummation or

– 13 –

performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time):

(i)      contravene, conflict with, or result in a violation of (A) any provision of the Organizational Documents of the Company or ABC, or (B) any resolution adopted by the board of directors or the shareholders of the Company or the members or managers of ABC;

(ii)      contravene, conflict with, or result in a violation of, or give any Governmental Body or other Person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under, any Legal Requirement or any Order to which the Company, ABC or Sellers, or any of the assets owned or used by the Company or ABC or the Shares may be subject;

(iii)      contravene, conflict with, or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate, or modify, any Governmental Authorization that is held by the Company or ABC or that otherwise relates to the business of, or any of the assets owned or used by, the Company or ABC;

(iv)      cause Buyer or the Company to become subject to, or to become liable for the payment of, any Tax;

(v)      cause any of the assets owned by the Company to be reassessed or revalued by any taxing authority or other Governmental Body;

(vi)      contravene, conflict with, or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Applicable Contract or any material contract to which ABC or the Sellers are a party; or

(vii)      result in the imposition or creation of any Encumbrance upon or with respect to any of the assets owned or used by the Company or ABC.

Except as set forth in Section 3.2 of the Sellers' Disclosure Schedule, to Sellers' Knowledge, neither Sellers nor the Company is or will be required to give any notice to or obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

**3.3      Capitalization.**

(a)      <u>The Company</u>.  The authorized equity securities of the Company consist of 5,000 shares of common stock, par value $1.00 per share, of which 1,500 shares are issued and outstanding and constitute the Shares.  No preferred stock is authorized or issued and outstanding.  The Sellers are and will be on the Closing Date the record and beneficial owner and

– 14 –

holder of the Shares, free and clear of all Encumbrances. Sellers owns 100% of the Shares. No legend or other reference to any purported Encumbrance appears on any certificate representing equity securities of the Company. All of the outstanding equity securities of the Company have been duly authorized and validly issued and are fully paid and non-assessable. There are no Contracts relating to the issuance, sale or transfer of any equity securities or other securities of the Company or any securities or instruments convertible into such securities. None of the outstanding equity securities or other securities of the Company was issued in violation of the Securities Act or any other Legal Requirement. The Company does not own, and does not have any Contract to acquire (excluding the Option Agreement), any equity securities or other securities of any Person or any direct or indirect equity or ownership interest in any other business. The Company has no Subsidiaries.

(b)     **ABC**. The membership interests or other ownership interests of ABC consist of units or percentages of membership interest held by the following Persons in the following amounts:

| <u>Member</u> | <u>Membership Units</u> |
|:---:|:---:|
| AC Technology Enterprises, LLC (or successor) | 50,000 (preferred) |
| AC Technology Enterprises, LLC (or successor) | 865 (common) |
| Justin Sands | 100 (common) |
| Jeffrey Groves | 20 (common) |
| Arthur Joyce | 15 (common) |

The foregoing members are and will be on the Closing Date the record and beneficial owner and holder of all of the membership interests of ABC, free and clear of all Encumbrances. There are no Contracts relating to the issuance, sale, or transfer of any membership interest or other securities of ABC. ABC does not own, and does not have any Contract to acquire, any equity securities or other securities of any Person or any direct or indirect equity or ownership interest in any other business. ABC has no Subsidiaries.

3.4     **Financial Statements**. Sellers have delivered to Buyer: (a) a consolidated balance sheet of the Company as of December 31, 2007 (the "***Balance Sheet***"), and the related statements of income and cash flow for the fiscal year then ended (the "***Annual Financial Statement***"), (b) an unaudited consolidated balance sheet of the Company as at May 31, 2008 (the "***Interim Balance Sheet***"), and the related statements of income and cash flow for the interim period then ended (the "***Year-To-Date Financial Statement***"), and (c) a consolidated balance sheet of the Company and the related statements of income and cash flow for each full month since May 31, 2008 (the "***Monthly Financial Statements***"). Such financial statements

– 15 –

and the related notes thereto fairly present the financial condition and the results of operations, and cash flow of the Company as at the respective dates of and for the periods referred to in such financial statements, all in accordance with GAAP, subject, in the case of interim financial statements, to normal recurring year-end adjustments (the effect of which will not, individually or in the aggregate, be materially adverse) and the absence of notes (that, if presented, would not differ materially from those included in the Balance Sheet); the financial statements referred to in this Section 3.4 reflect the consistent application of such accounting principles throughout the periods involved.  No financial statements of any Person other than the Company are required by GAAP to be included in the consolidated financial statements of the Company.

3.5    **Books and Records.**  The books of account, minute books, stock record books, and other records of the Company, all of which have been made available to Buyer, are complete and correct.  The minute books of the Company contain accurate and complete records of all meetings held of, and corporate action taken by, the stockholders, the Board of Directors, and committees of the Board of Directors of the Company.  At the Closing, all of those books and records will be in the possession of the Company.

3.6    **Title to Properties; Encumbrances.**  The Company owns no real property.  The Company owns all the properties and assets (whether tangible or intangible) that it purports to own located in the facilities operated by the Company or reflected as owned in the books and records of the Company, including all of the properties and assets reflected in the Balance Sheet and the Interim Balance Sheet (except for assets held under capitalized leases disclosed or not required to be disclosed and described in Section 3.6 of the Sellers' Disclosure Schedule and personal property sold since the date of the Balance Sheet and the Interim Balance Sheet, as the case may be, in the Ordinary Course of Business), and all of the properties and assets purchased or otherwise acquired by the Company since the date of the Balance Sheet (except for personal property acquired and sold since the date of the Balance Sheet in the Ordinary Course of Business and consistent with past practice).  All material properties and assets reflected in the Balance Sheet and the Interim Balance Sheet are or as of the Closing Date will be free and clear of all Encumbrances of any nature except for liens for current taxes not yet due.

3.7    **Condition and Sufficiency of Assets.**  To Sellers' Knowledge, the buildings, plants, structures and equipment owned or used by the Company are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, or equipment is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.  The buildings, plants, structures, and equipment owned or used by the Company are sufficient for the continued conduct of the Company's business after the Closing in substantially the same manner as conducted prior to the Closing.

3.8    **Accounts Receivable.**  Except as set forth in Section 3.8 of the Sellers' Disclosure Schedule, all accounts receivable of the Company that are reflected on the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Company as of the Closing Date (collectively, the "*Accounts Receivable*") represent or will represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business.  Unless paid prior to the Closing Date, the Accounts Receivable are or will

– 16 –

be as of the Closing Date current and collectible net of the respective reserves shown on the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Company as of the Closing Date (which reserves are adequate and calculated consistent with past practice and, in the case of the reserve as of the Closing Date, will not represent a greater percentage of the Accounts Receivable as of the Closing Date than the reserve reflected in the Interim Balance Sheet represented of the Accounts Receivable reflected therein and will not represent a material adverse change in the composition of such Accounts Receivable in terms of aging). Subject to such reserves and Section 3.8 of the Sellers' Disclosure Schedule, to Sellers' Knowledge (i) each of the Accounts Receivable either has been or will be collected in full, without any set-off, within ninety days after the day on which it first becomes due and payable, and (ii) there is no contest, claim, or right of set-off, other than returns in the Ordinary Course of Business, under any Contract with any obligor of an Accounts Receivable relating to the amount or validity of such Accounts Receivable. The Sellers have provided Buyer with a complete and accurate list of all Accounts Receivable as of the date of the Interim Balance Sheet, which list sets forth the aging of such Accounts Receivable.

    **3.9    Inventory.** The Sellers' have provided Buyer a list of all Inventory.

    **3.10    No Undisclosed Liabilities.** Except as set forth in Section 3.10 of the Sellers' Disclosure Schedule, to Sellers' Knowledge the Company has no liabilities or obligations of any nature (whether known or unknown and whether absolute, accrued, contingent, or otherwise) except for liabilities or obligations reflected or reserved against in the Balance Sheet or the Interim Balance Sheet and current liabilities incurred in the Ordinary Course of Business since the respective dates thereof.

    **3.11    Taxes.**

    (a)    The Company and ABC have filed or caused to be filed all Tax Returns that are or were required to be filed by or with respect to either company, either separately or on a consolidated basis, pursuant to applicable Legal Requirements. Sellers have delivered to Buyer copies of all such Tax Returns relating to income or franchise taxes filed since 2007. The Company has paid, or made provision for the payment of, all Taxes that have or may have become due pursuant to those Tax Returns or otherwise, or pursuant to any assessment received by Sellers or the Company, except such Taxes, if any, as are listed in Section 3.11 of the Sellers' Disclosure Schedule and are being contested in good faith and as to which adequate reserves (determined in accordance with GAAP) have been provided in the Balance Sheet and the Interim Balance Sheet.

    (b)    Section 3.11 of the Sellers' Disclosure Schedule contains a complete and accurate list of all audits of any Tax Returns by the IRS or relevant state tax authorities since 2005, including a reasonably detailed description of the nature and outcome of each audit. All deficiencies proposed as a result of such audits have been paid, reserved against, settled, or, as described in Section 3.11 of the Sellers' Disclosure Schedule, are being contested in good faith by appropriate proceedings. Section 3.11 of the Sellers' Disclosure Schedule describes all adjustments to the U.S. federal income Tax Returns filed by the Company or any group of corporations including the Company for all taxable years since 2005, and the resulting

– 17 –

deficiencies proposed by the IRS.  Except as described in Section 3.11 of the Sellers' Disclosure
Schedule, neither Sellers nor the Company has given or been requested to give waivers or
extensions (or is or would be subject to a waiver or extension given by any other Person) of any
statute of limitations relating to the payment of Taxes of the Company or for which the Company
may be liable.  No audit or other proceeding by any Governmental Body is pending or threatened
with respect to any Taxes due from or with respect to the Company or any Tax Return filed by or
with respect to the Company.

(c)    The charges, accruals, and reserves with respect to Taxes on the books of the
Company are adequate (determined in accordance with GAAP) and are at least equal to the
Company's liability for Taxes.  There exists no proposed tax assessment against the Company
except as disclosed in the Balance Sheet or in Section 3.11 of the Sellers' Disclosure Schedule.
No consent to the application of Section 341(f)(2) of the IRC has been filed with respect to any
property or assets held, acquired, or to be acquired by the Company.  All Taxes that the Company
is or was required by Legal Requirements to withhold or collect have been duly withheld or
collected and, to the extent required, have been paid to the proper Governmental Body or other
Person.  The Company is not currently subject to an agreement or requirement to make any
adjustment pursuant to Section 481 of the IRC by reason of any change in any accounting method
of the Company and there is no application pending with any Governmental Body requesting
permission for any changes in any accounting period.  The Company is not a "foreign person"
within the meaning of Section 1445(b)(12) of the IRC.

(d)    All Tax Returns filed by (or that include on a consolidated basis) the Company are
true, correct, and complete.  There is no tax sharing agreement that will require any payment by
the Company after the date of this Agreement.

**3.12    No Material Adverse Change.**  To the Sellers' Knowledge, since the date of the
Balance Sheet, except as set forth in the Seller's Disclosure Schedule, there has not been any
material adverse change in the business, operations, properties, prospects, assets or condition of
the Company, and no event has occurred or circumstance exists that may result in such a material
adverse change.

**3.13    Employee Benefits.**

(a)        (i)    Section 3.13(i) of the Sellers' Disclosure Schedule contains a
complete and accurate list of all Company Plans and Company Other Benefit
Obligations, and identifies as such all Company Plans that are (A) defined benefit
Pension Plans, (B) Qualified Plans or (C) Multi-Employer Plans.

(ii)    Section 3.13(ii) of the Sellers' Disclosure Schedule sets forth, for
each Multi-Employer Plan, the most recently available information within the
Knowledge of the Company or Sellers concerning the amount of potential
withdrawal liability of the Company and the Company's ERISA Affiliates,
calculated according to information made available pursuant to ERISA § 4221(e),
and, if applicable, the amount of such potential withdrawal liability allocable to

– 18 –

the Company based solely on their contribution history and/or the participation by their employees in the Multi-Employer Plan.

(iii)    Section 3.13(iii) of the Sellers' Disclosure Schedule sets forth the financial cost of all obligations owed under any Company Plan or Company Other Benefit Obligation that is not subject to the disclosure and reporting requirements of ERISA.

(b)    Sellers have delivered to Buyer:

(i)    all documents that set forth the terms of each Company Plan or Company Other Benefit Obligation and any related trust; custodial account or other funding vehicle;

(ii)    all personnel, payroll, and employment manuals and policies applicable to employees of the Company;

(iii)    all collective bargaining agreements pursuant to which contributions have been made or obligations incurred (including both pension and welfare benefits) by the Company, and all collective bargaining agreements pursuant to which contributions are being made or obligations are owed by such entities;

(iv)    a written description of any Company Plan or Company Other Benefit Obligation that is not otherwise in writing;

(v)    all insurance policies purchased by or to provide benefits under any Company Plan;

(vi)    all contracts with third party administrators, actuaries, investment managers, consultants and other independent contractors that relate to any Company Plan or Company Other Benefit Obligation;

(vii)    to Seller's Knowledge all reports submitted within the three years preceding the date of this Agreement by third party administrators, actuaries, investment managers, consultants, or other independent contractors with respect to any Company Plan or Company Other Benefit Obligation;

(viii)    a reasonably representative sample of notifications to employees of the Company of its rights under ERISA § 601 et seq. and IRC § 4980B;

(ix)    to Seller's Knowledge the Form 5500 filed in the three most recent plan years with respect to each Company Plan, including all schedules thereto and the opinions of independent accountants;

(x)    to Seller's Knowledge all notices that were given by the Company or any Company Plan to the IRS, the PBGC, or the U.S. Department of Labor,

– 19 –

pursuant to statute, within the three years preceding the date of this Agreement, including notices that are expressly mentioned elsewhere in this Section 3.13;

(xi)    to Seller's Knowledge all notices that were given by the IRS, the PBGC, or the U.S. Department of Labor to the Company or any Company Plan within the three years preceding the date of this Agreement; and

(xii)    to Seller's Knowledge, with respect to Company Plans which are Qualified Plans, the most recent determination letter (and where an application for same is pending, a copy of the application, and a copy of the acknowledgment from the IRS of receipt of such application), and with respect to Company Plans which are Welfare Plans, the most recent ruling concerning the tax-exempt status of any voluntary employees' beneficiary association under IRC § 501(c)(9) under which assets of such Welfare Plan are held and invested (and where an application for same is pending, a copy of such application).

(c)    Except as set forth in Section 3.13(iv) of the Sellers' Disclosure Schedule, to Seller's Knowledge:

(i)    The Company has performed all of its obligations under all Company Plans and Company Other Benefit Obligations. The Company has made appropriate entries in accordance with GAAP in its financial records and statements for all obligations and liabilities under such Plans and Company Other Benefit Obligations that have accrued but are not due.

(ii)    No statement, either written or oral, has been made by Sellers or the Company to any Person with regard to any Company Plan or Other Benefit Obligation that was not in accordance with the Plan or Other Benefit Obligation and that could have a materialadverse economic consequence to the Company or to Buyer.

(iii)    The Company, with respect to all Company Plans and Company Other Benefits Obligations are, and each Company Plan and Company Other Benefit Obligation is, in full compliance with ERISA, the IRC, and other applicable Laws including the provisions of such Laws expressly mentioned in this Section 3.13, and with any applicable collective bargaining agreement.

(A)    No transaction prohibited by ERISA § 406 and no "prohibited transaction" under IRC § 4975(c) have occurred with respect to any Company Plan.

(B)    The Company has no liability to the IRS with respect to any Company Plan or ERISA Affiliate Plan, including any liability for any excise tax liability imposed by Chapter 43 of the IRC.

(C)    The Company has no liability to pay any civil penalty under ERISA § 502 or § 4071.

– 20 –

(D)    All filings required by ERISA and the IRC as to each Company Plan have been timely filed, and all notices and disclosures to participants required by either ERISA or the IRC have been timely provided.

(iv)    Each Company Plan can be terminated within thirty days, without payment of any additional contribution or amount and without the vesting or acceleration of any benefits promised by such Plan.

(v)    No event has occurred or circumstance exists that could result in a material increase in premium costs of Company Plans and Company Other Benefit Obligations that are insured, or a material increase in benefit costs of such Plans and Obligations that are self-insured.

(vi)    Other than claims for benefits submitted by participants or beneficiaries in the Ordinary Course of Business, no claim against, or legal proceeding involving, any Company Plan or Company Other Benefit Obligation is pending or, to Sellers's Knowledge, is Threatened.

(vii)    All contributions required under ERISA § 302 and IRC § 402 with respect to any Company Plan or ERISA Affiliate Plan subject to same have been made timely and in full (without regard to any waiver or extension granted thereunder), and all PBGC premiums with respect to any Company Plan or ERISA Affiliate Plan which is a Title IV Plan have been paid timely and in full.

(viii)    Since the last valuation date for each Pension Plan of the Company, no event has occurred or circumstance exists that would increase the amount of benefits under any such Plan or that would cause the excess of Plan assets over benefit liabilities (as defined in ERISA § 4001) to decrease, or the amount by which benefit liabilities exceed assets to increase.

(ix)    Neither the Company nor any ERISA Affiliate of the Company has withdrawn from any Multi-Employer Plan with respect to which there is any outstanding liability as of the date of this Agreement.  No event has occurred or circumstance exists that presents a risk of the occurrence of any withdrawal from, or the termination, reorganization, merger, spin off, asset or liability transfer, or insolvency of, any Multi-Employer Plan that could result in any liability of either the Company or Buyer to a Multi-Employer Plan (or could materially increase any existing liability).

(x)    Except to the extent required under ERISA § 601 et seq. and IRC § 4980B, the Company does not provide health or welfare benefits for any retired or former employee or is obligated to provide health or welfare benefits to any active employee following such employee's retirement or other termination of service.

– 21 –

(xi)    No payment that is owed or may become due to any director, officer, employee, or agent of the Company will be non-deductible to the Company or subject to tax under IRC § 280G or § 4999; nor will the Company be required to "gross up" or otherwise compensate any such person because of the imposition of any excise tax on a payment to such person.

(xii)    The consummation of the Contemplated Transactions will not result in the payment, vesting, or acceleration of any benefit.

(xiii)    There is not now nor has there ever been a Company Plan or ERISA Affiliate Plan which is a Title IV Plan or which is otherwise subject to the minimum funding requirements imposed under IRC Section 412 and ERISA Section 302.

**3.14    Compliance with Legal Requirements; Governmental Authorizations.**

(a)    Except as set forth in Section 3.14 of the Sellers' Disclosure Schedule, to Seller's Knowledge:

(i)    the Company is, and at all times since December 31, 2006 has been, in full compliance with each Legal Requirement that is or was applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets;

(ii)    no event has occurred or circumstance exists that (with or without notice or lapse of time) (A) may constitute or result in a violation by the Company of, or a failure on the part of the Company to comply with, any Legal Requirement, (B) may give rise to any obligation on the part of the Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature or (C) may result in the imposition of lien against the Company or any its property under any Legal Requirement; and

(iii)    the Company has not received, at any time since December 31, 2006 any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential violation of, or failure to comply with, any Legal Requirement, or (B) any actual, alleged, possible, or potential obligation on the part of the Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature; and

(iv)    Sellers knows of no reason why such Governmental Authorizations will not be reissued or transferred in the ordinary course if required as a result of the execution and consummation of this Agreement.

(b)    Section 3.14 of the Sellers' Disclosure Schedule contains a complete and accurate list of each current Governmental Authorization that is held by the Company or that otherwise relates to the business of, or to any of the assets owned or used by, the Company.  Each

– 22 –

Governmental Authorization listed or required to be listed in Section 3.14 of the Sellers'
Disclosure Schedule is valid and in full force and effect. Except as set forth in Section 3.14 of
the Sellers' Disclosure Schedule, to Seller's Knowledge:

> (i)      the Company is, and at all times since December 31, 2006 has
> been, in full compliance with all of the terms and requirements of each
> Governmental Authorization identified or required to be identified in Section 3.14
> of the Sellers' Disclosure Schedule;

> (ii)     no event has occurred or circumstance exists that may (with or
> without notice or lapse of time) (A) constitute or result directly or indirectly in a
> violation of or a failure to comply with any term or requirement of any
> Governmental Authorization listed or required to be listed in Section 3.14 of the
> Sellers' Disclosure Schedule, or (B) result directly or indirectly in the revocation,
> withdrawal, suspension, cancellation, or termination of, or any modification to,
> any Governmental Authorization listed or required to be listed in Section 3.14 of
> the Sellers' Disclosure Schedule;

> (iii)    the Company has not received, at any time since December 31,
> 2006 any notice or other communication (whether oral or written) from any
> Governmental Body or any other Person regarding (A) any actual, alleged,
> possible, or potential violation of or failure to comply with any term or
> requirement of any Governmental Authorization, or (B) any actual, proposed,
> possible, or potential revocation, withdrawal, suspension, cancellation,
> termination of, or modification to any Governmental Authorization; and

> (iv)     all applications required to have been filed for the renewal of the
> Governmental Authorizations listed or required to be listed in Section 3.14 of the
> Sellers' Disclosure Schedule have been duly filed on a timely basis with the
> appropriate Governmental Bodies, and all other filings required to have been
> made with respect to such Governmental Authorizations have been duly made on
> a timely basis with the appropriate Governmental Bodies.

The Governmental Authorizations listed in Section 3.14 of the Sellers' Disclosure
Schedule collectively constitute all of the Governmental Authorizations necessary to permit the
Company to lawfully conduct and operate its businesses in the manner it currently conducts and
operates such businesses and to permit the Company to own and use its assets in the manner in
which it currently owns and uses such assets.

### 3.15    Legal Proceedings; Orders.

(a)      Except as set forth in Section 3.15 of the Sellers' Disclosure Schedule, to Seller's
Knowledge there is no pending Proceeding:

– 23 –

       (i)      that has been commenced by or against the Company or ABC or that otherwise relates to or may affect the business of, or any of the assets owned or used by, the Company or ABC; or

       (ii)      that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.

To the Knowledge of Sellers and the Company, (1) no such Proceeding has been Threatened, and (2) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Proceeding. Sellers have delivered to Buyer copies of all pleadings, correspondence, and other documents relating to each Proceeding listed in Section 3.15 of the Sellers' Disclosure Schedule. The Proceedings listed in Section 3.15 of the Sellers' Disclosure Schedule will not have a material adverse effect on the business, operations, assets, condition, or prospects of the Company.

    (b)    Except as set forth in Section 3.15 of the Sellers' Disclosure Schedule:

       (i)      there is no Order to which the Company or ABC, or any of the assets owned or used by the Company, is subject;

       (ii)      Neither Sellers nor ABC are subject to any Order that relates to the business of, or any of the assets owned or used by, the Company or ABC; and

       (iii)      no officer, director, agent, or employee of the Company or ABC is subject to any Order that prohibits such officer, director, agent, or employee from engaging in or continuing any conduct, activity, or practice relating to the business of the Company.

    (c)    Except as set forth in Section 3.15 of the Sellers' Disclosure Schedule:

       (i)      the Company and ABC are, and at all times since December 31, 2006 have been, in full compliance with all of the terms and requirements of each Order to which it, or any of the assets owned or used by it, is or has been subject;

       (ii)      no event has occurred or circumstance exists that may constitute or result in (with or without notice or lapse of time) a violation of or failure to comply with any term or requirement of any Order to which the Company or ABC, or any of the assets owned or used by the Company or ABC, is subject; and

       (iii)      neither the Company nor ABC has received, at any time since December 31, 2006, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply with, any term or requirement of any Order to which the Company or ABC, or any of the assets owned or used by the Company or ABC, is or has been subject.

**3.16    Absence of Certain Changes and Events.** Except as set forth in Section 3.16 of the Sellers' Disclosure Schedule, since the date of the Balance Sheet, the Company and ABC have conducted their business only in the Ordinary Course of Business and to Seller's Knowledge there has not been any:

(a)    change in the Company's or ABC's authorized or issued capital stock or membership interest; grant of any stock option or right to purchase shares of capital stock or membership interest of the Company or ABC; issuance of any security convertible into such capital stock or membership interest; grant of any registration rights; purchase, redemption, retirement, or other acquisition by the Company or ABC of any shares of any such capital stock or membership interest; or declaration or payment of any dividend or other distribution or payment in respect of shares of capital stock or membership interests;

(b)    amendment to the Organizational Documents of the Company or ABC;

(c)    payment or increase by the Company of any bonuses, salaries, or other compensation to any stockholder, director, officer, or (except in the Ordinary Course of Business) employee or entry into any employment, severance, or similar Contract with any director, officer, or employee;

(d)    adoption of, or increase in the payments to or benefits under, any profit sharing, bonus, deferred compensation, savings, insurance, pension, retirement, or other employee benefit plan for or with any employees of the Company or ABC;

(e)    damage to or destruction or loss of any asset or property of the Company or ABC, whether or not covered by insurance, materially and adversely affecting the properties, assets, business, financial condition, or prospects of the Company or ABC;

(f)    entry into, termination of, or receipt of notice of termination of (i) any material license, distributorship, dealer, sales representative, joint venture, credit, or similar agreement, or (ii) any Contract or transaction involving a total remaining commitment by or to the Company of at least $20,000;

(g)    other than in the Ordinary Course of Business, the sale, lease, or other disposition of any asset or property of the Company or ABC or mortgage, pledge, or imposition of any lien or other encumbrance on any material asset or property of the Company or ABC, including the sale, lease, or other disposition of any of the Intellectual Property Assets;

(h)    cancellation or waiver of any claims or rights with a value to the Company in excess of $20,000;

(i)    material change in the accounting methods used by the Company; or

(j)    agreement, whether oral or written, by the Company or ABC to do any of the foregoing.

**3.17    Contracts; No Defaults.**

– 25 –

(a)    Sellers have delivered to Buyer true and complete copies or lists, of:

(i)    each Applicable Contract that involves performance of services or delivery of goods or materials by the Company of an amount or value in excess of $20,000;

(ii)    each Applicable Contract that involves performance of services or delivery of goods or materials to the Company of an amount or value in excess of $20,000;

(iii)    each Applicable Contract that was not entered into in the Ordinary Course of Business and that involves expenditures or receipts of the Company in excess of $20,000;

(iv)    each lease, rental or occupancy agreement, license, installment and conditional sale agreement, and other Applicable Contract affecting the ownership of, leasing of, title to, use of, or any leasehold or other interest in, any real or personal property (except personal property leases and installment and conditional sales agreements having a value per item or aggregate payments of less than $5,000 and with terms of less than one year);

(v)    each licensing agreement or other Applicable Contract with respect to patents, trademarks, copyrights, or other intellectual property, including agreements with current or former employees, consultants, or contractors regarding the appropriation or the non-disclosure of any of the Intellectual Property Assets;

(vi)    each employment contract with any employee;

(vii)    each joint venture, partnership, and other Applicable Contract (however named) involving a sharing of profits, losses, costs, or liabilities by the Company with any other Person;

(viii)    each Applicable Contract containing covenants that in any way purport to restrict the business activity of the Company or any Affiliate of the Company or limit the freedom of the Company or any Affiliate of the Company to engage in any line of business or to compete with any Person;

(ix)    each Applicable Contract providing for payments to or by any Person based on sales, purchases, or profits, other than direct payments for goods;

(x)    each power of attorney that is currently effective and outstanding;

(xi)    each Applicable Contract entered into other than in the Ordinary Course of Business that contains or provides for an express undertaking by the Company to be responsible for consequential damages;

(xii)    each Applicable Contract for capital expenditures in excess of $20,000;

(xiii)    each written warranty, guaranty, and or other similar undertaking with respect to contractual performance extended by the Company other than in the Ordinary Course of Business; and

(xiv)    each amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

(b)    Except as set forth in Section 3.17(b) of the Sellers' Disclosure Schedule, to Sellers' Knowledge:

(i)    neither Sellers nor any Related Person of Sellers has or may acquire any rights under, and neither Sellers nor any Related Person of Sellers has or may become subject to any obligation or liability under, any Contract that relates to the business of, or any of the assets owned or used by, the Company; and

(ii)    no officer, director, agent, or employee of the Company is bound by any Contract that purports to limit the ability of such officer, director, agent, employee, consultant, or contractor to (A) engage in or continue any conduct, activity, or practice relating to the business of the Company, or (B) assign to the Company or to any other Person any rights to any invention, improvement, or discovery.

(c)    Except as set forth in Section 3.17(c) of the Sellers' Disclosure Schedule, to Sellers' Knowledge each material Contract of the Company is in full force and effect.

(d)    Except as set forth in Section 3.17(d) of the Sellers' Disclosure Schedule, to Sellers' Knowledge:

(i)    the Company is, and at all times since December 31, 2006 has been, in full compliance with all material applicable terms and requirements of each material Applicable Contract under which the Company has or had any obligation or liability or by which the Company or any of the assets owned or used by it is or was bound;

(ii)    each other Person that has or had any obligation or liability under any material Applicable Contract under which the Company has or had any rights is, and at all times since December 31, 2006 has been, in full compliance with all material applicable terms and requirements of such Applicable Contract;

(iii)    no event has occurred or circumstance exists that (with or without notice or lapse of time) may contravene, conflict with, or result in a violation or breach of, or give the Company or other Person the right to declare a default or

– 27 –

exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Applicable Contract; and

(iv)    the Company has not given to or received from any other Person, at any time since December 31, 2006, any notice or other communication (whether oral or written) regarding any actual, alleged, possible, or potential violation or breach of, or default under, any material Applicable Contract.

(e)    Except as set forth in Section 3.17(e) of the Sellers' Disclosure Schedule, to Sellers' Knowledge there are no renegotiations of, attempts to renegotiate, or outstanding rights to renegotiate any material amounts paid or payable to the Company under current or completed material Applicable Contracts with any Person and no such Person has made written demand for such renegotiation.

(f)    The Applicable Contracts relating to the sale, design, manufacture, or provision of products or services by the Company has been entered into in the Ordinary Course of Business and have been entered into without the commission of any act alone or in concert with any other Person, or any consideration having been paid or promised, that is or would be in violation of any Legal Requirement.

**3.18    Insurance.**

(a)    Sellers have delivered to Buyer:

(i)    true and complete copies of all policies of insurance to which the Company is a party or under which the Company, or any director of the Company, is or has been covered at any time within the year preceding the date of this Agreement;

(ii)    true and complete copies of all pending applications for policies of insurance; and

(iii)    any statement by the auditor of the Company's financial statements with regard to the adequacy of such entity's coverage or of the reserves for claims.

(b)    Section 3.18(b) of the Sellers' Disclosure Schedule describes:

(i)    any self-insurance arrangement by or affecting the Company, including any reserves established thereunder;

(ii)    any contract or arrangement, other than a policy of insurance, for the transfer or sharing of any risk by the Company; and

(iii)    all obligations of the Company to third parties with respect to insurance (including such obligations under leases and service agreements) and identifies the policy under which such coverage is provided.

– 28 –

(c)    Section 3.18(c) of the Sellers' Disclosure Schedule sets forth, by year, for the current policy year and the preceding policy year:

(i)    a summary of the loss experience under each policy;

(ii)    a statement describing each claim under an insurance policy for an amount in excess of $20,000, which sets forth:

(A)    the name of the claimant;

(B)    a description of the policy by insurer, type of insurance, and period of coverage; and

(C)    the amount and a brief description of the claim; and

(iii)    a statement describing the loss experience for all claims that were self-insured, including the number and aggregate cost of such claims.

(d)    Except as set forth on Section 3.18(d) of the Sellers' Disclosure Schedule:

(i)    All policies to which the Company is a party or that provide coverage to Sellers, the Company, or any director or officer of the Company:

(A)    are valid, outstanding, and enforceable;

(B)    taken together, in Sellers' opinion, provides adequate insurance coverage for the assets and the operations of the Company for risks to which the Company is normally exposed;

(C)    are sufficient for compliance with all Legal Requirements and Contracts to which the Company is a party or by which any of them is bound;

(D)    will continue in full force and effect following the consummation of the Contemplated Transactions; and

(E)    do not provide for any retrospective premium adjustment or other experienced-based liability on the part of the Company.

(ii)    Neither Sellers nor the Company has received (A) any refusal of coverage or any notice that a defense will be afforded with reservation of rights, or (B) any notice of cancellation or any other indication that any insurance policy is no longer in full force or effect or will not be renewed or that the issuer of any policy is not willing or able to perform its obligations thereunder.

(iii)    The Company has paid all premiums due, and have otherwise performed all of its obligations, under each policy to which the Company is a party or that provides coverage to the Company or director thereof.

– 29 –

(iv)    The Company has given notice to the insurer of all claims that may be insured thereby.

**3.19    Environmental Matters.** Except as set forth in Section 3.19 of the Sellers' Disclosure Schedule, to Sellers' Knowledge:

(a)    The Company is, and at all times has been, in full compliance with, and has not been and is not in violation of or liable under, any Environmental Law. Neither Sellers nor the Company have any basis to expect, nor has any of them or any other Person for whose conduct they are or may be held to be responsible received, any actual or Threatened Order, notice, or other communication from (i) any Governmental Body or private citizen acting in the public interest, or (ii) the current or prior owner or operator of any Facilities, of any actual or potential violation or failure to comply with any Environmental Law or of any actual or Threatened Release, or of any actual or Threatened obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities with respect to any of the Facilities or any other properties or assets (whether real, personal, or mixed) in which Sellers or the Company has had an interest, or with respect to any property or Facility at or to which Hazardous Materials were generated, manufactured, refined, transferred, imported, used, or processed by Sellers, the Company, or any other Person for whose conduct they are or may be held responsible, or from which Hazardous Materials have been transported, treated, stored, handled, transferred, disposed, recycled, or received.

(b)    There are no pending or Threatened claims, Encumbrances, or other restrictions of any nature, resulting from any Environmental, Health, and Safety Liabilities or arising under or pursuant to any Environmental Law, with respect to or affecting any of the Facilities or any other properties and assets (whether real, personal, or mixed) in which Sellers or the Company have or had an interest.

(c)    Neither Sellers nor the Company have any basis to expect, nor has any of them or any other Person for whose conduct they are or may be held responsible, received, any citation, directive, inquiry, notice, Order, summons, warning, or other communication that relates to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with any Environmental Law, or of any alleged, actual, or potential obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities with respect to any of the Facilities or any other properties or assets (whether real, personal, or mixed) in which Sellers or the Company had an interest, or with respect to any property or facility to which Hazardous Materials generated, manufactured, refined, transferred, imported, used, or processed by Sellers, the Company, or any other Person for whose conduct they are or may be held responsible, have been transported, treated, stored, handled, transferred, disposed, recycled, or received.

(d)    Neither Sellers nor Company, or any other Person for whose conduct they are or may be held responsible, have any Environmental, Health, and Safety Liabilities with respect to the Facilities or with respect to any other properties and assets (whether real, personal, or mixed) in which Sellers or the Company (or any predecessor), has or had an interest, or any such other property or assets.

– 30 –

(e)      There are no Hazardous Materials present on or in the Environment at the Facilities, including any Hazardous Materials contained in barrels, above or underground storage tanks, landfills, land deposits, dumps, equipment (whether moveable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Facilities or such adjoining property, or incorporated into any structure therein or thereon. Neither Sellers, the Company, any other Person for whose conduct they are or may be held responsible, nor any other Person, have permitted or conducted, or is aware of, any Hazardous Activity conducted with respect to the Facilities or any other properties or assets (whether real, personal, or mixed) in which Sellers or the Company has or had an interest.

(f)      There has been no Release or, to the Knowledge of Sellers and the Company, Threat of Release, of any Hazardous Materials at or from the Facilities or at any other locations where any Hazardous Materials were generated, manufactured, refined, transferred, transported, produced, imported, used, or processed from or by the Facilities, or from or by any other properties and assets (whether real, personal, or mixed) in which Sellers or the Company has or had an interest, whether by Sellers, the Company, or any other Person.

(g)      Sellers have delivered to Buyer true and complete copies and results of any reports, studies, analyses, tests, or monitoring possessed or initiated by Sellers or the Company pertaining to Hazardous Materials or Hazardous Activities in, on, or under the Facilities, or concerning compliance by Sellers, the Company, or any other Person for whose conduct they are or may be held responsible, with Environmental Laws.

**3.20    Employees.**

(a)      Sellers have provided to Buyer a complete and accurate list of the following information for each current employee or director of the Company, including each employee on leave of absence or layoff status:  employer; name; job title; current compensation paid or payable and any change in compensation since January 1, 2007; vacation accrued; and service credited for purposes of vesting and eligibility to participate under the Company's pension, retirement, profit-sharing, thrift-savings, deferred compensation, stock bonus, stock option, cash bonus, employee stock ownership (including investment credit or payroll stock ownership), severance pay, insurance, medical, welfare, or vacation plan or Other Benefit Obligations.

(b)      To Sellers' Knowledge no current employee of the Company is a party to, or is otherwise bound by, any agreement or arrangement, including any confidentiality, non-competition, or proprietary rights agreement, between such employee and any other Person (*"Proprietary Rights Agreement"*) that in any way adversely affects or will affect (i) the performance of his duties as an employee of the Company, or (ii) the ability of the Company to conduct its business, including any Proprietary Rights Agreement with Sellers or the Company by any such employee or director.  To the Knowledge of Sellers and the Company, no Key Employee of the Company intends to terminate his employment with the Company.

(c)      Sellers have also provided Buyer a complete and accurate list of the following information for each retired employee or director of the Company, or their dependents, receiving

benefits or scheduled to receive benefits in the future:  name, pension benefit, pension option election, retiree medical insurance coverage, retiree life insurance coverage, and other benefits.

**3.21   Labor Relations; Compliance.**  The Company has not been or is not a party to any collective bargaining or other labor Contract.  There has not been, there is not presently pending or existing, and there is not Threatened, (a) any strike, slowdown, picketing, work stoppage, or employee grievance process, (b) any Proceeding against or affecting the Company relating to the alleged violation of any Legal Requirement pertaining to labor relations or employment matters, including any charge or complaint filed by an employee or union with the National Labor Relations Board, the Equal Employment Opportunity Commission, or any comparable Governmental Body, organizational activity, or other labor or employment dispute against or affecting the Company or its premises, or (c) any application for certification of a collective bargaining agent.  No event has occurred or circumstance exists that could provide the basis for any work stoppage or other labor dispute.  There is no lockout of any employees by the Company, and no such action is contemplated by the Company.  The Company has complied in all respects with all Legal Requirements relating to employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar taxes, occupational safety and health, and plant closing.  The Company is not liable for the payment of any compensation, damages, taxes, fines, penalties, or other amounts, however designated, for failure to comply with any of the foregoing Legal Requirements.

**3.22   Intellectual Property.**

(a)      The term *"Intellectual Property Assets"* includes:

(i)      all fictional business names, trade names, logos, registered and unregistered trademarks, service marks, and applications for trademarks and service marks (collectively, *"Marks"*);

(ii)      all patents, patent applications, and inventions and discoveries that may be patentable (collectively, *"Patents"*);

(iii)      all copyrights in both published works and unpublished works (collectively, *"Copyrights"*); and

(iv)      all know-how, trade secrets, confidential information, customer lists, software, technical information, data, process technology, plans, drawings, and blue prints (collectively, *"Trade Secrets"*); owned, used, or licensed by the Company as licensee or licensor.

(b)      Sellers have provided to Buyer a complete and accurate list and summary description of all  material Intellectual Property Assets owned by the Company, or for which the Company holds a license, except for any license implied by the sale of a product and perpetual, paid-up licenses for commonly available software programs under which the Company is the

licensee. There are no outstanding and, to the Knowledge of Sellers and the Company, no Threatened disputes or disagreements with respect to any such agreement.

(i)     The Intellectual Property Assets are all those necessary for the operation of the Company's business as it is currently conducted. Except as set forth in Section 3.22(c) of the Sellers' Disclosure Schedule, to the Sellers' Knowledge the Company is the owner or licensee of all necessary rights, title, and interests in the Intellectual Property Assets necessary for the operation of the Company's business as it is currently conducted.

(ii)     Except as set forth in Section 3.22(c) of the Sellers' Disclosure Schedule, to Sellers' Knowledge all former and current employees of the Company have executed written Contracts with the Company that assign to the Company all rights to any inventions, improvements, discoveries, or information relating to the business of the Company. To Sellers' Knowledge, no employee of the Company has entered into any Contract that restricts or limits in any way the scope or type of work in which the employee may be engaged or requires the employee to transfer, assign, or disclose information concerning his work to anyone other than the Company.

(c)     Sellers have provided to Buyer a complete and accurate list and summary description of all Patents. To Sellers' Knowledge, the Company is the owner of all right, title, and interest in and to each of the Patents, free and clear of all Encumbrances.

(ii)     To Sellers' Knowledge, all of the issued Patents are currently in compliance with formal legal requirements (including payment of filing, examination, and maintenance fees and proofs of working or use), are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the Closing Date.

(iii)     To Sellers' Knowledge no Patent has been or is now involved in any interference, reissue, reexamination, or opposition proceeding. To the Knowledge of Sellers and the Company, there is no potentially interfering patent or patent application of any third party.

(iv)     To Sellers' Knowledge no Patent is infringed or, to the Knowledge of Sellers and the Company, has been challenged or threatened in any way. To Sellers' Knowledge, none of the products manufactured and sold, nor any process or know-how used, by the Company infringes or is alleged to infringe any patent or other proprietary right of any other Person.

(v)     To Sellers' Knowledge, all products made, used, or sold under the Patents have been marked with the proper patent notice.

– 33 –

(d)    Sellers have provided to Buyer a complete and accurate list and summary description of all Marks.  To Sellers' Knowledge, the Company is the owner of all right, title, and interest in and to each of the Marks, free and clear of all Encumbrances.

(i)    To Sellers' Knowledge, all Marks that have been registered with the United States Patent and Trademark Office are currently in compliance with all formal legal requirements (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the Closing Date.

(iii)    To Sellers' Knowledge, no Mark has been or is now involved in any opposition, invalidation, or cancellation and, to the Knowledge of Sellers and the Company, no such action is Threatened with the respect to any of the Marks.

(iv)    To the Knowledge of Sellers and the Company, there is no potentially interfering trademark or trademark application of any third party.

(v)    To Sellers' Knowledge, no Mark is infringed or, to the Knowledge of Sellers and the Company, has been challenged or threatened in any way.  To Sellers' Knowledge, none of the Marks used by the Company infringes or is alleged to infringe any trade name, trademark, or service mark of any third party.

(vi)    To Sellers' Knowledge, all products and materials containing a Mark bear the proper federal registration notice where permitted by law.

(vii)    To Sellers' Knowledge, the Company has taken reasonable steps to protect its rights to the Marks, including preventing third parties from improperly using confusingly similar marks to the extent Sellers were aware of such use.

(e)    Sellers have provided to Buyer a complete and accurate list and summary description of all Copyrights.  To Sellers' Knowledge, the Company is the owner of all right, title, and interest in and to each of the Copyrights, free and clear of all Encumbrances.

(i)    To Sellers' Knowledge, no Copyright is infringed or, to the Knowledge of Sellers and the Company, has been challenged or threatened in any way.  To Sellers' Knowledge, none of the subject matter of any of the Copyrights infringes or is alleged to infringe any copyright of any third party or is a derivative work based on the work of a third party.

(iv)    To Sellers' Knowledge, all works encompassed by the Copyrights have been marked with the proper copyright notice.

(f)    With respect to each Trade Secret, to Sellers' Knowledge the documentation relating to such Trade Secret is current, accurate, and sufficient in detail and content to identify and explain it and to allow its full and proper use without reliance on the knowledge or memory of any individual.

– 34 –

(i)     To Sellers' Knowledge, Sellers and the Company have taken all reasonable precautions to protect the secrecy, confidentiality, and value of their Trade Secrets.

(ii)     To Sellers' Knowledge, the Company has good title and an absolute (but not necessarily exclusive) right to use the Trade Secrets.  To Sellers' Knowledge, the Trade Secrets are not part of the public knowledge or literature, and, to the Knowledge of Sellers and the Company, have not been improperly used, divulged, or appropriated either for the benefit of any Person or to the detriment of the Company.  No Trade Secret is subject to any adverse claim or has been challenged or threatened in any way.

(iii)     To the Knowledge of Sellers and the Company, no Trade Secret has been alleged to have been misappropriated from any third party, or challenged or threatened in any way.  To Sellers' Knowledge, none of the Trade Secrets used by the Company infringes or is alleged to infringe any rights of a third party.

**3.23    Certain Payments.**  Since December 31, 2006, neither the Company nor any director, officer, agent, or employee of the Company, nor any other Person associated with or acting for or on behalf of the Company, has directly or indirectly (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services in violation of any Legal Requirement, or (b) established or maintained any fund or asset that has not been recorded in the books and records of the Company.

**3.24    Disclosure.**

(a)     No representation or warranty of Sellers in this Agreement and no statement in the Disclosure Schedule omits to state a known material fact necessary to make the statements herein or therein, in light of the circumstances in which they were made, not misleading.

(b)     No notice given pursuant to Section 5.5 will contain any known untrue statement or omit to state a known material fact necessary to make the statements therein or in this Agreement, in light of the circumstances in which they were made, not misleading.

(c)     There is no fact known to Sellers that has specific application to Sellers or the Company (other than general economic or industry conditions) and that materially adversely affects the assets, business, prospects, financial condition, or results of operations of the Company (on a consolidated basis) that has not been set forth in this Agreement or the Disclosure Schedule.

**3.25    Relationships with Related Persons.**  Neither Sellers nor any Related Person of Sellers or of the Company has, or since the first day of the next to last completed fiscal year of the Company has had, any interest in any property (whether real, personal, or mixed and whether tangible or intangible), used in or pertaining to the Company's business other than ABC.  Neither Sellers nor any Related Person of Sellers or of the Company is, or since the first day of the next

to last completed fiscal year of the Company has owned (of record or as a beneficial owner) an equity interest or any other financial or profit interest in, a Person other than ABC, that has (i) had business dealings or a material financial interest in any transaction with the Company other than business dealings or transactions conducted in the Ordinary Course of Business with the Company at substantially prevailing market prices and on substantially prevailing market terms, or (ii) engaged in competition with the Company with respect to any line of the products or services of the Company (a "*Competing Business*") in any market presently served by the Company except for less than one percent of the outstanding capital stock of any Competing Business that is publicly traded on any recognized exchange or in the over-the-counter market. Except as set forth in Section 3.25 of the Sellers' Disclosure Schedule or that will result from the Contemplated Transactions, neither Sellers nor any Related Person of Sellers or of the Company is a party to any Contract with, or has any claim or right against, the Company.

     **3.26    Brokers or Finders.**  Sellers shall be solely responsible for any and all obligations, fees and liabilities, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement and hereby indemnify and hold Buyer and the Company harmless from any and all claims, losses, liabilities and damages, including attorneys' fees relating to Sellers' brokers or finders.

<div align="center">

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

</div>

     Buyer hereby represents and warrants to Sellers as follows:

     **4.1    Authority; No Conflict.**

     (a)    This Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.  Upon the execution and delivery by Buyer of the Employment Agreements, Option Agreement and Reseller Agreement (collectively, the "*Buyer's Closing Documents*"), the Buyer's Closing Documents will constitute the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.  Buyer has the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and the Buyer's Closing Documents and to perform its obligations under this Agreement and the Buyer's Closing Documents.

     (b)    Neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of any of the Contemplated Transactions by Buyer will give any Person the right to prevent, delay, or otherwise interfere with any of the Contemplated Transactions pursuant to:

          (i)    any provision of Buyer's Organizational Documents;

          (ii)    any resolution adopted by the board of directors or the stockholders of Buyer;

          (iii)    any Legal Requirement or Order to which Buyer may be subject; or

<div align="center">

– 36 –

</div>

(iv)    any material Contract to which Buyer is a party or by which Buyer may be bound.

Buyer is not and will not be required to obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

**4.2    Certain Proceedings.**  There is no pending Proceeding that has been commenced against Buyer and that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.  To Buyer's Knowledge, no such Proceeding has been Threatened.

**4.3    Brokers or Finders.**  Buyer and its officers and agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement and will indemnify and hold Sellers harmless from any such payment alleged to be due by or through Buyer as a result of the action of Buyer or its officers or agents.

## ARTICLE V
## COVENANTS OF SELLERS PRIOR TO CLOSING DATE

**5.1    Access and Investigations.**  Between the date of this Agreement and the Closing Date, Sellers will, and will cause the Company and its Representatives to, (a) afford Buyer and its Representatives and prospective lenders and their Representatives (collectively, "***Buyer's Advisors***") full and free access to the Company's personnel, properties, contracts, books and records, and other documents and data, (b) furnish Buyer and Buyer's Advisors with copies of all such contracts, books and records, and other existing documents and data as Buyer may reasonably request, and (c) furnish Buyer and Buyer's Advisors with such additional financial, operating, and other data and information as Buyer may reasonably request.

**5.2    Operation of the Businesses of the Company and ABC.**  Between the date of this Agreement and the Closing Date, Sellers will, and will cause the Company and ABC to:

(a)    conduct the business of the Company and ABC only in the Ordinary Course of Business;

(b)    use their reasonable commercial efforts to preserve intact the current business organization of the Company and ABC, keep available the services of the current officers, employees, and agents of the Company and ABC, and maintain the relations and good will with suppliers, customers, landlords, creditors, employees, agents, and others having business relationships with the Company and ABC;

(c)    confer with Buyer concerning operational matters of a material nature;

(d)    otherwise report periodically to Buyer concerning the status of the business, operations, and finances of the Company and ABC; and

– 37 –

(e)    not violate or infringe the provisions of Article VII of this Agreement.

**5.3    Negative Covenant.** Except as otherwise expressly permitted by this Agreement, between the date of this Agreement and the Closing Date, Sellers will not, and will cause the Company and ABC not to, without the prior consent of Buyer, take any affirmative action, or fail to take any reasonable action within their or its control, as a result of which any of the changes or events listed in Section 3.16 is likely to occur or which may adversely affect Buyer's rights in or under the Option Agreement and Reseller Agreement.

**5.4    Required Approvals.** As promptly as practicable after the date of this Agreement, Sellers will, and will cause the Company and ABC to, make all filings required by Legal Requirements to be made by them in order to consummate the Contemplated Transactions. Between the date of this Agreement and the Closing Date, Sellers will, and will cause the Company and ABC to, cooperate with Buyer with respect to all filings that Buyer elects to make or is required by Legal Requirements to make in connection with the Contemplated Transactions.

**5.5    Notification.** Between the date of this Agreement and the Closing Date, Sellers will promptly notify Buyer in writing if Sellers, the Company or ABC becomes aware of any fact or condition that causes or constitutes a Breach of any of Sellers's representations and warranties as of the date of this Agreement, or if Sellers, the Company or ABC become aware of the occurrence after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a Breach of any such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition. Should any such fact or condition require any change in any Disclosure Schedule attached hereto if such Disclosure Schedule were dated the date of the occurrence or discovery of any such fact or condition, Sellers will promptly deliver to Buyer a supplement to such Disclosure Schedule specifying such change. During the same period, Sellers will promptly notify Buyer of the occurrence of any Breach of any covenant of Sellers in this Article V or of the occurrence of any event that may make the satisfaction of the conditions in Article VIII impossible or unlikely.

**5.6    Payment of Indebtedness by Related Persons.** Except as expressly provided in this Agreement or set forth in Section 5.6 of the Sellers' Disclosure Schedule , Sellers will cause all indebtedness owed to the Company by Sellers or any Related Person of Sellers to be paid in full prior to Closing.

**5.7    No Negotiation.** Until such time, if any, as this Agreement is terminated pursuant to Article X, Sellers will not, and will cause the Company and each of their Representatives not to, directly or indirectly solicit, initiate, or encourage any inquiries or proposals from, discuss or negotiate with, provide any non-public information to, or consider the merits of any unsolicited inquiries or proposals from, any Person (other than Buyer) relating to any transaction involving the sale of the business or assets (other than in the Ordinary Course of Business) of the Company or any of the capital stock of the Company, or any merger, consolidation, business combination, or similar transaction involving the Company or any other transaction that would conflict with or violate the Option Agreement.

## ARTICLE VI
### COVENANTS OF BUYER PRIOR TO CLOSING DATE

**6.1    Approvals of Governmental Bodies.**  As promptly as practicable after the date of this Agreement, Buyer will, and will cause each of its Related Persons to, make all filings required by Legal Requirements to be made by them to consummate the Contemplated Transactions.  Between the date of this Agreement and the Closing Date, Buyer will, and will cause each Related Person to, cooperate with Sellers with respect to all filings that Sellers is required by Legal Requirements to make in connection with the Contemplated Transactions, and cooperate with Sellers in obtaining all consents required by Sellers or by any third party; provided that this Agreement will not require Buyer to dispose of or make any change in any portion of its business or to incur any other burden to obtain a Governmental Authorization.

## ARTICLE VII
### NON-COMPETITION AND NON-SOLICITATION BY SELLERS

**7.1    Non-Competition; Non-Solicitation.**  In consideration of the purchase of the Shares by Buyer, each Seller agrees that from the date of the Closing until the second (2nd) anniversary thereof (the "*Restricted Period*"), each such Seller shall not, individually or in association with any other Person, including but not limited to ABC, and shall ensure that ABC does not independently:

(a)    within any jurisdiction or marketing area in which the Company is doing business or is qualified to do business, directly or indirectly own, manage, operate, control, be employed by or participate in the ownership, management, operation or control of, or be connected in any manner with, any business of the type and character engaged in and competitive with the Business of the Company.  For these purposes, ownership of securities of not in excess of 1% of any class of securities of a public company shall not be considered to be competition with the Company; or

(b)    persuade or attempt to persuade any potential customer or client to which the Company has made a presentation, proposal or bid prior to Closing, or with which the Company has been having discussions as of Closing, not to hire the Company or to hire another company to perform work within the Business of the Company; or

(c)    solicit for himself or herself or any Person other than the Company work within the Business of the Company from the business of any company which is a customer or client of the Company or was its customer or client within two years prior to the date of Closing, including but not limited to the diversion or circumvention of any customer contract, subcontract, program, work or relationship from the Company to ABC directly as a prime contract with such customer; or

(d)    excluding the Persons set forth in Section 7.1 of the Sellers' Disclosure Schedule, persuade or attempt to persuade any employee or contractor of the Company, or any individual who was its employee during the two years prior to the date of Closing, to leave the Company's

– 39 –

employ, or to become employed or contracted by any person other than the Company or such subsidiary or affiliate; or

(e)       disclose or use any confidential or secret information relating to the Company or its subsidiaries or affiliates or any of their clients and customers.

For the avoidance of doubt, this Article VII shall be construed and interpreted consistent with the following principles:

A.       Neither Sellers nor any Person with which Sellers are associated, including ABC, shall conduct business after the Closing Date in such manner as to unfairly compromise or impair the Company's Confidential Information, intellectual property, and Applicable Contracts;

**Deleted:** and customer relationships

B.       Any party and any Person associated with any party may compete for any new business or new contracts after Closing on such terms as it may desire consistent with principle A above;

C.       For any and all post-Closing work, task orders and services under the NSA and Northrop Grumman Applicable Contracts, and all extensions or renewals thereof, the Company shall have the right to perform and deliver all hardware, services and integration work and ABC shall have the right to deliver and perform all *BiObex*™ software licenses and development work, to the extent not prohibited by the customer or prime contractor.

As used herein, "*solicit*" means any request of, communication or contact with, oral or written, for any purpose adverse to Buyer or to encourage any such client, customer or organization to cease being (or not to become) a client, customer or organization of the Buyer at any tier or to suspend or alter Buyer's relationship therewith or therein.

It is the desire and intent of the parties to this Agreement that the provisions of this Section 7.1 shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  If any particular provisions or portion of this Section 7.1 shall be adjudicated to be invalid or unenforceable, this Section shall be deemed amended to delete therefrom such provision or portion adjudicated to be invalid or unenforceable, such amendment to apply only with respect to the operation of such Section in the particular jurisdiction in which such adjudication is made.

The parties recognize that the performance of the obligations under this Section 7.1 by each of the Sellers is special, unique and extraordinary in character, and that in the event of the breach by any such Seller of the terms and conditions of this Section 7.1 to be performed, the Company shall be entitled, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction, either in law or in equity, to obtain damages for any breach of this Section 7.1, or to enforce the specific performance thereof by such Seller or to enjoin such Seller from performing services for any such other person, firm or corporation.

# ARTICLE VIII
## CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE

Buyer's obligation to purchase the Shares and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

**8.1    Accuracy of Representations.**

(a)    All of Sellers' representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement, and must be accurate in all material respects as of the Closing Date as if made on the Closing Date, without giving effect to any supplement to the Sellers' Disclosure Schedule.

(b)    Each of Sellers' representations and warranties in Sections 3.3, 3.4, 3.12, and 3.24 must have been accurate in all respects as of the date of this Agreement, and must be accurate in all respects as of the Closing Date as if made on the Closing Date, without giving effect to any supplement to the Sellers' Disclosure Schedule.

**8.2    Sellers' Performance.**

(a)    All of the covenants and obligations that Sellers is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been duly performed and complied with in all material respects.

(b)    Each document required to be delivered pursuant to Section 2.4 must have been delivered, and each of the other covenants and obligations in Sections 5.4 must have been performed and complied with in all respects.

**8.3    Consents.** Each of the Consents identified in Section 3.2 of the Sellers' Disclosure Schedule must have been obtained and must be in full force and effect.

**8.4    No Proceedings.** Since the date of this Agreement, there must not have been commenced or Threatened against Buyer, or against any Person affiliated with Buyer, any Proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, any of the Contemplated Transactions, or (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with any of the Contemplated Transactions.

**8.5    No Claim Regarding Stock Ownership or Sale Proceeds.** There must not have been made or Threatened by any Person any claim asserting that such Person (a) is the holder or the beneficial owner of, or has the right to acquire or to obtain beneficial ownership of, any stock of, or any other voting, equity, or ownership interest in, the Company, or (b) is entitled to all or any portion of the Purchase Price payable for the Shares.

**8.6    No Prohibition.**  Neither the consummation nor the performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time), materially contravene, or conflict with, or result in a material violation of, or cause Buyer or any Person affiliated with Buyer to suffer any material adverse consequence under, (a) any applicable Legal Requirement or Order, or (b) any Legal Requirement or Order that has been published, introduced, or otherwise proposed by or before any Governmental Body.

## ARTICLE IX
## CONDITIONS PRECEDENT TO SELLERS'S OBLIGATION TO CLOSE

Sellers' obligation to sell the Shares and to take the other actions required to be taken by the Sellers at Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Sellers, in whole or in part):

**9.1    Accuracy of Representations.**  All of Buyer's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement and must be accurate in all material respects as of the Closing Date as if made on the Closing Date.

**9.2    Buyer's Performance.**

(a)    All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been performed and complied with in all material respects.

(b)    Buyer must have delivered each of the documents required to be delivered by Buyer pursuant to Section 2.4 and must have made the cash payments required to be made by Buyer pursuant to Sections 2.4(b)(i) and 2.4(b)(ii).

**9.3    Consents.**  Each of the Consents identified in Section 3.2 of the Sellers' Disclosure Schedule must have been obtained and must be in full force and effect.

**9.4    No Injunction.**  There must not be in effect any Legal Requirement or any injunction or other Order that (a) prohibits the sale of the Shares by Sellers to Buyer, and (b) has been adopted or issued, or has otherwise become effective, since the date of this Agreement.

## ARTICLE X
## TERMINATION

**10.1    Termination Events.**  This Agreement may, by notice given prior to or at the Closing, be terminated (and all references to Sellers herein shall refer to both Sellers jointly; *i.e.*, each Seller must agree to such action and both Sellers are subject to any actions by Buyer):

(a)    by either Buyer or Sellers if a material Breach of any provision of this Agreement has been committed by the other party and such Breach has not been waived;

– 42 –

(b)    (i)    by Buyer if any of the conditions in Article VIII has not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition on or before the Closing Date; or (ii) by Sellers, if any of the conditions in Article VIIII has not been satisfied of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Sellers to comply with its obligations under this Agreement) and Sellers has not waived such condition on or before the Closing Date;

(c)    by Buyer if any Governmental Authorization used by Sellers in the Ordinary Course of its business, shall be revoked, suspended or modified in any manner materially adverse to Sellers beyond the period for administrative or appellate review of such revocation, suspension or modification;

(d)    by mutual consent of Buyer and Sellers; or

(e)    by either Buyer or Sellers if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before August 10, 2008, or such later date as the parties may agree upon.

**10.2    Effect of Termination.**  Each party's right of termination under Section 10.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies.  If this Agreement is terminated pursuant to Section 10.1, all further obligations of the parties under this Agreement will terminate, except that the obligations in Sections 12.1 and 12.3 will survive; provided that if this Agreement is terminated by a party because of the Breach of the Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

Deleted: 11.1

Deleted: 11.3

<div align="center">

**ARTICLE XI
INDEMNIFICATION; REMEDIES**

</div>

**11.1    Survival; Right to Indemnification Not Affected by Knowledge.**  All representations, warranties, covenants, and obligations in this Agreement, the Disclosure Schedules attached hereto, any supplements to the Disclosure Schedules, the certificates delivered pursuant to Section 2.4(a)(vi), and any other certificate or document delivered pursuant to this Agreement will survive the Closing for eighteen (18) months after the Closing; provided, however, Section 3.11 shall survive for three years after the Closing.  The right to indemnification, payment of Damages or other remedy based on such representations, warranties, covenants, and obligations will not be affected by any investigation conducted in respect of due diligence at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation, but shall be affected by the Knowledge of the

<div align="center">– 43 –</div>

Buyers. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to indemnification, payment of Damages, or other remedy based on such representations, warranties, covenants, and obligations.

**11.2    Indemnification and Payment of Damages by Sellers.** Sellers, jointly and severally, shall indemnify and hold harmless Buyer, the Company, and their respective Representatives, stockholders, controlling persons and affiliates (collectively, the "*Indemnified Persons*") for, and will pay to the Indemnified Persons the amount of, any loss, liability, claim, damage (including incidental and consequential damages), expense (including costs of investigation and defense and reasonable attorneys' fees) or diminution of value, whether or not involving a third-party claim (collectively, "*Damages*"), arising, directly or indirectly, from or in connection with:

(a)    any Breach of any representation or warranty made by Sellers in this Agreement (without giving effect to any supplement to the Sellers' Disclosure Schedule), the Sellers' Disclosure Schedule, the supplements to the Sellers' Disclosure Schedule, or any other certificate or document delivered by Sellers pursuant to this Agreement;

(b)    any Breach of any representation or warranty made by Sellers in this Agreement as if such representation or warranty were made on and as of the Closing Date without giving effect to any supplement to the Sellers' Disclosure Schedule, other than any such Breach that is disclosed in a supplement to the Sellers' Disclosure Schedule and is expressly identified in the certificate delivered pursuant to Section 2.4(a)(vi) as having caused the condition specified in Section 8.1 not to be satisfied;

(c)    any Breach by Sellers of any covenant or obligation of Sellers in this Agreement;

(d)    any matter disclosed in any of the Sellers' Disclosure Schedules attached hereto; or

(e)    any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by any such Person with Sellers or the Company (or any Person acting on their behalf) in connection with any of the Contemplated Transactions.

The remedies provided in this Section 11.2 will not be exclusive of or limit any other remedies that may be available to Buyer or the other Indemnified Persons.

**11.3    Indemnification and Payment of Damages by Buyer.** Buyer will indemnify and hold harmless Sellers, and will pay to Sellers each Seller's proportionate share of the amount of any Damages arising, directly or indirectly, from or in connection with (a) any Breach of any representation or warranty made by Buyer in this Agreement or in any certificate delivered by Buyer pursuant to this Agreement, (b) any Breach by Buyer of any covenant or obligation of Buyer in this Agreement, or (c) any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have

– 44 –

been made by such Person with Buyer (or any Person acting on its behalf) in connection with any of the Contemplated Transactions.

**11.4    Time Limitations.** If the Closing occurs, Sellers will have no liability (for indemnification or otherwise) with respect to any representation or warranty, or covenant or obligation to be performed and complied with unless Buyer notifies Sellers of a claim specifying the factual basis of that claim in reasonable detail to the extent then known by Buyer within eighteen (18) months of the Closing. If the Closing occurs, Buyer will have no liability (for indemnification or otherwise) with respect to any representation or warranty, or covenant or obligation to be performed and complied with prior to the Closing Date, unless on or before six months following the Closing Date Sellers notify Buyer of a claim specifying the factual basis of that claim in reasonable detail to the extent then known by Sellers.

**11.5    Escrow; Right of Set-Off.** Upon notice to Sellers specifying in reasonable detail the basis for such set-off, Buyer may give notice of a Claim in such amount under the Escrow Agreement. Neither the exercise of nor the failure to exercise such right of set-off or to give a notice of a Claim under the Escrow Agreement will constitute an election of remedies or limit Buyer in any manner in the enforcement of any other remedies that may be available to it.

**11.6    Procedures for Indemnification -- Third Party Claims.**

(a)    Promptly after receipt by an indemnified party under of notice of the commencement of any Proceeding against it, such indemnified party will, if a claim is to be made against an indemnifying party under such Section, give notice to the indemnifying party of the commencement of such claim, but the failure to notify the indemnifying party will not relieve the indemnifying party of any liability that it may have to any indemnified party, except to the extent that the indemnifying party demonstrates that the defense of such action is prejudiced by the indemnifying party's failure to give such notice.

(b)    If any Proceeding referred to in Section 11.6(a) is brought against an indemnified party and it gives notice to the indemnifying party of the commencement of such Proceeding, the indemnifying party will, unless the claim involves Taxes, be entitled to participate in such Proceeding and, to the extent that it wishes (unless (i) the indemnifying party is also a party to such Proceeding and the indemnified party determines in good faith that joint representation would be inappropriate, or (ii) the indemnifying party fails to provide reasonable assurance to the indemnified party of its financial capacity to defend such Proceeding and provide indemnification with respect to such Proceeding), to assume the defense of such Proceeding with counsel satisfactory to the indemnified party and, after notice from the indemnifying party to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will not, as long as it diligently conducts such defense, be liable to the indemnified party under this Article X for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by the indemnified party in connection with the defense of such Proceeding, other than reasonable costs of investigation. If the indemnifying party assumes the defense of a Proceeding, (i) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; (ii) no compromise or settlement of such claims may be

– 45 –

effected by the indemnifying party without the indemnified party's consent unless (A) there is no finding or admission of any violation of Legal Requirements or any violation of the rights of any Person and no effect on any other claims that may be made against the indemnified party, and (B) the sole relief provided is monetary damages that are paid in full by the indemnifying party; and (iii) the indemnified party will have no liability with respect to any compromise or settlement of such claims effected without its consent. If notice is given to an indemnifying party of the commencement of any Proceeding and the indemnifying party does not, within ten days after the indemnified party's notice is given, give notice to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will be bound by any determination made in such Proceeding or any compromise or settlement effected by the indemnified party.

(c)    Notwithstanding the foregoing, if an indemnified party determines in good faith that there is a reasonable probability that a Proceeding may adversely affect it or its affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the indemnified party may, by notice to the indemnifying party, assume the exclusive right to defend, compromise, or settle such Proceeding, but the indemnifying party will not be bound by any determination of a Proceeding so defended or any compromise or settlement effected without its consent (which may not be unreasonably withheld).

(d)    Sellers hereby consents to the non-exclusive jurisdiction of any court in which a Proceeding is brought against any Indemnified Person for purposes of any claim that an Indemnified Person may have under this Agreement with respect to such Proceeding or the matters alleged therein, and agree that process may be served on Sellers with respect to such a claim anywhere in the world.

**11.7    Procedure for Indemnification -- Other Claims.**  A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party from whom indemnification is sought.

**11.8    Insurance.**  The amount of any indemnifiable loss suffered by the Buyer or a Seller shall be reduced by any third party insurance or other indemnification benefits which such party or its representatives receives in respect of or as a result of such indemnifiable loss.  If any indemnifiable loss for which indemnification is provided hereunder is subsequently reduced by any third party insurance payment or other indemnification recovery from a third party, the amount of the reduction shall be remitted to the indemnifying party.

**11.9    Limitation of Liability.**  The parties agree that based upon a number of factors, including without limitation, the expedited time schedule for the transaction, that notwithstanding any other provision contained in this Agreement, (a) the liability of either party arising out of or related to this Agreement for any breach of any representation, warranty, covenant, obligation or condition herein this Agreement, for any other cause of action, or for any Damages, shall be limited to actual damages only, and shall not include incidental, consequential or indirect damages, (b) the Seller shall not have any liability for any breaches or any Damages unless such breach or Damage exceeds $1,000 individually, or in the aggregate all breaches and Damages exceed $5,000, and (c) the total and cumulative liability (including any indemnification obligation) of the Seller for all breaches, Damages, or any other cause of action (whether in

– 46 –

contract, tort or otherwise) shall in no event exceed $1,500,000.  Notwithstanding anything else contained in this Agreement to the Contrary, the Buyer hereby acknowledges and agrees that from and after Closing, its sole remedy, and that of any indemnified Persons) with respect to any claim, indemnification, Damages or otherwise arising out of or related to this Agreement, shall be pursuant to the indemnification provisions contained in this Article XI

## ARTICLE XII
## MISCELLANEOUS

**12.1   Expenses.**  Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of agents, Representatives, counsel and accountants.  In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a Breach of this Agreement by another party.

**12.2   Public Announcements.**  Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued, if at all, at such time and in such manner as Buyer shall determine.  Unless consented to by Buyer in advance or required by Legal Requirements, prior to the Closing Sellers shall, and shall cause the Company to, keep this Agreement strictly confidential and may not make any disclosure of this Agreement to any Person.  Sellers and Buyer will consult with each other concerning the means by which the Company's employees, customers, and suppliers and others having dealings with the Company will be informed of the Contemplated Transactions, and Buyer will have the right to be present for any such communication.

**12.3   Confidentiality.**  Between the date of this Agreement and the Closing Date, Buyer and Sellers will maintain in confidence, and will cause the directors, officers, employees, agents, and advisors of Buyer and the Company to maintain in confidence, any written, oral, or other information obtained in confidence from another party or the Company in connection with this Agreement or the Contemplated Transactions, unless (a) such information is already known to such party or to others not bound by a duty of confidentiality or such information becomes publicly available through no fault of such party, (b) the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the Contemplated Transactions, or (c) the furnishing or use of such information is required by legal proceedings.

If the Contemplated Transactions are not consummated, each party will return or destroy as much of such written information as the other party may reasonably request.

**12.4   Notices.**  All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), provided that a copy is mailed by registered or certified mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service

– 47 –

(receipt requested), in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as a party may designate by notice to the other parties):

If to Sellers:



    Christopher A. Sands
    1105 Arbor Oak Place
    Herndon, VA 20170

Copy to:

    Todd Whay, Esq.
    The Whay Law Firm
    1984 Isaac Newton Square West
    Suite 300
    Reston, VA 20190
    Facsimile: 202.403.3814

If to Buyer

    Earl D. Munns, Jr.
    11660 Great Falls Way
    Great Falls, VA 22066
    Facsimile:    703.584.8901 (LTB)

Copy to:

    J. Stephen Britt, Esq.
    Leach Travell Britt pc
    8270 Greensboro Drive, Suite 1050
    Phone:    703.584.8900
    Facsimile:    703.584.8901

**12.5  Further Assurances.** The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

**12.6  Waiver.** The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in

– 48 –

this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

**12.7    Disclosure Schedules.**

(a)    The disclosures in the Disclosure Schedule, and those in any Supplement thereto, must relate only to the representations and warranties in the Section of the Agreement to which they expressly relate and not to any other representation or warranty in this Agreement.

(b)    In the event of any inconsistency between the statements in the body of this Agreement and those in the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules with respect to a specifically identified representation or warranty), the statements in the body of this Agreement will control.

(c)    Any matter or item disclosed in the Disclosure Schedule shall not be deemed to be material (whether singularly or in the aggregate) or deemed to give rise to circumstances which may result in a material adverse effect solely by reason of it being so disclosed therein.

**12.8    Assignments, Successors and No Third-Party Rights.**  Neither party may assign any of its rights under this Agreement without the prior consent of the other parties, which will not be unreasonably withheld, except that Buyer may assign any of its rights under this Agreement to any Subsidiary or affiliate of Buyer. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

**12.9    Severability.**  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**12.10    Article and Section Headings, Construction.**  The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Article", "Articles", "Section" or "Sections" refer to the corresponding Article, Articles, Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

– 49 –

**12.11   Time of Essence.** With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**12.12   Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the Commonwealth of Virginia. In addition, each of the parties hereto (a) consents to submit itself to the personal jurisdiction of the federal court for the Eastern District of Virginia located in Alexandria, Virginia or state court located in Loudoun County, Virginia in the event any dispute arises out of this Agreement or any of the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (c) agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated hereby in any court other than the above federal court or a state court located in the Commonwealth of Virginia.

**12.13   Counterparts.** This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

**12.14   No Other Warranties.** The Buyer hereby acknowledges and agrees that the Sellers are not making and have not made any representation or warranty whatsoever, express or implied, except for those representations and warranties of the Sellers explicitly set forth in this Agreement.

**12.15   ABC Intellectual Property And Other Matters.** The Buyer acknowledges and agrees that the Company and ABC have been primarily owned and operated by the Sellers, and the businesses have been collocated. Subject to the terms and conditions of this Agreement, the Option Agreement and the Reseller Agreement, and any later-executed agreement between the parties, the Buyer agrees not to assert any claim of ownership of, rights to, or challenge or interfere with ABC's ownership of or rights to (i) the Biobex software or any portion thereof, (ii) the Strong Authentication Log-In Software or any portion thereof, (iii) the KERBEROS Agent Software or any portion thereof, (iv) any trademark, copyright, patent, or trade secret currently held by or registered in ABC's name or otherwise arising out of or related to (i), (ii) or (iii), above, or (v) any post-Closing contracts, revenue or assets of ABC.

**12.16   Assets Not Conveying.** The items listed in Schedule 12.16 shall not convey with the purchase of the Shares and shall be deemed the exclusive property of the Sellers upon Closing.

**12.17   ABC's Use of Company's Facilities.** The Buyer agrees that for ninety days following Closing, ABC shall continue using the Company's facilities without rent or other charge.

**[Signatures on following page]**

– 50 –

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**SELLERS:**

**CHRISTOPHER A. SANDS**

By: _____
Name: Christopher A. Sands
Date:   June 30, 2008

**ARTHUR J. SANDS**

By: _____
Name: Arthur Sands
Date:   June 30, 2008

**BUYER:**

**MB SECURITY CORPORATION**

By: _____
Name: Earle D. Munns, Jr.
Title:   President & CEO
Date:   June 30, 2008

– 51 –

**EXHIBIT A**

**ABC OPTION AGREEMENT**

<u>**EXHIBIT B**</u>

<u>**ABC RESELLER AGREEMENT**</u>

**EXHIBIT C**

**SELLER' DISCLOSURE SCHEDULE**

**EXHIBIT D**

## TEXTRON AND NON-TEXTRON REIMBURSEMENTS

### Textron Payable Reimbursement

| Customer | AC Invoice | Amount |
|---|---|---|
| FAA | 11646 | $ 13,842.44 |
| D FAS | 11659 | $ 893.79 |
| DC WAS | 11666 | $ 246,100.17 |
| WildFlower | 11668 | $ 126,591.12 |
| NOAA | 11670 | $ 14,885.06 |
| Cherry Road | 11671 | $ 17,430.88 |
| Cherry Road | 11673 | $ 84,890.23 |
| Cherry Road | 11674 | $ 78,900.72 |
| AFRL | 11675 | $ 777.49 |
| NextiraOne Federal | 11677 | $ 24.00 |
| CACI | 11684 | $ 8,047.67 |
| Cherry Road | 11686 | $ 341,300.85 |
| Cherry Road | 11692 | $ 1,579.40 |
| NSWC | 11693 | $ 71,433.76 |
| NSOC | 11694 | $ 31,786.11 |
| AFRL | 11696 | $ 55,555.00 |
| CACI | 11697 | $ 20,556.84 |
| AVR Enterprise | 11702 | $ 699.69 |
| AFRL | 11704 | $ 8,851.47 |
| US Naval Station | 11705 | $ 18,481.32 |
| CSIC | 11713 | $ 5,490.00 |
| Bureau Of Census | 11715 | $ 13,489.54 |
| Argon | 11720 | $ 31,650.00 |
| AFRL | 11721 | $ 33,887.28 |
| | | |
| **Outstanding Total** | | $ **1,227,144.83** |

**Non-Textron Reimbursements:**    $618,252.87, on an unsecured basis, to be paid on such terms as agreed between the parties in writing after Closing over not more than 6 months.



EXHIBIT

E

| | |
|---|---|
| **From:** | Chris Sands |
| **Sent:** | Sunday, June 29, 2008 8:26 PM |
| **To:** | 'mabyrd@sydiansys.com'; 'EMUNNS2325@msn.com' |
| **Cc:** | 'Christopher Sands' |
| **Subject:** | MB Security Payment Schedule |
| **Attachments:** | MB Security Payment Schedule.xls |

Hi Guys,

In an effort to be completely fair to all parties, I calculated what the amount due Art & I would be ($1,890,513.46) from the amount paid Textron ($2,239,715.60) at closing and I have attached the schedule breakdown. I did not CC or BCC either attorney on this email, as I think it will be best if we discuss this among ourselves and relay to the attorneys what we want done.

Tomorrow morning I will meet Earle at the diner at 7:30am and hand-off the DD Books that will contain everything but the except the schedule of Inventory.

Additionally, I will need wire instructions from Bank of America for the $250,000.00 Contingent Liability Escrow and how the account will be named.

I will forward you and the attorneys the wire instructions for Art & I.

In the morning I will run a final A/R and A/P for the bank showing the new A/R amount.

Call me later to review the numbers....

Best
Chris


<u>Christopher Sands, CEO</u>
**AC TECHNOLOGY, INC.**
**22695 Commerce Center Ct.**
**Dulles, Virginia 20166**
**Tel: 703.481.6500 x101**
**Fax: 703.481.6562**
**Cell: 703.405.8205**
**Email:** csands@actechnology.com
**Websites:**
www.actechnology.com
www.biobex.com



EXHIBIT
F

Sands 000696

**AC Technology Inc & MB Security Payment Schedule**
**Closing Date June 30, 2008**

### Under Current Senario (which would not be fair to MB Security)

Selling Price
Less:Stock/Inter-Company Loan Re-Allocation
Less:Textron Financial Account Payable @Closing
Plus:Swept Cash
Plus: Pay A/R against the Textron Payable
Plus: A/R against Prepaid Textron Invoices Paid in Advance
Less: Contingent Liability Escrow Amount

**Total Amount Due Seller**

### Under My Senario (which would fair to all Parties)

Selling Price
Less:Stock/Inter-Company Loan Re-Allocation
Less:Textron Financial Account Payable @Closing
Plus:Swept Cash
Plus:Cash Refunds Receivable
Less:Cash Payroll: June 30, 2008
Plus: Remaining A/R against the Textron Payable
Plus: A/R against Prepaid Textron Invoices Paid in Advance

Total Amount Due Seller
Less: Contingent Liability Escrow Amount

**Total Amount Due Seller**

### Payment Due Art & Chris from Textron Payment

Amount Paid at Closing: Net Bank of America plus Swept Cash
Amount Paid after Closing: All Remaining A/R against the Textron Payables
Amount Paid after Closing: Balance due from prepaid Textron A/P: To be split 50/50 upon receipt of A/R balance pa

Total Amount Due Seller
Less: Contingent Liability Escrow Amount

**Total Amount Due Seller**

Sands 000694

$6,133,677.00
($1,333,677.00)
($2,239,715.60)
$1,574,213.17
$2,239,715.60
$780,397.74
($250,000.00)

**$6,904,610.91**


$6,133,677.00
($1,333,677.00)
($2,239,715.60)
$1,574,213.17
$5,654.59
($95,227.29)
$1,304,461.13
$780,397.74

$6,129,783.74
($250,000.00)

**$5,879,783.74**


$4,239,270.28
$1,304,461.13
$586,052.33

$6,129,783.74
($250,000.00)

**$5,879,783.74**

Sands 000695

| | |
|---|---|
| **From:** | Chris Sands |
| **Sent:** | Friday, June 27, 2008 7:43 PM |
| **To:** | 'mabyrd@sydiansys.com'; 'EMUNNS2325@msn.com' |
| **Subject:** | As of today A/P & A/R |
| **Attachments:** | AR-06-27-08.pdf; AP-06-27-08.pdf |

Guys,
Here are the requested documents....
Chris

*Christopher Sands, CEO*
**AC TECHNOLOGY, INC.**
**22695 Commerce Center Ct.**
**Dulles, Virginia 20166**
**Tel: 703.481.6500 x101**
**Fax: 703.481.6562**
**Cell: 703.405.8205**
**Email:csands@actechnology.com**
**Websites:**
www.actechnology.com
www.biobex.com

**EXHIBIT**

6

Sands 000693

6:00 PM

06/27/08

# AC TECHNOLOGY INC
## A/R Aging Summary
### As of June 27, 2008

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Advanced Biometric Controls, LLC | 1,445.60 | 0.00 | 0.00 | 0.00 | 0.00 | 1,445.60 |
| AFRL | 98,293.75 | 0.00 | 0.00 | 0.00 | 0.00 | 98,293.75 |
| Air Force | 15,672.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,672.00 |
| Air Force Research Laboratory | 6,227.56 | 0.00 | 0.00 | 0.00 | 0.00 | 6,227.56 |
| ArgonST | 31,650.00 | 0.00 | 0.00 | 0.00 | 0.00 | 31,650.00 |
| AVR Enterprises Inc. | 699.69 | 0.00 | 0.00 | 0.00 | 0.00 | 699.69 |
| Booz Allen Hamilton | 0.00 | -8,372.60 | 0.00 | 0.00 | 0.00 | -8,372.60 |
| Bureau of the Census | 178,668.11 | 0.00 | 0.00 | 0.00 | 0.00 | 178,668.11 |
| CACI, Inc. | 28,604.51 | 0.00 | 0.00 | 0.00 | 0.00 | 28,604.51 |
| CherryRoad GT Inc. | 342,880.25 | 227,473.29 | 0.00 | 0.00 | 0.00 | 570,353.54 |
| CSIC | 5,490.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,490.00 |
| DC Water & Sewer Authority | 246,100.17 | 0.00 | 0.00 | 0.00 | 0.00 | 246,100.17 |
| Defense Finance & Accounting Service | 0.00 | 893.79 | 0.00 | 0.00 | 0.00 | 893.79 |
| Defense Logistics Agency | 54,754.40 | 0.00 | 0.00 | 0.00 | 0.00 | 54,754.40 |
| DISA | 243,610.00 | 0.00 | 0.00 | 0.00 | 0.00 | 243,610.00 |
| FAA | 0.00 | 13,842.44 | 0.00 | 0.00 | 0.00 | 13,842.44 |
| General Dynamics | 169,200.00 | 0.00 | 0.00 | 0.00 | -5,490.87 | 163,709.13 |
| IRIDES, LLC | 0.00 | 0.00 | 0.00 | 0.00 | 2,723.48 | 2,723.48 |
| Lawrence Berkeley National Laboratory | 0.00 | 53,051.69 | 0.00 | 0.00 | 0.00 | 53,051.69 |
| Maryland Procurement Office | 2,007,460.66 | 0.00 | 0.00 | 0.00 | 0.00 | 2,007,460.66 |
| MOCA/Arrow, Inc. | 0.00 | 42,740.89 | 0.00 | 0.00 | 0.00 | 42,740.89 |
| Naval Air Warfare Center | 0.00 | 0.00 | 5,658.43 | 0.00 | 0.00 | 5,658.43 |
| Naval Satellite Operations Center | 31,786.11 | 0.00 | 0.00 | 0.00 | 0.00 | 31,786.11 |
| NEWTEC | 0.00 | 240.30 | 0.00 | 0.00 | 0.00 | 240.30 |
| NextiraOne Federal, LLC | 24.00 | 0.00 | 0.00 | 0.00 | 0.00 | 24.00 |
| NOAA | 0.00 | 14,885.06 | 0.00 | 0.00 | 0.00 | 14,885.06 |
| NSWC | 144,631.96 | 0.00 | 0.00 | 0.00 | 0.00 | 144,631.96 |
| ORC, Inc. | 17,033.56 | 0.00 | 0.00 | 0.00 | 0.00 | 17,033.56 |
| SensorCom Inc. | 255.20 | 0.00 | 0.00 | 0.00 | 0.00 | 255.20 |
| Sun Microsystems, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 311,929.00 | 311,929.00 |
| TKC Technology Solution, Inc | 0.00 | 1,581.95 | 0.00 | 0.00 | 0.00 | 1,581.95 |
| TKC Technology Solutions, LLC | 99,140.52 | 0.00 | 0.00 | 0.00 | 0.00 | 99,140.52 |
| UC Lawrence Berkley Lab | 358,461.18 | 0.00 | 0.00 | 0.00 | 0.00 | 358,461.18 |
| Unisys | 8,196.13 | 0.00 | 0.00 | 0.00 | 0.00 | 8,196.13 |
| US Naval Acadmey | 18,481.32 | 0.00 | 0.00 | 0.00 | 0.00 | 18,481.32 |
| Wildflower International, LTD. | 0.00 | 126,591.12 | 0.00 | 0.00 | 0.00 | 126,591.12 |
| **TOTAL** | **4,108,766.68** | **472,927.93** | **5,658.43** | **0.00** | **309,161.61** | **4,896,514.65** |

Sands 000691

6:03 PM

06/27/08

# AC TECHNOLOGY INC
## A/P Aging Summary
### As of June 27, 2008

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Arbitech | 5,060.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,060.00 |
| Arrow Electronics, Inc. | 735.22 | 0.00 | 0.00 | 0.00 | 0.00 | 735.22 |
| Capitol Office Solution | 101.65 | 0.00 | 0.00 | 0.00 | 0.00 | 101.65 |
| Carahsoft | 558.77 | 0.00 | 0.00 | 0.00 | 0.00 | 558.77 |
| David, Brody & Dondershine, LLP | 82.50 | 0.00 | 0.00 | 0.00 | 0.00 | 82.50 |
| GSSI | 1,950.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,950.00 |
| I- Tech | 4,579.20 | 0.00 | 0.00 | 0.00 | 0.00 | 4,579.20 |
| Ingram Micro, Inc. | 191.92 | 0.00 | 0.00 | 0.00 | 0.00 | 191.92 |
| Miller's Office Products | 278.25 | -69.17 | 0.00 | 0.00 | 0.00 | 209.08 |
| MOCA/Arrow | 2,678,311.18 | 79,103.23 | 77,830.84 | 0.00 | 0.00 | 2,835,245.25 |
| Pitney Bowes | 24.74 | 0.00 | 0.00 | 0.00 | 0.00 | 24.74 |
| Pitney Bowes Global Financial Svcs LLC | 356.47 | 0.00 | 0.00 | 0.00 | 0.00 | 356.47 |
| RDSK Inc, dba Litronic | 18,520.40 | 0.00 | 0.00 | 0.00 | 0.00 | 18,520.40 |
| Ritter & Company | 27,880.00 | 0.00 | 0.00 | 0.00 | 0.00 | 27,880.00 |
| Sky Electronics, Inc. | 3,174.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,174.00 |
| Softchoice Corporation | 5,647.86 | 0.00 | 0.00 | 0.00 | 0.00 | 5,647.86 |
| Synnex Corp. | 19,389.88 | 0.00 | 0.00 | 0.00 | 0.00 | 19,389.88 |
| Tech Data Corporation | 6,230.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6,230.00 |
| Travelers | 4,296.50 | 0.00 | 0.00 | 0.00 | 0.00 | 4,296.50 |
| Verizon | 182.13 | 0.00 | 0.00 | 0.00 | 0.00 | 182.13 |
| VIRGINIA LABOR LAW POSTER SERVICE | 67.25 | 0.00 | 0.00 | 0.00 | 0.00 | 67.25 |
| Whay Law Firm | 657.46 | 0.00 | 0.00 | 0.00 | 0.00 | 657.46 |
| XO Communications Services, Inc. | 26.35 | 0.00 | 0.00 | 0.00 | 0.00 | 26.35 |
| TOTAL | 2,778,301.73 | 79,034.06 | 77,830.84 | 0.00 | 0.00 | 2,935,166.63 |

Sands 000692

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

-----------------------------X
BANK OF AMERICA, N.A.,                :

        Counter-Claimant            :    16 148 Y 00590 09
                                      :
            -vs-                      :    Pages 1 - 257
                                      :
AC TECHNOLOGY, INC., EARLE           :
D. MUNNS and MICHAEL ANDREW          :
BYRD,                                 :
                                      :
        Counter-Respondents          :
-----------------------------X


                    Arbitration

                Washington, D.C.

            Monday, April 19, 2010






Job 1752


Before:  Howard G. Slavit, Arbitrator

Reported by:  Kathleen M. Vaglica, RMR

EXHIBIT
H

Page 13

1          In fact, an earlier e-mail by Mr. Steren

2    to yourself did state that most of those records

3    were in Mr. Byrd's possession, and he could have

4    presented those.  That is just an elaboration or

5    clarification of my earlier comment.

6          THE ARBITRATOR:  All right.

7          MR. STEREN:  Can I just one minor

8    correction?  I don't believe I've ever stated that

9    Mr. Byrd had possession of any documents other than

10   the Cardinal Bank account statements that he sent to

11   us on Sunday.

12         THE ARBITRATOR:  All right.  Well, this

13   continues to be very troublesome for me, the fact

14   that there were documents that were duly requested

15   and simply have not been produced.  And I'm not

16   convinced that there's good reason for those

17   documents having not been produced earlier.  So this

18   continues to be, you know, a serious consideration I

19   think in terms of this proceeding and how the

20   evidence in this proceeding ought to be received or

21   not be received.  I think, Mr. Steren, let me ask

22   you, and we did have a discussion off the record,

Case 11-01255-KHK   Doc 16-5   Filed 10/17/11   Entered 10/17/11 15:07:48   Desc
Exhibit(s) Exhibits to Hass Affidavit   Page 94 of 178

Page 32

1       Q.   Can you tell us, do you know what the --

2   strike that.  Was the loan backed up by any

3   collateral that was presented?

4       A.   The bank has a blanket lien on all the

5   assets of the company, including specifically the

6   main piece of collateral which are accounts

7   receivable.

8       Q.   Okay.  Now, did there come a time where

9   the, if I could, I'll refer to all these documents

10  as the loan documents.  Did there come a time when

11  there was a default on the loan documents?

12      A.   There was.

13      Q.   Can you explain to us what type of default

14  there was?

15      A.   The loan agreement had two financial

16  covenants.  One was a funded debt to EBITDA

17  covenant, and one was a fixed charge covenant.  The

18  covenant violation was for the funded debt to EBITDA

19  covenant.  The covenant was 2.7 times, and they

20  defaulted at a 9.86 times level.

21      Q.   If I can ask you to look at Exhibit 1

22  again, if you look at Section 5.1 --

Case 11-01255-KHK    Doc 16-5    Filed 10/17/11    Entered 10/17/11 15:07:48    Desc
Exhibit(s) Exhibits to Hass Affidavit    Page 95 of 178

Page 196

1    June 29, 2:08 at 11:19 a.m., you state to Diane

2    Jessica and Yanlin -- now Diane, Jessica and Yanlin,

3    they are members of Bank of America; correct?  This

4    is being sent to the Bank?

5        A.    They were the, Diane and Jessica were the

6    Vice Presidents that made the deal.

7        Q.    With Bank of America?

8        A.    Yes, right.

9        Q.    You state, "We sent our revised and

10   carefully reviewed BBC on Friday evening as per the

11   e-mail trail below.  See attachments."  You wrote

12   that; correct?

13       A.    Yes.

14       Q.    And you were part of that team 25

15   carefully reviewed the BBC before it went to the

16   Bank; correct?

17       A.    I reviewed, yes, I reviewed the, yes, I

18   did.

19       Q.    Okay.

20       A.    I mean, I don't remember doing it, but I

21   see this note here, so that means we did.

22       Q.    Well, but just to be clear, you recall

Page 200

1   out with A/R about $5 million above what Mr. Sands

2   tells you it is; correct?

3        A.   It changed, yes.  I don't know the exact

4   number, but, yes, it did change.  I mean, there were

5   a lot of updates that we received.  That was the

6   night I signed the personal guaranty, and I think he

7   shipped $2.1 million worth of products.

8        Q.   We'll get to that in a moment, but in

9   terms of the number in the Borrowing Base

10  Certificate, had it been what Mr. Sands reflected in

11  his e-mail of Exhibit 9, you could not have obtained

12  the loan of $5.5 million and closed on the

13  acquisition of AC Technology; correct?

14       A.   No, that is correct.

15       Q.   Initially you were the CEO and President

16  of AC Technology?

17       A.   Yes.

18       Q.   And, as you said before, you, personally,

19  interfaced with the customers of AC Tech; right?

20  You were involved in looking at the contracts?

21       A.   Some of the customers, yes.

22       Q.   And one of those was Arrow?

Page 203

1      Q.   Do you have any recollection of sending

2   this to the Bank?

3      A.   No, I wouldn't do this, but I'm just

4   saying we had a lawyer doing the transaction for us,

5   and he is a really good lawyer, and he would have

6   done that just automatically I would think.

7      Q.   Okay.  Well, if you look at page 166 of

8   your deposition --

9      A.   Right.

10      Q.   -- if you look at line 16 on page 166,

11   I'll ask the question for you.  "Did you inform

12   anybody at the Bank that you had personally

13   guarantied purchase invoices for approximately

14   $2.5 million?"  Your answer was?

15      A.   "To my knowledge, no, I did not personally

16   inform them.  Steve Britt may have informed them.

17   Mike may have informed them.  I don't know."

18      Q.   So you didn't inform the Bank about this

19   encumbrance or your personal guaranty?

20      A.   That's what I said, and I think Steve

21   Britt probably did.  I'm reasonably sure he did.

22      Q.   Do you have any evidence, any documents,

Page 206

1    thereafter, in fact, a lockbox was set up with Arrow

2    where A/R would go directly to a P.O. Box outside of

3    the bank accounts of AC Technology; correct?

4        A.   I found out about that after the fact.  I

5    didn't -- after the fact I found out about it.

6             THE ARBITRATOR:  Well, let me ask you this

7    then.  You say you found out after the fact.  Who in

8    your company agreed to this arrangement whereby

9    funds would be --

10            MR. MUNNS:  Mike Byrd.  Mike Byrd agreed.

11            THE ARBITRATOR:  Thank you.

12   BY MR. STEREN:

13       Q.   Now, Mr. Byrd testified he thought you

14   took out about a million two from the company.  You

15   thought it was somewhere close to 300,000; right?

16       A.   Of personal funds, yes.  I think less than

17   that probably.  Quite a bit less than that.

18       Q.   You used for personal means?

19       A.   I mean, I've got some pretty good numbers.

20   I think it's somewhere close to 250.  That's 2008

21   and 2009.

22       Q.   And a lot of the money that you took out

Case 11-01255-KHK   Doc 16-5   Filed 10/17/11   Entered 10/17/11 15:07:48   Desc
Exhibit(s) Exhibits to Hass Affidavit   Page 99 of 178

Page 211

1   A/R from AC Technology, and you had it deposited in

2   these accounts; correct?

3       A.   I had A/R that was coming in, actually

4   wasn't coming in, hadn't been billed, and I billed

5   them and got the A/R, yes.

6       Q.   And you got the A/R, and you understood,

7   though, that all the collateral, including all the

8   A/R, of AC Technology served as collateral for Bank

9   of America; correct?

10      A.   Yes, but I was still operating the

11  company, and I was trying to do business.

12      Q.   And let's take a look at what you did with

13  this money because the interesting thing about these

14  records, and we've talked about this earlier in the

15  day, that we don't have full access to all the

16  records 'cause we only got them on Sunday, so this

17  is the part where we're running a little blind, but

18  let's look at some of what you did with the money.

19          The operating account, Exhibit 40, has one

20  check attached, if you can look at it with me.   It's

21  a $25,000 check to Mr. Burkman; right?

22      A.   Okay.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| In re:  EARLE D. MUNNS ) | Case No.:  11-10912-RGM |
| ) | |
| Debtor. ) | Chapter 7 |
| ) | |
| ) | |
| BANK OF AMERICA, N.A. ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Adversary No. 11-01255-RGM |
| ) | |
| EARLE D. MUNNS ) | |
| a/k/a EARLE D. MUNNS, JR. ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S RULE 26(a)(2) EXPERT REPORT**
**OF GARRETT M. DATZ, MCSE, CCNA**



EXHIBIT
I

## I.    QUALIFICATIONS

I am a technology project manager in the Technology Services Group of Ellin & Tucker, Chartered.  I am responsible for internal technology operations, planning and special technology projects.

I graduated from the Robert H. Smith School of Business at the University of Maryland at College Park, and I am presently pursuing a Master in Science degree in information and telecommunication systems at the Carey Business School at the Johns Hopkins University.  I am a Microsoft Certified Systems Engineer and a Cisco Certified Network Associate.

I was retained by Bank of America, N.A. to review certain records of AC Technology and provide my opinions regarding the source of the documents.  I have not provided testimony as an expert either at trial or deposition in the last four (4) years.  My hourly rate for this engagement is $250.

## II.    SUMMARY OF OPINIONS

Based on my review of the information in Exhibit 1, it is my opinion that the first page of the exhibit (AC Technology Inc. A/R Aging Summary as of June 27, 2008) is an Adobe PDF document, which was prepared from a Microsoft Word document on June 27, 2008 at 9:43 p.m. by an individual logged in as "EMUNNS." My opinion is based on my review of the electronic document and the metadata (source information) contained in that document and included in the exhibit.  The time indicated on the Adobe PDF document is 7:39 p.m., which is inconsistent with the metadata in the exhibit.

Adobe PDF documents prepared from QuickBooks accounting software would have metadata that would show the source as Intuit and have a consistent time of preparation with that appearing on the document.  Therefore, it is my opinion that the Adobe PDF document was not prepared from the Company's QuickBooks accounting software.

**ELLIN & TUCKER, CHARTERED**
Certified Public Accountants

Garrett M. Datz, MCSE, CCNA
Report Preparer

Baltimore, Maryland
July 6, 2011

**EXHIBIT**

7:39 PM
06/27/08

# AC TECHNOLOGY INC.
## A/R Aging Summary
### As of June 27, 2008

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Advanced Biometric Controls, LLC | 1,445.60 | 0.00 | 0.00 | 0.00 | 0.00 | 1,445.60 |
| AFRL | 98,293.75 | 0.00 | 0.00 | 0.00 | 0.00 | 98,293.75 |
| Air Force | 15,672.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,672.00 |
| ArgonST | 31,650.00 | 0.00 | 0.00 | 0.00 | 0.00 | 31,650.00 |
| AVR Enterprises Inc. | 10,699.69 | 0.00 | 0.00 | 0.00 | 0.00 | 10,699.69 |
| Bureau of Labor Statistics | 0.00 | 7,427.78 | 0.00 | 0.00 | 0.00 | 7,427.78 |
| Bureau of the Census | 278,668.11 | 0.00 | 0.00 | 0.00 | 0.00 | 278,668.11 |
| CACI | 88,604.51 | 0.00 | 0.00 | 0.00 | 0.00 | 88,604.51 |
| Chenega Federal Systems LLC | 0.00 | 500.00 | 0.00 | 0.00 | 0.00 | 500.00 |
| CherryRoad GT Inc. | 343,506.21 | 226,847.33 | 0.00 | 0.00 | 0.00 | 570,353.54 |
| CSIC | 15,490.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,490.00 |
| DC Water & Sewer Authority | 246,100.17 | 0.00 | 0.00 | 0.00 | 0.00 | 246,100.17 |
| Defense Finance & Accounting Service | 1,215.57 | 0.00 | 893.79 | 0.00 | 0.00 | 2,109.36 |
| Defense Logistics Agency | 74,754.40 | 0.00 | 0.00 | 0.00 | 0.00 | 74,754.40 |
| Department of Homeland Security | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Enterprise Network MGMT OFC | 0.00 | 14,543.61 | 0.00 | 0.00 | 0.00 | 14,543.61 |
| FAA | 0.00 | 13,842.44 | 0.00 | 0.00 | 0.00 | 13,842.44 |
| General Dynamics | 4,475,000.00 | 0.00 | 0.00 | 0.00 | -5,490.87 | 4,469,509.13 |
| IRIDES, LLC | 0.00 | 0.00 | 0.00 | 0.00 | 2,723.48 | 2,723.48 |
| Lawrence Berkeley National Laboratory | 0.00 | 107,233.56 | 0.00 | 0.00 | 0.00 | 107,233.56 |
| Maryland Procurement Office | 0.00 | 25,980.00 | 0.00 | 0.00 | 0.00 | 25,980.00 |
| Michael Baker Corp | 0.00 | 9,790.28 | 0.00 | 0.00 | 0.00 | 9,790.28 |
| MOCA/Arrow, Inc. | 42,740.89 | 0.00 | 0.00 | 0.00 | 0.00 | 42,740.89 |
| Naval Air Warfare Center | 0.00 | 5,658.43 | 0.00 | 0.00 | 0.00 | 5,658.43 |
| Naval Satellite Operations Center | 51,786.11 | 0.00 | 0.00 | 0.00 | 0.00 | 51,786.11 |
| NCI Information Systems | 0.00 | 6,079.77 | 0.00 | 0.00 | 0.00 | 6,079.77 |
| NEWTEC | 0.00 | 2,400.30 | 0.00 | 0.00 | 0.00 | 2,400.30 |
| NOAA | 0.00 | 14,885.06 | 0.00 | 0.00 | 0.00 | 14,885.06 |
| Northrop Grumman Corporation | 0.00 | 2,030.11 | 0.00 | 0.00 | 0.00 | 2,030.11 |
| Maryland Procurement Office | 2,010,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,010,000.00 |
| NSWC | 344,631.96 | 0.00 | 0.00 | 0.00 | 0.00 | 344,631.96 |
| ORC, Inc. | 17,033.56 | 0.00 | 0.00 | 0.00 | 0.00 | 17,033.56 |
| SensorCom Inc. | 255.20 | 0.00 | 0.00 | 0.00 | 0.00 | 255.20 |
| Sun Microsystems, Inc | 0.00 | 0.00 | 0.00 | 0.00 | 311,929.00 | 311,929.00 |
| TKC Technology Solution, Inc | 0.00 | 1,581.95 | 0.00 | 0.00 | 0.00 | 1,581.95 |
| TKC Technology Solution, LLC | 99,140.52 | 26,093.68 | 0.00 | 0.00 | 0.00 | 125,234.20 |
| UC Lawrence Berkley Lab | 458,461.18 | 14,125.19 | 0.00 | 0.00 | 0.00 | 472,586.37 |
| Unisys | 8,196.13 | 0.00 | 0.00 | 0.00 | 0.00 | 8,196.13 |
| US House of Representatives | 0.00 | 485.56 | 0.00 | 0.00 | 0.00 | 485.56 |
| US Naval Academy | 18,461.32 | 0.00 | 0.00 | 0.00 | 0.00 | 18,461.32 |
| Wildflower International, LTD. | 0.00 | 126,591.12 | 0.00 | 0.00 | 0.00 | 126,591.12 |
| **TOTAL** | 8,731,826.88 | 607,640.72 | 893.79 | 0.00 | 309,161.61 | 9,649,523.00 |

Page 1

AR_Aging_Jun08.pdf

```
%PDF-1.4
%âãïó
6 0 obj <</Linearized 1/L 14661/O 9/E 10734/N 1/T 14495/H [ 736 161]>>
endobj

xref
6 22
0000000016 00000 n
0000000897 00000 n
0000000736 00000 n
0000000973 00000 n
0000001150 00000 n
0000001282 00000 n
0000001440 00000 n
0000001894 00000 n
0000002255 00000 n
0000002289 00000 n
0000002992 00000 n
0000003632 00000 n
0000004231 00000 n
0000004918 00000 n
0000005524 00000 n
0000006129 00000 n
0000006739 00000 n
0000007302 00000 n
0000009971 00000 n
0000010210 00000 n
0000010437 00000 n
0000010658 00000 n
trailer
<</Size 28/Prev 14485/Root 7 0 R/Info 5 0
R/ID[<ef8a4af27063c9609c2262d0b16e4e89><227ceb48e0a1b847803d409f8e814dfc>]>>
startxref
0
%%EOF

8 0 obj<</Length 84/Filter/FlateDecode/L 95/S 39>>stream
xúb``Ðf``Ôa Õ5E□TÀ□À,□□
(,ÂPÌÀ ÄÀÃñ!‰ýà>‘5lïKqÊÀ¼Ê‡¬U¯ƒ–18Ë#*›ì(□=#Hƒ¦/Df□b□€ □ àX`'
endstream
endobj
7 0 obj<</Pages 3 0 R/Type/Catalog/PageLabels 1 0 R/Metadata 4 0 R>>
endobj
9 0 obj<</Contents[15 0 R 16 0 R 17 0 R 18 0 R 19 0 R 20 0 R 21 0 R 22 0
R]/Type/Page/Parent 3 0 R/Rotate 0/MediaBox[0 0 612 792]/CropBox[0 0 612
792]/Resources 10 0 R>>
endobj
10 0 obj<</ColorSpace<</Cs6 14 0 R>>/Font<</TT2 11 0 R/TT4 12 0 R/TT6 13 0
R>>/ProcSet[/PDF/Text]/ExtGState<</GS1 27 0 R>>>
endobj
11 0 obj<</Type/Font/Encoding/WinAnsiEncoding/BaseFont/TimesNewRomanPSMT/FirstChar
32/LastChar 32/Subtype/TrueType/FontDescriptor 24 0 R/Widths[250]>>
endobj
12 0 obj<</Type/Font/Encoding/WinAnsiEncoding/BaseFont/Arial-BoldMT/FirstChar
32/LastChar 121/Subtype/TrueType/FontDescriptor 25 0 R/Widths[278 0 0 0 0 722 0 0
0 0 0 278 333 278 278 556 556 556 556 556 556 556 556 556 556 333 0 0 0 584 0 0 722
722 722 722 667 611 778 722 278 722 611 833 722 778 667 0 722 667 611 722 667 944
0 667 0 0 0 0 0 0 0 556 611 556 611 556 333 611 611 278 0 556 278 889 611 611 611 0
389 556 333 611 556 778 0 556]>>
endobj
13 0 obj<</Type/Font/Encoding/WinAnsiEncoding/BaseFont/ArialMT/FirstChar 32/LastChar
117/Subtype/TrueType/FontDescriptor 26 0 R/Widths[278 0 0 0 0 0 0 0 0 0 0 278 333
278 0 556 556 556 556 556 556 556 556 556 556 0 0 0 0 0 0 667 0 0 0 0 0 0 0 0 500
```

AR_Aging_Jun08.pdf

0 0 0 0 0 0 0 0 0 0 0 0 0 0 0 0 0 0 0 0 0 0 0 0 556 278 0 0 0 0 0 0 556 556 0
0 0 500 0 556]>>
endobj
14 0 obj[/ICCBased 23 0 R]
endobj
15 0 obj<</Length 634/Filter/FlateDecode>>stream
H‰œTKk0Q©0¼ëW‌IQ,¡¼;Û¹¡à;!mH‴þèRL A8|…,¨7"þÛÏhô²,¤ Hkˇ¡¦ 2ˇˇˇFÂf_¦¦5YÓ hhˇ M øæˇŽ6¬Ää
¡y{f;¼‡Ô¾ÝS‸_m,¡¡¡ü¿‹à®æ‡"'¦DAÍÛ'v¦ëŒFe¥ŒB¥¤µªÊÐb$ bÔ¥þfn#'ˇfJÔ'¡¡ä,+å¬Wu0Œo0O8¡¬¨8†jN
Šzd¾¡Ò˜¡yˇÛŒÞTµE˜ŽV5Ý·O¬WKwgÐàÓäÛ0Ûr¾÷Ç4}°ÒÛ_ˇCC‡¾,Kåg f¨NÉ×ÒEsˇ·¬ÂÛ˜Û r¨é
æÛÛ±S'Û§ÛÛ̧̐ˇˇ¨Û£,ÐˇÛ̦¦̇̌6=/̦Û_y¦x,ÛÉÛ[b9vkê²
ÛÔÛ#¤ójÞñ5¡Ž̂ần‰»B5$¨¹¬5{¨†¡3¬g¬ÛÁ¤mÇ¨ÛÛ¬Þ̂AÛäv
Û¤Û)vÝp kˇ̇²™ÛuÓ0wA‡4Û/{,,40Aeۇ̌1p™ˇầÛ̌̇…1¬(;ÿ̇0̌¬ÛÇ0GfzÛ̌ÝÛ²¼̌%0¬AK7}ÛP»¨¨þzÞRu¢÷¤
Û!rÁZ̀q¦Eä,°>XˇBH>³¬)*Ûkˇ>Œµ»&Cf5ÔÇ¦™,Û¾MÛ,¨xÛˇÛÛ¨æÞ¬¿Zˇ̀Û¦
RÛ,xˇ̣äˇwëxkÛ̌"É̇ÛÅ½¼F‡fk8á9#Û¨IS¯XC¦'Œ±™¦†¬KC
F
̧QcŒKÛd_Å5¬#Û¨{Ûk&¨*aè¨
ÅûˇÔX™'¦;x5$™W‰
<u¦¡zÑšÛ̂T«;š7¡µ&Éux¨5Ž̨™2¨yæxv@W¨b
ØÐWŽ̧;6ÛẏˇÀ,uJG¨a<ç¡M2Ý̂ ˇÛÛÅšøàšWdø¿‹êÛþ
0 ÉÔ†¨
endstream
endobj
16 0 obj<</Length 571/Filter/FlateDecode>>stream
H‰¬TK/ÓÛÔ¾çwøhKÉà÷äHÊ¬¼¨¨̇Ûˇ̄Gä³Û̇ÛŒÉ¦PÄ&(Iá¡3Y²ˇÝ¯>@„Tª¬ödÛ}óˇLy¬Ý¯™'¨¨¤¾ÕÛ̌Zᯨ'(WRÛ̂Œ^¬àHwg›¦Q
f¡,¨Žqä̌¯̀̌;¬€ˇxH¤¦̇ÏÛ)«Û÷3£,,¸¯̄³ÀjÔR{R.ÛA¯ÛˇvÞ̀à̌æÊÑ1ˇ̀ˇÛ¬ o™Û
é‰+$‡@ÛÛ¦ÀÓ5+«mXàÛ̈¯̄Ý̄¯¨¬̇¨Û̇¶êê9.ŽÛC-¬Ér:¦¡žˇ>ÝZ&ÛÀ·>'«T³Ly¬‸¬wÙ>²¯ZAo2)AHœy¦¼H™Û£¦
Û̇ÛÉµ̇6¨9äȦ1)¬4:EÉÛÛ̇jé Û̈¨ˇÝÛˇ(žf>ˇˇ8ÀÛ̇ Rñ,̧Û¦8w¯%ÛFˇ3Œ9»ÛñÛÛÛÛ̄¨H¨Û
x‰+¬GQ/3¦>¬A+3ÿ̇Bˇ);ÝÝf¦æ6¢Anˇ¦¦GL³¨Ðt>dˇ&¨Û0¨*æ̂̇Ç¨9Ý̇ˇÀ8Ûœwøf̧þsÛ̇…É¬¨§̧_^¨¦Ú,þyˇ-*¼oHá¢š³Q
a¸qÛ+ÿ̨ærX¶¦ˇyx̀hymu+¨[s/yu¬gñˇÛœfaß̂#Û¨³¨ÐÛc¦dsEÛâ¦
7ˇP¬½¬ëw¦eÛ»m¬C;Ûƒ̌Ô¾ÛâZˇˇ,Ç6ṅ̨äGˇÛ¨"ˇ/5ŽcÛ¦ˇ6&°[ˇ°²z½#ˇ†¬ÛÝXañ¬mZ0É2¬¾Eäˇˇ¢̇Û¨ˇˇ̇¦¨½¬VÔ̈äˇÀ³¬
8Û/¤¨¨ Û̀̂ôˇ,xÛÛ̇Ûˇ¼¬ª̇½̈†ø̌ÛẏÛæ,Û̇ˇ6¬7ÓføRO»e¨ˇ¨ÛâÔ̈ô»þL«̨_ Ûˇ¨ûL̆ ̄ŒLdÄ
endstream
endobj
17 0 obj<</Length 530/Filter/FlateDecode>>stream
H‰¬TKÛÛ0¾çwÛ4HÉ¬éÿ8Û̂.:dèˇ1¨Ût¢Cè³M†¦̇ÛywE¶̇Ý(YÉœvÛ̇4«/¢dŠúø̇ñ#Û̂0³³÷mkA@{7™'
é<ph/gœ¡¡ÛJ¨¬ÑB‡Ç̇Û
Û Ûˇ̄ÛÛˇL¨ µ'V1A¦KÛÝl¬ˇtÐZ̄ÛÅ¿#0)<gúy¸/m†£GÛ̌Ûo¬ˇ̄ÄÛTB»ŒjÛÛ̧\Pâ¬%
uˇˇ9X™Ý<Dzûb
Û¡pˇˇÛdvlˇ̇Û™ ÷'¦H¨ê¦š¨fÛ̈øÛšˇæHÄÛ™éFÛ>/É¦¸¦¦Ûˇ̂&¬¸#»†¼¾eš¨ñÐ̂ñuGv2¬¾qÇˇèêÊ̈nŒt}½/6/(̈ŒK
ˇÝFa¦@(¬f¦
Û̇yˇ̋¼G¦żÛxPM™'ÛänHˇÛÄä::Û=,KzyJ*ÄäSb¬Û¬/,YÞÄ̇ˇ¡æÝ5̧¸'»¥Ûe¸e2ˇGJ°Gâ³¦JQ̧̇™°q¼RF1£Û™67‡Æ
ˇbŽ5ˇ¿žÑ[ÀT:ÛÛ̈ÛyeœÄ;¦ÀG ¬
¦^ Û±¨w¯̨ÛÑš<bÛ<
µh°ħ̣b,J…̇ ÛÛ̇.Åz\.ÿf@w‰°ẋÄ̇ä̌̇ #a2á¨-I
N…™p¨pÿ¬c=)d²Bà#þ̌ÅZÛ̈/²‹pµ¡uê±nÛ-'¥HÐ¢Ûáˇ¸Ä?å¸,Û‡rwÛeäeÉ̄¯̈ÛscG±3ÒJø1Zˇˇ*ž;A±Û·DÄ̇K̂è¨
1Û'ù ¿ˇˇxÛ¿ÛÛBSyAÁÛ;¦ S¿Z.
endstream
endobj
18 0 obj<</Length 618/Filter/FlateDecode>>stream
H‰œTMOàÛ4½¬wøhK‰xßvŽ,Û¬UÛˇÉ
í!¦[\TQœ"f…ÛßˇØNÛÛ
EˇÏ‰¬äñ¬÷f¦ù9Ûv¬
qT_&¦"™ÿ̈ëÞˇÛ̇a\£r:ÉAeŒIṪˇ¨ñˇ¢̇ˇˇ¢̇mÛ̇ë§¬¬ák'D¼öḣ¾ˇÛ̌rMrG9î̂wše^†…Àó5™9xøŒ@¦jfÝ,«O¬5øi<•f°û#\Á
Û¨ße¬dä¨4½+XFPx,,ÀcÛ̈fµ¢ŠÄuZÛ ñfOXKSˇlw²P¬É¬ṁSpÇ̨z‡̇Ût€#¦̌¨(¬æ̇ÛV$K
ÛÛ

y¢€̇&wbà̇¦Aÿ̌¶{!¶§̇̄;Ûê f'¾$·pæG¬ÙÄ3[ßu:^7‡]tÝvçñÿ¬ÀÛ9·KXYÛ̇†™ÉÛ5™ˇˇ(øÄˇl)Ýjmo¬™@G*•°̄̇éÛ'
ˇÛ³9.zÛ̈žþZk0:,ÛÉÝüÛu]°¦J8ÝżÛ̇ˇtß X¢øÛgtsÉ$ãsC
Æá¨ ÛzGwÑrŽ:Ì¦¨Ž¥Û¨QÛ̈è™T̈æ*ÛJRÁO·¦ X€s¨-t.#Û,eÇ
Á!_|¬‡w\ÛwÛ>Û¨™S,*uz:05Ç¾ÿ¨*\ùÛ·uˇ̇¼5ᡇÇ;¾<¨™°Ç̇Æ/;Ää@»CÛ̈°*Tê£ê̇Û,¯
¥ ä]v¨Ûw¦,+x™*ÛuÛ¬Û¬ÐÛdŠL3àJÛÛÛÛ:ÀÛ̈¦u¬Æ7y÷¬°Û]O/ˇ34fQÛ̇ˇ̇Ûûé̇z¬}x
@u¥f™Ñ¨*7¢¢t×ÛuÉÛ€ŒÛ¬¡jVĄ̈¨q±)æ̇è·@°
Û¾ž{DBÛ¬÷ˇsœç*̄¬,¬ˇ̄ˇWQvÀw[uQm…»°Z¦Yö¨4«€é¢ÆÁÛV]O1¨3ÛpbÛ†ú/À JÄa±

AR_Aging_Jun08.pdf

endstream
endobj
19 0 obj<</Length 537/Filter/FlateDecode>>stream
H‰¬TËn0Ó3¼Ü+öHÌ Ä÷ã¨°−8h] 5z(r`\
1å₀Ò‡èßßwiÒ¶bÖ=Ø¹H$W¼Ê™c¥´ŒKí/CóyÄnç\B3?¬ð&?IZB−¥äŠoî*©A3íO·µB‰}\Mí˜ÚïŒˆêC"Äs¦
□□<4_&7M£A®ÖM¦Y Ò,ïn±Ž¨Ú□ Í€‰ê Ž̈ÖÒ¨Ì₀‡
Í,YFZ{²ú<ßÉ̈Üzþgt˜@p/IÜÜ®òve³©[Î□Cí›KË'dêPSŒE e¦
~Í₀‰;Þe8/fåŠ
‰ÝŠUdxÎ□c»,,Ò`vX$>µ=¤¥¦Óuŷr5GÉp'λ™ô"'¦¦8Ì̀Ö'¼ÂTX‡í¦´Æ¶*rK¥ÂxMB,,¤n©0Ì"]{ê±−k~˜#o4eR¤,»Ôî
´ÏFX‰¿Òüxñ̃BWúPËÊïÌ¦¦;´'Œö
ß)ã,ä¤˜bx×ìt−v}<¦µŠỳM"Ö‰"äs‰÷D'Aj² µMZÀÏ̈ðw1m\ò:ÇW¬Óv̧µMV,°ŷ¦²£3−°èy̧1ÀêúÏ•?NÜ̃Ñ¿f ↑Á™˜ì
Üô™ä_*"ã>n0e$ûåbÜ,cÍ^Ö>¦%Í¦ȨÁÊ̈bǗ³Þ¿xô
ê'□«['äy̧'jä−'P™$˜‌œ·□Ü÷1Î□ã¦îÚ̧çe™•,H□'¦wî_□˜#ŶʰÖN+Kå6Ów¤„à>]0._œ̃ž1'
Ỳ‰tM¾Ŷ6tàÏ[q‡uÜ]Î9¦x€¿r□ MÍ^j
endstream
endobj
20 0 obj<</Length 536/Filter/FlateDecode>>stream
H‰¬"TmÔÕã†íˆïz
□Î@þ‡«ÁcäxEt$.}<9µ=ỳªŒ°˜¥@vPôí¦¤jÊ−ỲMn}Ï̈ø̀Ìòî?Çỳ)yç¼&,ø̈u'ÏÊÀJK2Á−èCüÛê8 8äŠÜˆ̈ŷ•Ð̈Ü̈ÖG‾»
Ỳ̈¦ì¶3âì´´PÑ™¬□Ö{¢aMX&‰(Jö¨'S
ÀÜ83Ò:.†ấh§s®†}'VµÏ¤(€ê̈h¥̈äå«¿,,|At̃œª¨ŠN1žèy̧'eBÖ>)&Ç½=\Ê#'tZÊ‡c*kg&è.ÓÜ¢d UpUÛ=SÓî¿·Ë‾\
Ôœ™|h_Xf'¥Û0Ì»ª        Êq̧±˜Ỳ‡145,£ís÷§¦]î7â¢Á<xR¿'.A$PÄ__x˜Ïf<Ë•1N□
#Çª1−ÔỲ
«å□ú7'äÄ~°ä"ÖßȨ́cb¼)±R&1Ïfój[ÖỲvÖ−ê̈ö¦¬f_í\ á¤Ý1¦á̂¦°‾˜µ€„oð−e9F‰ž9Ø T     fÕŽê̈b
\Ð̈Ïçí¦Žï̧àdT__œ‌Œ̧ê̈Ââ¶1PƒuÀÛM̈â¦,¬Ò:µJpggÊ\£åÖỲ9
Î̧çTA=fÖ·ò̀ÒÈ™‰PÇw*Z3œ‌kZ̀ò³¢¼
‡Í−cC)n̊þwỲ'¿ÊxÇ£{H,¦Ú{ˆê]Ó.,₀₀Cô˜ÓúñÈ̈ Èk?·Ö&¦vVê̈w©qŽòöç©åß¦Ò„·ò̀ÖÛ̊œ8fs*èŒ₀¥&w›²
Ö
Ỳá›e¨Ëäx$ˆûÛì«î™Úîṕú̊ÄXä] 5 €‾]V
endstream
endobj
21 0 obj<</Length 541/Filter/FlateDecode>>stream
H‰¬•MsÓÖà†̈íỳ̈ü®{™f]¦Ò.Ž€ê|d8Psbz□Œ…œÁa'−1ỳz̈•e¦B4m1œ¼̈+kä÷}vµ®Þ,žU÷&„êj¦œdJ9pP½\H!¥TP5St
·øŒRU¼˜Ê̈îx$œ̧\Ûg&É/Ö‾)%5Ö‾îŽ‡øÌ,±xXÇ̈øã,ÁQT¼žKe'„Î%1TB¦äG*¦§â®*±g²Zä„Ë„,‰œ̈ zÒQp•½\ñé¥ÀX ‧Ä
p,¦ỲÖjLVRŽRJ0N€M,Ê^G@/_Û̈@Uo−À½'−ä¥0z̊µî×□t>5/fjêlÖ½/üä˜EdpÁK™'o¨¤t}{s=lë̈
xỲ5™−³TÖ□†ï˜Ô^ÉfʼaÖŠh€asLqÎ̈à₀¨ôd14ÁâAQT¼žKe'„Î%1TB¦äG*¦§â®*±g²Zä„Ë„,‰œ̈ zÒQp•½\ñé¥ÀX ‧Ä
ª=)à
□µpa&(T¶PÚàuO
ªph ¦‰n@}XÄ³œ‡åx£{í…b[zÖÇ0®íáE»ýÌn‰úî−L™@□{&ỳ̈œ±Ö6Ø€¿¦Àˆ·GØ¦ 7OãLò̀œ+ê8'´˜*èÀaÇHÖK²
tx»þ̈ã£&
£4]™'ÖT□ÖfʼP'ʌ^̂ôÇð,,h̊qbꞏë̈ṭ™™øỲzé̈ỳ̈ørfꞏ̈ÎQxµ'¥ePÀ̈ßµ'É̃Ñ¦WGPS'âÛ±mwm—ôê̈t‰˜‰c?p•š−î£̈Ỳ?X˜T'
_üYÖ!3Ï̈xtD□œzŠÎ̈ßâ̈]Ỳ;TÜaduª:²5œe□œÒ;Ë̈Ü̧^z*_ỳ'ÎÂwzØsỲÄÜ
,tÜhÄìÖw¿"ó̈@q¦»„ß□□ vÏeN
endstream
endobj
22 0 obj<</Length 494/Filter/FlateDecode>>stream
H‰™TmÔÖÜ̈δ¼̈ẃÖ(□6¦Rß̧ç
Ỳ̈äC™]nìÖíPl     □¦KM ©ỳ̈bdIvm7M[]™ÜTp#Ë¦r̈ª¦™"Ú̈Tp#Æ¦ỳ̈Ñ
H410#¨±TÖD:EPÖ^ʌ°*¥ÕÖ̀oQVÐ̈Ö™ØÉỲ÷C?‡ãCf'äS7˜Ä(÷₀ðvzÜỲOwG÷SỲˆó§ÖỲ±‡nÖhåm°Àè~¥Bè*aþ>bv F¦
□ÑË¦CwèÖ_ñ5     &_ÖÊ̈D˜H−Ê̈†Ú̈T™™8¶¦Aâ|ÏÂcÖ̈ÖGÁÜpÖˆ·²Œfꞏˆ̈›þ    Ïìz!)w8fz½
¥₀₀³å̊ô,,□x'Ë,µÖèÜ÷Ö4□1÷ü∶'tÖÀk̀1[¨`\Mñ@Ö0Ï̈ỲÖË<'4Ḭ̈̂Ÿ̈Ö− xÖ"¥•
åŖÏ̈ô<.,5,¦±w∶ ʌ̈Ï„1fgídú´°ÀaÉỲ∶€êâm5Óœ̀ãt7Ö̈¼âœvñ−z¼×Ö‡¦¦‡S6´́ãLë̈¦þỳ̈•¶¶˜îº ¥•gÖ1−ãSz„Ỳ−Ö¥w‡V±'−o1Ü~ỳ̈²ê−ø>ÑË̈DPŒ−
dß€˜>@Ü̈ñ€RÖä«P\LÇ£!¬œ‡<−‰¦˜−∶Ì    x9Ëó5&"□Ë̈ò&ƒ̈Á˜9)æz̧*†ỳ̈□□ Ö□/·
endstream
endobj
23 0 obj<</Length 2575/Filter/FlateDecode/N 3/Alternate/DeviceRGB>>stream
H‰œ−ỲTSWÖÇê̈oȨ̂zÖꞏ˜Ác
[€™□Ö51a´□□Q□î□□Ö̈ñ̈BHø̈;ADÖ̈ÖED„„ª•2Ömt̊FOE□.ªc−Öö̈}ê̈Ò̈Ü̈Ö̈0ê̈è8´□ẍZ̈□08G0Ng¦Ö†Ö†÷9+wïⁱỲ̈B½÷□ó
¨'¥ªµÖ̈Ö□□ö Ỳ̈z€À□□Öbª      □
‰œ̈ 2y−·,∶!oã´‌ÆK*zÜ     ü<ž^2ỳ̈ỳ̈™LÊ̈àÖÖ̧ỳ̈‰−x€
@Ö8í¦("µrœ̧;q®ª7èLÖ̈œ̈y̧¥•&↑qÖ̈ê̈™Ö̈q¶4±¦ž̈¼¦|ª9ÓÄ
□vÖ̈³)gÖ̈Bꞏ£Öñ¦œ̈w×ò·8#Ö̈8wÖ̈œ̈·Ö̈8_ÅÙ̈¥Ê˜QäÜÜ̈Ö«QËj□@é̈&»A)/Çü g°>'K,óÊ ÈtÖ;\úÄ□"

AR_Aging_Jun08.pdf

[binary/encoded PDF stream content — unreadable]

endstream
endobj
24 0 obj<</Type/FontDescriptor/FontBBox[-568 -307 2000
1007]/FontName/TimesNewRomanPSMT/Flags 34/StemV 82/CapHeight 656/XHeight 0/Ascent
891/Descent -216/ItalicAngle 0/FontFamily(Times New
Roman)/FontStretch/Normal/FontWeight 400>>
endobj
25 0 obj<</Type/FontDescriptor/FontBBox[-628 -376 2000
1010]/FontName/Arial-BoldMT/Flags 32/StemV 138/CapHeight 718/XHeight 515/Ascent
905/Descent -211/ItalicAngle 0/FontFamily(Arial)/FontStretch/Normal/FontWeight 700>>
endobj
26 0 obj<</Type/FontDescriptor/FontBBox[-665 -325 2000 1006]/FontName/ArialMT/Flags
32/StemV 88/CapHeight 718/XHeight 515/Ascent 905/Descent -211/ItalicAngle
0/FontFamily(Arial)/FontStretch/Normal/FontWeight 400>>
endobj
27 0 obj<</Type/ExtGState/SA false/OP false/SM 0.02/op false/OPM 1>>
endobj
1 0 obj<</Nums[0 2 0 R]>>
endobj
2 0 obj<</S/D>>
endobj
3 0 obj<</Count 1/Kids[9 0 R]/Type/Pages>>
endobj

AR_Aging_Jun08.pdf

```
4 0 obj<</Length 3339/Type/Metadata/Subtype/XML>>stream
<?xpacket begin='ï»¿' id='WSMOMpCehiHzreSzNTczkc9d'?>
<?adobe-xap-filters esc="CRLF"?>
<x:xmpmeta xmlns:x='adobe:ns:meta/' x:xmptk='XMP toolkit 2.9.1-13, framework 1.6'>
<rdf:RDF xmlns:rdf='http://www.w3.org/1999/02/22-rdf-syntax-ns#'
xmlns:iX='http://ns.adobe.com/iX/1.0/'>
<rdf:Description rdf:about='uuid:22b642ba-8600-435d-90fd-1053c75b43b4'
xmlns:pdf='http://ns.adobe.com/pdf/1.3/' pdf:Producer='Acrobat Distiller 6.0.1
(Windows)'></rdf:Description>
<rdf:Description rdf:about='uuid:22b642ba-8600-435d-90fd-1053c75b43b4'
xmlns:xap='http://ns.adobe.com/xap/1.0/' xap:CreatorTool='PScript5.dll Version
5.2.2' xap:ModifyDate='2008-06-27T21:05:43-04:00'
xap:CreateDate='2008-06-27T21:05:43-04:00'></rdf:Description>
<rdf:Description rdf:about='uuid:22b642ba-8600-435d-90fd-1053c75b43b4'
xmlns:xapMM='http://ns.adobe.com/xap/1.0/mm/'
xapMM:DocumentID='uuid:2a5f633f-8697-40b7-ace7-ebbf251e42e7'/>
<rdf:Description rdf:about='uuid:22b642ba-8600-435d-90fd-1053c75b43b4'
xmlns:dc='http://purl.org/dc/elements/1.1/'
dc:format='application/pdf'><dc:title><rdf:Alt><rdf:li
xml:lang='x-default'>Microsoft Word -
AR_Aging_Jun08.doc</rdf:li></rdf:Alt></dc:title><dc:creator><rdf:Seq><rdf:li>emunns<
/rdf:li></rdf:Seq></dc:creator></rdf:Description>
</rdf:RDF>
</x:xmpmeta>
```

**AR_Aging_Jun08.pdf**

```
<?xpacket end='w'?>
endstream
endobj
5 0
obj<</ModDate(D:20080627210543-04'00')/CreationDate(D:20080627210543-04'00')/Title(M
icrosoft Word - AR_Aging_Jun08.doc)/Creator(PScript5.dll Version
5.2.2)/Producer(Acrobat Distiller 6.0.1 \(Windows\))/Author(emunns)>>
endobj
xref
0 6
0000000000 65535 f
0000010734 00000 n
0000010767 00000 n
0000010790 00000 n
0000010840 00000 n
0000014255 00000 n
trailer
<</Size 6>>
startxref
116
%%EOF
```

**From:** Chris Sands
**Sent:** Monday, June 30, 2008 11:42 AM
**To:** 'mabyrd@sydiansys.com'; 'EMUNNS2325@msn.com'
**Cc:** 'Christopher Sands'
**Subject:** AR 06-30-08
**Attachments:** AR-June 30 2008.pdf

Gents,
Here is the A/R as of 8:30 am this morning June 30, 2008 ...the number is **$6,335,373.82.**
Any questions give me a call...
Best
Chris

_Christopher Sands, CEO_
**AC TECHNOLOGY, INC.**
**22695 Commerce Center Ct.**
**Dulles, Virginia 20166**
**Tel: 703.481.6500 x101**
**Fax: 703.481.6562**
**Cell: 703.405.8205**
**Email:csands@actechnology.com**
**Websites:**
www.actechnology.com
www.biobex.com



Sands 000698

11:58 AM

06/30/08

# AC TECHNOLOGY INC
## A/R Aging Summary
### As of June 30, 2008

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Advanced Biometric Controls, LLC | 1,445.60 | 0.00 | 0.00 | 0.00 | 0.00 | 1,445.60 |
| AFRL | 324,832.30 | 0.00 | 0.00 | 0.00 | 0.00 | 324,832.30 |
| Air Force | 55,533.81 | 15,672.00 | 0.00 | 0.00 | 0.00 | 71,205.81 |
| Air Force Research Laboratory | 6,227.56 | 0.00 | 0.00 | 0.00 | 0.00 | 6,227.56 |
| ArgonST | 31,650.00 | 0.00 | 0.00 | 0.00 | 0.00 | 31,650.00 |
| AVR Enterprises Inc. | 699.69 | 0.00 | 0.00 | 0.00 | 0.00 | 699.69 |
| Booz Allen Hamilton | 0.00 | -8,372.60 | 0.00 | 0.00 | 0.00 | -8,372.60 |
| Bureau of the Census | 13,489.54 | 165,178.57 | 0.00 | 0.00 | 0.00 | 178,668.11 |
| CACI, Inc. | 1,036,159.66 | 8,047.67 | 0.00 | 0.00 | 0.00 | 1,044,207.33 |
| CherryRoad GT Inc. | 1,579.40 | 568,774.14 | 0.00 | 0.00 | 0.00 | 570,353.54 |
| CSIC | 5,490.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,490.00 |
| DC Water & Sewer Authority | 0.00 | 246,100.17 | 0.00 | 0.00 | 0.00 | 246,100.17 |
| Defense Finance & Accounting Service | 0.00 | 893.79 | 0.00 | 0.00 | 0.00 | 893.79 |
| Defense Logistics Agency | 54,754.40 | 0.00 | 0.00 | 0.00 | 0.00 | 54,754.40 |
| Department of Labor | 28,566.94 | 0.00 | 0.00 | 0.00 | 0.00 | 28,566.94 |
| DISA | 243,610.00 | 0.00 | 0.00 | 0.00 | 0.00 | 243,610.00 |
| FAA | 15,622.97 | 13,842.44 | 0.00 | 0.00 | 0.00 | 29,465.41 |
| General Dynamics | 169,200.00 | 0.00 | 0.00 | 0.00 | -5,490.87 | 163,709.13 |
| IRIDES, LLC | 0.00 | 0.00 | 0.00 | 0.00 | 2,723.48 | 2,723.48 |
| Maryland Procurement Office | 2,135,268.47 | 0.00 | 0.00 | 0.00 | 0.00 | 2,135,268.47 |
| MOCA/Arrow, Inc. | 0.00 | 42,740.89 | 0.00 | 0.00 | 0.00 | 42,740.89 |
| National Institute of Health | 4,957.20 | 0.00 | 0.00 | 0.00 | 0.00 | 4,957.20 |
| Naval Air Warfare Center | 0.00 | 0.00 | 5,658.43 | 0.00 | 0.00 | 5,658.43 |
| Naval Satellite Operations Center | 31,786.11 | 0.00 | 0.00 | 0.00 | 0.00 | 31,786.11 |
| NEWTEC | 0.00 | 240.30 | 0.00 | 0.00 | 0.00 | 240.30 |
| NextiraOne Federal, LLC | 24.00 | 0.00 | 0.00 | 0.00 | 0.00 | 24.00 |
| NOAA | 0.00 | 14,885.06 | 0.00 | 0.00 | 0.00 | 14,885.06 |
| NSWC | 144,631.96 | 0.00 | 0.00 | 0.00 | 0.00 | 144,631.96 |
| ORC, Inc. | 17,033.56 | 0.00 | 0.00 | 0.00 | 0.00 | 17,033.56 |
| SensorCom Inc. | 255.20 | 0.00 | 0.00 | 0.00 | 0.00 | 255.20 |
| SRA International, Inc. | 18,862.71 | 0.00 | 0.00 | 0.00 | 0.00 | 18,862.71 |
| Sun Microsystems, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 311,929.00 | 311,929.00 |
| TKC Technology Solutions, LLC | 33,046.84 | 66,093.68 | 0.00 | 0.00 | 0.00 | 99,140.52 |
| UC Lawrence Berkley Lab | 358,461.18 | 0.00 | 0.00 | 0.00 | 0.00 | 358,461.18 |
| Unisys | 8,196.13 | 0.00 | 0.00 | 0.00 | 0.00 | 8,196.13 |
| US Naval Acadmey | 18,481.32 | 0.00 | 0.00 | 0.00 | 0.00 | 18,481.32 |
| Wildflower International, LTD. | 0.00 | 126,591.12 | 0.00 | 0.00 | 0.00 | 126,591.12 |
| **TOTAL** | **4,759,866.55** | **1,260,687.23** | **5,658.43** | **0.00** | **309,161.61** | **6,335,373.82** |

Sands 000697

## CONDITIONAL PERSONAL GUARANTY

THIS CONDITIONAL PERSONAL GUARANTY is made as of the 27th day of June 2008, by EARLE D. MUNNS, JR. (the "Guarantor"), of indebtedness of AC TECHNOLOGY, INC. (the "Company") in favor of and for the benefit of ARROW ELECTRONICS, INC. and subsidiaries ("Arrow").

### RECITALS

WHEREAS, to induce Arrow to extend credit to the Company on Purchase Order #89047 dated June 25, 2008, in the amount of $1,998,025.60 (the "Credit"), the Guarantor has agreed to execute and deliver to Arrow this Conditional Guaranty.

WHEREAS, the Guarantor is the President and majority owner of MB SECURITY CORPORATION, a Delaware corporation ("MBSC"), which is currently scheduled to close on the purchase of all or substantially all of the capital stock of the Company on Monday, June 30, 2008 (the "Transaction").

WHEREAS, Arrow has advised the Company that it would not consent to extending the Credit to the Company in the absence of the Company's guaranty of collection on the Credit no later than Thursday, July 3, 2008 by wired funds to Arrow/MOCA, should the Transaction not Close on June 30, 2008 and by Guarantor if the Transaction does close on June 30, 2008 (the effect of which being, termination of the Textron credit facility).

WHEREAS, MBSC has established a credit facility that would enable payment of the Credit as contemplated hereunder should the Transaction close as scheduled on June 30, 2008 (or on such other date as mutually agreed between the Company and Arrow thereafter).

NOW, THEREFORE, in consideration of the premises herein set forth and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce Arrow to extend the Credit, the Guarantor does hereby agree as follows.

1.    The Guarantor does hereby represent and warrant that the facts set forth in the foregoing Recitals are true and correct as of the date hereof and that this Guaranty is a legal, valid and binding obligation of the Guarantor, enforceable in accordance with its terms.

2.    The Guarantor hereby, subject only to the condition (the "Condition") that the Transaction involving the purchase of the Company by MBSC close on or promptly following June 30, 2008, absolutely and irrevocably guarantees to Arrow the due and punctual payment (and not merely the collectibility) by the Company of the Credit as and when due and payable thereby (taking into consideration any applicable grace periods) and any and all other sums and charges, if any, which may at any time be due and payable with regard to the Credit.

3.    The Guarantor waives compliance with, or notice of any defaults under, or grants of any other indulgences or forgivenesses with respect to, the Credit and agrees that Arrow may



EXHIBIT
tabbies
K

Sands 000143

modify or grant extensions or renewals of or with respect to the Credit without affecting this Guaranty.

    4.    This Guaranty shall be governed by and construed under the laws of the State of Colorado and Guarantor hereby consents to the jurisdiction of the courts of Colorado.

    5.    Should the Condition regarding the timely Closing of the Transaction not occur, this Guaranty shall forthwith terminate and be void.

    IN WITNESS WHEREOF, the Guarantor, intending to be legally bound hereby, has duly and validly executed this Guaranty under seal the day and year first written above.

GUARANTOR

_____
Earle D. Munns, Jr.
President, MBSC

## ACKNOWLEDGMENT

STATE OF VIRGINIA    )
                    ) SS.
COUNTY OF FAIRFAX    )

    This instrument was acknowledged before me the 27th day of June 2008, by Earle D. Munns, Jr., President of MB SECURITY CORPORATION.

_____
Notary Public

[Notary Seal]

My Commission expires: _____01\31\11_____

NICOLE E. DYBART
Notary Public
Commonwealth of Virginia
184896
My Commission Expires Jan 31, 2011

2

Sands 000144

## SUPPLEMENTAL CONDITIONAL PERSONAL GUARANTY

THIS SUPPLEMENTAL CONDITIONAL PERSONAL GUARANTY is made as of the 30th day of June 2008, by EARLE D. MUNNS, JR. (the "Guarantor"), of indebtedness of AC TECHNOLOGY, INC. (the "Company") in favor of and for the benefit of ARROW ELECTRONICS, INC. and subsidiaries ("Arrow").

### RECITALS

WHEREAS, to induce Arrow to extend credit to the Company on Purchase Order #89060 dated June 30, 2008, in the amount of $511,363.20 (the "Credit"), the Guarantor has agreed to execute and deliver to Arrow this Conditional Guaranty.

WHEREAS, the Guarantor is the President and majority owner of MB SECURITY CORPORATION, a Delaware corporation ("MBSC"), which is currently scheduled to close on the purchase of all or substantially all of the capital stock of the Company on Monday, June 30, 2008 (the "Transaction").

WHEREAS, Arrow has advised the Company that it would not consent to extending the Credit to the Company in the absence of the Company's guaranty of collection on the Credit no later than Thursday, July 3, 2008 by wired funds to Arrow/MOCA, should the Transaction not Close on June 30, 2008 and by Guarantor if the Transaction does close on June 30, 2008 (the effect of which being, termination of the Textron credit facility).

WHEREAS, MBSC has established a credit facility that would enable payment of the Credit as contemplated hereunder should the Transaction close as scheduled on June 30, 2008 (or on such other date as mutually agreed between the Company and Arrow thereafter).

NOW, THEREFORE, in consideration of the premises herein set forth and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce Arrow to extend the Credit, the Guarantor does hereby agree as follows.

1.    The Guarantor does hereby represent and warrant that the facts set forth in the foregoing Recitals are true and correct as of the date hereof and that this Guaranty is a legal, valid and binding obligation of the Guarantor, enforceable in accordance with its terms.

2.    The Guarantor hereby, subject only to the condition (the "Condition") that the Transaction involving the purchase of the Company by MBSC close on or promptly following June 30, 2008, absolutely and irrevocably guarantees to Arrow the due and punctual payment (and not merely the collectibility) by the Company of the Credit as and when due and payable thereby (taking into consideration any applicable grace periods) and any and all other sums and charges, if any, which may at any time be due and payable with regard to the Credit.

3.    The Guarantor waives compliance with, or notice of any defaults under, or grants

1



EXHIBIT

L

Sands 000231

of any other indulgences or forgivenesses with respect to, the Credit and agrees that Arrow may modify or grant extensions or renewals of or with respect to the Credit without affecting this Guaranty.

    4.    This Guaranty shall be governed by and construed under the laws of the State of Colorado and Guarantor hereby consents to the jurisdiction of the courts of Colorado.

    5.    Should the Condition regarding the timely Closing of the Transaction not occur, this Guaranty shall forthwith terminate and be void.

    IN WITNESS WHEREOF, the Guarantor, intending to be legally bound hereby, has duly and validly executed this Guaranty under seal the day and year first written above.

GUARANTOR

_____
Earle D. Munns, Jr.
President, MBSC

ACKNOWLEDGMENT

STATE OF VIRGINIA    )
                   ) SS.
COUNTY OF FAIRFAX    )

    This instrument was acknowledged before me the 30th day of June 2008, by Earle D. Munns, Jr., President of MB SECURITY CORPORATION.

_____
Notary Public

[Notary Seal]

My Commission expires:

> NICOLE E. DYEART
> Notary Public
> Commonwealth of Virginia
> 104896
> My Commission Expires Jan 31, 2011

2

Sands 000232

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

In the Matter of the Arbitration between

Re: 16 148 Y 00590 09
    AC Technology, Inc., Michael Byrd and Earle Munns, Jr.,
      Claimants and Counter-Respondents

    and

Bank of America, N.A.,
    Respondent and Counter-Claimant.

## INTERIM AWARD OF ARBITRATOR

    I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreements entered into pursuant to the (1) Credit and Security Agreement between AC Technology, Inc. ("AC Technology") and MB Security Corporation ("MB Security") and Bank of America, N.A. ("Bank of America" or the "Bank"), dated June 30, 2008 (the "Credit Agreement"), (2) Continuing and Unconditional Guaranty provided by Earle D. Munns, Jr. to Bank of America, N.A., dated June 30, 2008 (the "Munns Guaranty"), and (3) Continuing and Unconditional Guaranty provided by Michael A. Byrd to Bank of America, N.A., dated June 30, 2008 (the "Byrd Guaranty"), and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby AWARD in this Interim Award, subject to entry of a Final Award as further provided for herein, as follows:

## I. BACKGROUND

    This arbitration proceeding was initiated by Claimants/Counter-Respondents during related judicial proceedings initiated by Bank of America against Claimants/Counter-Respondents in the federal district court in Alexandria, Virginia. Although Claimants/Counter-Respondents claimed the amount of $4,733,916.31 in their arbitration demand, they did not pay the required AAA Proceed Fee following due notice and opportunity. As a result, Claimants/Counter-Respondents were notified by AAA on November 20, 2009 that their claim had not been properly filed and therefore administration of the claim would not continue. Accordingly, no claims of Claimants/Counter-Respondents have been considered or heard in this arbitration proceeding.

    On September 17, 2009, Bank of America filed its answering statement and counterclaim request with the AAA. In that filing it incorporated by reference the Verified Complaint For Breach of Contract, Fraud and Conversion (the "Complaint") that it had filed against the Claimants/Counter-Respondents in the court proceeding. Bank of America has pursued those claims in this arbitration proceeding and has been represented by outside counsel.



**EXHIBIT**
M

Claimants/Counter-Respondents were not represented by counsel until after the April 19, 2010 hearing on the merits (the "Hearing"). Prior to that time, they represented themselves pro se through Mr. Munns who, although a non-practicing attorney, at the Hearing called and questioned a witness, cross-examined the Bank's witnesses and introduced documents which were admitted into the record.

As Claimants/Counter-Respondents did not comply with their discovery obligations in this proceeding, on March 5, 2010 (incorporating my e-mail ruling of February 24, 2010) I granted a motion to compel filed by Bank of America. It appears that there was thereafter some, but not complete, compliance by Claimants/Counter-Respondents with that order. I indicated in my order that I would consider the imposition of appropriate sanctions in this matter and on April 7, 2010, as a result of claimed non-compliance by Claimants/Counter-Respondents with my order, Bank of America filed a Motion to Preclude Claimants/Counter-Respondents from Introducing Evidence at the Hearing. That motion was considered during an April 14, 2010 conference call hearing with the parties. As a result of that hearing, and representations made by Mr. Munns relative to compliance with my order, I deferred ruling on the Bank's motion but agreed to further consider it at the commencement of the Hearing. It appears that since Mr. Munns produced documents to Bank of America after the April 14th conference call, Bank of America effectively withdrew the motion to preclude as it did not request at the Hearing or otherwise that any further action be taken relative to the motion.

The Hearing proceeded against only AC Technology, Inc. and Mr. Munns. All claims and causes asserted by Bank of America against Mr. Byrd were dismissed with prejudice (each party to bear their own costs) pursuant to a Stipulation of Dismissal dated April 14, 2010 signed by Bank of America and Mr. Byrd and ordered by the Arbitrator on April 16, 2010.

At the Hearing the only witness from Bank of America to testify was Robert S. Cashion, a Senior Vice President in the Bank's workout group. Mr. Cashion testified that he was not involved with, and thus had no personal knowledge regarding, any of the events leading up to or surrounding the subject loan transaction whereby the Bank approved a $10 million credit facility and pursuant to the Credit Agreement and related loan documents, including the Munns Guaranty and Byrd Guaranty, loaned $5.5 million of that facility to AC Technology and MB Security. The latter was the entity used by Messrs. Munns and Byrd, using exclusively the loan proceeds received from the Bank, to acquire AC Technology from its then owners, Chris and Art Sands, on or about June 30, 2008.

Also testifying for the Bank was Todd A. Feuerman, a forensic accountant. After AC Technology had allegedly defaulted on its loan obligations to the Bank in late 2008, he conducted an investigation in March 2009 on behalf of the Bank regarding the financial viability of AC Technology and also the "integrity" of certain financial information (discussed herein) that had been provided to the Bank. The Bank also called Messrs. Byrd and Munns who provided testimony. Significantly, the Bank did not call, or seek to subpoena, the prior owners of AC Technology including Mr. Chris Sands who apparently resides in the Washington, D.C. area. The Bank similarly did not call Ms. Catherine Gaddis, its Controller both before and after the company was acquired by Messrs. Munns and Byrd. Ms. Gaddis apparently resides in Maryland. The Bank also did not call, or seek to subpoena, any other former official or

employee of the company or any other fact witnesses. Rather, as indicated, in attempting to prove its breach of contract, fraud and conversion claims, the Bank elected to rely solely on the testimony of Mr. Cashion, Mr. Feuerman, Messrs. Byrd and Munns and certain documentary evidence.

After the April 19th Hearing I received post-hearing briefs and reply briefs from counsel for the Parties. At the request of counsel for Claimants/Counter-Respondents, I also heard closing arguments in a June 22, 2010 conference call.

II. THE CLAIMS

1. COUNT I (Breach of Contract Against AC Technology)
   COUNT II (Action on Munns Guaranty)

Pursuant to Count I, Bank of America seeks to recover from AC Technology under the Credit Agreement and related loan documents the amounts claimed to be owed to it resulting from the alleged defaults by AC Technology. Pursuant to Count II, the Bank seeks to recover such claimed amounts from Mr. Munns under the Munns Guaranty. Although liability and amount was contested by AC Technology and Mr. Munns up to and during the Hearing, in their post-hearing brief at page 1, AC Technology and Mr. Munns conceded these claims to the Bank:

> In light of the evidence introduced during the evidentiary
> hearings conducted on April 19, 2010, Defendants' [sic] concede
> the breach of contract claims included in Counts I and II of the
> Plaintiff's Complaint.

At the Hearing Bank of America established, and I hereby find, that as of April 19, 2010, it was owed the amount of $5,061,643.57 from AC Technology and Mr. Munns, consisting of $4,686,915.75 in principal and $374,727.82 in interest. It also established, and I hereby find, that it is entitled including under Sections 6 and 7 of the Credit Agreement and under the Munns Guaranty to recover from AC Technology and Mr. Munns additional interest for the period after April 19, 2010 on the amounts owed pursuant to the interest provisions of the Credit Agreement and related loan documents and also its Enforcement Costs as defined in Section 1 of the Credit Agreement and provided for in Section 7.4 of the Credit Agreement. These Enforcement Costs include its reasonable attorneys' fees (discussed further herein).

Accordingly, Counts I and II are GRANTED consistent with the foregoing.

2. COUNT III (Action on Byrd Guaranty)

This claim is moot in view of the dismissal with prejudice of all claims against Mr. Byrd.

Accordingly, Count III is DENIED.

3. COUNT IV (Fraudulent Misrepresentation Against Messrs. Munns and Byrd)

As to Mr. Byrd, this claim is moot in view of the above-referenced dismissal with prejudice.

As to Mr. Munns, Bank of America claims that he committed actual fraud against the Bank in two ways by inducing the Bank to issue and administer the $10 million revolving line of credit. The first way claimed concerns the submission of financial information to the Bank regarding AC Tech's accounts receivable ("AR") before the subject line was then, based on that information, initially funded in the amount of $5.5 million in connection with the acquisition of AC Tech by Messrs. Byrd and Munns through MB Security. In particular, the Bank claims that Mr. Munns committed actual fraud because the Borrowing Base Certificate dated June 27, 2008 (the "BBC") submitted to the Bank included materially false information which caused the Bank to loan an amount significantly higher than the amount the Bank would have loaned if the BBC had not included the false information. According to the Bank, it was thereby fraudulently induced to loan the higher amount.

The BBC was prepared, signed and submitted by Mr. Byrd as Executive Vice President on behalf of MB Security. The Bank maintains, however, that Mr. Munns committed actual fraud based on his personal involvement in the submission including when he resent it to the Bank on June 29, 2008 and in his transmittal email described the BBC as "revised and carefully reviewed ... ." For the Bank, however, to prevail on this claim, it had to prove by clear and convincing evidence that Mr. Munns through his misrepresentations and other actions had intentionally and knowingly misled the Bank or acted in reckless disregard of the truth and that the Bank relied on those actions with resulting damage. The Bank, however, did not meet its burden of proof.

The Bank claimed that Mr. Munns had essentially created false AR information in the BBC which materially differed from certain AR information that had been provided by Mr. Sands to Messrs. Byrd and Munns prior to submission of the BBC to the Bank. The record evidence, however, confirms that information for the BBC was provided by Mr. Sands. There is no evidence that Mr. Munns created false information which was then included in the BBC or that he otherwise set out to intentionally mislead the Bank. As indicated, the Bank did not call or seek to subpoena Mr. Sands as a witness. In this regard, as consummation of the pending sale of AC Tech was dependent on the Bank's funding, Mr. Sands would not have been able to sell his business unless the BBC included sufficient AR's. He may, therefore, have provided AR information including in the "11th hour" which was not accurate or in accord with what would have qualified as an AR for purposes of the BBC. Moreover, the evidence confirms that Mr. Munns did not have access to the company's books and records. Simply stated, the Bank's largely circumstantial evidence regarding submission of the BBC and also later BBC's fell far short of meeting its heavy burden to prove actual fraud by Mr. Munns.

Bank of America also failed to meet its burden of proving by clear and convincing evidence that Mr. Munns committed actual fraud in a second way to induce the Bank to issue and administer the line of credit. The Bank claims that Mr. Munns, in contravention of provisions in the Credit Agreement, committed actual fraud by allowing accounts used as collateral for the Bank's loan to be encumbered and that this included certain actions involving Arrow Electronics both prior to approval of the line and funding (allowing a credit facility and personally

-4-

guaranteeing those receivables) and also after funding (allowing a subsequent security arrangement and for funds to be deposited in a "secret" lock box). The Bank did not assert a separate breach of contract claim in this proceeding relative to those actions.

Although the Bank claims that Mr. Munns intentionally concealed his actions prior to funding from the Bank, the record evidence indicates that Steve Britt, the attorney for MB Security and then AC Tech, was in contact with and had informed the involved Bank officials of this matter. In this regard, it should be noted that the Credit Agreement included provisions for possible "Permitted Liens." Although the Bank could have called or sought to subpoena Mr. Britt or the involved Bank officials as witnesses, it did not.

Regarding the claimed post-funding collateral violation, the credible record evidence confirms that the actions taken by AC Tech with Arrow were taken by Mr. Byrd, not by Mr. Munns, and that Mr. Munns only learned of them after the fact. There is no evidence that Mr. Munns set out to intentionally mislead the Bank. Moreover, as the claimed violation occurred after loan approval and funding, Virginia's Economic Loss Rule would in any event bar this portion of the claim.

Accordingly, Count IV is DENIED consistent with the foregoing.

### 4. COUNT V (Constructive Fraud Against Messrs. Munns and Byrd)

As to Mr. Byrd, this claim is moot in view of the above-referenced dismissal with prejudice.

As to Mr. Munns, the record supports a finding of constructive fraud. To prove constructive fraud, it is sufficient that the misrepresentation was made innocently or negligently. It need not be done knowingly and intentionally with an intent to mislead. Bank of America proved at the Hearing that certain AR information in the BBC, including for General Dynamics, was false. In his post-hearing brief, and during closing arguments, Mr. Munns did not dispute that the information in the BBC he provided to the Bank on June 29, 2008 was false and conceded at page 3 of his brief that "these representations were made innocently." He argued, however, that the Bank had not proven constructive fraud because it had not reasonably relied upon the misrepresentations.

The record evidence, however, including testimony from Mr. Cashion, a Bank official familiar with BBC's and their significance to the Bank's lending practices, as well as from Messrs. Byrd and Munns, confirms that although Bank of America, through a previous field audit and other due diligence, had acquired certain knowledge of AC Tech and its financial wherewithal, it reasonably relied on the false information in the BBC when it loaned AC Tech $5.5 million instead of what would have been a significantly lower amount. It is especially significant that Mr. Munns testified that he understood that the BBC was to serve as the foundation for the amount of the loan to be received from the Bank.

I find that the amounts awarded under Counts I and II adequately compensate the Bank for any and all losses resulting from the constructive fraud. I find no basis to award consequential or other damages including punitive damages.

Accordingly, Count V is GRANTED as to Mr. Munns consistent with the foregoing.

5. COUNT VI (Conversion by Messrs. Munns and Byrd)

As to Mr. Byrd, this claim is moot in view of the above-referenced dismissal with prejudice.

In its Complaint, Bank of America asserted that Mr. Munns improperly directed proceeds from the revolving line of credit to his personal account. At the hearing the Bank argued that when Mr. Munns opened various accounts for AC Tech at Cardinal Bank after the Bank had issued its default notice and had commenced collection activities, diverted accounts receivable into those accounts and then used certain funds in those accounts for personal purposes, he converted funds which had served as the Bank's collateral. Although the Bank had started to pursue various collection remedies it had in light of the default, the Cardinal Bank funds at issue were not the Bank's property. It did not own these funds. There also was no requirement for the funds to be held in trust on behalf of the Bank. I find, therefore, that Mr. Munns did not under applicable law engage in conversion. Further, Mr. Munns testified and there is other evidence that the funds were used by AC Tech for legitimate ongoing business purposes and that this included some compensation for himself and Mr. Byrd. Bank of America did not call or seek to subpoena any witnesses in an attempt to undermine this evidence.

Accordingly, Count VI is DENIED.

III.   ATTORNEYS' FEES

Consistent with the foregoing determinations, Bank of America may, within seven (7) days of issuance of this Interim Award, serve and submit to the Arbitrator evidence of its reasonable attorneys' fees and other Enforcement Costs as provided in the Credit Agreement. Claimants/Counter-Respondents may serve and submit any response within seven (7) days. A Final Award in this proceeding will then be forthcoming.

August 12, 2010

Howard G. Slavit, Arbitrator

-6-

michael byrd                    3012181889                    p.4



**Bank**

AC TECHNOLOGY
OPERATING ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

506-005-3799
PAGE   1 OF   2
STATEMENT PERIOD
FROM       05/14/09
THRU       05/31/09

ENCLOSURES              0



EXHIBIT
N

FDIC COVERAGE INCREASED TO $250,000. ON OCTOBER 3, 2008, FDIC
DEPOSIT INSURANCE TEMPORARILY INCREASED FROM $100,000 TO
$250,000 PER DEPOSITOR THROUGH DECEMBER 31, 2009.

------------------- FREE BUSINESS CHECKING -------------------

ACCOUNT NBR DD   506-005-3799
MINIMUM BAL        $25,034.00-

| | |
|---|---:|
| BEGINNING BALANCE | $.00 |
| DEPOSITS/CREDITS | $681,148.70 |
| INTEREST PAID | $.00 |
| CHECKS/DEBITS | $373,148.85- |
| SERVICE CHARGES | $5.00- |
| ENDING BALANCE | $307,994.85 |
| # DEPOSITS/CREDITS | 3 |
| # CHECKS/DEBITS | 10 |



| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---:|---:|
| 05/14 | BEGINNING BALANCE | | $.00 |
| 05/20 | CK#      0 | 25,000.00- | 25,000.00- |
| 05/20 | DEBIT-NSF PAID ITEM | 34.00- | 25,034.00- |
| | CK#000000000   AMT     25000.00 | | |
| 05/21 | WDL-ADJ-NSF RETURN ITEM | 25,000.00 | 34.00- |
| | CK#      0 | | |
| | EFF DATE 05-20-09 | | |
| 05/21 | DEBIT-STOP PMT CHG | 30.00- | 64.00- |
| 05/21 | DEBIT-OD BALANCE FEE | 5.00- | 69.00- |
| 05/22 | DEPOSIT- | 30.00 | 39.00- |
| 05/28 | DEPOSIT-ACH | 645,578.85 | 645,539.85 |
| | CCB1 TREAS  3/MISC PAY    -541600337130400 | | |
| | RMR*IV*12091\ | | |
| 05/28 | DEBIT-TRANSFER | 27,500.00- | 618,039.85 |
| | TRF ACCT DD  5050166072 | | |
| 05/28 | DEBIT-STOP PMT CHG | 30.00- | 618,009.85 |
| 05/28 | DEBIT-SPECIAL | 245,539.85- | 372,470.00 |
| 05/28 | DEBIT-SPECIAL | 30,000.00- | 342,470.00 |



michael byrd                     3012181889              P.5

```
                                              506-005-3799
AC TECHNOLOGY                       PAGE    2 OF   2
OPERATING ACCOUNT                   STATEMENT PERIOD
22695 COMMERCE CENTER ST SUITE C    FROM      05/14/09
DULLES, VA  20166                   THRU      05/31/09
```

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 05/29 | OUTGOING WIRE TRANSFER<br>WIRE TO CITIBANK FSB | 60,000.00- | 282,470.00 |
| 05/29 | DEBIT-SERVICE CHARGE | 15.00- | 282,455.00 |
| 05/29 | CREDIT-TRANSFER<br>TRF ACCT DD  5060053815 | 35,539.85 | 317,994.85 |
| 05/29 | DEBIT-SPECIAL | 10,000.00- | 307,994.85 |
| 05/31 | ENDING BALANCE | | $307,994.85 |

### BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 05-20 | 25,034.00- | 05-22 | 39.00- | 05-29 | 307,994.85 |
| 05-21 | 69.00- | 05-28 | 342,470.00 | | |



GO PAPERLESS AND RECEIVE QUICKER ACCESS TO YOUR MONTHLY
DEPOSIT STATEMENTS. WE'LL SEND YOU AN E-MAIL NOTIFICATION
WHEN YOUR ACCOUNT IS READY TO VIEW. SIGN UP TODAY AT
WWW.CARDINALBANK.COM – ONLINE BANKING. IT'S THE PERFECT
ALTERNATIVE TO PAPER STATEMENTS.

PRINTSET=2236005060053807 Y

michael byrd                    3012181889                p.6

Account 5060053799        Cardinal Bank                            Page 3 of 3



Date 5/20 Amount $25,000.00



michael byrd                    3012181889                    p.1



AC TECHNOLOGY                                    506-005-3799
OPERATING ACCOUNT                        PAGE    1 OF    2
22695 COMMERCE CENTER ST SUITE C         STATEMENT PERIOD
DULLES, VA  20166                        FROM        07/01/09
                                         THRU        07/31/09

                                         ENCLOSURES          7

CHANGES IN FDIC DEPOSIT INSURANCE COVERAGE.
EFFECTIVE MAY 20, 2009, DEPOSITS AT FDIC-INSURED INSTITUTIONS
ARE NOW INSURED UP TO AT LEAST $250,000 PER DEPOSITOR THROUGH
DECEMBER 31, 2013. FOR MORE INFORMATION, GO TO
WWW.CARDINALBANK.COM

———————————————— FREE BUSINESS CHECKING ————————————————



ACCOUNT NBR DD   506-005-3799          BEGINNING BALANCE    $164,714.71
MINIMUM BAL      $126,589.87           DEPOSITS/CREDITS            $.00
                                       INTEREST PAID              $.00
                                       CHECKS/DEBITS        $38,124.84-
                                       SERVICE CHARGES            $.00
                                       ENDING BALANCE       $126,589.87
                                       # DEPOSITS/CREDITS            0
                                       # CHECKS/DEBITS              14

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|--|--------|---------|
| 07/01 | BEGINNING BALANCE | | | $164,714.71 |
| 07/01 | CK# | 1004 | 700.00- | 164,014.71 |
| 07/02 | OUTGOING WIRE TRANSFER | | 6,149.76- | 157,864.95 |
|       | WIRE TO WACHOVIA BANK | | | |
| 07/02 | DEBIT-SERVICE CHARGE | | 15.00- | 157,849.95 |
| 07/02 | OUTGOING WIRE TRANSFER | | 7,000.00- | 150,849.95 |
|       | WIRE TO WACHOVIA BANK | | | |
| 07/02 | DEBIT-SERVICE CHARGE | | 15.00- | 150,834.95 |
| 07/02 | OUTGOING WIRE TRANSFER | | 8,380.08- | 142,454.87 |
|       | WIRE TO BANK OF AMERICA | | | |
| 07/02 | DEBIT-SERVICE CHARGE | | 15.00- | 142,439.87 |
| 07/02 | CK# | 1005 | 750.00- | 141,689.87 |
| 07/03 | CK# | 1006 | 2,300.00- | 139,389.87 |
| 07/06 | CK# | 1007 | 300.00- | 139,089.87 |
| 07/15 | CK# | 1009 | 3,000.00- | 136,089.87 |
| 07/16 | CK# | 1010 | 2,500.00- | 133,589.87 |
| 07/28 | CK# | 1008 | 2,000.00- | 131,589.87 |

MEMBER FDIC          8770 Greensboro Drive, Suite 500, McLean, VA 22102



michael byrd                          3012181889                    P.2

AC TECHNOLOGY                                    506-005-3799
OPERATING ACCOUNT                         PAGE    2 OF   2
22695 COMMERCE CENTER ST SUITE C          STATEMENT PERIOD
DULLES, VA  20166                         FROM      07/01/09
                                          THRU      07/31/09

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 07/29 | DEBIT-TRANSFER | | |
| | TRF ACCT DD  5060053815 | 5,000.00- | 126,589.87 |
| 07/31 | ENDING BALANCE | | $126,589.87 |

### CHECK REGISTER

| CHECK# | DATE | AMOUNT | CHECK# | DATE | AMOUNT |
|--------|------|--------|--------|------|--------|
| 1004 | 07/01 | 700.00 | 1008 | 07/28 | 2,000.00 |
| 1005 | 07/02 | 750.00 | 1009 | 07/15 | 3,000.00 |
| 1006 | 07/03 | 2,300.00 | 1010 | 07/16 | 2,500.00 |
| 1007 | 07/06 | 300.00 | | | |

* INDICATES NON-CONSECUTIVE CHECK NUMBER(S)

### BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 07-01 | 164,014.71 | 07-06 | 139,089.87 | 07-28 | 131,589.87 |
| 07-02 | 141,689.87 | 07-15 | 136,089.87 | 07-29 | 126,589.87 |
| 07-03 | 139,389.87 | 07-16 | 133,589.87 | | |

GO PAPERLESS AND RECEIVE QUICKER ACCESS TO YOUR MONTHLY
DEPOSIT STATEMENTS. WE'LL SEND YOU AN E-MAIL NOTIFICATION
WHEN YOUR ACCOUNT IS READY TO VIEW. SIGN UP TODAY AT
WWW.CARDINALBANK.COM - ONLINE BANKING. IT'S THE PERFECT
ALTERNATIVE TO PAPER STATEMENTS.

PRINTSET=2236005060053807 Y



michael byrd                    3012181889                    P.3

Account 5060053799          Cardinal Bank

Page 3 of 4



Check 1004 Amount $700.00 Date 7/1



Check 1005 Amount $750.00 Date 7/2



Check 1006 Amount $2,300.00 Date 7/3



Check 1007 Amount $300.00 Date 7/6



Check 1008 Amount $2,000.00 Date 7/28



Check 1009 Amount $3,000.00 Date 7/15

michael byrd                 3012181889                 p.1





AC TECHNOLOGY
OPERATING ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

506-005-3799
PAGE    1 OF    2
STATEMENT PERIOD
FROM      08/01/09
THRU      08/31/09

ENCLOSURES         5

CHANGES IN FDIC DEPOSIT INSURANCE COVERAGE.
EFFECTIVE MAY 20, 2009, DEPOSITS AT FDIC-INSURED INSTITUTIONS
ARE NOW INSURED UP TO AT LEAST $250,000 PER DEPOSITOR THROUGH
DECEMBER 31, 2013. FOR MORE INFORMATION, GO TO
WWW.CARDINALBANK.COM

———————————————— FREE BUSINESS CHECKING ————————————————

| ACCOUNT NBR DD   506-005-3799 | BEGINNING BALANCE | $126,589.87 |
| MINIMUM BAL       $72,885.87 | DEPOSITS/CREDITS | $.00 |
| | INTEREST PAID | $.00 |
| | CHECKS/DEBITS | $53,704.00- |
| | SERVICE CHARGES | $.00 |
| | ENDING BALANCE | $72,885.87 |
| | # DEPOSITS/CREDITS | 0 |
| | # CHECKS/DEBITS | 11 |

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 08/01 | BEGINNING BALANCE | | $126,589.87 |
| 08/03 | CK#    1011 | 750.00- | 125,839.87 |
| 08/04 | DEBIT-TRANSFER | 4,000.00- | 121,839.87 |
| | TRF ACCT DD  5060053815 | | |
| 08/05 | DEBIT-SPECIAL | 1,854.00- | 119,985.87 |
| 08/06 | DEBIT-TRANSFER | 4,000.00- | 115,985.87 |
| | TRF ACCT DD  5060053815 | | |
| 08/07 | DEBIT-TRANSFER | 4,000.00- | 111,985.87 |
| | TRF ACCT DD  5060053815 | | |
| 08/12 | CK#    1012 | 700.00- | 111,285.87 |
| 08/17 | DEBIT-TRANSFER | 9,500.00- | 101,785.87 |
| | PER MR EARL | | |
| | TRF ACCT DD  5060053815 | | |
| 08/17 | CK#       0 | 500.00- | 101,285.87 |
| 08/17 | CK#       0 | 17,900.00- | 83,385.87 |
| 08/18 | DEBIT-SPECIAL | 6,500.00- | 76,885.87 |
| 08/18 | CK#    1013 | 4,000.00- | 72,885.87 |
| 08/31 | ENDING BALANCE | | $72,885.87 |



michael byrd                    3012181889              P.2



506-005-3799
PAGE    2 OF    2
STATEMENT PERIOD

AC TECHNOLOGY
OPERATING ACCOUNT
22695 COMMERCE CENTER ST SUITE C          FROM        08/01/09
DULLES, VA  20166                          THRU        08/31/09

CHECK REGISTER

| CHECK# | DATE | AMOUNT | CHECK# | DATE | AMOUNT |
|--------|------|--------|--------|------|--------|
| 0 | 08/17 | 500.00 | 1012 | 08/12 | 700.00 |
| 0 | 08/17 | 17,900.00 | 1013 | 08/18 | 4,000.00 |
| 1011* | 08/03 | 750.00 | | | |

* INDICATES NON-CONSECUTIVE CHECK NUMBER(S)

BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 08-03 | 125,839.87 | 08-06 | 115,985.87 | 08-17 | 83,385.87 |
| 08-04 | 121,839.87 | 08-07 | 111,985.87 | 08-18 | 72,885.87 |
| 08-05 | 119,985.87 | 08-12 | 111,285.87 | | |

GO PAPERLESS AND RECEIVE QUICKER ACCESS TO YOUR MONTHLY
DEPOSIT STATEMENTS. WE'LL SEND YOU AN E-MAIL NOTIFICATION
WHEN YOUR ACCOUNT IS READY TO VIEW. SIGN UP TODAY AT
WWW.CARDINALBANK.COM - ONLINE BANKING. IT'S THE PERFECT
ALTERNATIVE TO PAPER STATEMENTS.

PRINTSET=2236005060053807 Y

michael byrd                     3012181889                  p.3

Account 5060053799        Cardinal Bank                          Page 3 of 3



Date 8/17 Amount $17,900.00



Date 8/17 Amount $500.00



Check 1011 Amount $750.00 Date 8/3



Check 1012 Amount $700.00 Date 8/12

Check 1013 Amount $4,000.00 Date 8/18

michael byrd                    3012181889              p.3



AC TECHNOLOGY
OPERATING ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

506-005-3799
PAGE     1 OF    2
STATEMENT PERIOD
FROM        09/01/09
THRU        09/30/09

ENCLOSURES        0

CHANGES IN FDIC DEPOSIT INSURANCE COVERAGE.
EFFECTIVE MAY 20, 2009, DEPOSITS AT FDIC-INSURED INSTITUTIONS
ARE NOW INSURED UP TO AT LEAST $250,000 PER DEPOSITOR THROUGH
DECEMBER 31, 2013. FOR MORE INFORMATION, GO TO
WWW.CARDINALBANK.COM

——————————— FREE BUSINESS CHECKING ———————————

| | | |
|---|---|---|
| ACCOUNT NBR DD   506-005-3799 | BEGINNING BALANCE | $72,885.87 |
| MINIMUM BAL        $7,861.50 | DEPOSITS/CREDITS | $.00 |
| | INTEREST PAID | $.00 |
| | CHECKS/DEBITS | $65,024.37- |
| | SERVICE CHARGES | $.00 |
| | ENDING BALANCE | $7,861.50 |
| | # DEPOSITS/CREDITS | 0 |
| | # CHECKS/DEBITS | 10 |



| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| 09/01 | BEGINNING BALANCE | | $72,885.87 |
| 09/02 | DEBIT-SPECIAL | 15,000.00- | 57,885.87 |
| 09/04 | DEBIT-SPECIAL | 524.37- | 57,361.50 |
| 09/05 | DEBIT-TRANSFER TRF ACCT DD  5060053815 | 5,000.00- | 52,361.50 |
| 09/08 | DEBIT-TRANSFER TRF ACCT DD  5060053815 | 3,000.00- | 49,361.50 |
| 09/08 | DEBIT-SPECIAL | 12,500.00- | 36,861.50 |
| 09/09 | DEBIT-TRANSFER TRF ACCT DD  5060053823 | 12,000.00- | 24,861.50 |
| 09/10 | DEBIT-TRANSFER TRF ACCT DD  5060053815 | 10,000.00- | 14,861.50 |
| 09/14 | DEBIT-TRANSFER TRF ACCT DD  5060053815 | 3,000.00- | 11,861.50 |
| 09/18 | DEBIT-TRANSFER TRF ACCT DD  5060053815 | 2,000.00- | 9,861.50 |
| 09/28 | DEBIT-TRANSFER TRF ACCT DD  5060053815 | 2,000.00- | 7,861.50 |
| 09/30 | ENDING BALANCE | | $7,861.50 |



michael byrd                    3012181889                    p.4

AC TECHNOLOGY
OPERATING ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

506-005-3799
PAGE    2 OF   2
STATEMENT PERIOD
FROM      09/01/09
THRU      09/30/09

## BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 09-02 | 57,885.87 | 09-08 | 36,861.50 | 09-14 | 11,861.50 |
| 09-04 | 57,361.50 | 09-09 | 24,861.50 | 09-18 | 9,861.50 |
| 09-05 | 52,361.50 | 09-10 | 14,861.50 | 09-28 | 7,861.50 |



GO PAPERLESS AND RECEIVE QUICKER ACCESS TO YOUR MONTHLY
DEPOSIT STATEMENTS. WE'LL SEND YOU AN E-MAIL NOTIFICATION
WHEN YOUR ACCOUNT IS READY TO VIEW. SIGN UP TODAY AT
WWW.CARDINALBANK.COM - ONLINE BANKING. IT'S THE PERFECT
ALTERNATIVE TO PAPER STATEMENTS.



PRINTSET=2236005060053807 Y

michael byrd                    3012181889                    p.3


**CARDINAL** Bank

506-005-3815
PAGE    1 OF    1
STATEMENT PERIOD
FROM    05/28/09
THRU    05/31/09

ENCLOSURES    0

AC TECHNOLOGY
EXPENSE ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

FDIC COVERAGE INCREASED TO $250,000. ON OCTOBER 3, 2008, FDIC
DEPOSIT INSURANCE TEMPORARILY INCREASED FROM $100,000 TO
$250,000 PER DEPOSITOR THROUGH DECEMBER 31, 2009.

----------------------- FREE BUSINESS CHECKING -----------------------

| | | |
|---|---|---|
| ACCOUNT NBR DD    506-005-3815 | BEGINNING BALANCE | $.00 |
| MINIMUM BAL    $5,000.00 | DEPOSITS/CREDITS | $40,539.85 |
| | INTEREST PAID | $.00 |
| | CHECKS/DEBITS | $35,539.85- |
| | SERVICE CHARGES | $.00 |
| | ENDING BALANCE | $5,000.00 |
| | # DEPOSITS/CREDITS | 1 |
| | # CHECKS/DEBITS | 1 |

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | | | $.00 |
| 05/28 | BEGINNING BALANCE | | |
| 05/28 | DEPOSIT- | 40,539.85 | 40,539.85 |
| 05/29 | DEBIT-TRANSFER | 35,539.85- | 5,000.00 |
| | TRF ACCT DD  5060053799 | | |
| 05/31 | ENDING BALANCE | | $5,000.00 |

BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 05-28 | 40,539.85 | 05-29 | 5,000.00 | | |

GO PAPERLESS AND RECEIVE QUICKER ACCESS TO YOUR MONTHLY
DEPOSIT STATEMENTS. WE'LL SEND YOU AN E-MAIL NOTIFICATION
WHEN YOUR ACCOUNT IS READY TO VIEW. SIGN UP TODAY AT
WWW.CARDINALBANK.COM - ONLINE BANKING. IT'S THE PERFECT
ALTERNATIVE TO PAPER STATEMENTS.

PRINTSET=2236005060053823 Y

michael byrd                3012181889              p.1



CARDINAL
Bank

```
                                                506-005-3815
                                        PAGE   1 OF   6
                                        STATEMENT PERIOD
    AC TECHNOLOGY                        FROM   06/01/09
    EXPENSE ACCOUNT                      THRU   06/30/09
    22695 COMMERCE CENTER ST SUITE C
    DULLES, VA  20166
                                        ENCLOSURES       0
```

CHANGES IN FDIC DEPOSIT INSURANCE COVERAGE.
EFFECTIVE MAY 20, 2009, DEPOSITS AT FDIC-INSURED INSTITUTIONS
ARE NOW INSURED UP TO AT LEAST $250,000 PER DEPOSITOR THROUGH
DECEMBER 31, 2013. FOR MORE INFORMATION, GO TO
WWW.CARDINALBANK.COM

———————————————— FREE BUSINESS CHECKING ————————————————

```
ACCOUNT NBR DD  506-005-3815        BEGINNING BALANCE      $5,000.00
MINIMUM BAL         $40.33          DEPOSITS/CREDITS      $15,012.95
                                    INTEREST PAID              $.00
                                    CHECKS/DEBITS        $15,551.53-
                                    SERVICE-CHARGES            $.00
                                    ENDING BALANCE        $4,461.42
                                    # DEPOSITS/CREDITS            5
                                    # CHECKS/DEBITS              78
```



| DATE | DESCRIPTION | | | AMOUNT | BALANCE |
|------|-------------|---|---|--------|---------|
| 06/01 | BEGINNING BALANCE | | | | $5,000.00 |
| 06/08 | WITHDRAWAL-POS | 2415 | | 110.85− | 4,889.15 |
| | 06/06 ONSTAR SUBSCRIPT 888-4ONSTAR | MI | | | |
| | EFF DATE 06-07-09 | | | | |
| 06/08 | WITHDRAWAL-POS | 2415 | | 28.32− | 4,860.83 |
| | 06/05 301.468.3535HOUS ROCKVILLE | MD | | | |
| | EFF DATE 06-07-09 | | | | |
| 06/08 | WITHDRAWAL-POS | 2415 | | 413.37− | 4,447.46 |
| | 06/06 TOTAL WINE AND M MCLEAN | VA | | | |
| 06/09 | WITHDRAWAL-POS | 2415 | | 276.89− | 4,170.57 |
| | 06/07 CHIMA STEAKHOUSE VIENNA | VA | | | |
| 06/10 | WITHDRAWAL-POS | 2415 | | 131.88− | 4,038.69 |
| | 06/06 CLYDES TOWER OAK ROCKVILLE | MD | | | |
| 06/10 | WITHDRAWAL-POS | 2415 | | 27.43− | 4,011.26 |
| | 06/09 MCCORMICK & SCHM MCLEAN | VA | | | |
| 06/10 | WITHDRAWAL-ATM | 2415 | | 100.00− | 3,911.26 |
| | 8270 GREENSBORO DRIMCLEAN | VA | | | |
| 06/11 | WITHDRAWAL-POS | 2415 | | 69.75− | 3,841.51 |
| | 06/09 JACKSONS MIGHTYF RESTON | VA | | | |
| 06/11 | WITHDRAWAL-POS | 2415 | | 160.54− | 3,680.97 |
| | 06/09 CLYDES TOWER OAK ROCKVILLE | MD | | | |

michael byrd                    3012181889                    p.2



AC TECHNOLOGY
EXPENSE ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

506-005-3815
PAGE    2 OF   6
STATEMENT PERIOD
FROM      06/01/09
THRU      06/30/09

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|---|---|---|---|---|
| 06/11 | WITHDRAWAL-POS               2415 | | 8.00- | 3,672.97 |
| | 06/09 DULLES INTERNATI WASHINGTON DC | | | |
| 06/11 | WITHDRAWAL-ATM               2415 | | 500.00- | 3,172.97 |
| | 8270 GREENSBORO DRIMCLEAN          VA | | | |
| 06/12 | WITHDRAWAL-POS               2415 | | 42.25- | 3,130.72 |
| | 06/10 STARBUCKS USA 00 RESTON     VA | | | |
| 06/12 | WITHDRAWAL-POS               2415 | | 100.00- | 3,030.72 |
| | 06/10 CCBILL.COM  *JAN 888-5969279 AZ | | | |
| 06/12 | WITHDRAWAL-POS               2415 | | 700.00- | 2,330.72 |
| | 06/11 V2NRLSS-IVR VE  800-9220204  CA | | | |
| 06/12 | WITHDRAWAL-POS               2415 | | 28.70- | 2,302.02 |
| | 06/11 CHAMPPS #65207     RESTON    VA | | | |
| 06/12 | WITHDRAWAL-ATM               2415 | | 303.00- | 1,999.02 |
| | *QUINCE ORCHARD    GAITHERSBURG MD | | | |
| 06/13 | WITHDRAWAL-POS               2415 | | 166.53- | 1,832.49 |
| | 06/12 CLYDES TOWER OAK ROCKVILLE   MD | | | |
| 06/13 | WITHDRAWAL-POS               2415 | | 107.20- | 1,725.29 |
| | 06/12 THAT'S AMORE-SG  ROCKVILLE   MD | | | |
| 06/15 | WITHDRAWAL-POS               2415 | | 87.03- | 1,638.26 |
| | 06/13 JIFFY LUBE #1911 STERLING    VA | | | |
| | EFF DATE 06-14-09 | | | |
| 06/15 | WITHDRAWAL-POS               2415 | | 71.59- | 1,566.67 |
| | 06/13 SWEETWATER TAVER STERLING    VA | | | |
| 06/15 | WITHDRAWAL-POS               2415 | | 56.94- | 1,509.73 |
| | 06/13 EXXONMOBIL      46 RESTON    VA | | | |
| 06/15 | CREDIT-TRANSFER | | 2,000.00 | 3,509.73 |
| | TRF ACCT DD  5060053799 | | | |
| 06/15 | WITHDRAWAL-POS               2415 | | 27.51- | 3,482.22 |
| | GIANT FOOD INC # RESTON      VA | | | |
| 06/16 | WITHDRAWAL-POS               2415 | | 26.94- | 3,455.28 |
| | 06/14 TRAVELOCITY.COM  800-256-9089 TX | | | |
| 06/16 | WITHDRAWAL-POS               2415 | | 49.35- | 3,405.93 |
| | 06/15 HARRIS TEETER     RESTON     VA | | | |
| 06/16 | WITHDRAWAL-POS               2415 | | 31.38- | 3,374.55 |
| | 06/14 ASHLAND TRUCKSTO ASHLAND     VA | | | |
| 06/16 | WITHDRAWAL-POS               2415 | | 941.80- | 2,432.75 |
| | 06/14 UNITED AIR  0167 SAN ANTONIO TX | | | |

michael byrd                          3012181889                    p.1

506-005-3815
PAGE   3 OF   6
STATEMENT PERIOD
FROM      06/01/09
THRU      06/30/09

AC TECHNOLOGY
EXPENSE ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|--|--------|---------|
| 06/17 | WITHDRAWAL-POS | 2415 | 140.89- | 2,291.86 |
|  | 06/16 BLUE TALON BISTR WILLIAMSBURG VA | | 235.21- | 2,056.65 |
| 06/17 | WITHDRAWAL-POS | 2415 | | |
|  | 06/16 AVIS RENT-A-CAR  DULLES     VA | | 31.22- | 2,025.43 |
| 06/18 | WITHDRAWAL-POS | 2415 | | |
|  | 06/16 EXXONMOBIL    42 QUINTON    VA | | 24.00- | 2,001.43 |
| 06/18 | WITHDRAWAL-POS | 2415 | | |
|  | 06/16 CAPITOL REGION A RICHMOND    VA | | 74.63- | 1,926.80 |
| 06/18 | WITHDRAWAL-POS | 2415 | | |
|  | 06/17 THAT'S AMORE-SG ROCKVILLE    MD | | 4,000.00 | 5,926.80 |
| 06/18 | CREDIT-TRANSFER | | | |
|  | TRF ACCT DD  5060053823 | | 500.00- | 5,426.80 |
| 06/18 | WITHDRAWAL-ATM | 2415 | | |
|  | 8270 GREENSBORO DRIMCLEAN     VA | | 29.51- | 5,397.29 |
| 06/19 | WITHDRAWAL-POS | 2415 | | |
|  | 06/17 ZOOMS BYPASS  51 WILLIAMSBURG VA | | 1,064.19- | 4,333.10 |
| 06/19 | WITHDRAWAL-POS | 2415 | | |
|  | 06/17 KINGSMILL RESORT WILLIAMSBURG VA | | 148.05- | 4,185.05 |
| 06/19 | WITHDRAWAL-POS | 2415 | | |
|  | 06/17 KINGSMILL RESORT WILLIAMSBURG VA | | 35.04- | 4,150.01 |
| 06/19 | WITHDRAWAL-POS | 2415 | | |
|  | 06/17 MAMA STEVES PANC WILLIAMSBURG VA | | 240.54- | 3,909.47 |
| 06/19 | WITHDRAWAL-POS | 2415 | | |
|  | 06/16 FAT CANARY      WILLIAMSBURG VA | | 400.00- | 3,509.47 |
| 06/19 | WITHDRAWAL-ATM | 2415 | | |
|  | 8270 GREENSBORO DRIMCLEAN     VA | | 200.13- | 3,309.34 |
| 06/20 | WITHDRAWAL-POS | 2415 | | |
|  | 06/19 CLYDES TOWER OAK ROCKVILLE    MD | | 127.97- | 3,181.37 |
| 06/20 | WITHDRAWAL-POS | 2415 | | |
|  | 06/19 ONSTAR CALLING M 888-4ONSTAR  MI | | 23.00- | 3,158.37 |
| 06/22 | WITHDRAWAL-POS | 2415 | | |
|  | 06/19 RIO GRANDE CAFOO GAITHERSBURG MD | | | |
|  | EFF DATE 06-21-09 | | 53.11- | 3,105.26 |
| 06/22 | WITHDRAWAL-POS | 2415 | | |
|  | 06/19 EXXONMOBIL    47 VIENNA     VA | | | |
|  | EFF DATE 06-21-09 | | | |

michael byrd                    3012181889                    p.3

506-005-3815
PAGE    4 OF    6
STATEMENT PERIOD
FROM        06/01/09
THRU        06/30/09

AC TECHNOLOGY
EXPENSE ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166



| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|--|--------|---------|
| 06/22 | WITHDRAWAL-POS          2415 | | 658.20- | 2,447.06 |
|       | 06/19 THE MEN'S WEARHO GAITHERSBURG MD | | | |
|       | EFF DATE 06-21-09 | | | |
| 06/22 | WITHDRAWAL-POS          2415 | | 55.38- | 2,391.68 |
|       | 06/19 REDROCK CANYON G GAITHERSBURG MD | | | |
|       | EFF DATE 06-21-09 | | | |
| 06/22 | WITHDRAWAL-POS          2415 | | 160.61- | 2,231.07 |
|       | 06/20 GIANT FOOD INC # GAITHERSBURG MD | | | |
|       | EFF DATE 06-21-09 | | | |
| 06/22 | WITHDRAWAL-POS          2415 | | 403.44- | 1,827.63 |
|       | COSTCO WHSE #002 GAITHERSBURG   MD | | | |
|       | EFF DATE 06-21-09 | | | |
| 06/22 | WITHDRAWAL-POS          2415 | | 125.74- | 1,701.89 |
|       | 06/19 GUAPOS CANTINA    GAITHERSBURG MD | | | |
| 06/22 | WITHDRAWAL-POS          2415 | | 47.64- | 1,654.25 |
|       | 06/20 THE HOME DEPOT 2 GAITHERSBURG MD | | | |
| 06/22 | WITHDRAWAL-POS          2415 | | 25.28- | 1,628.97 |
|       | 06/20 THE HOME DEPOT 2 GAITHERSBURG MD | | | |
| 06/23 | WITHDRAWAL-POS          2415 | | 19.84- | 1,609.13 |
|       | 06/21 CLYDES TOWER OAK ROCKVILLE   MD | | | |
| 06/23 | WITHDRAWAL-POS          2415 | | 75.45- | 1,533.68 |
|       | 06/21 CLYDES TOWER OAK ROCKVILLE   MD | | | |
| 06/23 | WITHDRAWAL-POS          2415 | | 25.00- | 1,508.68 |
|       | 06/22 PASSIONFISH      RESTON     VA | | | |
| 06/23 | WITHDRAWAL-POS          2415 | | 106.63- | 1,402.05 |
|       | 06/22 PASSIONFISH      RESTON     VA | | | |
| 06/23 | WITHDRAWAL-POS          2415 | | 408.00- | 994.05 |
|       | 06/22 ENTERPRISE RENT- SPRINGFIELD VA | | | |
| 06/24 | WITHDRAWAL-POS          2415 | | 52.05- | 942.00 |
|       | 06/22 JACKSONS MIGHTYF RESTON     VA | | | |
| 06/25 | WITHDRAWAL-POS          2415 | | 30.01- | 911.99 |
|       | 06/23 SHELL OIL 575421 VIENNA     VA | | | |
| 06/25 | WITHDRAWAL-POS          2415 | | 80.81- | 831.18 |
|       | 06/24 CLYDES TOWER OAK ROCKVILLE   MD | | | |
| 06/25 | WITHDRAWAL-POS          2415 | | 123.73- | 707.45 |
|       | 06/23 DAILY GRILL BETH BETHESDA   MD | | | |
| 06/25 | WITHDRAWAL-POS          2415 | | 117.46- | 589.99 |
|       | 06/24 THAT'S AMORE-SG ROCKVILLE   MD | | | |

michael byrd                    3012181889                    P.2

AC TECHNOLOGY
EXPENSE ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

506-005-3815
PAGE    5 OF    6
STATEMENT PERIOD
FROM       06/01/09
THRU       06/30/09

| DATE | DESCRIPTION | | | | AMOUNT | BALANCE |
|------|-------------|--|--|--|--------|---------|
| 06/25 | WITHDRAWAL-ATM | 2415 | | | 300.00- | 289.99 |
| | 8270 GREENSBORO DRIMCLEAN | | VA | | | |
| 06/26 | CREDIT-TRANSFER | | | | 4,000.00 | 4,289.99 |
| | TRF ACCT DD  5060053799 | | | | | |
| 06/26 | WITHDRAWAL-ATM | 2415 | | | 380.00- | 3,909.99 |
| | 8270 GREENSBORO DRIMCLEAN | | VA | | | |
| 06/26 | DEBIT-SPECIAL | | | | 300.00- | 3,609.99 |
| 06/27 | WITHDRAWAL-POS | 2415 | | | 232.99- | 3,377.00 |
| | 06/25 THE MELTING POT | POTOMAC | MD | | | |
| 06/27 | WITHDRAWAL-POS | 2415 | | | 152.95- | 3,224.05 |
| | 06/26 ENTERPRISE RENT- | SPRINGFIELD | VA | | | |
| 06/27 | WITHDRAWAL-ATM | 2415 | | | 202.25- | 3,021.80 |
| | @SAFEWAY #0945 | POTOMAC | MD | | | |
| 06/29 | WITHDRAWAL-POS | 2415 | | | 20.36- | 3,001.44 |
| | 06/27 GIANT FOOD INC # | ROCKVILLE | MD | | | |
| | EFF DATE 06-28-09 | | | | | |
| 06/29 | WITHDRAWAL-POS | 2415 | | | 1,863.49- | 1,137.95 |
| | 06/27 BLOOMINGDALE'S # | MCLEAN | VA | | | |
| | EFF DATE 06-28-09 | | | | | |
| 06/29 | WITHDRAWAL-POS | 2415 | | | 50.75- | 1,087.20 |
| | 06/26 WILDFIRE TYSONS | MCLEAN | VA | | | |
| 06/29 | WITHDRAWAL-POS | 2415 | | | 40.24- | 1,046.96 |
| | 06/26 LEGAL SEA FOODS | MCLEAN | VA | | | |
| 06/29 | WITHDRAWAL-POS | 2415 | | | 30.02- | 1,016.94 |
| | 06/27 EXXONMOBIL | 47 GERMANTOWN | MD | | | |
| 06/29 | WITHDRAWAL-POS | 2415 | | | 175.00- | 841.94 |
| | 06/27 LINDSAY COLLISIO | 703-6474500 | VA | | | |
| 06/29 | WITHDRAWAL-POS | 2415 | | | 201.02- | 640.92 |
| | 06/28 REDROCK CANYON G | GAITHERSBURG | MD | | | |
| 06/29 | WITHDRAWAL-POS | 2415 | | | 37.32- | 603.60 |
| | 06/28 STARBUCKS USA 00 | VIENNA | VA | | | |
| 06/29 | WITHDRAWAL-POS | 2415 | | | 49.18- | 554.42 |
| | 06/27 WILDFIRE TYSONS | MCLEAN | VA | | | |
| 06/29 | WITHDRAWAL-POS | 2415 | | | 514.09- | 40.33 |
| | 06/28 WS OUTLET 0468 | LEESBURG | VA | | | |
| 06/30 | WITHDRAWAL-POS | 2415 | | | 39.73- | .60 |
| | 06/28 RIO GRANDE CAFOO | GAITHERSBURG | MD | | | |

michael byrd                    3012181889              P.4

506-005-3815
PAGE    6 OF    6
STATEMENT PERIOD

AC TECHNOLOGY
EXPENSE ACCOUNT                                      FROM    06/01/09
22695 COMMERCE CENTER ST SUITE C                    THRU    06/30/09
DULLES, VA  20166

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 06/30 | WITHDRAWAL-POS | 2415 | 52.13- | 51.53- |
| | 06/28 EXXONMOBIL | 47 VIENNA       VA | | |
| 06/30 | DEPOSIT-POS | 2415 | 12.95 | 38.58- |
| | 06/29 ENTERPRISE RENT- SPRINGFIELD VA | | | |
| 06/30 | CREDIT-TRANSFER | | 5,000.00 | 4,961.42 |
| | TRF ACCT ID  5060053823 | | | |
| 06/30 | WITHDRAWAL-ATM | 2415 | 500.00- | 4,461.42 |
| | 8270 GREENSBORO DRIMCLEAN      VA | | | |
| 06/30 | ENDING BALANCE | | | $4,461.42 |



BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 06-08 | 4,447.46 | 06-16 | 2,432.75 | 06-24 | 942.00 |
| 06-09 | 4,170.57 | 06-17 | 2,056.65 | 06-25 | 289.99 |
| 06-10 | 3,911.26 | 06-18 | 5,426.80 | 06-26 | 3,609.99 |
| 06-11 | 3,172.97 | 06-19 | 3,509.47 | 06-27 | 3,021.80 |
| 06-12 | 1,999.02 | 06-20 | 3,181.37 | 06-29 | 40.33 |
| 06-13 | 1,725.29 | 06-22 | 1,628.97 | 06-30 | 4,461.42 |
| 06-15 | 3,482.22 | 06-23 | 994.05 | | |

GO PAPERLESS AND RECEIVE QUICKER ACCESS TO YOUR MONTHLY
DEPOSIT STATEMENTS. WE'LL SEND YOU AN E-MAIL NOTIFICATION
WHEN YOUR ACCOUNT IS READY TO VIEW. SIGN UP TODAY AT
WWW.CARDINALBANK.COM - ONLINE BANKING. IT'S THE PERFECT
ALTERNATIVE TO PAPER STATEMENTS.

PRINTSET=2236005060053823 Y

michael byrd                    3012181889                    p.1

Account 5060053799        Cardinal Bank

Page 4 of 4



Date 6/29 Amount $2,000.00



Check 1001 Amount $1,200.00 Date 6/24




Check 1002 Amount $1,500.00 Date 6/25



Check 1003 Amount $1,750.00 Date 6/30

michael byrd                    3012181889                p.1



**CARDINAL**
Bank

506-005-3815
PAGE   1 OF  10
STATEMENT PERIOD
FROM      08/01/09
THRU      08/31/09

AC TECHNOLOGY
EXPENSE ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166                        ENCLOSURES        3

CHANGES IN FDIC DEPOSIT INSURANCE COVERAGE.
EFFECTIVE MAY 20, 2009, DEPOSITS AT FDIC-INSURED INSTITUTIONS
ARE NOW INSURED UP TO AT LEAST $250,000 PER DEPOSITOR THROUGH
DECEMBER 31, 2013. FOR MORE INFORMATION, GO TO
WWW.CARDINALBANK.COM

———————————————— FREE BUSINESS CHECKING ————————————————

| | | |
|---|---|---|
| ACCOUNT NBR DD  506-005-3815 | BEGINNING BALANCE | $8,134.77 |
| MINIMUM BAL        $3,558.10 | DEPOSITS/CREDITS | $29,403.30 |
| | INTEREST PAID | $.00 |
| | CHECKS/DEBITS | $33,979.97- |
| | SERVICE CHARGES | $.00 |
| | ENDING BALANCE | $3,558.10 |
| | # DEPOSITS/CREDITS | 7 |
| | # CHECKS/DEBITS | 142 |

| DATE | DESCRIPTION | | | | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|
| 08/01 | BEGINNING BALANCE | | | | | $8,134.77 |
| 08/01 | WITHDRAWAL-POS | 2415 | | | 50.69- | 8,084.08 |
| | 07/31 LA TASCA | ROCKVILLE | MD | | | |
| 08/01 | WITHDRAWAL-POS | 2415 | | | 2,500.00- | 5,584.08 |
| | 07/30 AT&T W164 6638 | VIENNA | VA | | | |
| 08/01 | WITHDRAWAL-POS | 2415 | | | 78.21- | 5,505.87 |
| | 07/30 AUSTIN GRILL 007 | ROCKVILLE | MD | | | |
| 08/01 | WITHDRAWAL-POS | 2415 | | | 432.00- | 5,073.87 |
| | 08/01 AETNA INDIVIDUAL | 800-435-8742 | PA | | | |
| 08/01 | WITHDRAWAL-ATM | 2415 | | | 303.00- | 4,770.87 |
| | TRAVILLE VILLAGE CTGAITHERSBURG MD | | | | | |
| 08/03 | DEPOSIT-POS | 2415 | | | 52.84 | 4,823.71 |
| | 08/01 VICTORIA SECRET | 800-888-1500 | OH | | | |
| | EFF DATE 08-02-09 | | | | | |
| 08/03 | WITHDRAWAL-POS | 2415 | | | 50.47- | 4,773.24 |
| | 07/31 EXXONMOBIL    46 | ROCKVILLE | MD | | | |
| | EFF DATE 08-02-09 | | | | | |
| 08/03 | WITHDRAWAL-POS | 2415 | | | 11.27- | 4,761.97 |
| | 08/01 TEXACO 00307378 | BEL AIR | MD | | | |
| | EFF DATE 08-02-09 | | | | | |




LENDER   1/09

michael byrd                    3012181889                    p.1

                                                506-005-3815
                                        PAGE    3 OF    10
                                        STATEMENT PERIOD
                                        FROM        08/01/09
                                        THRU        08/31/09

AC TECHNOLOGY
EXPENSE ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

| DATE | DESCRIPTION | | | AMOUNT | BALANCE |
|------|-------------|--|--|--------|---------|
| 08/06 | WITHDRAWAL-ATM *RESEARCH | 2415 ROCKVILLE | MD | 503.00- | 9,824.88 |
| 08/06 | WITHDRAWAL-POS COSTCO WHSE #002 | 2415 GAITHERSBURG | MD | 161.22- | 9,663.66 |
| 08/07 | WITHDRAWAL-POS 08/06 HOTELS.COM | 2415 800-219-4606 | TX | 575.74- | 9,087.92 |
| 08/07 | WITHDRAWAL-POS 08/06 HOTELS.COM | 2415 800-219-4606 | TX | 828.30- | 8,259.62 |
| 08/07 | WITHDRAWAL-POS 08/06 IAN TRAVEL SERVI | 2415 800-394-1454 | TX | 350.46- | 7,909.16 |
| 08/07 | CREDIT-TRANSFER TRF ACCT DD  5060053799 | | | 4,000.00 | 11,909.16 |
| 08/07 | WITHDRAWAL-ATM 8270 GREENSBORO DR | 2415 MCLEAN | VA | 500.00- | 11,409.16 |
| 08/08 | WITHDRAWAL-POS 08/06 PALM TYSONS | 2415 MCLEAN | VA | 38.45- | 11,370.71 |
| 08/08 | WITHDRAWAL-POS 08/07 ROSETTA STONE | 2415 540-432-6166 | VA | 628.95- | 10,741.76 |
| 08/08 | WITHDRAWAL-POS 08/07 GORDON BIERSCH-M | 2415 MCLEAN | VA | 46.75- | 10,695.01 |
| 08/08 | WITHDRAWAL-POS 08/07 BLOOMINGDALE'S # | 2415 CHEVY CHASE | MD | 165.10- | 10,529.91 |
| 08/08 | WITHDRAWAL-ATM 10 AVENUE OF THE A | 2415 PHILADELPHIA | PA | 203.25- | 10,326.66 |
| 08/08 | WITHDRAWAL-ATM 121 SOU BROAD ST | 2415 PHILADELPHIA | PA | 503.00- | 9,823.66 |
| 08/10 | WITHDRAWAL-POS 08/07 LA SANDIA RESTAU EFF DATE 08-09-09 | 2415 MCLEAN | VA | 45.80- | 9,777.86 |
| 08/10 | WITHDRAWAL-POS 08/08 GIANT FOOD INC # EFF DATE 08-09-09 | 2415 ROCKVILLE | MD | 10.24- | 9,767.62 |
| 08/10 | WITHDRAWAL-POS 08/08 WASHINGTONIAN W- EFF DATE 08-09-09 | 2415 GAITHERSBURG | MD | 30.24- | 9,737.38 |
| 08/10 | WITHDRAWAL-POS 08/08 CAPITAL GRILLE00 | 2415 PHILADELPHIA | PA | 466.16- | 9,271.22 |

michael byrd                    3012181889              p.2

```
                                                    506-005-3815
                                              PAGE    5 OF  10
                                              STATEMENT PERIOD
       AC TECHNOLOGY                          FROM      08/01/09
       EXPENSE ACCOUNT                        THRU      08/31/09
       22695 COMMERCE CENTER ST SUITE C
       DULLES, VA  20166
```

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 08/14 | WITHDRAWAL-ATM          2415 | 503.00- | 6,771.18 |
|       | *RESEARCH              ROCKVILLE    MD | | |
| 08/14 | CK#     0 | 2,500.00- | 4,271.18 |
| 08/15 | WITHDRAWAL-POS          2415 | 224.00- | 4,047.18 |
|       | 08/13 HAHN DENTISTRY   POTOMAC FALLSVA | | |
| 08/15 | WITHDRAWAL-POS          2415 | 45.13- | 4,002.05 |
|       | 08/14 GIANT FOOD INC # GAITHERSBURG MD | | |
| 08/17 | WITHDRAWAL-POS          2415 | 47.55- | 3,954.50 |
|       | 08/14 EXXONMOBIL     46 ROCKVILLE    MD | | |
|       | EFF DATE 08-16-09 | | |
| 08/17 | WITHDRAWAL-POS          2415 | 255.29- | 3,699.21 |
|       | 08/15 DICK'S CLOTHING& GAITHERSBURG MD | | |
|       | EFF DATE 08-16-09 | | |
| 08/17 | WITHDRAWAL-POS          2415 | 2,975.27- | 723.94 |
|       | 08/15 HYATT HOTELS BET BETHESDA     MD | | |
| 08/17 | WITHDRAWAL-POS          2415 | 76.63- | 647.31 |
|       | 08/15 HYATT HOTELS BET BETHESDA     MD | | |
| 08/17 | WITHDRAWAL-POS          2415 | 106.90- | 540.41 |
|       | 08/16 THAT'S AMORE-SG  ROCKVILLE    MD | | |
| 08/17 | CREDIT-TRANSFER | 9,500.00 | 10,040.41 |
|       | TRF ACCT DD  5060053799 | | |
| 08/17 | CK#     0 | 69.00- | 9,971.41 |
| 08/17 | CK#    1001 | 300.00- | 9,671.41 |
| 08/18 | WITHDRAWAL-POS          2415 | 48.08- | 9,623.33 |
|       | 08/16 EXXONMOBIL     47 GERMANTOWN   MD | | |
| 08/18 | WITHDRAWAL-POS          2415 | 44.81- | 9,578.52 |
|       | 08/16 GREAT INDOORS    GAITHERSBURG MD | | |
| 08/18 | WITHDRAWAL-POS          2415 | 21.75- | 9,556.77 |
|       | 08/17 CREST CLEANERS # 301-330-6055 MD | | |
| 08/18 | WITHDRAWAL-POS          2415 | 329.34- | 9,227.43 |
|       | COSTCO WHSE #002 GAITHERSBURG   MD | | |
| 08/19 | WITHDRAWAL-POS          2415 | 128.75- | 9,098.68 |
|       | 08/18 ONSTAR CALLING M 888-4ONSTAR  MI | | |
| 08/19 | WITHDRAWAL-POS          2415 | 108.00- | 8,990.68 |
|       | 08/18 TARGET        00 GAITHERSBURG MD | | |
| 08/19 | WITHDRAWAL-POS          2415 | 101.56- | 8,889.12 |
|       | 08/18 THAT'S AMORE-SG  ROCKVILLE    MD | | |

michael byrd                    3012181889                    p.2

506-005-3815
PAGE    6 OF   10
STATEMENT PERIOD
AC TECHNOLOGY                                              FROM        08/01/09
EXPENSE ACCOUNT                                           THRU        08/31/09
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166



| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 08/20 | WITHDRAWAL-POS | 2415 | 124.00- | 8,765.12 |
| | 08/18 CLYDES TOWER OAK ROCKVILLE     MD | | | |
| 08/20 | WITHDRAWAL-POS | 2415 | 30.62- | 8,734.50 |
| | 08/19 GIANT FOOD INC # ROCKVILLE     MD | | | |
| 08/20 | WITHDRAWAL-ATM | 2415 | 423.00- | 8,311.50 |
| | TRAVILLE VILLAGE CTGAITHERSBURG MD | | | |
| 08/20 | WITHDRAWAL-POS | 2415 | 43.92- | 8,267.58 |
| | 08/19 SHELL OIL 575425 ROCKVILLE     MD | | | |
| 08/20 | WITHDRAWAL-POS | 2415 | 137.80- | 8,129.78 |
| | 08/20 LOWES #00223*    GAITHERSBURG MD | | | |
| 08/21 | WITHDRAWAL-POS | 2415 | 461.08- | 7,668.70 |
| | 08/20 ORECK CLEAN HOME GAITHERSBURG MD | | | |
| 08/21 | WITHDRAWAL-POS | 2415 | 29.51- | 7,639.19 |
| | 08/20 STARBUCKS USA 00 GAITHERSBURG MD | | | |
| 08/22 | WITHDRAWAL-POS | 2415 | 195.43- | 7,443.76 |
| | 08/20 SEARS ROEBUCK    GAITHERSBURG MD | | | |
| 08/22 | WITHDRAWAL-POS | 2415 | 86.91- | 7,356.85 |
| | 08/20 RIO GRANDE CAF00 GAITHERSBURG MD | | | |
| 08/22 | WITHDRAWAL-POS | 2415 | 158.19- | 7,198.66 |
| | 08/20 IMAGE ACE       GAITHERSBURG MD | | | |
| 08/22 | WITHDRAWAL-POS | 2415 | 85.19- | 7,113.47 |
| | 08/21 CLYDES TOWER OAK ROCKVILLE     MD | | | |
| 08/22 | WITHDRAWAL-POS | 2415 | 292.74- | 6,820.73 |
| | 08/21 TARGET      00 GAITHERSBURG MD | | | |
| 08/22 | WITHDRAWAL-POS | 2415 | 2,980.90- | 3,839.83 |
| | 08/21 BEST BUY    00 GAITHERSBURG MD | | | |
| 08/22 | WITHDRAWAL-POS | 2415 | 73.11- | 3,766.72 |
| | 08/21 BEST BUY    00 GAITHERSBURG MD | | | |
| 08/24 | WITHDRAWAL-POS | 2415 | 110.22- | 3,656.50 |
| | 08/21 THE MEN'S WEARHO GAITHERSBURG MD | | | |
| | EFF DATE 08-23-09 | | | |
| 08/24 | WITHDRAWAL-POS | 2415 | 25.44- | 3,631.06 |
| | 08/21 THE MEN'S WEARHO GAITHERSBURG MD | | | |
| | EFF DATE 08-23-09 | | | |
| 08/24 | WITHDRAWAL-POS | 2415 | 106.87- | 3,524.19 |
| | 08/22 CLYDES TOWER OAK ROCKVILLE     MD | | | |
| | EFF DATE 08-23-09 | | | |

michael byrd                    3012181889              p.3

506-005-3815
PAGE    7 OF   10
STATEMENT PERIOD
FROM      08/01/09
THRU      08/31/09

AC TECHNOLOGY
EXPENSE ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 08/24 | WITHDRAWAL-POS          2415 | | 200.00- | 3,324.19 |
|  | 08/22 MILLENNIUM MEDI-- CHEVY CHASE  MD | | | |
|  | EFF DATE 08-23-09 | | | |
| 08/24 | WITHDRAWAL-POS          2415 | | 245.41- | 3,078.78 |
|  | 08/22 GB-ROCKVILLE     ROCKVILLE    MD | | | |
|  | EFF DATE 08-23-09 | | | |
| 08/24 | WITHDRAWAL-POS          2415 | | 94.44- | 2,984.34 |
|  | 08/22 ILBEAN TYSON'S   MCLEAN       VA | | | |
|  | EFF DATE 08-23-09 | | | |
| 08/24 | WITHDRAWAL-POS          2415 | | 130.97- | 2,853.37 |
|  | COSTCO WHSE #002 GAITHERSBURG   MD | | | |
|  | EFF DATE 08-23-09 | | | |
| 08/24 | WITHDRAWAL-POS          2415 | | 28.48- | 2,824.89 |
|  | 08/21 GUAPOS CANTINA   GAITHERSBURG MD | | | |
| 08/24 | WITHDRAWAL-POS          2415 | | 84.00- | 2,740.89 |
|  | 08/23 MNCPPC PARK PASS SILVER SPRINGMD | | | |
| 08/24 | WITHDRAWAL-POS          2415 | | 101.63- | 2,639.26 |
|  | 08/23 COMFORT INNS     GAITHERSBURG MD | | | |
| 08/24 | WITHDRAWAL-POS          2415 | | 62.99- | 2,576.27 |
|  | 08/22 CHEF GEOFF'S TYS VIENNA       VA | | | |
| 08/24 | CREDIT-TRANSFER | | 7,500.00 | 10,076.27 |
|  | TRF ACCT DD  5060053823 | | | |
| 08/24 | WITHDRAWAL-ATM          2415 | | 203.95- | 9,872.32 |
|  | 920 KING FARM BLVD ROCKVILLE    MD | | | |
| 08/25 | WITHDRAWAL-POS          2415 | | 154.14- | 9,718.18 |
|  | 08/23 THE HOME DEPOT 2 GERMANTOWN   MD | | | |
| 08/25 | WITHDRAWAL-POS          2415 | | 324.95- | 9,393.23 |
|  | 08/24 NEXTTEN*STAUER   888-333-2012 MN | | | |
| 08/25 | WITHDRAWAL-POS          2415 | | 89.95- | 9,303.28 |
|  | 08/24 NEXTTEN/STAUER   888-333-2012 MN | | | |
| 08/25 | WITHDRAWAL-POS          2415 | | 700.15- | 8,603.13 |
|  | 08/23 PERFORMANCE BIKE GAITHERSBURG MD | | | |
| 08/25 | WITHDRAWAL-POS          2415 | | 58.00- | 8,545.13 |
|  | 08/24 CREST CLEANERS # 301-330-6055 MD | | | |
| 08/25 | WITHDRAWAL-ATM          2415 | | 503.00- | 8,042.13 |
|  | *RESEARCH             ROCKVILLE    MD | | | |
| 08/26 | WITHDRAWAL-POS          2415 | | 174.61- | 7,867.52 |
|  | 08/25 HOTELS.COM       800-219-4606 TX | | | |

michael byrd                    3012181889                    p.3



```
                                                           506-005-3815
                                                      PAGE   8 OF  10
            AC TECHNOLOGY                            STATEMENT PERIOD
            EXPENSE ACCOUNT                          FROM      08/01/09
            22695 COMMERCE CENTER ST SUITE C         THRU      08/31/09
            DULLES, VA  20166
```

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 08/26 | WITHDRAWAL-POS | 2415 | 19.95- | 7,847.57 |
| | 08/24 TRAVELOCITY.COM  800-256-9089 TX | | | |
| 08/26 | WITHDRAWAL-POS | 2415 | 728.40- | 7,119.17 |
| | 08/24 AMERICAN AI 0017 SAN ANTONIO  TX | | | |
| 08/26 | WITHDRAWAL-POS | 2415 | 99.60- | 7,019.57 |
| | 08/25 VILLAGE VACUME A GAITHERSBURG MD | | | |
| 08/26 | WITHDRAWAL-POS | 2415 | 161.34- | 6,858.23 |
| | 08/25 CLYDES TOWER OAK ROCKVILLE   MD | | | |
| 08/26 | WITHDRAWAL-POS | 2415 | 25.37- | 6,832.86 |
| | 08/25 BOB EVANS REST # GERMANTOWN   MD | | | |
| 08/26 | WITHDRAWAL-POS | 2415 | 1.33- | 6,831.53 |
| | 08/25 FEDEX KINKO'S #1 ROCKVILLE    MD | | | |
| 08/27 | WITHDRAWAL-POS | 2415 | 29.49- | 6,802.04 |
| | 08/25 SHERATON ROCKVIL ROCKVILLE   MD | | | |
| 08/27 | WITHDRAWAL-POS | 2415 | 41.24- | 6,760.80 |
| | 08/26 SHERATON ROCKVIL ROCKVILLE   MD | | | |
| 08/27 | WITHDRAWAL-POS | 2415 | 24.62- | 6,736.18 |
| | 08/26 ONSTAR CALLING M 888-4ONSTAR  MI | | | |
| 08/27 | WITHDRAWAL-POS | 2415 | 55.09- | 6,681.09 |
| | 08/26 TEXICAN CAFE BRO AUSTIN      TX | | | |
| 08/27 | WITHDRAWAL-AIM | 2415 | 502.00- | 6,179.09 |
| | 114 W 7TH ST. SUITEAUSTIN      TX | | | |
| 08/28 | WITHDRAWAL-POS | 2415 | 350.00- | 5,829.09 |
| | 08/26 AMERICAN AI 0010 ADMIRALS CLUBTX | | | |
| 08/28 | WITHDRAWAL-POS | 2415 | 29.35- | 5,799.74 |
| | 08/26 SULLIVANS-AUST00 AUSTIN      TX | | | |
| 08/28 | WITHDRAWAL-POS | 2415 | 348.44- | 5,451.30 |
| | 08/26 III FORKS #350  AUSTIN      TX | | | |
| 08/28 | WITHDRAWAL-POS | 2415 | 33.53- | 5,417.77 |
| | 08/26 TRULUCKS AUSTIN  400 COLORADO TX | | | |
| 08/28 | WITHDRAWAL-POS | 2415 | 49.99- | 5,367.78 |
| | 08/26 DREAM MARRIAGE C 877-373-6277 CA | | | |
| 08/28 | WITHDRAWAL-POS | 2415 | 14.50- | 5,353.28 |
| | 08/27 CREST CLEANERS # 301-330-6055 MD | | | |
| 08/28 | WITHDRAWAL-POS | 2415 | 3.00- | 5,350.28 |
| | 08/27 CITY OF AUSTIN P 512-9742000 TX | | | |
| 08/28 | WITHDRAWAL-POS | 2415 | 129.32- | 5,220.96 |
| | 08/27 TUESDAY MORNING  AUSTIN      TX | | | |

michael byrd                    3012181889                    P.4

506-005-3815
PAGE  9 OF  10
STATEMENT PERIOD
FROM        08/01/09
THRU        08/31/09

AC TECHNOLOGY
EXPENSE ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

| DATE | DESCRIPTION | | | AMOUNT | BALANCE |
|------|-------------|---|---|--------|---------|
| 08/28 | WITHDRAWAL-POS | 2415 | | 72.56- | 5,148.40 |
| | 08/27 PERRY'S GRILLE A AUSTIN | | TX | | |
| 08/28 | WITHDRAWAL-POS | 2415 | | 315.31- | 4,833.09 |
| | 08/27 PERRY'S GRILLE A AUSTIN | | TX | | |
| 08/28 | WITHDRAWAL-POS | 2415 | | 55.84- | 4,777.25 |
| | EXXONMOBIL      AUSTIN     TX | | | | |
| 08/28 | WITHDRAWAL-POS | 2415 | | 24.18- | 4,753.07 |
| | SHELL SERVICE ST ITALY     TX | | | | |
| 08/29 | WITHDRAWAL-POS | 2415 | | 18.11- | 4,734.96 |
| | 08/28 FEDEX 8686612122 800-4633339 | | TN | | |
| 08/29 | WITHDRAWAL-POS | 2415 | | 33.00- | 4,701.96 |
| | 08/27 FLORES MEXICAN R AUSTIN | | TX | | |
| 08/31 | WITHDRAWAL-POS | 2415 | | 53.68- | 4,648.28 |
| | 08/28 HEB GROCERY #225 AUSTIN | | TX | | |
| | EFF DATE 08-30-09 | | | | |
| 08/31 | WITHDRAWAL-POS | 2415 | | 32.74- | 4,615.54 |
| | 08/28 ENCHILADAS RESTA MESQUITE | | TX | | |
| | EFF DATE 08-30-09 | | | | |
| 08/31 | WITHDRAWAL-POS | 2415 | | 36.95- | 4,578.59 |
| | 08/29 ONSTAR SUBSCRIPT 888-4ONSTAR | | MI | | |
| | EFF DATE 08-30-09 | | | | |
| 08/31 | WITHDRAWAL-POS | 2415 | | 56.92- | 4,521.67 |
| | 08/27 CANTINA LAREDO # AUSTIN | | TX | | |
| | EFF DATE 08-30-09 | | | | |
| 08/31 | WITHDRAWAL-POS | 2415 | | 156.23- | 4,365.44 |
| | 08/28 BOSTONS GOURMET  LITTLE ROCK | | AR | | |
| | EFF DATE 08-30-09 | | | | |
| 08/31 | WITHDRAWAL-POS | 2415 | | 46.00- | 4,319.44 |
| | 08/30 HILTON KNOXVILLE KNOXVILLE | | TN | | |
| | EFF DATE 08-30-09 | | | | |
| 08/31 | WITHDRAWAL-POS | 2415 | | 107.38- | 4,212.06 |
| | 08/29 COPPER CELLAR    KNOXVILLE | | TN | | |
| | EFF DATE 08-30-09 | | | | |
| 08/31 | WITHDRAWAL-POS | 2415 | | 150.96- | 4,061.10 |
| | 08/31 HILTON KNOXVILLE KNOXVILLE | | TN | | |
| 08/31 | WITHDRAWAL-ATM | 2415 | | 503.00- | 3,558.10 |
| | *RESEARCH      ROCKVILLE    MD | | | | |
| 08/31 | ENDING BALANCE | | | | $3,558.10 |

michael byrd                    3012181889            p.4

506-005-3815
PAGE   10 OF   10
STATEMENT PERIOD
AC TECHNOLOGY                                      FROM      08/01/09
EXPENSE ACCOUNT                                   THRU      08/31/09
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

CHECK REGISTER

| CHECK# | DATE | AMOUNT | CHECK# | DATE | AMOUNT |
|--------|------|--------|--------|------|--------|
| 0 | 08/14 | 2,500.00 | 1001* | 08/17 | 300.00 |
| 0 | 08/17 | 69.00 | | | |

* INDICATES NON-CONSECUTIVE CHECK NUMBER(S)

BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 08-01 | 4,770.87 | 08-12 | 8,392.12 | 08-22 | 3,766.72 |
| 08-03 | 4,071.14 | 08-13 | 7,718.47 | 08-24 | 9,872.32 |
| 08-04 | 7,492.01 | 08-14 | 4,271.18 | 08-25 | 8,042.13 |
| 08-05 | 6,890.69 | 08-15 | 4,002.05 | 08-26 | 6,831.53 |
| 08-06 | 9,663.66 | 08-17 | 9,671.41 | 08-27 | 6,179.09 |
| 08-07 | 11,409.16 | 08-18 | 9,227.43 | 08-28 | 4,753.07 |
| 08-08 | 9,823.66 | 08-19 | 8,889.12 | 08-29 | 4,701.96 |
| 08-10 | 8,954.56 | 08-20 | 8,129.78 | 08-31 | 3,558.10 |
| 08-11 | 8,651.56 | 08-21 | 7,639.19 | | |



GO PAPERLESS AND RECEIVE QUICKER ACCESS TO YOUR MONTHLY
DEPOSIT STATEMENTS. WE'LL SEND YOU AN E-MAIL NOTIFICATION
WHEN YOUR ACCOUNT IS READY TO VIEW. SIGN UP TODAY AT
WWW.CARDINALBANK.COM - ONLINE BANKING. IT'S THE PERFECT
ALTERNATIVE TO PAPER STATEMENTS.

PRINTSET=2236005060053823 Y

michael byrd                    3012181889                    p.5

Account 5060053815        Cardinal Bank                    Page 11 of 11



Date 8/17 Amount $69.00



Date 8/14 Amount $2,500.00



Check 1001 Amount $300.00 Date 8/17

michael byrd                    3012181889                    P.1



506-005-3815
PAGE   1 OF   8
STATEMENT PERIOD
FROM        09/01/09
THRU        09/30/09

AC TECHNOLOGY
EXPENSE ACCOUNT
22695 COMMERCE CENTER ST SUITE C          ENCLOSURES        3
DULLES, VA  20166

CHANGES IN FDIC DEPOSIT INSURANCE COVERAGE.
EFFECTIVE MAY 20, 2009, DEPOSITS AT FDIC-INSURED INSTITUTIONS
ARE NOW INSURED UP TO AT LEAST $250,000 PER DEPOSITOR THROUGH
DECEMBER 31, 2013. FOR MORE INFORMATION, GO TO
WWW.CARDINALBANK.COM

--------------------- FREE BUSINESS CHECKING ---------------------

ACCOUNT NBR DD    506-005-3815          BEGINNING BALANCE      $3,558.10
MINIMUM BAL          $148.85            DEPOSITS/CREDITS      $30,034.00
                                        INTEREST PAID              $.00
                                        CHECKS/DEBITS        $27,724.46-
                                        SERVICE CHARGES            $.00
                                        ENDING BALANCE         $5,867.64
                                        # DEPOSITS/CREDITS            9
                                        # CHECKS/DEBITS              95

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| | | | $3,558.10 |
| 09/01 | BEGINNING BALANCE | | $3,558.10 |
| 09/01 | WITHDRAWAL-POS         2415 | 67.01- | 3,491.09 |
| | 08/31 CLYDES TOWER OAK ROCKVILLE   MD | | |
| 09/01 | WITHDRAWAL-POS         2415 | 43.50- | 3,447.59 |
| | 08/31 CREST CLEANERS # 301-330-6055 MD | | |
| 09/01 | WITHDRAWAL-ATM         2415 | 203.95- | 3,243.64 |
| | 920 KING FARM BLVD ROCKVILLE    MD | | |
| 09/02 | WITHDRAWAL-POS         2415 | 84.30- | 3,159.34 |
| | 08/31 THE MELTING POT   POTOMAC     MD | | |
| 09/02 | WITHDRAWAL-POS         2415 | 199.00- | 2,960.34 |
| | 08/31 DREAM MARRIAGE     877-373-6277 WA | | |
| 09/02 | WITHDRAWAL-POS         2415 | 93.77- | 2,866.57 |
| | 09/01 GIANT FOOD INC # GAITHERSBURG MD | | |
| 09/02 | WITHDRAWAL-POS         2415 | 138.23- | 2,728.34 |
| | 09/01 THAT'S AMORE-SG   ROCKVILLE   MD | | |
| 09/03 | WITHDRAWAL-POS         2415 | 42.13- | 2,686.21 |
| | 09/01 EXXONMOBIL     46 ROCKVILLE   MD | | |
| 09/03 | WITHDRAWAL-POS         2415 | 45.41- | 2,640.80 |
| | 09/01 SHERATON ROCKVIL ROCKVILLE   MD | | |
| 09/03 | WITHDRAWAL-ATM         2415 | 503.00- | 2,137.80 |
| | TRAVILLE VILLAGE CTGAITHERSBURG MD | | |



michael byrd                    3012181889                    P.2



                                                                506-005-3815
AC TECHNOLOGY                                           PAGE    2 OF    8
EXPENSE ACCOUNT                                         STATEMENT PERIOD
22695 COMMERCE CENTER ST SUITE C                       FROM      09/01/09
DULLES, VA  20166                                      THRU      09/30/09

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 09/04 | WITHDRAWAL-POS | 2415 | 54.95- | 2,082.85 |
| | 09/03 THAT'S AMORE-SG  ROCKVILLE    MD | | | |
| 09/04 | CK#      0 | | 1,900.00- | 182.85 |
| 09/04 | DEBIT-NSF PAID ITEM | | 34.00- | 148.85 |
| | CK#000000000   AMT    1900.00 | | | |
| 09/05 | WITHDRAWAL-POS | 2415 | 121.61- | 27.24 |
| | 09/03 CLYDES TOWER OAK ROCKVILLE    MD | | | |
| 09/05 | WITHDRAWAL-POS | 2415 | 40.50- | 13.26- |
| | 09/04 CREST CLEANERS # 301-330-6055 MD | | | |
| 09/05 | CREDIT-TRANSFER | | 5,000.00 | 4,986.74 |
| | TRF ACCT DD  5060053799 | | | |
| 09/08 | WITHDRAWAL-POS | 2415 | 153.02- | 4,833.72 |
| | 09/04 RIO GRANDE CAF00 GAITHERSBURG MD | | | |
| | EFF DATE 09-06-09 | | | |
| 09/08 | WITHDRAWAL-POS | 2415 | 56.98- | 4,776.74 |
| | 09/05 WASHINGTONIAN W- GAITHERSBURG MD | | | |
| | EFF DATE 09-06-09 | | | |
| 09/08 | WITHDRAWAL-ATM | 2415 | 503.00- | 4,273.74 |
| | TRAVILLE VILLAGE CTGAITHERSBURG MD | | | |
| | EFF DATE 09-06-09 | | | |
| 09/08 | WITHDRAWAL-POS | 2415 | 113.11- | 4,160.63 |
| | 09/06 TOTAL WINE AND M MCLEAN      VA | | | |
| | EFF DATE 09-07-09 | | | |
| 09/08 | WITHDRAWAL-POS | 2415 | 127.46- | 4,033.17 |
| | 09/06 GB-ROCKVILLE   ROCKVILLE    MD | | | |
| | EFF DATE 09-07-09 | | | |
| 09/08 | WITHDRAWAL-POS | 2415 | 21.85- | 4,011.32 |
| | 09/06 THE RITZ CARLTON MCLEAN      VA | | | |
| 09/08 | WITHDRAWAL-POS | 2415 | 107.45- | 3,903.87 |
| | 09/07 DICK'S CLOTHING& GAITHERSBURG MD | | | |
| 09/08 | CREDIT-TRANSFER | | 3,000.00 | 6,903.87 |
| | TRF ACCT DD  5060053799 | | | |
| 09/08 | CREDIT-TRANSFER | | 3,000.00 | 9,903.87 |
| | TRF ACCT DD  5060053823 | | | |
| 09/08 | WITHDRAWAL-POS | 2415 | 470.70- | 9,433.17 |
| | COSTCO WHSE #002 GAITHERSBURG   MD | | | |
| 09/08 | WITHDRAWAL-ATM | 2415 | 503.00- | 8,930.17 |
| | MONTGOMERY MALL 1  BETHESDA     MD | | | |

michael byrd                      3012181889                    P.1

AC TECHNOLOGY
EXPENSE ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

506-005-3815
PAGE    3 OF    8
STATEMENT PERIOD
FROM        09/01/09
THRU        09/30/09

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 09/08 | CREDIT-SPECIAL | | 34.00 | 8,964.17 |
| 09/09 | WITHDRAWAL-POS | 2415 | 144.86- | 8,819.31 |
| | 09/08 CLYDES TOWER OAK ROCKVILLE   MD | | | |
| 09/09 | WITHDRAWAL-POS | 2415 | 531.10- | 8,288.21 |
| | 09/08 USAA P&C PREMIUM 800-531-8111 TX | | | |
| 09/09 | WITHDRAWAL-ATM | 2415 | 403.00- | 7,885.21 |
| | 12244 ROCKVILLE PIKROCKVILLE    MD | | | |
| 09/10 | WITHDRAWAL-POS | 2415 | 57.71- | 7,827.50 |
| | 09/09 GIANT FOOD INC # GAITHERSBURG MD | | | |
| 09/10 | WITHDRAWAL-POS | 2415 | 6,070.93- | 1,756.57 |
| | 09/08 HYATT HOTELS BET BETHESDA    MD | | | |
| 09/10 | WITHDRAWAL-POS | 2415 | 14.50- | 1,742.07 |
| | 09/09 CREST CLEANERS # GAITHERSBURG MD | | | |
| 09/10 | CREDIT-TRANSFER | | 10,000.00 | 11,742.07 |
| | TRF ACCT DD  5060053799 | | | |
| 09/10 | CK#       0 | | 1,000.00- | 10,742.07 |
| 09/11 | WITHDRAWAL-POS | 2415 | 50.93- | 10,691.14 |
| | 09/09 EXXONMOBIL    46 ROCKVILLE    MD | | | |
| 09/11 | WITHDRAWAL-POS | 2415 | 200.30- | 10,490.84 |
| | 09/09 301.468.3535HOUS ROCKVILLE    MD | | | |
| 09/14 | WITHDRAWAL-POS | 2415 | 96.96- | 10,393.88 |
| | 09/12 CLYDES TOWER OAK ROCKVILLE    MD | | | |
| | EFF DATE 09-13-09 | | | |
| 09/14 | WITHDRAWAL-POS | 2415 | 41.65- | 10,352.23 |
| | 09/12 GIANT FOOD INC # GAITHERSBURG MD | | | |
| | EFF DATE 09-13-09 | | | |
| 09/14 | WITHDRAWAL-POS | 2415 | 45.26- | 10,306.97 |
| | 09/12 WASHINGTONIAN W- GAITHERSBURG MD | | | |
| | EFF DATE 09-13-09 | | | |
| 09/14 | WITHDRAWAL-POS | 2415 | 169.20- | 10,137.77 |
| | 09/11 AMERICAN AI 0011 MANKATO    MN | | | |
| | EFF DATE 09-13-09 | | | |
| 09/14 | WITHDRAWAL-POS | 2415 | 136.11- | 10,001.66 |
| | 09/08 LEGAL SEA FOODS  BETHESDA    MD | | | |
| | EFF DATE 09-13-09 | | | |

michael byrd                    3012181889                    P.3



```
                                                        506-005-3815
                                                    PAGE   4 OF   8
        AC TECHNOLOGY                              STATEMENT PERIOD
        EXPENSE ACCOUNT                            FROM      09/01/09
        22695 COMMERCE CENTER ST SUITE C           THRU      09/30/09
        DULLES, VA  20166
```

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 09/14 | WITHDRAWAL-ATM | 2415 | 403.00- | 9,598.66 |
| | GAITHERSBURG-GERMANGERMANTOWN  MD | | | |
| | EFF DATE 09-13-09 | | | |
| 09/14 | CREDIT-TRANSFER | | 3,000.00 | 12,598.66 |
| | TRF ACCT DD  5060053799 | | | |
| 09/14 | CREDIT-TRANSFER | | 2,000.00 | 14,598.66 |
| | TRF ACCT DD  5060053807 | | | |
| 09/15 | WITHDRAWAL-POS | 2415 | 46.56- | 14,552.10 |
| | 09/13 RIO GRANDE CAF00 GAITHERSBURG MD | | | |
| 09/15 | WITHDRAWAL-POS | 2415 | 199.00- | 14,353.10 |
| | 09/12 DREAM MARRIAGE  877-373-6277 WA | | | |
| 09/15 | WITHDRAWAL-POS | 2415 | 1,643.93- | 12,709.17 |
| | 09/13 HYATT HOTELS BET BETHESDA    MD | | | |
| 09/15 | WITHDRAWAL-POS | 2415 | 62.84- | 12,646.33 |
| | 09/14 TARGET      00 GAITHERSBURG MD | | | |
| 09/16 | WITHDRAWAL-POS | 2415 | 147.36- | 12,498.97 |
| | 09/15 TARGET      00 GAITHERSBURG MD | | | |
| 09/16 | WITHDRAWAL-POS | 2415 | 188.83- | 12,310.14 |
| | 09/15 CLYDES TOWER OAK ROCKVILLE   MD | | | |
| 09/16 | WITHDRAWAL-POS | 2415 | 134.93- | 12,175.21 |
| | 09/15 THAT'S AMORE-SG  ROCKVILLE   MD | | | |
| 09/17 | WITHDRAWAL-POS | 2415 | 44.31- | 12,130.90 |
| | 09/16 GIANT FOOD INC # ROCKVILLE   MD | | | |
| 09/17 | WITHDRAWAL-POS | 2415 | 16.13- | 12,114.77 |
| | 09/16 THE UPS STORE #4 ROCKVILLE   MD | | | |
| 09/17 | WITHDRAWAL-POS | 2415 | 105.05- | 12,009.72 |
| | 09/16 THE POTOMAC GRIL ROCKVILLE   MD | | | |
| 09/17 | WITHDRAWAL-POS | 2415 | 103.85- | 11,905.87 |
| | 09/16 INTERACTIVE DATA 262-2522400 WI | | | |
| 09/18 | WITHDRAWAL-POS | 2415 | 117.92- | 11,787.95 |
| | 09/16 DALLAS COWBOYS P 877-6322697 TX | | | |
| 09/18 | WITHDRAWAL-POS | 2415 | 57.93- | 11,730.02 |
| | 09/17 WASHINGTONIAN W- GAITHERSBURG MD | | | |
| 09/18 | WITHDRAWAL-POS | 2415 | 43.50- | 11,686.52 |
| | 09/17 CREST CLEANERS # 240-314-0144 MD | | | |
| 09/18 | WITHDRAWAL-POS | 2415 | 21.75- | 11,664.77 |
| | 09/17 CREST CLEANERS # 240-314-0144 MD | | | |

michael byrd                          3012181889                    p.2

AC TECHNOLOGY                                      506-005-3815
EXPENSE ACCOUNT                                    PAGE    5 OF   8
22695 COMMERCE CENTER ST SUITE C                   STATEMENT PERIOD
DULLES, VA  20166                                  FROM      09/01/09
                                                   THRU      09/30/09

| DATE | DESCRIPTION | | | AMOUNT | BALANCE |
|---|---|---|---|---|---|
| 09/18 | CREDIT-TRANSFER | | | 2,000.00 | 13,664.77 |
| | TRF ACCT ID  5060053799 | | | | |
| 09/21 | WITHDRAWAL-POS | 2415 | | 124.94- | 13,539.83 |
| | 09/18 TIMPANO ROCKVILL ORLANDO | | FL | | |
| | EFF DATE 09-20-09 | | | | |
| 09/22 | WITHDRAWAL-POS | 2415 | | 56.22- | 13,483.61 |
| | 09/21 WASHINGTONIAN W- GAITHERSBURG | | MD | | |
| 09/23 | WITHDRAWAL-POS | 2415 | | 36.00- | 13,447.61 |
| | 09/22 MYLIFE/REUNION-S 888-7041900 | | CA | | |
| 09/23 | WITHDRAWAL-POS | 2415 | | 19.95- | 13,427.66 |
| | 09/22 CLKBANK*COM_E2Q5 800-390-6035 | | ID | | |
| 09/23 | WITHDRAWAL-POS | 2415 | | 25.00- | 13,402.66 |
| | 09/22 CLKBANK*COM_E2Q5 800-390-6035 | | ID | | |
| 09/23 | WITHDRAWAL-POS | 2415 | | 10.00- | 13,392.66 |
| | 09/22 CLKBANK*COM_8EWH 800-390-6035 | | ID | | |
| 09/23 | WITHDRAWAL-POS | 2415 | | 35.40- | 13,357.26 |
| | 09/22 PSM*PEOPLESERCHP 888-455-2792 | | NE | | |
| 09/23 | WITHDRAWAL-POS | 2415 | | 9.95- | 13,347.31 |
| | 09/22 PSM*PEOPLESERCHP 888-455-2792 | | NE | | |
| 09/23 | WITHDRAWAL-POS | 2415 | | 9.95- | 13,337.36 |
| | 09/22 PSM*PEOPLESERCHP 888-455-2792 | | NE | | |
| 09/23 | WITHDRAWAL-POS | 2415 | | 109.66- | 13,227.70 |
| | 09/22 THAT'S AMORE-SG ROCKVILLE | | MD | | |
| 09/23 | WITHDRAWAL-POS | 2415 | | 155.94- | 13,071.76 |
| | 09/22 GIANT FOOD INC # GAITHERSBURG | | MD | | |
| 09/24 | WITHDRAWAL-ATM | 2415 | | 303.00- | 12,768.76 |
| | TRAVILLE VILLAGE CTGAITHERSBURG MD | | | | |
| 09/24 | WITHDRAWAL-POS | 2415 | | 221.35- | 12,547.41 |
| | COSTCO WHSE #021 GAITHERSBURG | | MD | | |
| 09/24 | WITHDRAWAL-POS | 2415 | | 280.22- | 12,267.19 |
| | COSTCO WHSE #021 GAITHERSBURG | | MD | | |
| 09/25 | WITHDRAWAL-POS | 2415 | | 86.44- | 12,180.75 |
| | 09/24 IL PIZZICO ROCKVILLE | | MD | | |
| 09/25 | CK#    1008 | | | 5,300.00- | 6,880.75 |
| 09/26 | WITHDRAWAL-POS | 2415 | | 130.00- | 6,750.75 |
| | 09/23 COPA AIR    2123 PANAMA | | PA | | |
| 09/26 | WITHDRAWAL-POS | 2415 | | 25.00- | 6,725.75 |
| | 09/23 COPA AIR    2123 PANAMA | | PA | | |

michael byrd                    3012181889                    p.4

```
                                              506-005-3815
                                        PAGE   6 OF   8
                                        STATEMENT PERIOD
        AC TECHNOLOGY                    FROM     09/01/09
        EXPENSE ACCOUNT                  THRU     09/30/09
        22695 COMMERCE CENTER ST SUITE C
        DULLES, VA  20166
```

| DATE | DESCRIPTION | | | AMOUNT | BALANCE |
|------|-------------|---|---|-------|---------|
| 09/26 | WITHDRAWAL-POS | 2415 | | 168.45- | 6,557.30 |
| | 09/25 SHERATON ROCKVIL | ROCKVILLE | MD | | |
| 09/28 | WITHDRAWAL-POS | 2415 | | 29.90- | 6,527.40 |
| | 09/26 CLKBANK*COM FEFM | 800-390-6035 | ID | | |
| | EFF DATE 09-27-09 | | | | |
| 09/28 | WITHDRAWAL-POS | 2415 | | 191.43- | 6,335.97 |
| | 09/26 CLYDES TOWER OAK | ROCKVILLE | MD | | |
| | EFF DATE 09-27-09 | | | | |
| 09/28 | WITHDRAWAL-POS | 2415 | | 29.95- | 6,306.02 |
| | 09/26 PSM*PEOPLESERCHP | 888-455-2792 | NE | | |
| | EFF DATE 09-27-09 | | | | |
| 09/28 | WITHDRAWAL-POS | 2415 | | 7.50- | 6,298.52 |
| | 09/26 PSM*PEOPLESERCHP | 888-455-2792 | NE | | |
| | EFF DATE 09-27-09 | | | | |
| 09/28 | WITHDRAWAL-POS | 2415 | | 74.95- | 6,223.57 |
| | 09/26 PSM*PEOPLESERCHP | 888-455-2792 | NE | | |
| | EFF DATE 09-27-09 | | | | |
| 09/28 | WITHDRAWAL-POS | 2415 | | 27.94- | 6,195.63 |
| | 09/26 WHOLEFDS KTL 101 | GAITHERSBURG | MD | | |
| | EFF DATE 09-27-09 | | | | |
| 09/28 | WITHDRAWAL-POS | 2415 | | 400.00- | 5,795.63 |
| | 09/26 KAY JEWELERS #11 | GAITHERSBURG | MD | | |
| | EFF DATE 09-27-09 | | | | |
| 09/28 | WITHDRAWAL-POS | 2415 | | 49.77- | 5,745.86 |
| | 09/26 EXXONMOBIL    46 | ROCKVILLE | MD | | |
| 09/28 | WITHDRAWAL-POS | 2415 | | 112.12- | 5,633.74 |
| | 09/26 BONEFISH #8104 | GAITHERSBURG | MD | | |
| 09/28 | WITHDRAWAL-POS | 2415 | | 130.70- | 5,503.04 |
| | 09/26 MICHAELS #8809 | GAITHERSBURG | MD | | |
| 09/28 | WITHDRAWAL-POS | 2415 | | 49.99- | 5,453.05 |
| | 09/26 DREAM MARRIAGE C | 877-373-6277 | CA | | |
| 09/28 | WITHDRAWAL-POS | 2415 | | 150.00- | 5,303.05 |
| | 09/26 AMERICAN AI 0012 | WASHINGTON | DC | | |
| 09/28 | WITHDRAWAL-POS | 2415 | | 55.97- | 5,247.08 |
| | 09/27 FOX & HOUND 6508 | GERMANTOWN | MD | | |
| 09/28 | CREDIT-TRANSFER | | | 2,000.00 | 7,247.08 |
| | TRF ACCT DD  5060053799 | | | | |

michael byrd                    3012181889                    p.3

AC TECHNOLOGY                                       506-005-3815
EXPENSE ACCOUNT                            PAGE    7 OF    8
22695 COMMERCE CENTER ST SUITE C          STATEMENT PERIOD
DULLES, VA  20166                         FROM      09/01/09
                                          THRU      09/30/09

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 09/29 | WITHDRAWAL-POS | 2415 | 29.95- | 7,217.13 |
|       | 09/28 PSM*PEOPLESERCHP | 888-455-2792 NE | | |
| 09/29 | WITHDRAWAL-POS | 2415 | 67.65- | 7,149.48 |
|       | 09/28 CREST CLEANERS # | 301-330-6055 MD | | |
| 09/29 | WITHDRAWAL-POS | 2415 | 25.18- | 7,124.30 |
|       | 09/28 GIANT FOOD INC # ROCKVILLE   MD | | | |
| 09/29 | WITHDRAWAL-POS | 2415 | 49.83- | 7,074.47 |
|       | 09/26 ACNIMARK.COM | 877-749-4728 GB | | |
| 09/30 | WITHDRAWAL-POS | 2415 | 36.95- | 7,037.52 |
|       | 09/29 ONSTAR SUBSCRIPT 888-4ONSTAR   MI | | | |
| 09/30 | WITHDRAWAL-POS | 2415 | 103.37- | 6,934.15 |
|       | 09/28 CLYDES TOWER OAK ROCKVILLE   MD | | | |
| 09/30 | WITHDRAWAL-POS | 2415 | 116.53- | 6,817.62 |
|       | 09/29 PACKERS PRO SHOP 920-569-7344 WI | | | |
| 09/30 | WITHDRAWAL-POS | 2415 | 900.00- | 5,917.62 |
|       | 09/29 MILLENNIUM MEDI- CHEVY CHASE  MD | | | |
| 09/30 | WITHDRAWAL-POS | 2415 | 49.98- | 5,867.64 |
|       | 09/27 FUNDMNGR.COM | 877-522-1878 GB | | |
| 09/30 | ENDING BALANCE | | | $5,867.64 |

## CHECK REGISTER

| CHECK# | DATE | AMOUNT | CHECK# | DATE | AMOUNT |
|--------|------|--------|--------|------|--------|
| 0 | 09/04 | 1,900.00 | 1008* | 09/25 | 5,300.00 |
| 0 | 09/10 | 1,000.00 | | | |

* INDICATES NON-CONSECUTIVE CHECK NUMBER(S)

## BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 09-01 | 3,243.64 | 09-09 | 7,885.21 | 09-17 | 11,905.87 |
| 09-02 | 2,728.34 | 09-10 | 10,742.07 | 09-18 | 13,664.77 |
| 09-03 | 2,137.80 | 09-11 | 10,490.84 | 09-21 | 13,539.83 |
| 09-04 | 148.85 | 09-14 | 14,598.66 | 09-22 | 13,483.61 |
| 09-05 | 4,986.74 | 09-15 | 12,646.33 | 09-23 | 13,071.76 |
| 09-08 | 8,964.17 | 09-16 | 12,175.21 | 09-24 | 12,267.19 |

**michael byrd**                    3012181889                    **p.5**

506-005-3815
PAGE    8 OF    8
STATEMENT PERIOD
FROM    09/01/09
THRU    09/30/09

AC TECHNOLOGY
EXPENSE ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 09-25 | 6,880.75 | 09-28 | 7,247.08 | 09-30 | 5,867.64 |
| 09-26 | 6,557.30 | 09-29 | 7,074.47 | | |



GO PAPERLESS AND RECEIVE QUICKER ACCESS TO YOUR MONTHLY
DEPOSIT STATEMENTS. WE'LL SEND YOU AN E-MAIL NOTIFICATION
WHEN YOUR ACCOUNT IS READY TO VIEW. SIGN UP TODAY AT
WWW.CARDINALBANK.COM - ONLINE BANKING. IT'S THE PERFECT
ALTERNATIVE TO PAPER STATEMENTS.

PRINTSET=2236005060053823 Y

michael byrd                    3012181889                    p.6

Account 5060053815        Cardinal Bank                    Page 9 of 9





Date 9/4 Amount $1,900.00                    Date 9/10 Amount $1,000.00



Check 1008 Amount $5,300.00 Date 9/25

michael byrd                3012181889              p.2



                                                    506-005-3823
                                              PAGE   1 OF   1
                                              STATEMENT PERIOD
        AC TECHNOLOGY                          FROM      05/28/09
        ESCROW ACCOUNT                         THRU      05/31/09
        22695 COMMERCE CENTER ST SUITE C
        DULLES, VA  20166
                                              ENCLOSURES         0


        FDIC COVERAGE INCREASED TO $250,000. ON OCTOBER 3, 2008, FDIC
        DEPOSIT INSURANCE TEMPORARILY INCREASED FROM $100,000 TO
        $250,000 PER DEPOSITOR THROUGH DECEMBER 31, 2009.

------------------------------- FREE BUSINESS CHECKING -------------------------------

        ACCOUNT NBR DD  506-005-3823        BEGINNING BALANCE         $.00
        MINIMUM BAL     $200,000.00         DEPOSITS/CREDITS    $200,000.00
                                            INTEREST PAID             $.00
                                            CHECKS/DEBITS             $.00
                                            SERVICE CHARGES           $.00
                                            ENDING BALANCE      $200,000.00
                                            # DEPOSITS/CREDITS           1
                                            # CHECKS/DEBITS              0

   DATE      DESCRIPTION                     AMOUNT           BALANCE

   05/28  BEGINNING BALANCE                                      $.00
   05/28  DEPOSIT-                        200,000.00       200,000.00

   05/31  ENDING BALANCE                                   $200,000.00

                        BALANCE SUMMARY

        DATE      BALANCE     DATE      BALANCE     DATE      BALANCE

        05-28    200,000.00


        GO PAPERLESS AND RECEIVE QUICKER ACCESS TO YOUR MONTHLY
        DEPOSIT STATEMENTS. WE'LL SEND YOU AN E-MAIL NOTIFICATION
        WHEN YOUR ACCOUNT IS READY TO VIEW. SIGN UP TODAY AT
        WWW.CARDINALBANK.COM ~ ONLINE BANKING. IT'S THE PERFECT
        ALTERNATIVE TO PAPER STATEMENTS.

   PRINTSET=2236005060053856 Y



MEMBER FDIC          8270 Greensboro Drive, Suite 500, McLean, VA 22102 • (703) 584-3400   www.cardinalbank.com

michael byrd                    3012181889                    p.1


CARDINAL
Bank

AC TECHNOLOGY                                    506-005-3823
ESCROW ACCOUNT                            PAGE   1 OF   2
22695 COMMERCE CENTER ST SUITE C         STATEMENT PERIOD
DULLES, VA  20166                        FROM      06/01/09
                                         THRU      06/30/09

                                         ENCLOSURES      9

CHANGES IN FDIC DEPOSIT INSURANCE COVERAGE.
EFFECTIVE MAY 20, 2009, DEPOSITS AT FDIC-INSURED INSTITUTIONS
ARE NOW INSURED UP TO AT LEAST $250,000 PER DEPOSITOR THROUGH
DECEMBER 31, 2013. FOR MORE INFORMATION, GO TO
WWW.CARDINALBANK.COM

————————————— FREE BUSINESS CHECKING —————————————

ACCOUNT NBR DD   506-005-3823        BEGINNING BALANCE    $200,000.00
MINIMUM BAL      $111,435.00         DEPOSITS/CREDITS           $.00
                                     INTEREST PAID             $.00
                                     CHECKS/DEBITS         $88,565.00-
                                     SERVICE CHARGES           $.00
                                     ENDING BALANCE       $111,435.00
                                     # DEPOSITS/CREDITS          0
                                     # CHECKS/DEBITS            16

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 06/01 | BEGINNING BALANCE | | $200,000.00 |
| 06/05 | DEBIT-SPECIAL | 5,400.00- | 194,600.00 |
| 06/05 | DEBIT-SPECIAL | 4,000.00- | 190,600.00 |
| 06/09 | CK#      0 | 10,000.00- | 180,600.00 |
| 06/12 | CK#      0 | 1,100.00- | 179,500.00 |
| 06/18 | DEBIT-TRANSFER | 4,000.00- | 175,500.00 |
|       | TRF ACCT DD  5060053815 | | |
| 06/18 | CK#      0 | 25,000.00- | 150,500.00 |
| 06/19 | OUTGOING WIRE TRANSFER | 20,000.00- | 130,500.00 |
|       | WIRE TO BANK OF AMERICA | | |
| 06/19 | DEBIT-SERVICE CHARGE | 15.00- | 130,485.00 |
| 06/19 | CK#      0 | 500.00- | 129,985.00 |
| 06/22 | CK#      0 | 2,500.00- | 127,485.00 |
| 06/22 | CK#      0 | 600.00- | 126,885.00 |
| 06/22 | CK#      0 | 450.00- | 126,435.00 |
| 06/23 | CK#      0 | 2,000.00- | 124,435.00 |
| 06/25 | DEBIT-TRANSFER | 6,000.00- | 118,435.00 |
|       | TRF ACCT DD  5050166072 | | |





michael byrd                    3012181889                    p.2

AC TECHNOLOGY
ESCROW ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

506-005-3823
PAGE    2 OF    2
STATEMENT PERIOD
FROM        06/01/09
THRU        06/30/09

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 06/25 | CK#     0 | | |
| 06/30 | DEBIT-TRANSFER | 2,000.00- | 116,435.00 |
| | TRF ACCT DD   5060053815 | 5,000.00- | 111,435.00 |
| 06/30 | ENDING BALANCE | | |
| | | | $111,435.00 |

### CHECK REGISTER

| CHECK# | DATE | AMOUNT | CHECK# | DATE | AMOUNT |
|--------|------|--------|--------|------|--------|
| 0 | 06/09 | 10,000.00 | 0 | 06/22 | 600.00 |
| 0 | 06/12 | 1,100.00 | 0 | 06/22 | 2,500.00 |
| 0 | 06/18 | 25,000.00 | 0 | 06/23 | 2,000.00 |
| 0 | 06/19 | 500.00 | 0 | 06/25 | 2,000.00 |
| 0 | 06/22 | 450.00 | | | |

\* INDICATES NON-CONSECUTIVE CHECK NUMBER(S)

### BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 06-05 | 190,600.00 | 06-18 | 150,500.00 | 06-23 | 124,435.00 |
| 06-09 | 180,600.00 | 06-19 | 129,985.00 | 06-25 | 116,435.00 |
| 06-12 | 179,500.00 | 06-22 | 126,435.00 | 06-30 | 111,435.00 |



GO PAPERLESS AND RECEIVE QUICKER ACCESS TO YOUR MONTHLY
DEPOSIT STATEMENTS. WE'LL SEND YOU AN E-MAIL NOTIFICATION
WHEN YOUR ACCOUNT IS READY TO VIEW. SIGN UP TODAY AT
WWW.CARDINALBANK.COM - ONLINE BANKING. IT'S THE PERFECT
ALTERNATIVE TO PAPER STATEMENTS.

PRINTSET=2236005060053831 Y

michael byrd                          3012181889                    p.3

Account 5060053823        Cardinal Bank

Page 3 of 4



Date 6/22 Amount $2,500.00



Date 6/18 Amount $25,000.00



Date 6/19 Amount $500.00



Date 6/9 Amount $10,000.00



Date 6/12 Amount $1,000.00



Date 6/22 Amount $600.00

michael byrd                    3012181889                    p.4



**CARDINAL** Bank

                                        506-005-3823
                                    PAGE   1 OF   2
                                    STATEMENT PERIOD
AC TECHNOLOGY                       FROM      07/01/09
ESCROW ACCOUNT                      THRU      07/31/09
22695 COMMERCE CENTER ST SUITE C
DULLES, VA   20166
                                    ENCLOSURES       6

CHANGES IN FDIC DEPOSIT INSURANCE COVERAGE.
EFFECTIVE MAY 20, 2009, DEPOSITS AT FDIC-INSURED INSTITUTIONS
ARE NOW INSURED UP TO AT LEAST $250,000 PER DEPOSITOR THROUGH
DECEMBER 31, 2013. FOR MORE INFORMATION, GO TO
WWW.CARDINALBANK.COM

———————————————— FREE BUSINESS CHECKING ————————————————

ACCOUNT NBR DD   506-005-3823      BEGINNING BALANCE    $111,435.00
MINIMUM BAL      $48,044.16        DEPOSITS/CREDITS           $.00
                                   INTEREST PAID              $.00
                                   CHECKS/DEBITS       $63,390.84-
                                   SERVICE CHARGES            $.00
                                   ENDING BALANCE       $48,044.16
                                   # DEPOSITS/CREDITS            0
                                   # CHECKS/DEBITS              11

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| 07/01 | BEGINNING BALANCE | | $111,435.00 |
| 07/01 | WITHDRAWAL-ACH | 11,015.84- | 100,419.16 |
| | OPTIMUM    /OCI PBP    ID#M73427 | | |
| 07/02 | DEBIT-TRANSFER | 5,000.00- | 95,419.16 |
| | TRF ACCT DD  5060053815 | | |
| 07/06 | CK#   1002 | 3,000.00- | 92,419.16 |
| 07/10 | DEBIT-TRANSFER | 7,000.00- | 85,419.16 |
| | TRF ACCT DD  5060053815 | | |
| 07/10 | DEBIT-TRANSFER | 12,000.00- | 73,419.16 |
| | TRF ACCT DD  5050166072 | | |
| 07/10 | CK#   1004 | 4,000.00- | 69,419.16 |
| 07/14 | CK#   1003 | 10,800.00- | 58,619.16 |
| 07/22 | DEBIT-TRANSFER | 3,000.00- | 55,619.16 |
| | TRF ACCT DD  5060053815 | | |
| 07/27 | CK#   1005 | 6,450.00- | 49,169.16 |
| 07/27 | CK#   1006 | 600.00- | 48,569.16 |
| 07/28 | CK#   1008 | 525.00- | 48,044.16 |
| 07/31 | ENDING BALANCE | | $48,044.16 |

MEMBER FDIC       8270 Greensboro Drive Suite 500 McLean VA 22102 • (703) 584-3400    www.cardinalbank.com



michael byrd                3012181889              p.5

506-005-3823
PAGE    2 OF   2
STATEMENT PERIOD
FROM        07/01/09
THRU        07/31/09

AC TECHNOLOGY
ESCROW ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

## CHECK REGISTER

| CHECK# | DATE | AMOUNT | CHECK# | DATE | AMOUNT |
|--------|------|--------|--------|------|--------|
| 1002 | 07/06 | 3,000.00 | 1005 | 07/27 | 6,450.00 |
| 1003 | 07/14 | 10,800.00 | 1006 | 07/27 | 600.00 |
| 1004 | 07/10 | 4,000.00 | 1008* | 07/28 | 525.00 |

* INDICATES NON-CONSECUTIVE CHECK NUMBER(S)

## BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 07-01 | 100,419.16 | 07-10 | 69,419.16 | 07-27 | 48,569.16 |
| 07-02 | 95,419.16 | 07-14 | 58,619.16 | 07-28 | 48,044.16 |
| 07-06 | 92,419.16 | 07-22 | 55,619.16 | | |



GO PAPERLESS AND RECEIVE QUICKER ACCESS TO YOUR MONTHLY
DEPOSIT STATEMENTS. WE'LL SEND YOU AN E-MAIL NOTIFICATION
WHEN YOUR ACCOUNT IS READY TO VIEW. SIGN UP TODAY AT
WWW.CARDINALBANK.COM - ONLINE BANKING. IT'S THE PERFECT
ALTERNATIVE TO PAPER STATEMENTS.

PRINTSET=2236005060053831 Y

michael byrd                    3012181889                    p.6

Account 5060053823        Cardinal Bank                        Page 3 of 3



Check 1002 Amount $3,000.00 Date 7/6



Check 1003 Amount $10,800.00 Date 7/14



Check 1004 Amount $4,000.00 Date 7/10



Check 1005 Amount $8,450.00 Date 7/27



Check 1006 Amount $600.00 Date 7/27

Check 1008 Amount $525.00 Date 7/28

michael byrd                    3012181889              p.4


**CARDINAL** Bank

| | |
|---|---|
| AC TECHNOLOGY | 506-005-3823 |
| ESCROW ACCOUNT | PAGE   1 OF   2 |
| 22695 COMMERCE CENTER ST SUITE C | STATEMENT PERIOD |
| DULLES, VA  20166 | FROM      08/01/09 |
| | THRU      08/31/09 |
| | |
| | ENCLOSURES         3 |

CHANGES IN FDIC DEPOSIT INSURANCE COVERAGE.
EFFECTIVE MAY 20, 2009, DEPOSITS AT FDIC-INSURED INSTITUTIONS
ARE NOW INSURED UP TO AT LEAST $250,000 PER DEPOSITOR THROUGH
DECEMBER 31, 2013. FOR MORE INFORMATION, GO TO
WWW.CARDINALBANK.COM

———————————————— FREE BUSINESS CHECKING ————————————————

| | | | |
|---|---|---|---|
| ACCOUNT NBR DD   506-005-3823 | | BEGINNING BALANCE | $48,044.16 |
| MINIMUM BAL        $6,997.76 | | DEPOSITS/CREDITS | $.00 |
| | | INTEREST PAID | $.00 |
| | | CHECKS/DEBITS | $41,046.40- |
| | | SERVICE CHARGES | $.00 |
| | | ENDING BALANCE | $6,997.76 |
| | | # DEPOSITS/CREDITS | 0 |
| | | # CHECKS/DEBITS | 6 |

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| 08/01 | BEGINNING BALANCE | | $48,044.16 |
| 08/17 | CK#    1010 | 2,182.40- | 45,861.76 |
| 08/19 | CK#    1011 | 10,000.00- | 35,861.76 |
| 08/19 | CK#    1009 | 1,364.00- | 34,497.76 |
| 08/24 | DEBIT-TRANSFER | 7,500.00- | 26,997.76 |
| | TRF ACCT DD  5060053815 | | |
| 08/31 | DEBIT-TRANSFER | 10,000.00- | 16,997.76 |
| | TRF ACCT DD  5050166072 | | |
| 08/31 | DEBIT-TRANSFER | 10,000.00- | 6,997.76 |
| | TRF ACCT DD  5050166023 | | |
| 08/31 | ENDING BALANCE | | $6,997.76 |

CHECK REGISTER

| CHECK# | DATE | AMOUNT | CHECK# | DATE | AMOUNT |
|---|---|---|---|---|---|
| 1009 | 08/19 | 1,364.00 | 1011 | 08/19 | 10,000.00 |
| 1010 | 08/17 | 2,182.40 | | | |

* INDICATES NON-CONSECUTIVE CHECK NUMBER(S)





michael byrd                    3012181889                    p.5

506-005-3823
PAGE     2 OF     2
STATEMENT PERIOD

AC TECHNOLOGY
ESCROW ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA 20166

FROM        08/01/09
THRU        08/31/09

BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 08-17 | 45,861.76 | 08-24 | 26,997.76 | 08-31 | 6,997.76 |
| 08-19 | 34,497.76 | | | | |

GO PAPERLESS AND RECEIVE QUICKER ACCESS TO YOUR MONTHLY
DEPOSIT STATEMENTS. WE'LL SEND YOU AN E-MAIL NOTIFICATION
WHEN YOUR ACCOUNT IS READY TO VIEW. SIGN UP TODAY AT
WWW.CARDINALBANK.COM - ONLINE BANKING. IT'S THE PERFECT
ALTERNATIVE TO PAPER STATEMENTS.

PRINTSET=2236005060053831 Y

michael byrd                          3012181889                    p.6

Account 5060053823        Cardinal Bank                            Page 3 of 3



Check 1009 Amount $1,364.00 Date 8/19



Check 1010 Amount $2,182.40 Date 8/17



Check 1011 Amount $10,000.00 Date 8/19

michael byrd                 3012181889              p.1



**CARDINAL**
Bank



506-005-3823
PAGE   1 OF   2
STATEMENT PERIOD
FROM        09/01/09
THRU        09/30/09

ENCLOSURES        0

AC TECHNOLOGY
ESCROW ACCOUNT
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

CHANGES IN FDIC DEPOSIT INSURANCE COVERAGE.
EFFECTIVE MAY 20, 2009, DEPOSITS AT FDIC-INSURED INSTITUTIONS
ARE NOW INSURED UP TO AT LEAST $250,000 PER DEPOSITOR THROUGH
DECEMBER 31, 2013. FOR MORE INFORMATION, GO TO
WWW.CARDINALBANK.COM

———————————— FREE BUSINESS CHECKING ————————————

ACCOUNT NBR DD   506-005-3823
MINIMUM BAL        $8,536.24-

| | |
|---|---|
| BEGINNING BALANCE | $6,997.76 |
| DEPOSITS/CREDITS | $12,034.00 |
| INTEREST PAID | $.00 |
| CHECKS/DEBITS | $15,534.00- |
| SERVICE CHARGES | $.00 |
| ENDING BALANCE | $3,497.76 |
| # DEPOSITS/CREDITS | 2 |
| # CHECKS/DEBITS | 3 |

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| 09/01 | BEGINNING BALANCE | | $6,997.76 |
| 09/08 | DEBIT-TRANSFER | 3,000.00- | 3,997.76 |
| | TRF ACCT DD  5060053815 | | |
| 09/08 | DEBIT-SPECIAL | 12,500.00- | 8,502.24- |
| 09/08 | DEBIT-NSF PAID ITEM | 34.00- | 8,536.24- |
| 09/09 | CREDIT-TRANSFER | 12,000.00 | 3,463.76 |
| | TRF ACCT DD  5060053799 | | |
| 09/10 | CREDIT-SPECIAL | 34.00 | 3,497.76 |
| 09/30 | ENDING BALANCE | | $3,497.76 |

BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 09-08 | 8,536.24- | 09-09 | 3,463.76 | 09-10 | 3,497.76 |



MEMBER FDIC        8270 Greensboro Drive, Suite 500, McLean, VA 22102 • (703) 584-3400    www.cardinalbank.com

michael byrd                3012181889                p.2



506-005-3823
PAGE    2 OF   2
STATEMENT PERIOD
AC TECHNOLOGY                              FROM        09/01/09
ESCROW ACCOUNT                            THRU        09/30/09
22695 COMMERCE CENTER ST SUITE C
DULLES, VA  20166

GO PAPERLESS AND RECEIVE QUICKER ACCESS TO YOUR MONTHLY
DEPOSIT STATEMENTS. WE'LL SEND YOU AN E-MAIL NOTIFICATION
WHEN YOUR ACCOUNT IS READY TO VIEW. SIGN UP TODAY AT
WWW.CARDINALBANK.COM - ONLINE BANKING. IT'S THE PERFECT
ALTERNATIVE TO PAPER STATEMENTS.

PRINTSET=2236005060053831 Y

Entered: April 26, 2010
Signed: April 24, 2010

**SO ORDERED**



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

| | | |
|---|---|---|
| In re: | * | |
| | | |
| **MICHAEL ANDREW BYRD** | * | **Case No. 10-13755-TJC** |
| | | |
| Debtor | * | **Chapter 7** |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

| | | |
|---|---|---|
| **BANK OF AMERICA, N.A.,** | * | |
| | | |
| Plaintiff, | * | |
| | | |
| v. | * | **Adversary No. 10-00179** |
| | | |
| **MICHAEL ANDREW BYRD,** | * | |
| | | |
| Defendant. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### CONSENT ORDER (I) ENTERING MONEY JUDGMENT,
### (II) DETERMINING NON- DISCHARGEABILITY OF DEBT, AND
### (III) RELATED STIPULATION REGARDING LIMIT OF ENFORCEMENT

WHEREAS, Michael Andrew Byrd (the "Debtor") filed a petition for relief under

Chapter 7 of the United States Bankruptcy Code on February 25, 2010;

WHEREAS, Bank of America, N.A. (the "Bank") made a revolving line of credit

facility (the "Line of Credit") available to AC Technology, Inc. and MB Security



EXHIBIT

Corporation (collectively, the "Borrowers") in the maximum principal amount of $15,000,000.00;

WHEREAS, the Borrowers' obligation to repay advances under the Line of Credit is evidenced by that certain Revolving Loan Note dated June 30, 2008 (the "Note") in the original principal amount of $25,000,000.00 payable by the Borrowers to the order of the Bank;

WHEREAS, payment of the Note is unconditionally guaranteed by the Debtor pursuant to that certain Continuing and Unconditional Guaranty dated June 30, 2008 (the "Guaranty") by the Debtor in favor of the Bank;

WHEREAS, the Note, the Guaranty and all written agreements, instruments and documents executed in connection therewith shall hereinafter be referred to as the "Financing Documents";

WHEREAS, the Financing Documents are in default;

WHEREAS, all indebtedness to the Bank under the Financing Documents is immediately due and payable;

WHEREAS, as of July 21, 2009, the Debtor owed the Bank under the Guaranty $4,733,916.31, plus late charges, attorneys' fees and expenses and other costs of collection;

WHEREAS, interest continues to accrue on the unpaid principal balance due and owing under the Guaranty at a variable rate, which is currently $1,212.39 per day, after July 21, 2009;

WHEREAS, the Bank commenced this adversary proceeding on March 22, 2010 by filing a Complaint to Determine Dischargeability of Debt and for Money Judgment

2

(the "Complaint") seeking (i) a determination that the Debtor's indebtedness to the Bank

under the Guaranty is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2) and (ii) entry

of a money judgment in favor of the Bank against the Debtor in the amount of the

Debtor's indebtedness to the Bank under the Guaranty;

WHEREAS, the Debtor believes he has certain defenses to the claims asserted by

the Bank in the Complaint;

WHEREAS, the Bank and the Debtor have resolved their differences with respect

to the claims asserted by the Bank in the Complaint, and the Debtor's defenses thereto,

and the Bank and the Debtor desire to settle this adversary proceeding pursuant to the

terms of a Settlement Agreement and Mutual Release dated as of April 14, 2010 (the

"Settlement Agreement"); and

WHEREAS, pursuant to the terms of the Settlement Agreement, the Bank and the

Debtor consent to the entry of a non-dischargeable judgment in favor of the Bank against

the Debtor as set forth in this Order.

It is therefore hereby **ORDERED, ADJUDGED AND DECREED THAT**:

1.     Judgment is hereby entered in favor of Bank of America, N.A. against

Michael Andrew Byrd in the amount of $4,733,916.31, plus interest after July 21, 2009

until the date of entry of this Order at the daily rate of $1,213.39, plus costs of suit and

post-judgment interest at the judgment rate of interest set forth in Section 6.1-330.54 of

the Virginia Code Annotated (the "Judgment").

2.     The Debtor's indebtedness to the Bank as evidenced by the Judgment is

non-dischargeable pursuant to 11 U.S.C. § 523(a)(2).

3.      Effective as of the date of this Order, and notwithstanding the automatic stay (if still applicable) or the discharge injunction (when applicable), both of which are hereby modified to the extent necessary to give full effect to the terms of this Order, the Judgment may be enforced by the Bank and its successors and assign in accordance with applicable nonbankruptcy law, subject only to the limitations set forth in this Order. The Bank agrees that all funds collected by the Bank from the Debtor under this Judgment shall first be applied against outstanding interest and then outstanding principal. Nothing in this Order shall act as a limitation on the Debtor from pursuing any third-party claims or actions against third parties other than the Bank, it officers, directors, employees and agents.

4.      If, at any time, the Bank shall enforce the Judgment by wage garnishment or similar wage attachment, as provided by applicable law, the Bank shall be entitled to collect from any employer of the Debtor not more than twenty percent (20%) of the Debtor's gross wages per pay period. If the Bank receives funds from an employer of the Debtor in excess of twenty percent (20%) of the Debtor's gross wages for the applicable pay period, the Bank shall promptly deliver to the Debtor any excess for such period. The provisions of this paragraph shall have no effect upon any other enforcement action, including without limitation writs of garnishment of property, writs of attachment, writs of Fi Fa, or similar actions under applicable law.

5.      By her signature below, counsel for the Debtor certifies that the Debtor: (i) has read the provisions of this Order, (ii) has consulted with counsel about all matters contained herein and (iii) understands the contents of this Order and his rights with respect thereto.

STIPULATED AND AGREED:

/s/ Sari Karson Kurland                      /s/ Walter R. Kirkman
Sari Karson Kurland (Bar No. 09174)      Nikolaus F. Schandlbauer (Bar No. 08304)
The Law Office of Sari K. Kurland, LLC    E. John Steren (Bar No. 11379)
211 Jersey Lane                              Walter R. Kirkman (Bar No. 28032)
Rockville, Maryland  20850            Ober, Kaler, Grimes & Shriver, P.C.
(301) 424-2834                            1401 H Street, N.W., Fifth Floor
(301) 424-2884 (facsimile)           Washington, D.C.  20005-3324
skurland2@comcast.net               (202) 326-5016
                                      (202) 336-5216 (facsimile)
Attorney for Michael Andrew Byrd    nfschandlbauer@ober.com

Attorney for Bank of America, N.A.

## <u>CERTIFICATION OF CONSENT</u>

      I HEREBY CERTIFY that the terms of the copy of the Consent Order (I)

Entering Money Judgment, (II) Determining Non-Dischargeability of Debt, and (III)

Related Stipulation Regarding Limit of Enforcement submitted to the Court are identical

to those set forth in the original consent to judgment and the signatures represented by the

/s/ on this copy reference the signatures of consenting parties on the original consent to

judgment.

                                       /s/ Walter R. Kirkman
                                       Nikolaus F. Schandlbauer (Bar No. 08304)
                                       E. John Steren (Bar No. 11379)
                                       Walter R. Kirkman (Bar No. 28032)
                                       Ober, Kaler, Grimes & Shriver, P.C.
                                       1401 H Street, N.W., Fifth Floor
                                       Washington, D.C.  20005-3324
                                       (202) 326-5016
                                       (202) 336-5216 (facsimile)
                                       nfschandlbauer@ober.com

cc:    Michael Andrew Byrd
       2201 Darnell Court
       Bowie, Maryland  20721

       Sari Karson Kurland, Esquire
       The Law Offices of Sari K. Kurland, LLC
       211 Jersey Lane
       Rockville, Maryland  20850

       E. John Steren, Esquire
       Ober, Kaler, Grimes & Shriver, P.C.
       1401 H. Street, N.W., Fifth Floor
       Washington, D.C.  20005-3324

**END OF ORDER**